**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF ST. LOUIS and ELECTRICAL WORKERS PENSION FUND, LOCAL 103, I.B.E.W., | Case No. 2:20-cv-04813 |
| Plaintiffs, | Chief Judge Algenon L. Marbley |
| v. | Magistrate Judge Kimberly A. Jolson |
| CHARLES E. JONES, et al., | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| FIRSTENERGY CORP., | |
| Nominal Defendant. | |

**CONSOLIDATED VERIFIED**
**<u>SHAREHOLDER DERIVATIVE COMPLAINT</u>**

## TABLE OF CONTENTS

I.  NATURE OF THE ACTION ...................................................................................... 2

II.  JURISDICTION AND VENUE ................................................................................. 8

III.  PARTIES ................................................................................................................... 8

    A.  Plaintiffs ........................................................................................................ 8

    B.  Nominal Defendant ........................................................................................ 9

    C.  The Individual Defendants ........................................................................... 10

        1.  The Director Defendants .................................................................. 10

        2.  The Officer Defendants .................................................................... 16

    D.  Relevant Non-Parties ................................................................................... 19

IV.  SUBSTANTIVE ALLEGATIONS ......................................................................... 22

    A.  FirstEnergy's Business ................................................................................. 22

    B.  FirstEnergy's Financial Problems ................................................................ 24

    C.  Defendants Turn to Illegal, Pay-to-Play "Legislative Solutions" To Fix
        FirstEnergy's Problems ................................................................................ 25

        1.  Householder Reenters Ohio Politics with a Reputation for
            Accepting Illegal "Pay-to-Play" Payments ..................................... 25

        2.  Defendants Agree to Bankroll Householder While Preventing
            Disclosure, Transparency and Accountability for FirstEnergy's
            Lobbying ........................................................................................... 26

        3.  FirstEnergy Continues the Largest Bribery Scheme of Public
            Officials in Ohioan History after the Board's Successful Actions in
            Preventing Disclosure, Transparency and Accountability ...................... 32

        4.  Defendants' Scheme to Elect Householder as Speaker Is
            Successful ......................................................................................... 42

        5.  Householder Delivers His End of the Illegal Quid-Pro-Quo: HB6 ......... 43

        6.  Defendants Continue to Funnel FirstEnergy Money to
            Householder's Generation Now........................................................ 49

D. Defendants' Actions Subjected FirstEnergy to Massive Potential Liability and Severely Harmed and Continue to Harm the Company's Reputation .......... 51

    1. Defendants' Actions Have Subjected FirstEnergy to Potential Criminal Liability ........................................................................ 51

    2. Defendants' Actions Have Subjected FirstEnergy to Potential Draconian Civil Liability ........................................................... 54

    3. Defendants Have Wasted FirstEnergy Assets, Harmed FirstEnergy's Goodwill and Reputation, and Exposed the Company to the Risk that HB6 is Repealed .............................................. 55

E. The Fallout from the Bribery Scheme Continues ................................. 56

V. The DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT ......... 59

A. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Statements in the 2018 Proxy .......................................... 61

B. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Financial Statements in the 2017 Form 10-K .................................. 65

C. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Statements in the 2019 Proxy .......................................... 67

D. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Financial Statements in the 2018 Form 10-K .................................. 71

E. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Statements in the 2020 Proxy .......................................... 73

F. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Financial Statements in the 2019 Form 10-K .................................. 77

VI. DERIVATIVE ALLEGATIONS ........................................................................ 79

VII. THE INDIVIDUAL DEFENDANTS' DUTIES ............................................................ 79

A. Fiduciary Duties ........................................................................ 79

B. Control, Access, and Authority ........................................................ 80

C. Reasonable and Prudent Supervision ................................................... 81

D. Defendants' Obligations and Representations in the Company's Corporate Codes and Policies ..................................................................... 82

VIII. DEMAND FUTILITY ALLEGATIONS ................................................................ 86

A.     Demand is Excused Because All Director Defendants Participated in Misconduct in Violation of State and Federal Law ............................................. 86

B.     Demand is Excused Because Each Individual Defendant Is Incapable of Exercising Objective and Disinterested Judgment ............................... 88

    1.     Jones.............................................................................................. 88

    2.     Anderson ....................................................................................... 89

    3.     Demetriou ...................................................................................... 91

    4.     Johnson ......................................................................................... 92

    5.     Misheff.......................................................................................... 94

    6.     Mitchell ......................................................................................... 96

    7.     O'Neil ........................................................................................... 98

    8.     Pappas ......................................................................................... 100

    9.     Pianalto ....................................................................................... 101

    10.    Reyes ........................................................................................... 103

    11.    Turner ......................................................................................... 104

C.     A Majority of the Director Defendants Have Additional Suspicious Contacts with or Donations To Householder ....................................... 106

D.     Demand Is Excused Because The Director Defendants' Conduct Did Not Constitute A Valid Exercise of Business Judgment ......................................... 107

IX.     CLAIMS AGAINST DEFENDANTS.......................................................... 108

X.     PRAYER FOR RELIEF ............................................................................... 114

XI.     JURY DEMAND ......................................................................................... 115

## CAST OF CHARACTERS

| Name | Title | Affiliation |
|------|-------|-------------|
| Anderson, Michael J. | Director (2007-Present); Chair of the Audit Committee; Member of the Finance Committee | FirstEnergy |
| Borges, Matthew | Registered Lobbyist for FirstEnergy Solutions | FirstEnergy Solutions |
| Cespedes, Juan | Multi-Client Lobbyist Retained by FirstEnergy Solutions.  Pled guilty in October 2020 to racketeering conspiracy. | FirstEnergy Solutions |
| Clark, Neil | Ohio Based Lobbyist | Enterprise |
| Demetriou, Steven J. | Director (2017-Present); Chair of the Finance Committee and Member of the Operations and Safety Oversight Committee | FirstEnergy |
| Dowling, Michael | SVP, External Affairs (2011-October 2020); Vice President, External Affairs (2010-2011); Vice President, Communications (2008-2010) | FirstEnergy |
| Householder, Larry | Member of the Ohio House of Representatives (January 2017-Present); Speaker of the House (January 2019-July 30, 2020) | Ohio House of Representatives |
| Johnson, Julia L. | Director (2011-Present); Chair of the Corporate Governance and Corporate Responsibility Committee; Member of the Finance Committee | FirstEnergy |
| Jones, Charles E. | CEO and Director (2015-October 2020) | FirstEnergy |
| Longstreth, Jeffrey | Campaign and Political Strategist to Larry Householder.  Pled guilty in October 2020 to racketeering conspiracy. | Enterprise |
| Misheff, Donald T. | Director (2012-Present); Non-Executive Chairman of FirstEnergy Board (May 2018-Present); Member of the Audit and Corporate Governance and Corporate Responsibility Committees | FirstEnergy |
| Mitchell, Thomas N. | Director (2016-Present); Chair of the Operations and Safety Oversight Committee; Member of the Corporate Governance and Corporate Responsibility Committee | FirstEnergy |
| O'Neil, III, James F. | Director (2017-Present); Chair of the Compensation Committee; Member of the Operations and Safety Oversight Committee | FirstEnergy |

| NAME | TITLE | AFFILIATION |
|---|---|---|
| Pappas, Christopher D. | Director (2011-Present); Executive Director of the Board (October 2020-Present) | FirstEnergy |
| Pearson, James F. | VP of Finance (March 2018-April 2019); CFO (2013-March 2018) | FirstEnergy |
| Pianalto, Sandra | Director (2018-Present); Member of the Compensation and Audit Committees | FirstEnergy |
| Randazzo, Samuel | Former chairman of the Public Utilities Commission of Ohio (PUCO) | PUCO |
| Reffner, Robert | SVP and Chief Legal Officer (2018-November 2020) | FirstEnergy |
| Reyes, Luis A. | Director (2013-Present); Member of the Corporate Governance and Corporate Responsibility Committee and Operations and Safety Oversight Committee | FirstEnergy |
| Strah, Steven E. | Acting CEO (October 2020-Present); President (May 2020-Present); CFO (March 2018-May 2020); Senior VP of FirstEnergy's Utilities Operations (Until March 2018) | FirstEnergy |
| Taylor, K. Jon | CFO (Present); Vice President of Utilities Operations (2019-2020) | FirstEnergy |
| Turner, Leslie M. | Director (2018-Present); Member of the Audit and Compensation Committees | FirstEnergy |
| Yeboah-Amankwah, Ebony | Vice President, General Counsel and Chief Ethics Officer (2018-November 2020) | FirstEnergy |

Co-Lead Plaintiffs Employees Retirement System of the City of St. Louis ("St. Louis Employees") and Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Local 103") (together, "Co-Lead Plaintiffs") and additional plaintiff Massachusetts Laborers Pension Fund (together with Co-Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and FirstEnergy Corp. ("FirstEnergy" or the "Company"), bring this shareholder derivative action against the Company's board of directors (the "Board") and certain current and former officers (collectively, "Defendants") for breach of fiduciary duty and violation of the federal securities laws. Except for allegations specifically pertaining to Plaintiffs and Plaintiffs' own acts, the allegations in this complaint are based upon information and belief, including the investigation of counsel, which includes a review and analysis of: (i) findings and allegations by Ohio state and federal authorities in connection with the misconduct in this action and the criminal indictments arising therefrom, including court documents containing factual allegations filed in the following matters: *USA v. Householder, et al.,* No. 1:20-cr-00077-TSB (S.D. Ohio), *USA v. Borges*, No. 1:20-mj-00526 (S.D. Ohio), and *Ohio ex rel. Yost v. FirstEnergy Corp. et al.*, No. 20-CV-006281, 2020 WL 5743219 (Ohio Ct. Com. Pl., Franklin Cnty.); (ii) campaign finance disclosures filed with the Ohio Secretary of State; (iii) FirstEnergy's public filings with the U.S. Securities and Exchange Commission ("SEC"); (iv) news articles concerning Defendants' misconduct; (v) securities analysts' reports about FirstEnergy; (vi) press releases and other publications issued by FirstEnergy and related parties; (vii) shareholder communications, conference calls and postings on the Company's websites; and (viii) other publicly available information concerning FirstEnergy and Defendants.

*"**This is likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio…bribery, pure and simple. This was a quid pro quo.**"*

—David DeVillers, United States Attorney, Southern District of Ohio

*FirstEnergy "**complies with all federal and state lobbying registration and disclosure requirements.**"*

—Director Defendants in March 2016 and March 2017 Proxy Statements

*The Board's "**Corporate Governance Committee maintains an informed status with respect to the Company's practices relating to corporate political participation**."*

—Director Defendants in March 2018 Proxy Statement

## I.   <u>NATURE OF THE ACTION</u>

1.      Corporate fiduciaries cannot in good faith and consistent with their fiduciary duties allow the company they oversee to bribe elected officials and undermine our representative system of government.   Contrary to this plain and unambiguous duty, FirstEnergy's Board, led by Director and Chief Executive Officer Charles E. Jones ("Jones"), chose to implement a massive, years-long bribery, racketeering and pay-to-play scheme to procure favorable legislation from the Ohio Speaker of the House, Larry Householder ("Householder").

2.      Defendants illegally funneled over *$60 million* of FirstEnergy funds to Householder and other public officials in exchange for favorable legislation, causing the largest political bribery scandal in the history of Ohio and one of the most egregious examples ever of corporate fiduciaries' intentional misuse of corporate funds to undermine our Nation's system of representative government.   Defendants' use of Company assets to pay illegal bribes was driven by the Officer Defendants' selfish interests in executive compensation tied to revenues, contrary to FirstEnergy's long-term interests, and exposed the Company to enormous harm.

3.     FirstEnergy is one of the largest investor-owned electric utility companies in the country. The Company owns and operates two nuclear power plants in the State of Ohio and serves more than six million customers across the Midwest and Mid-Atlantic regions. By late 2016, FirstEnergy was struggling after sinking hundreds of millions of dollars into maintaining its aging nuclear power plants while demand for nuclear power diminished. Faced with these difficulties, FirstEnergy's Board and senior management decided to seek "legislative solutions" to the Company's financial woes.

4.     Householder's 2016 bid to reenter Ohio politics presented an opportunity for FirstEnergy to obtain a legislative solution to its problems. Householder had resigned in disgrace from his position as Speaker of the Ohio House of Representatives in 2004 amidst accusations that he accepted kickbacks and traded legislation for campaign contributions. When Householder announced his reentry into politics and desire to again seek the Speakership of the House, FirstEnergy decided to make massive, undisclosed contributions to Householder's campaign in return for favorable legislation that would increase the Officer Defendants' executive compensation. Defendants turned to, among others, Matthew Borges—a lobbyist who had previously pled guilty to charges of "improper use of a public office" for illegal campaign contributions to Ohio Treasurer Republican Joe Deters in a pay-to-play scandal in 2004. Borges described the convergence of FirstEnergy, Householder, and his firm as an "unholy alliance."

5.     The unholy alliance was successful. Between 2017 and 2019, FirstEnergy transferred tens of millions of dollars—while publicly reporting only a fraction of that amount—to various entities controlled by Householder to support Householder's bid for Speaker of the House, and to support other House candidates that FirstEnergy and Householder believed would vote for Householder's Speakership candidacy. Householder took office in Ohio's House of

-3-

Representatives on January 3, 2017, and a few days later, flew on FirstEnergy's private jet to Washington, D.C., to attend the inauguration of President Trump. Two months later, in March 2017, FirstEnergy made the first of a series of $250,000 quarterly payments to a 501(c)(4) entity called "Generation Now" that Householder secretly controlled. Householder's co-conspirator Neil Clark explained this entity was structured to allow "donors" to "give as much or more to the (c)(4) and *nobody would ever know*."

6. Householder was elected as Speaker of the House in January 2019. Shortly thereafter, the House introduced and passed House Bill 6 ("HB6") to provide a *billion-dollar-bailout* for FirstEnergy's uncompetitive power plants funded by monthly ratepayer surcharges. HB6 also removed incentives to build renewable energy projects, canceled statewide energy conservation efforts, and allowed FirstEnergy to up-charge Ohio customers for their energy. HB6 was derided by contemporaneous news reports as the "worst energy bill of the 21st century," and overwhelmingly opposed by ratepayer groups, business groups, free market conservative groups, environmental groups, and Ohioans generally. HB6 faced an immediate statewide ballot referendum seeking to repeal it. FirstEnergy funneled an additional $38 million in just a few months to oppose the initiative, going so far as to bribe an employee of a signature collection firm to sabotage it. FirstEnergy's efforts paid off: the referendum was defeated.

7. One year after HB6 was signed into law, the public learned how FirstEnergy was able to secure the legislation. On July 17, 2020, the U.S. Attorney for the Southern District of Ohio filed an 80-page criminal complaint with an FBI affidavit (the "Criminal Complaint" and "FBI Affidavit") against two FirstEnergy lobbyists, Householder, and Householder staff members. In announcing the indictments, U.S. Attorney David DeVillers stated that "*[t]his is likely the largest bribery, money laundering scheme ever perpetrated against the people of the*

*state of Ohio…bribery, pure and simple. This was a quid pro quo*." Chris Hoffman, FBI Special Agent in Charge of the investigation, described the scheme as a "shameful betrayal" and a "*sophisticated criminal conspiracy to enact legislation on behalf of Corporation A*"—widely acknowledged as FirstEnergy. DeVillers all but confirmed FirstEnergy's direct involvement, stating: "Company A provided $60 million in return for the $1.5 billion bailout. *Everyone in this room knows who Company A is*." While noting that "no one from the Company has *of yet* been charged," DeVillers added that "there's going to be a lot of busy FBI agents in the Southern District of Ohio . . . *this is by no means over*."

8.      The Criminal Complaint confirmed the damning details of the scheme, including the fact that Defendants actively participated in the wrongdoing, making them liable to FirstEnergy and excusing a pre-suit demand. The Criminal Complaint confirmed, for example, that FirstEnergy's most senior executives, including FirstEnergy Director and CEO, Defendant Charles E. Jones, were directly and actively involved in the illegal bribery scheme. The Criminal Complaint meticulously catalogued evidence implicating these FirstEnergy fiduciaries, including transcripts of phone calls, recorded conversations, call logs, text messages, meeting minutes and bank records. Householder had over 200 phone calls with FirstEnergy executives between 2016 and 2019, including at least 84 calls with Defendant Jones. Householder also met with Defendant Jones and "Company brass" to discuss defeating the HB6 referendum.

9.      The Director Defendants actively participated in the bribery and pay-to-play scheme. They allowed the Company to make massive illegal payments propping up the Officer Defendants' executive compensation and covered up the scheme in violation of Ohio law and the federal securities laws. In March 2017—right after Householder used FirstEnergy's airplane to attend the presidential inauguration and the same month that FirstEnergy made a $250,000

payment to Householder's Generation Now—the Board urged the Company's shareholders to vote *against* improved disclosure, transparency, and accountability for FirstEnergy's lobbying efforts, knowing that "[a]bsent a system of accountability [for lobbying efforts], company assets could be used for objectives contrary to FirstEnergy's long-term interests."

10.    Moreover, "[a]fter careful consideration," the Director Defendants represented in filings with the SEC in March 2016 and March 2017 that FirstEnergy ***complies with all federal and state lobbying registration and disclosure requirements.***"  They also represented that the Company's "current procedures and policies promote transparency and compliance with law" and in its March 2018 SEC filing, that the Board's "Corporate Governance Committee maintains an informed status with respect to the Company's practices relating to corporate political participation."  While Defendants made these representations opposing improved disclosure, transparency and accountability of FirstEnergy lobbying efforts, FirstEnergy's most senior officers, including its Director and CEO, Defendant Jones, were directly implicated in paying massive bribes in the largest pay-to-play scheme ever perpetrated against the people of the state of Ohio.

11.    Throughout this time, media articles, investigative journalists and public-sector watchdogs persistently questioned the propriety of FirstEnergy's ties to Householder—intense scrutiny of which the Director Defendants must have been aware when they were giving "careful consideration" to repeated shareholder proposals directed to them to improve disclosure, transparency, and accountability for FirstEnergy's lobbying efforts.

12.    Media reports described FirstEnergy's relationship with Householder as "cozy" and "warm," and a March 2017 *Dayton Daily News* article juxtaposed Householder's history of kickbacks with his suspicious trip aboard FirstEnergy's corporate jet to President Trump's

inauguration. In April 2018, a *Cleveland.com* article questioned the "***big checks***" that FirstEnergy was providing to Householder and his allies, asking "***why FirstEnergy decided to put so much money behind Team Householder***." Notably, the article only referenced FirstEnergy's publicly reported donations of $154,000, as opposed to the tens of millions of dollars in undisclosed bribes that FirstEnergy was surreptitiously funneling to Householder-controlled entities.

13. After the commencement of this shareholder derivative action, the Company terminated the employment of: Defendant Jones (October 29, 2020), SVP External Affairs; Defendant Michael J. Dowling (October 29, 2020), SVP of Product Development, Marketing, and Branding; Dennis M. Chack (October 29, 2020), SVP and Chief Legal Officer; Defendant Robert Reffner (November 8, 2020), and VP, General Counsel and Chief Ethics Officer; and Defendant Ebony Yeboah-Amankwah (November 8, 2020). According to Company statements, these Defendants' employment with FirstEnergy was terminated because they did not "maintain and promote a control environment with an ***appropriate tone of compliance***" and engaged in conduct that was "influenced by ***the improper tone at the top***."

14. FirstEnergy and its shareholders have been harmed, and are threatened with continued and increasing harm, because of the Defendants' disregard for the law and their fiduciary duties. FirstEnergy is a named defendant and faces civil liability in numerous lawsuits arising from the scandal, including a federal securities fraud suit and multiple Racketeer Influenced and Corrupt Origination Act ("RICO") actions. FirstEnergy also faces regulatory liability, including in proceedings before the Public Utilities Commission of Ohio. Further, the Company also faces potential criminal exposure in the Householder criminal action where it was identified as "Company A." Plaintiffs seek judicial intervention to hold Defendants accountable.

## II.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.    Venue is proper in this Court because the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, and FirstEnergy has suffered and will continue to suffer harm in this District. A class action alleging violations of the federal securities laws is pending in this District, including *Owens v. FirstEnergy Corp., et al.*, No. 2:20-cv-03785 (S.D. Ohio) (the "Securities Class Action").  In addition, the Criminal Complaint is pending in this District, as are three civil actions against the Company for the complained of scheme by Ohio ratepayers, *Smith v. FirstEnergy Corp.*, *et al.*, No. 2:20-cv-3755 (S.D. Ohio), *Buldas v. FirstEnergy Corp., et al.,* No. 1:20-cv-00593 (S.D. Ohio), and *Hudock et al. v. FirstEnergy Corp., et al.*, No. 2:20-cv-03954 (S.D. Ohio).  Defendants have appeared in this venue and the Court has denied their motion to stay this action in favor of *Miller v. Anderson, et al.*, No. 5:20-cv-01743 (N.D. Ohio).

## III.    PARTIES

### A.    Plaintiffs

17.    Co-Lead Plaintiff Employees Retirement System of the City of St. Louis is a public pension system organized for the benefit of current and retired public employees of the city of St Louis, Missouri.  As of January 2021, St. Louis Employees had pension assets under management of approximately $800 million.  St. Louis Employees has owned FirstEnergy common stock since at least January 2016, held FirstEnergy common stock continuously at all relevant times, and is presently a stockholder of the Company.

18.     Co-Lead Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W. is a pension fund based in Boston, Massachusetts that provides retirement benefits to active and retired Boston electrical workers.  As of January 2021, Local 103 had pension assets under management of approximately $1 billion.  Local 103 has owned FirstEnergy common stock since at least January 2017, held FirstEnergy common stock at all relevant times, and is presently a stockholder of the Company.

19.     Additional Plaintiff Massachusetts Laborers Pension Fund is a jointly-trusteed Taft-Hartley benefit fund that provides retirement benefits to members of various local unions in Massachusetts and northern New England that are affiliated with the Laborers International Union of North America.  As of December 2019, Plaintiff had approximately $1.5 billion under management.

20.     Plaintiffs bring this action derivatively on behalf of FirstEnergy and its stockholders to redress injuries that Company suffered, and will suffer, as a direct result of Defendants' misconduct. FirstEnergy is named as a Nominal Defendant solely in a derivative capacity.  Plaintiffs have owned FirstEnergy common stock at all relevant times and remain current stockholders of the Company. Plaintiffs intend to retain shares in FirstEnergy throughout the duration of this litigation.  Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in this litigation.

**B.     Nominal Defendant**

21.     Nominal Defendant FirstEnergy Corp. is incorporated under the laws of Ohio and headquartered at 76 South Main Street, Akron, Ohio 44308.  FirstEnergy is an electric utility involved in the distribution, transmission, and generation of electricity, as well as energy management and other related services. The Company is one of the largest investor-owned utilities, serving more than six million customers across the Midwest and Mid-Atlantic regions.

The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FE." FirstEnergy has more than 540 million shares of common stock outstanding.

### C. The Individual Defendants

#### 1. The Director Defendants

22. Defendant **Charles E. Jones** ("Jones") served as Chief Executive Officer ("CEO") and Director of FirstEnergy from 2015 until his termination on October 29, 2020—after the commencement of this action. According to the Board, Jones was terminated for violating FirstEnergy policies and its code of conduct, including failing to "maintain and promote a control environment with an appropriate tone of compliance in certain areas of FirstEnergy's business." Defendant Jones held various positions with the Company or its subsidiaries since at least 1978. In 2016 and 2017, Jones opposed shareholder proposals seeking disclosure of FirstEnergy's lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Jones also opposed disclosure of a description of the decision-making process and oversight by management and the Board for making lobbying payments while falsely representing, along with his fellow directors, that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements." From 2016 to 2019, Jones' total compensation was $55,207,422. Jones is a named defendant in the Securities Class Action. Defendant Jones made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations. Defendant Jones also reviewed, approved, signed and certified FirstEnergy's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, which contained materially false and misleading statements and omissions.

23.     Defendant **Michael J. Anderson** ("Anderson") has served as a Director of FirstEnergy since 2007. Anderson is also the Chair of the Audit Committee and member of the Finance Committee. From 2016 through 2019, Anderson was also a member of the Corporate Governance and Corporate Responsibility Committee and, according to FirstEnergy's 2018 proxy statement, "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."   In 2016 and 2017, Anderson opposed shareholder proposals seeking disclosure of FirstEnergy's lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests."   Anderson also opposed disclosure of a description of the decision-making process and oversight by management and the Board for making lobbying payments while falsely representing, along with his fellow directors, that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."   Between 2016 and 2019, Anderson was given $1,031,757 in fees, stock awards, and other compensation for his service on the Board.

24.     Defendant **Steven J. Demetriou** ("Demetriou") has served as a Director of FirstEnergy since 2017 and is the Chair of the Finance Committee and a member of the Operations and Safety Oversight Committee.   Demetriou was a member of the Compensation Committee from 2018 through 2019.   Demetriou was informed of significant shareholder support for a proposal that required disclosure of lobbying payments and he, along with his fellow directors, approved an amendment to the Corporate Governance Committee Charter to "clarify" its responsibility in overseeing FirstEnergy's lobbying activities to stave off another shareholder proposal demanding disclosure of lobbying activities and expenditures in 2018. From 2017

through 2019, Demetriou was given $704,538 in fees, stock awards, and other compensation for his service on the Board.

25.     Defendant **Julia L. Johnson** ("Johnson") has served as a Director of FirstEnergy since 2011. Johnson is a member of the Finance Committee. Johnson is also the Chair of the Corporate Governance and Corporate Responsibility Committee and, according to FirstEnergy's 2018 proxy statement, "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." In 2016 and 2017, Johnson opposed shareholder proposals seeking disclosure of FirstEnergy's lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Johnson also opposed disclosure of a description of the decision-making process and oversight by management and the Board for making lobbying payments while falsely representing, along with her fellow directors, that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements." From 2016 through 2019, Johnson was given $953,825 in fees, stock awards, and other compensation for her service on the Board.

26.     Defendant **Donald T. Misheff** ("Misheff") has served as a Director of FirstEnergy since 2012 and has been the Non-Executive Chairman of the FirstEnergy Board since May 2018. Misheff is also a member of the Audit Committee and Corporate Governance and Corporate Responsibility Committee, and, according to FirstEnergy's 2018 proxy statement, "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." In 2016 and 2017, Misheff opposed shareholder proposals seeking disclosure of FirstEnergy's

lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Misheff also opposed disclosure of a description of the decision making process and oversight by management and the Board for making lobbying payments while falsely representing, along with his fellow directors, that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements." Misheff served on the Compensation Committee from 2016 through 2018. From 2016 to 2019, Misheff was given $1,224,230 in fees, stock awards, and other compensation for his service on the Board. Directors Misheff and Demetriou served together on the Aleris Corporation board of directors. Misheff served as a director from December 2013 through April 2018. Demetriou served as Chairman and CEO from 2004 through 2015.

27. Defendant **Thomas N. Mitchell** ("Mitchell") has served as a Director of FirstEnergy since 2016. Mitchell is also the Chair of the Operations and Safety Oversight Committee and a member of the Corporate Governance and Corporate Responsibility Committee and, according to FirstEnergy's 2018 proxy statement, "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." In 2016 and 2017, Mitchell opposed shareholder proposals seeking disclosure of FirstEnergy's lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Mitchell also opposed disclosure of a description of the decision-making process and oversight by management and the Board for making lobbying payments while falsely representing, along with his fellow directors, that FirstEnergy "complies with all federal and state lobbying registration

and disclosure requirements." From 2016 to 2019, Mitchell was given $978,193 in fees, stock awards, and other compensation for his service on the Board.

28. Defendant **James F. O'Neil, III** ("O'Neil") has served as a Director of FirstEnergy since 2017. O'Neil is also the Chair of the Compensation Committee and a member of the Operations and Safety Oversight Committee. He was also on the Audit Committee from May 2017 to May 2019. In 2016 and 2017, O'Neil opposed shareholder proposals seeking disclosure of FirstEnergy's lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." O'Neil also opposed disclosure of a description of the decision-making process and oversight by management and the Board for making lobbying payments while falsely representing, along with his fellow directors, that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements." From 2017 through 2019, O'Neil was given $739,825 in fees, stock awards, and other compensation for his service on the Board.

29. Defendant **Christopher D. Pappas** ("Pappas") has served as a Director of FirstEnergy since 2011. On October 29, 2020, it was announced that Pappas was appointed to the temporary position of Executive Director. Pappas previously was the Chair of the Finance Committee and a member of the Compensation Committee. In 2016 and 2017, Pappas opposed shareholder proposals seeking disclosure of FirstEnergy's lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Pappas also opposed disclosure of a description of the decision-making process and oversight by management and the Board for making lobbying payments while falsely representing, along with his fellow directors,

-14-

that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements." From 2016 through 2019, Pappas was given $1,009,482 in fees, stock awards, and other compensation for his service on the Board.

30. Defendant **Sandra Pianalto** ("Pianalto") has served as a Director of FirstEnergy since 2018 and is a member of the Compensation and Audit Committees. She also served on the Finance Committee from 2018 through 2019. From 2018 through 2019, Pianalto was given $452,838 in fees, stock awards, and other compensation for her service on the Board. Pianalto attended the University of Akron with Defendant Jones and Defendant Misheff.

31. Defendant **Luis A. Reyes** ("Reyes") has served as a Director of FirstEnergy since 2013 and is a member of the Operations and Safety Oversight Committee and the Corporate Governance and Corporate Responsibility Committee, and, according to FirstEnergy's 2018 proxy statement, "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." In 2016 and 2017, Reyes opposed shareholder proposals seeking disclosure of FirstEnergy's lobbying activities and expenditures to the Company's shareholders, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Reyes also opposed disclosure of a description of the decision-making process and oversight by management and the Board for making lobbying payments while falsely representing, along with his fellow directors, that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements." From 2016 to 2019, Reyes received $948,601 in fees, stock awards, and other compensation for his service on the Board.

32.     Defendant **Leslie M. Turner** ("Turner") has served as a Director of FirstEnergy since 2018 and is a member of the Audit and Compensation Committees. Turner also chairs a recently constructed subcommittee of the Audit Committee that assesses and implements changes to the Company's compliance program. From 2018 through 2019, Turner was given $314,836 in fees, stock awards, and other compensation for her service on the Board.  Turner previously was a partner at Akin Gump.  Akin Gump, a FirstEnergy advisor, was involved in lobbying for the passage of HB6.

33.     Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner are collectively referred to herein as the "Director Defendants."

### 2.     The Officer Defendants

34.     Defendant **Michael J. Dowling** ("Dowling") was FirstEnergy's Senior Vice President, External Affairs from 2011 until his termination on October 29, 2020—after the commencement of this action.  As an officer of FirstEnergy, Dowling owed fiduciary duties to the Company and its shareholders.  Pursuant to FirstEnergy's Corporate Political Activity Policy, Dowling was responsible for approving political contributions and "confirm[ing] that the proposed contribution or expenditure is in the best interests of FirstEnergy."  Dowling was also responsible for working with the FirstEnergy Legal Department to "confirm that any contribution or expenditure we consider complies with applicable election laws, rules and regulations."  According to the Criminal Complaint, Dowling spoke with Householder (fourteen times) and Longstreth multiple times (the latter of which has plead guilty to federal racketeering charges) before the Ohio primary election and at times closely preceding certain of FirstEnergy's illegal payments to Generation Now. He held various positions with the Company or its subsidiaries since at least 1986.

35.     Defendant **James F. Pearson** ("Pearson") served as FirstEnergy's CFO from 2013 until March 2018. Pearson then transitioned to Executive Vice President of Finance until his retirement in April 2019. He previously held various positions, including management positions, with the Company or its subsidiaries since at least 1976. As an officer of FirstEnergy, Pearson owed fiduciary duties to the Company and its shareholders.  From 2016 to 2019, Pearson's total compensation was $22,803,462.  Defendant Pearson made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations.  Defendant Pearson also reviewed, approved, signed and certified FirstEnergy's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, which contained materially false and misleading statements and omissions.

36.     Defendant **Robert Reffner** ("Reffner") was FirstEnergy's Senior Vice President and Chief Legal Officer, with responsibility for Legal, Corporate Secretary, Ethics, Risk and Internal Auditing, and the Innovation Center.  Reffner reported to Defendant Jones. As an officer of FirstEnergy, Reffner owed fiduciary duties to the Company and its shareholders.  Pursuant to FirstEnergy's Corporate Political Activity Policy, Reffner was responsible for confirming that political contributions complied with applicable election laws, rules and regulations.  Reffner joined FirstEnergy in 2007 and was elected Senior Vice President and General Counsel in 2018. Reffner was separated from the Company effective as of November 8, 2020—after the commencement of this action—"due to inaction and conduct that the [Director Defendants] determined was influenced by the improper tone at the top."  Reffner's total 2019 compensation was $2,467,891 and his base salary was $537,594.

37.     Defendant **Steven E. Strah** ("Strah") is the President and acting CEO of FirstEnergy. Strah was appointed to his current position in October 2020 immediately following

the termination of Defendant Jones.  Strah previously served as FirstEnergy's CFO from March 2018 until May 2020. Prior to March 2018, Strah served as Senior Vice President and President of FirstEnergy's Utilities Operations. He has held various positions with the Company or its subsidiaries, since at least 1984. As an officer of FirstEnergy, Strah owes fiduciary duties to the Company and its shareholders.  According to the FBI Affidavit supporting the criminal complaint against Householder and his co-conspirators, Strah **_personally_** signed checks for payments into the illegal bribery scheme.  Defendant Strah made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations. Defendant Strah also reviewed, approved, signed and certified FirstEnergy's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, which contained materially false and misleading statements and omissions.  From 2016 to 2019, Strah's total compensation was $16,848,974.

38.     Defendant **K. Jon Taylor** ("Taylor") took over as FirstEnergy's CFO from Defendant Strah, who he reports to. Prior to assuming this position, he was the Company's Vice President, Controller and Chief Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, Vice President of Utilities. Taylor joined FirstEnergy in 2009 and progressed through various senior level financial positions. As an officer of FirstEnergy, Taylor owes fiduciary duties to the Company and its shareholders.  Defendant Taylor made materially false and misleading statements and omissions during earnings calls, investor conferences and industry presentations.  Defendant Taylor also reviewed, approved, signed and certified FirstEnergy's quarterly and annual filings with the SEC on Forms 10-Q and 10-K, which contained materially false and misleading statements and omissions.

39.     Defendant     **Ebony Yeoah-Amankwah** ("Yeoah-Amankwah") was FirstEnergy's Vice President, General Counsel and Chief Ethics Officer, reporting to Reffner. As an officer of FirstEnergy, Yeoah-Amankwah owed fiduciary duties to the Company and its shareholders. Pursuant to FirstEnergy's Corporate Political Activity Policy, Yeoah-Amankwah was responsible for confirming that political contributions complied with applicable election laws, rules and regulations. Yeoah-Amankwah joined FirstEnergy in 2005 and developed expertise in state and federal regulatory affairs. She joined the External Affairs Department in 2011 as Executive Director of External Affairs before returning to the Legal Department in 2012 as executive director, State and Federal Energy Regulatory Legal Affairs. Yeoah-Amankwah advanced to Vice President, State and Federal Regulatory Legal Affairs in January 2017. Yeoah-Amankwah was separated from the Company effective as of November 8, 2020—after the commencement of this action—"due to inaction and conduct that the [Director Defendants] determined was influenced by the improper tone at the top."

40.     Defendants Jones (in his capacity as CEO), Dowling, Pearson, Reffner, Strah, Taylor and Yeoah-Amankwah are collectively referred to as the "Officer Defendants."

41.     The Director Defendants and the Officer Defendants are collectively referred to herein as the "Defendants" or the "Individual Defendants."

**D.     Relevant Non-Parties**

42.     Larry Householder ("Householder") has been a member of the Ohio House of Representatives since January 2017 and was Speaker of the House from January 2019 until his removal on July 30, 2020. Householder previously was a House member representing Ohio's 72nd District from 1997 to 2004 and served as Ohio Speaker of the House from 2001 to 2004, before resigning after reports of alleged corrupt activity surfaced in the media and were publicly referred to the FBI. According to the Department of Justice's indictment charges, Householder

personally benefitted from FirstEnergy as at least $300,000 in bribes were used to pay his legal fees and settle a lawsuit against him; over $100,000 paid for costs associated with his Florida home; and $97,000 went to campaign related expenses.

43. Generation Now ("Generation Now") is registered as a 501(c)(4), which is an IRS designation for a tax-exempt, social welfare organization. Pursuant to federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection. From 2017 to the present, Generation Now received approximately $60 million from FirstEnergy and its affiliates.

44. Matthew Borges ("Borges") is a registered lobbyist for FirstEnergy Solutions ("FES"), a FirstEnergy subsidiary. Borges was a key middleman between FirstEnergy and Generation Now and was at the center of the effort to thwart the referendum opposing HB6. Borges received $1.62 million in wire transfers from Generation Now, according to the FBI Affidavit. Borges also paid himself over $350,000 from FirstEnergy to Generation Now proceeds. Borges called FirstEnergy's flow of funds to Generation Now "Monopoly money." Further, according to the FBI Affidavit, Borges personally bribed an employee of the ballot campaign (with a $15,000 check sourced from FirstEnergy payments) to overturn HB6 in order to gain confidential information on how many signatures the ballot campaign had obtained.

45. Juan Cespedes ("Cespedes") is a multi-client lobbyist whose services were retained by FirstEnergy. Cespedes was central to FirstEnergy's efforts to get the bailout legislation passed in Ohio as records show that Cespedes was the listed "lead consultant" relating to FirstEnergy's attempts to pursue legislation that would save the failing Nuclear Power Plants. According to the FBI Affidavit, Cespedes "was in regular contact with both [FirstEnergy] and Enterprise members during the relevant period." Cespedes received $227,000 from FirstEnergy

-20-

in 2019 and approximately $600,000 from the Enterprise. The FBI Affidavit further states that, "supported by toll records and search warrant returns, Cespedes coordinated the timely payment of $15 million from [FirstEnergy] to Generation Now." In October 2020, Cespedes pled guilty to a charge of racketeering conspiracy. In his plea agreement, signed on October 6, Cespedes admitted he and others "orchestrat[ed] payments on multiple occasions to Generation Now … in return for specific official action by Householder relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio."

46. Jeffrey Longstreth ("Longstreth") is Householder's longtime campaign and political strategist and instrumental to the Enterprise's efforts to pass HB6. According to the Criminal Complaint, "Longstreth led the messaging efforts both in the campaign to pass HB6 and to defeat the referendum, and was a point of contact for [FirstEnergy]." Longstreth personally benefitted from FirstEnergy to the tune of $5 million, including at least $1 million that he transferred to his brokerage account in January 2020. In October 2020, Longstreth pled guilty to a charge of racketeering conspiracy. In his plea deal, signed on October 23, Longstreth admitted to knowingly organizing Generation Now at the behest of Householder to "be used as a mechanism to receive undisclosed donations" for Householder's campaign for Ohio House speaker. Longstreth also acknowledged that he managed the nonprofit's bank accounts and made "financial transactions that were designed to conceal the nature, source, ownership, and control of the payments made by Company A to Generation Now."

47. Neil Clark ("Clark") is a longtime lobbyist who owns Grant Street Consultants and was previously a budget director for the Ohio Senate Republican Caucus. Clark served as Householder's "'proxy' relating to [FirstEnergy's] matters" and in the Enterprise's efforts to further the enactment of HB6 and ensure HB6 went into effect in October 2019 by defeating the

subsequent ballot-initiative challenge. Clark also communicated directly with House members to further the Enterprise. Clark stated that FirstEnergy operated as the Enterprise's "Bank" as the Company's "deep pockets" allowed funds to be "unlimited." Clark personally benefitted from FirstEnergy, receiving at least $290,000.

48.     Householder, Longstreth, Clark, Borges, Cespedes, and Generation Now are collectively referred to as the "Enterprise" as that term is defined in ¶8 of the FBI Affidavit.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     FirstEnergy's Business

49.     FirstEnergy is a utility company incorporated under Ohio law that generates, transmits, and distributes electricity through its subsidiaries and affiliates. It is one of the nation's largest investor-owned electric systems. The Company's current core business segments are Regulated Distribution, comprising 85% of its revenues, and Regulated Transmission, comprising 15% of its revenues. The Regulated Distribution segment distributes electricity through FirstEnergy's ten utility operating companies, serving approximately 6 million customers within 65,000 square miles of Ohio, Pennsylvania, West Virginia, Maryland, New Jersey and New York. The Regulated Transmission segment transmits electricity through transmission facilities owned and operated by certain of FirstEnergy's subsidiaries and affiliates.

50.     FirstEnergy also owns and operates FirstEnergy Service Co. ("FESC"), a principal subsidiary that provides legal, financial, and other corporate support to its affiliated companies. FESC does not have its own CEO or board of directors and was under the control and management of FirstEnergy and Defendants at all relevant times.

51.     FirstEnergy has a business segment, known as Competitive Energy Services ("CES"), which is comprised of three entities: FirstEnergy Solutions ("FES"), FirstEnergy Nuclear Operating Co. ("FENOC"), and Allegheny Energy Supply ("AE Supply"). Through FES

-22-

and FENOC, FirstEnergy owned, operated, and maintained two nuclear power plants in Ohio: the Perry Nuclear Generating Station (the "Perry Plant") and the Davis-Besse Nuclear Power Station (the "Davis-Besse Plant").[1] It was the deterioration in value of these two plants that led to the bribery scandal. Among the shared services FESC provided to FES were "external affairs," including "corporate contributions," as well as "advocacy at the Federal, State, and Local Levels."

52.     FirstEnergy has a history of treating compliance with the law as optional and a business risk to be managed rather than a red line that should not be crossed:

- In 2003, shareholders brought a derivative action against the Company's board for ignoring repeated signs of inadequate and decaying equipment at the Company's Davis-Besse Plant, failing to maintain legally required emergency control systems, and neglecting to establish an adequate financial reporting system after a nuclear powerplant incident caused nearly 100 deaths and the largest electrical blackout in United States history.

- In 2004, FirstEnergy paid illegal bribes to the Executive Director of Ohio's Office of Consumers' Counsel, Robert Tongren, in exchange for his agreement to destroy an unpublished consultant report disputing FirstEnergy's claim that it should recoup up to *$8.8 billion* from ratepayers for its nuclear power plants.

- In 2006, FirstEnergy paid a record *$28 million fine* to avoid criminal prosecution for perjury for misleading the U.S. Nuclear Regulatory Commission. Assistant AG Sue Ellen Wooldridge of the DOJ's Environmental and Natural Resources Division announced that "[b]y misleading the NRC about its prior safety inspections, FENOC failed to meet its regulatory obligations and violated the public's trust" and put the public at risk of a nuclear disaster.

---

[1] Following a March 2018 bankruptcy and later reorganization, FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively. Energy Harbor Corp. emerged from bankruptcy on February 27, 2020. Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES and FENOC and an active role in financing and overseeing the corrupt conspiracy to pass HB6 as detailed herein.

-23-

## B. FirstEnergy's Financial Problems

53. FirstEnergy's Competitive Energy Services—especially its FES subsidiary—were facing increasing headwinds in 2016. On July 28, 2016, FirstEnergy reported a second quarter loss of $1.1 billion, including a *$1.259 billion* loss in the Company's energy services segment that was partially offset by gains in other segments. The Company's Form 10Q for the second quarter of 2016 explained that "competitive markets continue to be challenged by depressed power and capacity prices" and that, as a result, FirstEnergy "recognized a goodwill impairment charge of $800 million, representing the total amount of goodwill at CES as well as valuation allowances against state and local NOL carryforwards of $159 million. . ." FirstEnergy made clear that it did not intend to "infuse additional equity into CES, including FES, in order to support that segment's credit ratings."

54. The next day, on July 29, 2016, Moody's downgraded the senior unsecured rating for FES from "investment grade" Baa3 to "below investment grade" Ba2. Three days later, on August 1, 2016, S&P downgraded FES's corporate credit rating from investment grade BBB- to below investment grade BB-. The downgrades to "junk" status signified that loans to FES faced a substantial risk of default and significantly increased FirstEnergy's borrowing costs for its capital-intensive nuclear operations.

55. The situation did not improve. In November 2016, FirstEnergy announced a strategic review with the goal to exit the competitive power generation business of FES in the next 12 to 18 months. During a November 4, 2016 presentation at the EEI Financial Conference in Phoenix, Arizona, Defendant Jones explained that FES was facing a number of risks, including sustained weak energy and capacity prices and the requirement to refinance upcoming $645 million in debt maturities through 2018, prompting FirstEnergy to assess alternatives.

56.     On February 21, 2017, FirstEnergy's outside auditor, PricewaterhouseCoopers LLP, issued a report that was attached to the Company's Form 10-K for 2016, observing that "FirstEnergy Solutions Corp.'s current financial position and the challenging market conditions impacting liquidity raise *substantial doubt about its ability to continue as a going concern*."

C.     **Defendants Turn to Illegal, Pay-to-Play "Legislative Solutions" To Fix FirstEnergy's Problems**

1.     **Householder Reenters Ohio Politics with a Reputation for Accepting Illegal "Pay-to-Play" Payments**

57.     As FirstEnergy was assessing alternatives for its ailing FES segment, Larry Householder was making his way back into Ohio politics.  Householder was the former Speaker of the House, who left that position in 2004 under the cloud of an FBI investigation into allegations of money laundering, kickbacks from vendors, and illegal campaign contributions in exchange for favorable legislation.  The prior allegations and investigation of Householder were common knowledge.  For example, a March 12, 2017 profile of Householder published in the *Dayton Daily News* entitled *Former Ohio House speaker Householder looking to return to power*, discussed the political corruption allegations that "hounded" Householder's previous departure from politics, noting that Householder "*relishe[d] being known as the prince of darkness*."  The same article observed that "*Householder is cozy with FirstEnergy*" and, quoting former *Cleveland Plain Dealer* bureau chief, Sandy Theis, that "*under a Speaker Householder look for deep-pocketed interests like utilities and payday lenders to get what they want. Look for consumers of all kinds to get hosed.*"

58.     Householder ran in, and won, the November 2016 election for the House seat representing Ohio's 72nd District.  This was the first step in Householder's strategy to be reelected as Speaker when the then-current Speaker, Cliff Rosenberg, would retire at the end of 2018.  Householder planned to raise money and support "a team of electable candidates who

-25-

would support Householder's bid for speakership." FirstEnergy featured prominently in that plan.

> ### 2. Defendants Agree to Bankroll Householder While Preventing Disclosure, Transparency and Accountability for FirstEnergy's Lobbying

59.     Householder reassumed office on January 3, 2017. A few days later, Householder flew on FirstEnergy's private jet to Washington, D.C. to attend the inauguration of President Trump.[2] The corrupt deal was struck and, as FirstEnergy lobbyist and Householder co-conspirator Borges described, the "unholy alliance" was formed.

60.     After taking Householder to Washington, FirstEnergy informed investors that it would turn to "legislative solutions" to help the Company's ailing nuclear power business. As FirstEnergy explained in its 2016 Form 10-K, filed on February 21, 2017:

> Although FirstEnergy is targeting mid-2018 to exit from competitive operations, the options for the remaining portion of CES' generation are still uncertain, but could include one or more of the following:
>
> - Legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits,
>
> - Additional asset sales and/or plant deactivations,
>
> - Restructuring FES debt with its creditors, and/or
>
> - Seeking protection under U.S. bankruptcy laws for FES and possibly FENOC.

61.     On the Company's earnings call with analysts the next day, February 22, 2017, Defendant Jones explained that FirstEnergy's proposed "legislative solution" was a bailout of the Perry and Davis-Besse nuclear power plants that was paid for and sponsored by the State of

---

[2] The *Dayton Daily News* reported that months after this flight, FirstEnergy still had not billed Householder for the trip, nor had he made an ethics disclosure regarding the trip.

Ohio. Jones explained that this bailout could come through "zero emissions" legislation that he expected would be introduced soon:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. ***Our top priority is the preservation of our two nuclear plants in the state and legislation for a zero-emission nuclear program is expected to be introduced soon*** …
>
> ***We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets.*** We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.

62.     Defendant Jones had good reason to be optimistic that the legislation would be introduced soon. Householder was an outspoken proponent of charging Ohio rate payers to keep FirstEnergy's nuclear power plants open. As the March 12, 2017 *Dayton Daily News* article reported: "Householder favors a plan to help keep two nuclear plants owned by a FirstEnergy subsidiary open by allowing the owners to charge customers extra money."

63.     Moreover, in March 2017, FirstEnergy began making quarterly payments of $250,000 into the bank account Generation Now—a 501(c)(4) entity that Householder secretly controlled and that was incorporated shortly after Householder's trip to Washington on FirstEnergy's private jet. Generation Now was structured to be as opaque as possible. As Neil Clark, a lobbyist and Householder co-conspirator described it, Generation Now's structure allowed donors to "***give as much or more to the (c)(4) and nobody would ever know***."

64.     Householder put FirstEnergy's money to use. Householder's secret, FirstEnergy funded slush fund, Generation Now, reportedly paid $1 million into a pro-Householder "Growth & Opportunity" PAC to promote House Bill 381—a law allowing FirstEnergy to charge customers an additional $2.50 per month to subsidize the Davis-Besse and Perry nuclear power plants.

65.     Meanwhile, FirstEnergy's resort to "legislative solution[s]" alarmed the Company's shareholders.  In March 2017, one of the Company's shareholders renewed a proposal to increase disclosure, transparency, and accountability for FirstEnergy's "direct and indirect lobbying expenditures."

66.     The Board had successfully defeated similar shareholder proposals in 2015 and 2016. In 2015, a shareholder proposal was included that would have required FirstEnergy to prepare an annual report disclosing its lobbying expenditures (the "2015 Proposal"). In support, shareholders noted that, despite FirstEnergy agreeing "to report annually on its political campaign contributions" in 2007, "FirstEnergy has not disclosed any record of its political spending" since 2009. The 2015 Proposal further noted that "shareholders are missing key information needed to assess our company's efforts to influence public policy" because FirstEnergy did not disclose "lobbying to influence legislation in states." The shareholders concluded that the Company's state of affairs posed a significant risk, warning that: "*Lobbying expenditures can undermine our company's reputation with consumers and the public*." As the Company's shareholders explained to the Director Defendants:

> *Shareholders are concerned that the company's social license to operate may be at risk if the company continues to lobby against interests of consumers and the public. Additional disclosure is needed for shareholders to assess whether lobbying expenditures are in the best interests of stockholders and long-term value.*

67.     Shareholder Green Century Capital Management ("Green Century") supported the proposal, noting in its submission that "*[a]ccountability and transparency in the use of . . . company funds to influence legislation, regulations and public policy is critical,*" while noting that "[t]hird-party organizations estimate that FirstEnergy spends millions every year on lobbying to influence public policy, *however the total actual amounts spent on the state and federal level are undisclosed by our company*. Consequently, shareholders do not have the

-28-

information necessary to evaluate trends or risks associated with the Company's efforts to influence public policy, or whether these activities are in the best interest of shareholders." In support of the 2015 Proposal, Green Century stated, "FirstEnergy does not describe the company's decision-making process and oversight mechanisms for making lobbying contributions." The proposal continued:

> FirstEnergy does not detail its oversight mechanisms for lobbying decisions or rationales governing its lobbying expenditures, nor what the company's top lobbying priorities are and how they were chosen or may have shifted over time. Shareholders therefore have no way of knowing whether there are appropriate oversight mechanisms in place to ensure FirstEnergy's lobbying activities to influence the regulatory and legislative processes are in the best interest of the company and its shareholders.

68.     The Director Defendants on the Board represented to shareholders that "***Your Company complies with all federal and state lobbying registration and disclosure requirements***" and successfully defeated the proposal.

69.     In 2016, shareholders again included a proposal in FirstEnergy's 2016 Proxy that would require FirstEnergy to increase disclosure, transparency and accountability for lobbying efforts and expenditures (the "2016 Proposal").  The Board again represented to shareholders that "***Your Company complies with all federal and state lobbying registration and disclosure requirements***" and again successfully defeated the proposal.

70.     In 2017—a few weeks after FirstEnergy flew Householder to Washington DC on the Company's private jet to attend the inauguration of President Trump and at the same time that FirstEnergy began making undisclosed $250,000 "pay-to-play" installments to Generation New—shareholders again made a proposal to increase disclosure, transparency and accountability for FirstEnergy lobbying efforts and expenditures.  The Nathan Cummings Foundation made the following proposal – reflected in Item 9 of the March 31, 2017 Proxy Statement:

*The Nathan Cummings Foundation, 475 Tenth Avenue, 14th Floor, New York, New York 10018, plans to introduce the following resolution at the Annual Meeting. We have been notified that The Nathan Cummings Foundation is the beneficial owner of no less than 824 shares of your Company's common stock.*

**Whereas**, we believe full disclosure of our company's direct and indirect lobbying activities and expenditures is <u>required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders</u>.

**Resolved**, the shareholders of FirstEnergy request <u>the preparation of a report, updated annually, disclosing:</u>

1  <u>Company policy and procedures governing lobbying</u>, both direct and indirect, and grassroots lobbying communications.

2  <u>Payments by FirstEnergy used for (a) direct or indirect lobbying</u> or (b) grassroots lobbying communications, <u>in each case including the amount of the payment and the recipient.</u>

3  FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.

4  <u>A description of the decision-making process and oversight by management and the Board for making payments</u> described in section 2 and 3 above.

For purposes of this proposal, a "grassroots lobbying communication" is a communication directed to the general public that (a) refers to specific legislation or regulation, (b) reflects a view on the legislation or regulation and (c) encourages the recipient of the communication to take action with respect to the legislation or regulation. "Indirect lobbying" is lobbying engaged in by a trade association or other organization of which FirstEnergy is a member.

Both "direct and indirect lobbying" and "grassroots lobbying communications" include efforts at the local, state and federal levels.

<u>The report shall be presented to the Audit Committee</u> or other relevant oversight committee and posted on FirstEnergy's website.

71.  In a "supporting statement," the Nathan Cummings Foundation explained that, as a shareholder of FirstEnergy, the foundation encouraged "transparency and accountability in FirstEnergy's use of corporate funds to influence legislation and regulation, both directly and indirectly" and that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests."

72.     The Nathan Cummings Foundation's concerns were well-founded.  For example, in April 2016, two independent research organizations dedicated to corporate governance and accountability—the Investor Responsibility Research Center Institute ("IRRCI") and the Center for Political Accountability—noted that, of the top 25 electric utilities in the U.S., FirstEnergy had the second highest level of political spending relative to its revenues, yet ranked number 22 in transparency surrounding political spending.

73.     Faced with the unambiguous shareholder proposal, each of the Director Defendants knew that they had a duty to "oversee and proactively promote compliance by employees, officers and other directors, with laws, rules and regulations" and to ensure that Company were used for "legitimate business purposes."  The Director Defendants on the Corporate Governance Committee also knew that they had an affirmative duty to oversee FirstEnergy's "practices relating to corporate political participation."  And the Director Defendants on the Audit Committee members knew that they had a duty to "meet with appropriate members of management to review adherence to applicable federal, state, and local laws."

74.     Despite these clear, known, duties, the Director Defendants again represented to shareholders, **_"[a]fter careful consideration_**" in March 2017, that FirstEnergy "**_complies with all federal and state lobbying registration and disclosure requirement_**s" even as: (i) the Officer Defendants were using FirstEnergy assets to make illegal $250,000 quarterly installments to Generation Now; and (ii) widespread media reports highlighted Householder's "cozy" relationship with FirstEnergy and his January 2017 flight on FirstEnergy's private jet to Washington, DC for the presidential inauguration.  Furthermore, the Director Defendants urged shareholders to vote "AGAINST" the shareholder proposal, knowing that FirstEnergy's Political

-31-

Activity Policy did not constitute an effective system of accountability and that FirstEnergy assets were being used for lobbying efforts contrary to FirstEnergy's long-term interests, just as FirstEnergy shareholders feared.

75.     The Nathan Cummings Foundation's 2017 shareholder proposal seeking increased disclosure, transparency and accountability for FirstEnergy's lobbying efforts was narrowly defeated.  At the annual meeting of shareholders, the proposal received support from shareholders representing *133,463,630* shares (41% of the votes cast).

76.     After the vote, Defendants elicited shareholder feedback on the Company's practices and disclosures of its lobbying activities to stave off a renewed shareholder proposal for increased disclosure, transparency and accountability for their lobbying efforts.  The Director Defendants represented to shareholders that in 2017 and based on shareholder feedback, the Board "*strengthened its oversight over [FirstEnergy's] lobbying activities.*"  The Board amended the Corporate Governance Committee Charter to "clarify this responsibility" and represented to shareholders that this Committee "*maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation*, and dues and/or contributions to industry groups and trade associations."

### 3.     FirstEnergy Continues the Largest Bribery Scheme of Public Officials in Ohioan History after the Board's Successful Actions in Preventing Disclosure, Transparency and Accountability

77.     FES' downward spiral continued in 2017 while FirstEnergy payments to Householder were ramping up.  The credit rating agencies downgraded FES to extremely low credit ratings, reflecting that outstanding debt was highly vulnerable to nonpayment and that FES was likely in, or very near, default.  This limited FirstEnergy's ability to exit the competitive power generation business.

78.    Furthermore, on January 12, 2018, the Federal Energy Regulatory Commission ("FERC") rejected FirstEnergy's application to transfer certain assets from CES (FES' direct parent) to another subsidiary, limiting the Company's ability to deactivate plants, restructure its debt, or to put its segment into bankruptcy. As FirstEnergy's 2017 Form 10-K explained:

> The strategic options to exit the remaining portion of the CES portfolio, which is primarily at FES, are limited. The credit quality of FES, including its unsecured debt rating of Ca at Moody's, C at S&P, and C at Fitch and the negative outlook from Moody's and S&P, has challenged its ability to consummate asset sales. Furthermore, the inability to obtain legislative support under the Department of Energy's recent NOPR, which was rejected by FERC, limits FES' strategic options to plant deactivations, restructuring its debt and other financial obligations with its creditors, and/or to seek protection under U.S. bankruptcy laws.

79.    In short, the Board's senior management's mismanagement of FES—while illegally funding "legislative solutions"—had trapped FirstEnergy into owning a deeply troubled subsidiary with limited options to extricate the Company. Under the Company's compensation agreements, FirstEnergy's continued ownership of these troubled assets directly impacted each of the Defendants' compensation—giving each of them a direct and substantial financial incentive to support illegal "legislative solutions."

80.    Despite Householder's and FirstEnergy's efforts, the zero emissions law and the surcharge bill were both defeated. When the bills failed to pass, Defendants continued to fund Householder's plan to retake the Speakership in return for favorable legislation. The agreement was clear: Defendants would support the candidacies of Householder and his allies in the 2018 election and Householder's bid to become Speaker using FirstEnergy resources in exchange for legislative relief that would bail out FES and financially benefit them personally.

81.    Specifically, the Officer Defendants were motivated to engage in the Ohio bribery scheme because it increased the amount of their performance-based compensation tied to the achievement of certain FirstEnergy financial targets. FirstEnergy's proxy statements claimed

-33-

that the Company's compensation structure was "intended to mitigate excessive risk taking." That was false. FirstEnergy's compensation structure *incentivized* the Officer Defendants to use FirstEnergy resources to bribe public officials in order to pass HB6. For example, the vast majority of Defendant Jones's total compensation was based on the annual financial performance of FirstEnergy. In 2017, 2018 and 2019, Jones's performance-based compensation comprised 87% of his total compensation. Compensation for other officers in 2017, 2018 and 2019 was 76%, 75%, and 74% incentive-based, respectively.

82.     The Officer Defendants were well-aware that their compensation was directly tied to the passage of HB6. HB6 included a "decoupling" provision that ensures a guaranteed level of income for FirstEnergy thereby setting a floor for the Officer Defendants' "performance-based" compensation. As the FBI Affidavit explained, the decoupling amendment was added to HB6 "as a result of the successful influence campaign waged by Company A and the Enterprise" and had the following effect:

> [The] amendments included a provision that gave an electric distribution utility, such as Company A Corp., the ability to decouple its energy rates. Decoupling is the dissociation of annual revenue from volume of energy sales. The decoupling mechanism was based upon the baseline revenue the company received in 2018. ***Therefore, if a given year's annual revenue is less than it was in 2018, the company may charge retail customers a rider, or surcharge, to compensate for the lost revenue.***

83.     During a November 4, 2019 investor call, Defendant Jones explained that the HB6 decoupling provision "fixes our base revenues and essentially it takes about one-third of our company and I think makes it somewhat recession-proof."

84.     According to Ohio energy consultant RunnerStone LLC, the "decoupling" is estimated to allow FirstEnergy to charge ratepayers a total of ***$355 million*** in additional charges through 2024 to guarantee the Company a yearly revenue of $978 million. A *Cleveland.com* December 2, 2020 article entitled "*Here's what HB6's controversial 'decoupling' policy is and*

*why Ohio lawmakers are trying to repeal it*" explained, "that's the amount FirstEnergy raised in 2018 -- a year in which the utility made more money than in other recent years thanks to hot weather and other factors." State Rep. David Leland, the ranking Democrat on the Ohio House committee considering repeal legislation, asked the following during a September 2020 hearing: "Wouldn't it be fair to characterize the $355 million subsidy, the decoupling subsidy, as the smoking gun?" On January 13, 2021, Ohio Attorney General Dave Yost filed an injunction to prevent FirstEnergy from receiving "$102 million in 2021 for the sole purpose of padding FirstEnergy's bottom-line" due to the "perverse form of decoupling," "something even more costly to customers than the nuclear bailout," that was "designed to line a few pockets."

85.     The decoupling provision further provides that a unilateral ruling from PUCO can extend FirstEnergy's decoupling at the utility's discretion. This could, for example, inflate FirstEnergy's financials by an additional ***$400 million*** if extended from 2025 through 2030.  On November 16, 2020, the Chairman of PUCO, Sam Randazzo, resigned two days after the FBI raided his home and the day before FirstEnergy disclosed paying a $4 million bribe to "an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates." Yost's decoupling-related injunction discusses "FirstEnergy's use of Sam Randazzo" referring to Randazzo's emails, including to Householder, "to craft the language of H.B.6 for FirstEnergy's benefit" and help formulate talking points.

86.     While Defendants insulated their compensation against a potential recession by offloading that risk on Ohio rate payers, they continued to manipulate Ohio officials with a pricing provision added to Ohio's two-year state budget.  Specifically, Ohio's 2019 budget bill (HB 166) allows FirstEnergy to combine the profits of three subsidiaries to avoid a finding that

one subsidiary has "significantly excessive" profits that would prompt an Ohio rate payer refund. Ohio law requires utilities to return "significantly excessive" profits, typically about 17 percent, to customers. By allowing to combine the profits of three subsidiaries, FirstEnergy lowers or eliminates altogether any obligation for a refund, thereby increasing its "performance" and related executive compensation. This provision would potentially save the Company $50 million in customer refunds from 2017-2019, according to one estimate. In a statement calling for the repeal of the "Corrupt Price Gouging Budget Amendment Benefiting FirstEnergy," one of the bill's sponsors said that the "pay-to-play mentality has to come to an end."

87. FirstEnergy's executive compensation plan—adopted by the Compensation Committee—is geared towards making use of legislative loopholes for the benefit of the Officer Defendants. A September 2020 report by the Energy and Policy Institute explained that FirstEnergy is "using misleading or problematic financial metrics to calculate executive compensation." For example, regarding 2019 compensation, FirstEnergy excluded several "special items" from 2019 performance calculations like non-GAAP operating earnings and EPS, including "exit of competitive generation" through its ill-fated FES subsidiary. This exclusion served as a basis for calculating executive compensation, yielding a non-GAAP EPS of $2.58 that was significantly higher than the $1.70 per share of standard GAAP calculation and accounted for *50%* of the performance measures to calculate FirstEnergy's long-term incentives in 2019. It also constituted 70% of short-term incentive measures for the CEO and 50 to 60% for other named executive officers (NEOs). In 2019—the same year that HB6 passed and Defendants wired over $38 million to the Householder criminal conspiracy—Jones's compensation increased to *$15 million* or 32% from the prior year.

88. Additionally, FirstEnergy allows for "limited" personal use of corporate aircraft by executives and Board members, valued at $59,308 in 2019 for CEO Charles E. Jones. Notably, as discussed above, the FirstEnergy/Householder deal was made in 2017, when Householder flew to Donald Trump's presidential inauguration on board FirstEnergy's corporate plane.

89. Given this backdrop, Defendants commenced building Team Householder to further their interests. From 2017 to 2018, Generation Now spent about $3 million funneled from FirstEnergy to support the election bids of Householder and nearly two dozen different candidates friendly to Householder who would then vote for his elevation to Speaker. Most of these candidates won the 2018 general election; all who were elected voted to name Householder as Speaker; and all but two eventually voted for FirstEnergy's bailout.

90. FirstEnergy used FirstEnergy Service, as well as another entity it controlled, known in the FBI Affidavit as "Energy Pass-Through," to funnel its payments to Householder. Money that FirstEnergy paid to Generation Now was also used to pay for Householder's reelection staff (which otherwise would have been paid by Householder's candidate committee), which gave Householder a competitive edge over his opponents. Householder also used FirstEnergy's money, laundered through Generation Now, to purchase at least $97,000 worth of mail and radio advertisements in his district.

91. Between the time when Generation Now's bank account was first opened in February 2017 and the 2018 general election, FirstEnergy funneled nearly $2.5 million into Generation Now:

| Date | Amount | Method | Funding Entity |
|------|--------|--------|----------------|
| March 16, 2017 | $250,000 | Wire | FirstEnergy Service Co. |
| May 17, 2017 | $250,000 | Wire | FirstEnergy Service Co. |

| Date | Amount | Method | Funding Entity |
|------|--------|--------|----------------|
| August 10, 2017 | $250,000 | Wire | FirstEnergy Service Co. |
| December 8, 2017 | $250,000 | Wire | FirstEnergy Service Co. |
| March 15, 2018 | $300,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| May 4, 2018 | $100,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| August 8, 2018 | $54,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| August 16, 2018 | $500,000 | Wire | FirstEnergy Service Co. (via Energy Pass Through) |
| October 9, 2018 | $400,000 | Check | FirstEnergy Service Co. |
| October 29, 2018 | $100,000 | Check | FirstEnergy Service Co. |
| **Total** | **$2,454,000** | | |

92.     Notably, the FBI Affidavit states that one-fifth of these payments—in the final month before the 2018 general election—were made through checks that were signed by the Senior Vice President and CFO for FESC, Defendant Strah, who is now President and the current Acting CEO of FirstEnergy.  In addition, FirstEnergy funneled an additional $500,000 to a dark money group associated with the Enterprise on October 29, 2018—bringing FirstEnergy's total illicit payments to $2,954,000.

93.     While FirstEnergy was funneling massive sums of money to Householder through Generation Now, senior FirstEnergy executives were in regular contact with Householder and his allies in furtherance of their illicit scheme. As the FBI Affidavit lays out, for example, prior to FirstEnergy's $300,000 payment to Householder on March 15, 2018, there were multiple phone calls between the Enterprise and FirstEnergy executives that "corroborate the close coordination" between members of the Ohio bribery scheme:

-38-

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| March 12, 2018 | 2:03 pm | Householder | FESC SVP, External Affairs | 24 seconds |
| March 12, 2018 | 3:06 pm | FESC SVP, External Affairs | Householder | 3:03 minutes |
| March 12, 2018 | 3:11 pm | FESC SVP, External Affairs | Householder | 9 seconds |
| March 12, 2018 | 4:59 pm | Householder | FirstEnergy Ohio Director of State Affairs | 11:34 minutes |
| March 12, 2018 | 5:45 pm | FirstEnergy Ohio Director of State Affairs | Householder | 0 seconds |
| March 12, 2018 | 5:45 pm | FirstEnergy Ohio Director of State Affairs | Householder | 13 seconds |
| March 12, 2018 | 7:55 pm | Householder | FirstEnergy Ohio Director of State Affairs | 11:17 minutes |
| March 13, 2018 | 5:22 pm | FESC SVP, External Affairs | Householder | 1:32 minutes |
| March 13, 2018 | 5:24 pm | FESC SVP, External Affairs | Householder | 56 seconds |

94.    The FBI Affidavit lays out a similar pattern that occurred prior to FirstEnergy's

May 4, 2018 payment of $100,000, which occurred just days prior to the 2018 primary elections:

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| April 27, 2018 | 10:49 am | FESC SVP, External Affairs | Longstreth | 0 seconds |
| April 27, 2018 | 10:49 am | FESC SVP, External Affairs | Longstreth | 3 seconds |
| April 27, 2018 | 10:55 am | Longstreth | FESC SVP, External Affairs | 2:47 minutes |
| April 27, 2018 | 1:37 pm | Longstreth | FESC SVP, External Affairs | 2:56 minutes |
| April 28, 2018 | 10:38 am | FESC SVP, External Affairs | Longstreth | 1:30 minutes |

| Date | Time | Caller | Called Party | Duration |
|------|------|--------|--------------|----------|
| April 28, 2018 | 11:40 am | Longstreth | FESC SVP, External Affairs | 2:14 minutes |
| April 30, 2018 | 9:11 am | Longstreth | FESC SVP, External Affairs | 2:11 minutes |
| May 1, 2018 | 6:41 pm | FirstEnergy Ohio Director of State Affairs | Longstreth | 15:49 minutes |
| May 3, 2018 | 10:09 pm | FirstEnergy Ohio Director of State Affairs | Longstreth | Text message |
| May 4, 2018 | 6:10 am | Longstreth | FirstEnergy Ohio Director of State Affairs | Text message |
| May 4, 2018 | 6:18 am | FirstEnergy Ohio Director of State Affairs | Longstreth | Text message |
| May 4, 2018 | 6:25 am | Longstreth | FirstEnergy Ohio Director of State Affairs | 14:12 minutes |

95. On April 10, 2018, about a month before the 2018 Ohio primary elections, then-Speaker Cliff Rosenberger abruptly announced his resignation from the Speakership. Two days later, when that resignation became effective, Householder called FESC's Vice President of External Affairs while his co-conspirator Longstreth spoke with FirstEnergy's Ohio Director of State Affairs—further showing that FirstEnergy was part of Householder's illicit conspiracy to retake the Speakership.

96. Defendant Dowling was FirstEnergy's SVP for External Affairs at the time of the telephone calls described in the FBI Affidavit and ¶¶91-95 above.

97. FirstEnergy's millions of dollars in illicit payments were kept hidden from the public. However, FirstEnergy's publicly disclosed payments to Householder and his legislative allies were drawing additional media attention. For example:

-40-

- On April 20, 2018 *Cleveland.com* published "*FirstEnergy PAC writes big checks to House speaker hopeful Larry Householder, campaign allies,*" reporting that state campaign records showed FirstEnergy "donated more than $5,000 to [Householder] and a total of about $149,000 to more than a dozen other House candidates" who backed him as speaker. The article further noted "*[i]t's unclear exactly why FirstEnergy decided to put so much money behind Team Householder. But Householder has enjoyed a warm relationship with the company – last year, he and one of his sons used a FirstEnergy corporate plane to attend President Donald Trump's inauguration.*"

- On May 22, 2018, the Center for Public Integrity published an article in the *Columbus Dispatch* entitled "*Negative Energy*," reporting how FirstEnergy retaliated against law makers who had opposed its favored energy bills, including Christina Hagan, a candidate for an Ohio congressional seat. She explained that she "became the target of [FirstEnergy] and the members of our leadership team who wanted to get it done but couldn't because I wasn't going to be supportive." After facing a barrage of attack ads from another 501(c)(4) organization tied to FirstEnergy, Hagan stated "*I'm sure they just wanted to make an example of me in my race for higher office that if you don't play well, this is what will happen to you.*"

- On July 18, 2018, *Cleveland.com* published "*Dark money groups spent millions on Ohio legislative races,*" which discussed dark money funding of ads in Republican House primaries, including one "pro-Householder" PAC that raised $1 million from Generation Now and was supportive of the *House Bill 381 "which would subsidize two nuclear power plants in Ohio owned by FirstEnergy, the financially troubled utility company.*"

98. Given the importance and potential impact of HB6 on the financial situation of FirstEnergy's two nuclear power plants, it is not reasonable to infer that the Director Defendants were unaware of the widespread, persistent media stories connecting the passage of HB6 to illegal and undisclosed lobbying expenditures by FirstEnergy. Any director acting in good faith and charged with the duty to "oversee and proactively promote compliance by employees, officers and other directors, with laws, rules and regulations" who represented to his or her shareholders "[a]fter careful consideration" that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements" would have used his or her powers to immediately end FirstEnergy's illegal, undisclosed lobbying expenditures. Under Ohio law,

-41-

"[a]*ll of the authority of the corporation* [was] exercised by or under the direction of" the Director Defendants, Ohio Gen. Corp. Law §1701.59(A).

99.     Any director acting in good faith and charged with the duty to "meet with appropriate members of management to review adherence to applicable federal, state, and local laws" (the Audit Committee) or to oversee FirstEnergy's lobbying activities while "maintaining an informed status with respect to the Company's practices relating to corporate political participation" (Corporate Governance Committee) would have met with Defendants Jones, Dowling, Reffner, Strah, Pearson, Taylor and Yeboah-Amankwah and instructed them to end FirstEnergy's illegal unclosed lobbying expenditures to Householder and Generation Now. Instead, the Director Defendants continued FirstEnergy's illegal conduct.

### 4.     Defendants' Scheme to Elect Householder as Speaker Is Successful

100.     Most of the FirstEnergy-bankrolled and Householder-approved candidates won their primaries. On August 1, 2018, Householder met with FirstEnergy executives in Columbus in furtherance of their scheme, to refocus their efforts on ensuring that Householder and his allies won the upcoming general election in November. According to the FBI Affidavit, later that month, FirstEnergy wired $500,000 to Generation Now, the first of $1.5 million of total payments to Generation Now between August and October 2018.  In addition to that $1.5 million, on October 29, 2018, FirstEnergy funneled an additional $500,000 to a dark money group set up by Householder's co-conspirator Longstreth.

101.     The FirstEnergy-backed scheme to elect Householder and his allies in the 2018 general election worked. Householder won his reelection bid and was named Speaker. Having secured the Speakership, Householder was now ready to pay FirstEnergy back by pursuing its legislative bailout. Householder's co-conspirator Clark explained that Householder "went to war for [FirstEnergy]" after accepting millions from the Company because he was "pay-to-play."  In

return, the Enterprise referred to FirstEnergy as the "Bank" "because they can do, they can fund these things for 20 years if they want to . . . They've got too much money . . ."

### 5. Householder Delivers His End of the Illegal Quid-Pro-Quo: HB6

102. The very day that Householder was elected Speaker, he pledged to create a standing subcommittee on energy generation. As Householder later admitted, this committee was created for the express purpose of passing forthcoming HB6, which was introduced on April 12, 2019.

103. While entitled "Ohio Clean Air Program," the FBI Affidavit explained that "HB6 essentially was created to prevent the shutdown of [FirstEnergy's] nuclear plants." It would do this by creating a $9 subsidy per megawatt hour of energy produced by nuclear or solar generators. The subsidy would be funded by instituting a monthly fixed charge on all residential, commercial, and industrial consumers. The fixed charge was projected to produce $140 million in its first year, and $200 million per year thereafter. Given that FirstEnergy's nuclear plants produced over 18.3 million megawatts in 2018 alone (compared to just 1,095 megawatts produced by Ohio's six combined solar facilities), FirstEnergy would collect approximately 94% of the subsidy, which would total more than $160 million annually. Newspapers throughout Ohio derided HB6 as a "bailout" for the specific benefit of FirstEnergy.

104. Householder gave a press conference on April 12, 2019, the day that HB6 was introduced. When asked where the amount of the subsidy came from, Householder replied that "*for two years I've had this in my head*, and I've had various versions on that white board over the last several months." Notably, roughly two years before the introduction of HB6, FirstEnergy had funneled its first $250,000 to Householder through Generation Now, in March 2017.

-43-

105. During this time, numerous articles continued to identify suspicious connections between the "unprecedented" advertising campaign, including, television ads, in support for HB6 that were "mysteriously funded" by millions of dollars, FirstEnergy, and Householder:

- An April 15, 2019 article by the Ohio radio station WKSU entitled "*Proposed State Energy Policy Overhaul Influenced by Utility Company*" questioned Householder about publicly disclosed donations he received from FirstEnergy and whether those donations influenced his support for HB6, which benefited the Company. The article noted that "***FirstEnergy donated more than $150,000 to House Republicans during the 2018 election***" and was then rewarded by Householder who was "pushing for a new energy plan that would steer about $170 million in subsidies to two nuclear plants owned by FirstEnergy Solutions, which used to be a subsidiary of FirstEnergy."

- A May 23, 2019, Common Cause Ohio report entitled "Connecting the Dots: FirstEnergy Political $$$, Profits, and Utility Policy" discussed ***the unmistakable connection between the lobbying by FirstEnergy to pass HB6 and Generation Now's $1 million donation*** to Growth & Opportunity PAC to purchase advertising supporting the legislation. The report called HB6 a "handout" to the Company that was "rushed through the process" of passage, a result made possible by FirstEnergy's secret payments to legislators. The report further inquired "***whether FirstEnergy is using secret money to build public pressure this year***," and "how a pro-House Bill 6 tv advertisement is connected to FirstEnergy."

- A May 23, 2019 *Cleveland.com* article reviewed "***all the ways FirstEnergy and its allies have worked to get HB6 passed***," including "***well-placed campaign contributions, to lobbyist-engineered testimony, [and] millions of dollars in mysteriously funded TV and radio ads.***" One Republican ad consultant reportedly called Generation Now's multi-million-dollar ad campaign "unprecedented." and observed that "[*r]arely if ever has a public affairs campaign aimed at a vote in the state legislature seen this level of TV spending in Ohio. The stakes are high for [FirstEnergy Solutions]. They need this taxpayer funded bailout to stay afloat, so no amount of money is probably too much for them to spend on this endeavor*."

- A July 28, 2019 article in the *Columbus Dispatch* entitled "*FirstEnergy handed out $1 million in campaign cash before nuclear bailout vote*" reported that the campaign to pass HB6 "included ***$9.5 million in TV ads, largely from a dark-money group backing FirstEnergy, which supported salvaging its bankrupt spinoff FirstEnergy Solutions***." The article noted that "FirstEnergy officials refused to answer questions about the contributions" while detailing FirstEnergy's publicly-known campaign contributions of $163,382 to Householder-backed candidates, noting that "[i]t paid to be allied with Householder." The article quoted the executive director of the Energy and

Policy Institute, as stating that "[w]hile it's unfortunately typical for investor-owned utilities to spend money to influence politicians, *the amount of money that FirstEnergy Solutions, AEP and allied dark-money groups spent to buy support from legislators for their coal and nuclear bailout has been astronomical*."

106. Any director acting in good faith and charged with the duty to "oversee and proactively promote compliance by employees, officers and other directors, with laws, rules and regulations" who represented to his or her shareholders "[a]fter careful consideration" that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements" would have used his or her oversight powers to immediately put an end to FirstEnergy's astronomical, illegal lobbying expenditures. Under Ohio law, "[a]ll of the authority of [the] corporation [was] exercised by or under the direction of" the Director Defendants, Ohio Gen. Corp. Law §1701.59(A). Instead, the Director Defendants *continued* FirstEnergy's illegal conduct and scheme.

107. As HB6 moved through various House committees and subcommittees, FirstEnergy bankrolled a media blitz to influence public opinion and pressure legislators to vote in favor of HB6. Significantly, the FBI Affidavit explained that FirstEnergy funded this entire media blitz, wiring $9.5 million to Generation Now in just April and May 2019 alone:

| Date | Amount | Method | Funding Entity |
|---|---|---|---|
| April 30, 2019 | $1,500,000 | Wire | FirstEnergy Service Co. |
| May 7, 2019 | $1,500,000 | Wire | FirstEnergy Service Co. |
| May 15, 2019 | $2,500,000 | Wire | FirstEnergy Service Co. |
| May 22, 2019 | $2,500,000 | Wire | FirstEnergy Service Co. |
| May 29, 2019 | $1,500,000 | Wire | FirstEnergy Service Co. |
| **Total** | **$9,500,000** | | |

108. The evidence presented in the Criminal Complaint and the FBI Affidavit provide undeniable evidence of the criminal scheme and FirstEnergy's central role in it. Indeed, text

messages from Juan Cespedes, one of FirstEnergy's lobbyists, to Longstreth state that FirstEnergy "***approved $15M***" for the media blitz. Indeed, Cespedes was in frequent contact with Householder's lieutenants to coordinate the logistics regarding the laundered funds and to ensure that the campaign remained within FirstEnergy's $15 million budget. For example, the FBI Affidavit recounts the following exchange with Longstreth:



109.    HB6 passed the House on May 29, 2019.   While the passage of HB6 in the House helped Householder maintain his agreement with FirstEnergy, it did not fulfill that agreement. Householder still needed to ensure that HB6 passed the Senate and was signed into law. On May 29, 2019, FirstEnergy released a statement explaining that the bill was "an effective legislative solution to keep [FirstEnergy's] nuclear power plants open" and stating that "[u]ntil the Senate vote, [FirstEnergy] will continue to engage in a constructive dialogue with legislators . . ."

110.    On June 3, 2019, in response to negative press coverage regarding HB6 passing the House, Householder co-conspirator Longstreth pulled the "whole HB6 team" together for a strategy session. Longstreth texted FirstEnergy lobbyist Cespedes, stating "Speaker has asked me to pull together the whole HB6 team on Monday. Are you available?" adding, "Speaker is on a rampage." Cespedes responded "Understood. Just let me know what I should be prepared for. I want to make sure I have answers and do not want the speaker's rage directed at me lol." Longstreth told Cespedes that Householder "was p*ssed" about a newspaper article, to which Cespedes replied "Aw f*ck. Sorry to hear that. I've got your back. You have been great. ***Let's just regroup and get the rest of the deal done***."

111.    Text messages recovered from Householder co-conspirator Longstreth showed that FirstEnergy had budgeted and was paying for the costs associated with the campaign to pass HB6 through the Senate.  Less than a week after HB6 was introduced in the Senate, FirstEnergy wired $2 million to Generation Now, the first of what would eventually amount to nearly $7.4 million in illicit funds:

| Date | Amount | Method | Funding Entity |
|------|--------|--------|----------------|
| June 5, 2019 | $2,000,000 | Wire | FirstEnergy Service Co. |
| June 13, 2019 | $1,361,899 | Wire | FirstEnergy Service Co. |
| June 20, 2019 | $2,116,899 | Wire | FirstEnergy Service Co. |

-47-

| July 5, 2019 | $1,879,457 | Wire | First Energy Solutions |
|---|---|---|---|
| **Total** | **$7,358,255** | | |

112. These funds paid for numerous television commercials which the Enterprise targeted at individual Senators. Notably, as the FBI Affidavit explains, many of these commercials disclosed that they were "paid for by Generation Now"—another red flag that would have been immediately apparent to anyone meaningfully monitoring FirstEnergy's outgoing wire transfers to Generation Now.

113. Investigative news articles continued to question the relationship between FirstEnergy and Householder as HB6 moved through the Senate. An article published on July 2, 2019 in the *Cincinnati Enquirer* asked, "*Who paid all that money to buy all those nuclear bailout ads raining on Ohio?*" The article reported that HB6, "which has the backing of powerful House Speaker Larry Householder, triggered up to $8.3 million in ads and other campaign spending," only $2.7 million of which was reported to the FCC, due to broadcasters choosing not to disclose the figures, which further obscured the sources of the funding. According to the article, Generation Now was the primary financial backer of HB6, and that "while it's clear which candidates got the 'dark money' boosting the nuke plant bailout… it's uncertain who originally contributed it or the money that bought airtime."

114. Bankrolled by Defendants using tens of millions of dollars belonging to FirstEnergy, Householder's strategy worked. The Ohio Senate passed HB6 approximately one month after it was introduced and on July 23, 2019, the Governor signed HB6 into law. In all, FirstEnergy illicitly paid approximately $15 million to back Householder's media blitz and ensure that HB6 was signed into law.

115.    As the FBI Affidavit explains, "[t]he volume of [FirstEnergy's] payments, the timing of these payments, communication, and coordination amongst co-conspirators and [FirstEnergy], the official action taken by Householder, and the actions to maintain the official action, show the corrupt arrangement was [FirstEnergy] funding Householder's speakership bid in exchange for a legislative fix."  In this regard the millions of dollars that FirstEnergy "paid into the entity [were] **akin to bags of cash**—unlike campaign or PAC contributions, **they were not regulated, not reported, not subject to public scrutiny**—and the Enterprise freely spent the bribe payments to further the Enterprise's political interests and to enrich themselves."

116.    Moreover, as the FBI Affidavit explained, almost all of the nearly $60 million paid from FirstEnergy to Householder's Generation Now entity were wired through the Company's FirstEnergy Service subsidiary, which was "under the management of [FirstEnergy's] leadership team."

### 6.    Defendants Continue to Funnel FirstEnergy Money to Householder's Generation Now

117.    HB6 faced an immediate statewide ballot referendum seeking to repeal it.  To defeat the effort, Defendants wired **$38 million** of FirstEnergy funds to Generation Now from the period following passage of HB6 through October 2019.  One of Householder's indicted conspirators, FirstEnergy lobbyist Clark, explained that he and the rest of the group called FirstEnergy "the Bank" because they could "fund these things for 20 years if they want … They've got too much money, too much power."

118.    Generation Now used FirstEnergy's money on another "media blitz," including misleading mailers about China being behind the ballot initiative, as well as ads featuring project managers from FirstEnergy's nuclear plants. As the FBI Affidavit concluded: "the media campaign is significant… evidence of the corrupt relationship with [FirstEnergy]-the

Enterprise likely would not be spending millions of dollars from Company A that was passed through a 501(c)(4) account for the benefit of Company A's main legislative priority absent an agreement with Company A." In other words, "the media campaign against the ballot initiative [was] indicative of the corrupt exchange with [FirstEnergy]."

119. FirstEnergy and its lobbyists also retained signature collection firms so that they could not work on the ballot initiative to defeat HB6 because of a conflict of interest. The FBI reported that Defendant Jones and FirstEnergy lobbyist Borges together visited numerous signature collectors who were working on behalf of the initiative. Borges also bribed an employee of the ballot initiative to obtain inside information on its signature collection efforts for the benefit FirstEnergy and Householder. Borges told the employee that "he and his firm were working for [FirstEnergy] on the ballot project." Describing his efforts to defeat the ballot initiative and his coordination with FirstEnergy, Borges said: "The only people on my side is this f*cking company."

120. Householder and other criminal defendants also continued to personally benefit from FirstEnergy money donated to Generation Now. Following the defeat of the ballot initiative, Energy Pass-Through, which was funded by FirstEnergy Service, wired $3 million to Generation Now, which then found its way to accounts controlled by Longstreth and Householder. Householder helped himself to over $100,000 "in [FirstEnergy]-to-Generation Now payments . . . to pay for costs associated with his residence in Florida." Borges would comment "that it was 'insane' how much Enterprise members were making off [FirstEnergy]."

121. Defendants' massive, undisclosed payments using FirstEnergy funds helped defeat the repeal of HB6. The ballot initiative did not collect the needed signatures and HB6 went into effect on October 21, 2019.

122.    The scheme remained largely inactive from October 2018 until January-February 2020, when the Enterprise wired $1,010,000 of FirstEnergy money to "Team Householder" candidates for the 2020 primary election.

**D.    Defendants' Actions Subjected FirstEnergy to Massive Potential Liability and Severely Harmed and Continue to Harm the Company's Reputation**

123.    Defendants' actions have exposed the Company to massive potential liability— including potential criminal liability—for its role in the largest public bribery and "pay-to-play" scheme in the history of Ohio.  In addition to the criminal charges, several other lawsuits have been filed in connection with the Ohio bribery scheme, including a consolidated securities class action: *Owens v. FirstEnergy Corp., et al.,* 2:20-cv-03785 (S.D. Ohio); four RICO class actions: *Smith v. FirstEnergy Corp., et al.,* No. 2:20-cv-03755 (S.D. Ohio), *Buldas v. FirstEnergy Corp., et al.,* No. 1:20-cv-00593 (S.D. Ohio), *Hudock v. FirstEnergy Corp.*, No. 2:20-cv-03954 (S.D. Ohio), and *Szep v. FirstEnergy Corp., et al.*, Summit C.P. No. CV-2020-07-2133; and a class action alleging, *inter alia*, gross negligence, breach of contract, and deceptive consumer acts or practices: *Emmons v. FirstEnergy Corp.*, Cuyahoga C.P. No. CV-20-935557.  Defendants' actions have also severely damaged the Company's goodwill and reputation.

**1.    Defendants' Actions Have Subjected FirstEnergy to Potential Criminal Liability**

124.    On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio announced the filing of criminal charges against Householder, Generation Now, Cespedes, Borges, and Householder associates Jeffrey Longstreth and Neil Clark for federal racketeering conspiracy.  The U.S. Attorney called it the "largest bribery, money-laundering scheme ever perpetrated against the people of the state of Ohio…bribery, pure and simple. This was a quid pro quo."

125.    According to the supporting documents, FirstEnergy's most senior executives, including Director and Chief Executive Officer, Defendant Jones, were personally involved and implicated.  In the crucial months when FirstEnergy and Householder were pushing for HB6's passage, Jones had at least 30 calls with Householder.  They had 84 calls from just before when FirstEnergy started making payments to Generation Now in March 2017 through HB6's passage in July 2019.

126.    Other senior executives with direct responsibility for approving political expenditures and ensuring that they complied with the law also had numerous phone contacts with the criminal defendants while FirstEnergy was making large, illicit payments to Generation Now, including FirstEnergy Service's VP of External Affairs (14 calls), Defendant Dowling, and his subordinate FirstEnergy's Director of Ohio Affairs (188 calls). The FBI Affidavit said that these calls, as well as text messages and other communications, taken together with bank records of FirstEnergy's donations to Generation Now, "paint a clear picture of the partnership between the Enterprise and [FirstEnergy] in working towards their agreement."

127.    In addition to the billion-dollar bailout of the Nuclear Power Plants, the FBI Affidavit detailed other benefits received by FirstEnergy which were included by legislators in HB6 "as a result of the successful influence campaign waged" by the Company, Householder, and other criminal defendants. For example, in May 2019, when HB6 was referred to the Ohio House Rules and Reference Committee, it was amended to include "a provision permitting an electric company with taxable property that is fueled by nuclear power (a company such as [FirstEnergy]) to file a petition for a reduction in taxable property value. This provision was an added benefit to [FirstEnergy]." Then, HB6 was further amended in the Ohio State Senate to include a provision allowing electric utilities to charge customers more to make up for lost

revenue in a given year. According to the FBI Affidavit, this amendment was a "further benefit" to FirstEnergy, added to HB6 "as a result of the successful influence campaign waged by Company A and the Enterprise."

128.    In announcing the charges on July 21, 2020, U.S. Attorney David M. DeVillers and Chris Hoffman, FBI, Special Agent in Charge described the gravity of the charges. Hoffman stressed to reporters that this was a "**shameful betrayal**," a "**sophisticated criminal conspiracy to enact legislation on behalf of Corporation A to corruptly defeat the potential ballot initiative that could've gone in front of the Ohio taxpayers**."

129.    During the July 21, 2020 conference, U.S. Attorney DeVillers noted that "Company A, provided $60 Million in return for the $1.5 billion bailout. **Everyone in this room knows who Company A is**, I will not be mentioning the name of Company A because of our regulations and rules…No one from the Company has **of yet** been charged."  He further noted that the investigation is ongoing, that "individuals that work for Company A, and Company A in and of itself, we will continue to investigate this and investigate wherever it leads and where it is and whoever they work for," and that "there are going to be a lot of busy FBI agents in the Southern District of Ohio . . . **this is by no means over**."

130.    On July 21, 2020, FirstEnergy released a statement stating that the Company had received subpoenas in connection with the investigation.  Three days later, Defendant Jones **admitted** that FirstEnergy paid significant, previously undisclosed amounts of money to Generation Now that, stating on a July 24 earnings call with analysts:

> On your specific question, as I've said, **I'm not going to get into the details of the case, but I will say this, that of the funds that are referenced in the Department of Justice affidavit, FirstEnergy's share of that is about 25%.** And in the context of 5.5 years of meeting or exceeding every earnings commitment that we've given you every quarter, we do make prudent decisions to spend corporate funds on issues that we believe are important to our customers and shareholders. Beyond

that, we intend to provide the details on what we spent, how we spend it to the Department of Justice in the coming weeks.

131.    Defendant Jones refused to answer questions about "the underlying vetting process at the time" of the payments or about his numerous telephone calls to Householder and his staff.

### 2.    Defendants' Actions Have Subjected FirstEnergy to Potential Draconian Civil Liability

132.    The SEC has launched an investigation into FirstEnergy in a probe tied to the bribery scandal involving HB 6.  The SEC's investigation—which had been concealed by the Company for months—came to light in a lawsuit FirstEnergy filed on September 1, 2020 against a former employee of a consulting company contracted by FirstEnergy who had access to internal FirstEnergy documents.  The court filings in that lawsuit indicate that the former employee provided internal FirstEnergy documents to the SEC as part of the SEC's whistleblower program.  In particular, the whistleblower provided the SEC with 57 confidential FirstEnergy files relating to the bribery investigation, including reviews and approvals of wire transfers and tax payments.  The investigation is being led by the SEC's public finance abuse unit, which focuses on allegations of corruption involving publicly traded companies.

133.    On September 23, 2020, the Ohio Attorney General filed a civil racketeering lawsuit against FirstEnergy, Householder, and other co-conspirators.  The lawsuit seeks, in large part, to block FirstEnergy's two nuclear power plants from receiving the more than $1 billion ratepayer bailout enacted as part of HB 6.  The lawsuit also seeks compensatory, punitive, and treble damages.  At the time the lawsuit was filed, Ohio Attorney General Dave Yost stated that "Ohio laws should not be built on the basis of fraud, deceit and intimidation."  Attorney General Yost further stated that "[g]iven the corruption surrounding House Bill 6, it is proper to block these ill-gotten gains from filling the coffers of those under criminal indictment."

-54-

134. The Office of the Ohio Consumers' Counsel ("OCC")—a statewide legal representative for Ohio's residential consumers in matters related to their investor-owned electric, natural gas, telephone, and water utilities—has filed a motion before the Public Utilities Commission of Ohio ("PUCO") asking PUCO to open an independent management audit and investigation of FirstEnergy. Specifically, the OCC's September 8, 2020 motion requested that the PUCO investigate FirstEnergy's *whether any money collected from consumers was improperly used for to pay bribes in connection with HB 6 instead of for legitimate electric utility service*. On December 2, 2020, PUCO selected Marcum LLP as a third-party auditor to assist PUCO with its investigation. On December 30, 2020, the commission granted the motion.

135. A putative shareholder class action was also filed in this District on July 28, 2020, asserting claims under the federal securities laws against FirstEnergy and Defendants Jones, Pearson, Strah and Taylor. The consolidated securities class action is brought on behalf of all purchasers of FirstEnergy common stock between February 21, 2017 and July 21, 2020. The securities class action alleges that Defendants Jones, Pearson, Strah and Taylor falsely represented that they were complying with state and federal laws and regulations regarding regulatory matters, exposing the Company and its investors to the extreme undisclosed risks of reputational, legal and financial harm. On news of the Criminal Affidavit's release, the price of FirstEnergy stock plummeted, trading as low as $22.85 per share on July 22, 2020, down 45% from its closing price of $41.26 per share on July 20, 2020, inflicting massive losses on FirstEnergy shareholders. This lawsuit seeks recompense for those losses.

### 3. Defendants Have Wasted FirstEnergy Assets, Harmed FirstEnergy's Goodwill and Reputation, and Exposed the Company to the Risk that HB6 is Repealed

136. The Individual Defendants' actions have caused FirstEnergy to waste substantial capital resources by causing them to be used for illegal, undisclosed bribes for public officials.

Defendants caused FirstEnergy to spend tens of millions of dollars in illegal "pay-to-play" payments and expend additional Company resources to obtain favorable legislation.

137. The Defendants actions also caused damage to the Company's reputation and goodwill. This is particularly important now. As news of the concealed payments and massive bribery scheme surfaced, investors lost confidence in the Company and politicians called for a repeal of HB6. For example, on July 23, 2020, Ohio Governor Mike DeWine asked the state legislature to "repeal and replace House Bill 6" stating that "*[w]hile the policy, in my opinion, is good, the process by which it was created stinks. It's terrible. It's not acceptable.*" Other lawmakers support repeal of HB 6 and have distanced themselves from FirstEnergy, including by publicly donating funds they received from FirstEnergy's Political Action Committee.

### E. The Fallout from the Bribery Scheme Continues

138. The fallout from the bribery scheme has been dramatic, severe, and destructive for FirstEnergy and will only continue to worsen as more information regarding the details of the scheme are revealed.

139. In October 2020, both FirstEnergy lobbyist Cespedes and Householder associate Longstreth plead guilty to federal racketeering charges, in exchange for a "2-level reduction in offense level . . . based upon the Defendant's acceptance of responsibility." Cespedes and Longstreth may testify against their co-conspirators Householder, Clark, and Borges. State Rep. David Leland, D-Columbus, the ranking minority party member of the Ohio House panel considering legislation to deal with HB6, said that the pleas "affirmed what was already widely accepted to be true — that a crime was committed in the passage of HB 6.

140. On October 29, 2020, a committee of the Board announced "a leadership transition, including the termination of the Company's Chief Executive Officer, Charles E. Jones, effective immediately." In addition to Defendant Jones, the Company also fired Senior

Vice President of External Affairs, Defendant Dowling and Senior Vice President, Marketing and Branding, Dennis Chack stating that he and other executives "violated certain FirstEnergy policies and its code of conduct."

141. The Director Defendants appointed Defendant Strah as Acting Chief Executive Officer, even though the FBI Affidavit made clear that he *personally signed checks* for 20% of the undisclosed $2.9 million payments to Generation Now in the months before the 2018 election.

142. The Director Defendants appointed Defendant Pappas as Executive Director, even though Pappas opposed increased disclosure, transparency, and accountability for FirstEnergy's lobbying expenditures in 2015, 2016, and 2017 and, "[a]fter careful consideration," had falsely represented to the Company's shareholders that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."

143. On November 9, 2020, FirstEnergy announced that it had fired Senior Vice President and Chief Legal Officer of FirstEnergy, Defendant Reffner, and Vice President, General Counsel, and Chief Ethics Officer, Defendant Yeboah-Amankwah.

144. On November 19, 2020, FirstEnergy filed its third quarter 2020 Form 10-Q, which noted that as part of an internal investigation, the Company would investigate a $4.3 million payment to "an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating the Ohio Companies, including with respect to distribution rates." The Chairman of PUCO, Sam Randazzo, fit this description and resigned the next day. The FBI had raided Randazzo's home a few days earlier, on November 16, 2020, pursuant to its ongoing racketeering conspiracy investigation focused on the efforts to pass HB6.

145. On November 20, 2020, Fitch downgraded FirstEnergy's credit rating to "BB+" from "BBB-" and stated that the ratings outlook for the Company remained Negative. The downgrade was due to disclosure of FirstEnergy's $4.3 million payment to Randazzo as "***the disclosure significantly deepens regulatory, political, legal and liquidity risks already heightened by investigations underway at the Department of Justice (DOJ) and SEC***." The Fitch report added that "[a]s a result of the disclosure, FE and FET were out of compliance with representations and warranties contained in the companies' credit facilities, specifically Section 4.01 (m) Anti-Corruption Laws and Sanctions."

146. On November 25, 2020, the S&P also lowered FirstEnergy's credit rating from "BB+" to "BB." S&P commented that they "***believe these violations at the highest level within the company as demonstrative of insufficient internal controls and a cultural weakness. We view the severity of these violations as significantly outside of industry norms and, in our view, they represent a material deficiency in the company's governance.***"

147. On December 23, 2020, the *Cincinnati Enquirer* reported in an article entitled "Groups backing Gov. DeWine and his daughter received FirstEnergy cash funneled through dark money outfits" that 501(c)4 groups funded with FirstEnergy money made undisclosed payments to Ohio Governor, Mike DeWine and his daughter, Alice DeWine. The Enquirer reported that Governor DeWine spoke with FirstEnergy officials in 2019 to request donations for his daughter's campaign to be elected Greene County prosecutor. In 2019, FirstEnergy paid ***$20 million*** into 501(c)4 organization "Partners for Progress Inc.—a different 501(c)4 than Generation Now used for Householder—which then supported the campaigns of Governor DeWine and his daughter.

148.    According to the *Cincinnati Enquirer*, FirstEnergy was the only contributor to Partners for Progress in 2019.  In addition to funding Governor DeWine's and his daughter's campaigns, Partners for Progress also paid $13 million to Generation Now and additional payments to other dark money groups.

149.    The full costs to FirstEnergy from its illicit conduct have yet to fully materialize. Indeed, a July 24, 2020 *Spectrum News* article entitled "*Majority of Ohio Legislature Received Campaign Funds From FirstEnergy*" reported that "FirstEnergy had a relationship with the majority of both chambers" of the Ohio legislature: "*32 out of the 33 senators received money from FirstEnergy* at some point in their career" and in the House "*77 out of 99 members benefited from FirstEnergy funding*."

150.    Initial reports from analysts suggest that regulatory fines will be massive. Reports have drawn "parallels to Commonwealth Edison's agreement to pay $200 million to resolve a bribery complaint involving Illinois legislators." *Wolfe Research* and *CreditSights* have estimated fines and penalties to the Company in the $500 million range. Mizuho Securities USA LLC estimates a $1.0 billion fine in connection with the Householder investigation. Scotiabank downgraded the Company's stock and stated, "*it seems quite likely to us that things will get worse for FE before they get better*."

## V.    THE DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT

151.    The Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing FirstEnergy to issue proxy statements falsely representing "[a]fter careful consideration" that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements" and that the Company's "current procedures and policies promote transparency and compliance with law."  The opposite was true.

152. Defendants also caused the Company to issue Form 10-Ks falsely representing that FirstEnergy's "internal control over financial reporting was effective" under the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control – Integrated Framework* published in 2013. This representation was false because FirstEnergy's control environment did ***not*** comply with the COSO requirements, including the requirements that FirstEnergy's internal control "[d]emonstrates commitment to integrity and ethical values" and "[e]nforces accountability."

153. Relying on Defendants' false statements, FirstEnergy's outside auditor, PricewaterhouseCoopers, incorrectly informed the Company's shareholders in reports attached for FirstEnergy Form 10-K's in 2017, 2018, 2019, and 2020 that FirstEnergy "maintained in all material respects, effective internal control over financial reporting." One of the stated reasons for terminating FirstEnergy's officers, including Defendant Jones, in the wake of the scandal was that they withheld relevant information from FirstEnergy's independent auditors. FirstEnergy Form 10-K's did not disclose the tens of millions of dollars in cash payments in secret, "pay-to-play" bribes.

154. The Defendants' misrepresentations and omissions violated Section 14(a) of the Exchange Act and rules promulgated thereunder. The Defendants' misrepresentations and omissions to shareholders and to PricewaterhouseCoopers likewise constituted a breach of their fiduciary duties.

155. Defendants' false and misleading disclosures in the Company's annual proxy statements are particularly troubling because those statements were designed to secure Defendants' re-election to the Board and stop further proxy proposals regarding greater disclosure of the Company's political spending and lobbying. Had the Board made accurate

disclosures concerning the Company's massive, years-long bribery, racketeering and pay-to-play scheme and continuing transparency deficiencies regarding political spending, shareholders would have made additional proposals as they had in 2015, 2016 and 2017 and as they are now bringing in 2021. Shareholders would have also had the ability to replace the Director Defendants and ensure the Company complied with its unambiguous legal obligations. By misleading stockholders into believing that FirstEnergy complied with all federal and state lobbying registration and disclosure requirements and had effective internal controls, Defendants deprived shareholders of their right to cast an informed vote and were able to retain their Board seats without a meaningful contested election.

### A. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Statements in the 2018 Proxy

156. On March 30, 2018, Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, and Reyes caused FirstEnergy to issue its 2018 Annual Proxy Statement (the "2018 Proxy") in connection with the 2018 annual stockholders meeting to be held on May 15, 2018. The 2018 Proxy was signed by Defendant Yeboah-Amankwah. Defendants Jones and Misheff signed the opening letter touting "the Board's strong corporate governance practices" that accompanied the 2018 Proxy.

157. In the 2018 Proxy, these Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, and (ii) approve executive compensation. With respect to each of these solicited votes, the Director Defendants issued materially false or misleading statements.

158. The 2018 Proxy described the Board's key role in risk oversight. Specifically, the 2018 Proxy stated, "***Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks***." The 2018 Proxy added that the "Board

-61-

administers its risk oversight function through the full Board, as well as through the various Board committees." The 2018 Proxy assured investors that the "***full Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company***." In sum, the "***Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy***."

159. The 2018 Proxy also detailed how FirstEnergy's Audit Committee, was in place to assist the Board with: "the integrity of your Company's financial statements; ***your Company's compliance with legal, risk management and oversight, and regulatory requirements***; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and ***compliance with legal and regulatory requirements***."

160. With respect to the Corporate Governance Committee, the 2018 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, ***including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations***." According to the 2018 Proxy, "[t]he Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

161. Significantly, the 2018 Proxy misleadingly touted that the Board had implemented "***Enhanced Board Oversight of Lobbying Activities and Related Disclosures***," and that the Board' Corporate Governance Committee maintained "***an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations***," stating:

> Although it did not pass, in response to the vote received on the 2017 lobbying activities shareholder proposal, we elicited shareholder feedback on the

Company's current practices and disclosures concerning our lobbying activities....some investors suggested that we include more specific information about the Corporate Governance Committee's oversight role of our lobbying activities. ***Accordingly, in 2017, your Board further strengthened its oversight of your Company's lobbying activities and amended the Corporate Governance Committee's Charter to clarify this responsibility. The Corporate Governance Committee maintains an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations.*** We also regularly evaluate our related disclosures and anticipate updating these disclosures on our website.

162.     In short, the 2018 Proxy, falsely and misleadingly represented to FirstEnergy's shareholders that the Board and its relevant committees were actively working to mitigate significant risks to the Company, ensure the Officer Defendants were not incentivized to place their own financial interests before the interests of the Company, ensure the Company's legal and regulatory compliance and, in particular, ensure the Company was not engaged in any misconduct relating to the Company's "lobbying activities" and "corporate political participation." Nothing could have been further from the truth.  The 2018 Proxy was materially false and misleading when made, because it gave the false impression that the Board had taken effective steps to prevent the use of FirstEnergy resources for illegal lobbying activities and expenditures.  In truth, Defendants orchestrated a multi-million-dollar campaign to corrupt the political process of the State of Ohio to secure the passage of advantageous legislation.

163.     Indeed, by the time the 2018 Proxy was filed, the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions to support the candidacies of Householder and his allies in the 2018 election, in exchange for legislative actions desired by the Company's leaders.   Moreover, by the time the 2018 Proxy was filed, there was already heightened scrutiny over Householder's problematic past, and numerous news reports had pointed to Householder's relationship with FirstEnergy.

164.    The 2018 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2018 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Reyes and elect Pianalto to the Board.  Had FirstEnergy stockholders known the truth, they would not have reelected FirstEnergy's incumbent directors and would have instead worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action.

165.    With respect to the Company's compensation plan, the 2018 Proxy stated that FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking" by mitigating features such as ensuring "[t]he mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking[.]"

166.    The statements in the 2018 Proxy related to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance.  In reality, FirstEnergy's compensation system encouraged the misconduct that led to the Ohio bribery scheme.

167.    On the basis of the false and misleading 2018 Proxy, FirstEnergy shareholders voted in support of significant executive compensation, including compensation to Defendants Jones, Pearson, and Strah totaling over $15.2 million, $5.9 million, and $3.9 million, respectively, in 2017 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' roles in, and their failure to address, the Ohio bribery scheme.

**B.     The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Financial Statements in the 2017 Form 10-K**

168.     In addition to the 2018 Proxy, FirstEnergy shareholders were instructed to review the Company's 2017 Annual Report. The Director Defendants caused FirstEnergy to file a Form 10-K for the year 2017 ("2017 Form 10-K") on February 20, 2018.

169.     The 2017 Form 10-K included consolidated statements of cash flows for FirstEnergy Corp. and FirstEnergy Solutions, including a breakdown of expenses. The Form 10-K did not disclose the millions of dollars in lobbying expenditures that FirstEnergy was paying into the Householder "pay-to-play" scheme through Generation Now or to other politicians.

170.     The "Management Report on Internal Control over Financial Reporting" represented that:

> Using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control — Integrated Framework* published in 2013, the respective management of each registrant conducted an evaluation of the effectiveness of their registrant's internal control over financial reporting under the supervision of each respective registrant's chief executive officer and chief financial officer. ***Based on that evaluation, the respective management of each registrant concluded that their registrant's internal control over financial reporting was effective as of December 31, 2017.***

171.     This representation was false. The 2013 COSO criteria include 17 principles for effective internal controls in five different components (five principles in the "control environment" component, four principles in "risk assessment;" three principles in "control activities;" three principles in "information and communication;" and two principles in "monitoring."). The 2013 COSO control environment criteria required that FirstEnergy: (1) "Demonstrates commitment to integrity and ethical values;" (2) "Exercises oversight responsibility;" (3) "Establishes structure, authority, and responsibility;" (4) "Demonstrates commitment to competence;" and (5) "Enforces accountability." As COSO furthered explained:

-65-

For management to conclude that its system of internal control is effective, all five components of internal control and ***all relevant principles must be present and functioning***. Being "present" implies a given component or principle exists within the design and implementation of an entity's system of internal control. "Functioning" implies the component or principle continues to exist in the operation and conduct of the control system.

172.   FirstEnergy's management—the same management that represented that the Company's internal controls were effective—was directly implicated in the largest bribery scheme of public officials in the history of the State of Ohio.  FirstEnergy's internal controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct.

173.   The 2017 Form 10-K included a report from FirstEnergy's outside auditor, PricewaterhouseCoopers, to shareholders concluding that:

the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and December 31, 2016, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

174.   This conclusion was false.  The 2017 Form 10-K did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Householder's 501(c)4 Generation Now.  FirstEnergy did not have effective internal controls over financial reporting based on the 2013 COSO criteria because FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct.

175.   The Form 10-K was signed by Defendants Jones (President, Chief Executive Officer, Director, and "Principal Executive Officer), Pearson (Executive Vice President, Chief

-66-

Financial Officer, and "Principal Financial Officer"), Taylor (Vice President, Controller, Chief Accounting Officer and "Principal Accounting Officer"), Anderson (Director), Demetriou (Director), Johnson (Director), Misheff (Director), Mitchell (Director), O'Neil (Director), Pappas (Director), Pianalto (Director), and Reyes (Director).

176.    Officer Defendants Jones, Pearson, and Taylor were personally responsible for the management report on internal controls in the 2017 Form 10-K.  One of the stated reasons for terminating FirstEnergy officers, including Defendant Jones, in the wake of the scandal was that they withheld relevant information from PricewaterhouseCoopers.    Under the Charter of the Audit Committee, Defendants Misheff and O'Neil were personally responsible for overseeing the adequacy of the Company's internal controls under the 2013 COSO criteria.

### C.    The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Statements in the 2019 Proxy

177.    On April 1, 2019, the Director Defendants caused FirstEnergy to issue its 2019 Annual Proxy Statement (the "2019 Proxy") in connection with the 2019 annual stockholders meeting to be held on May 21, 2019. The 2019 Proxy was signed by Defendant Yeboah-Amankwah.  An opening letter touting the Board's "strong corporate governance practices" that accompanied the 2019 Proxy was signed by Defendants Jones and Misheff.  In the 2019 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

178.    The 2019 Proxy described the Board's key role in risk oversight.  Specifically, the 2019 Proxy stated, "***Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks***."  The 2019 Proxy added that the "Board administers its risk oversight function through the full Board, as well as through the various

Board committees." The 2019 Proxy assured investors that the "***Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company***." In sum, the "***Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in your Company's strategy***."

179. The 2019 Proxy also detailed how FirstEnergy's Audit Committee, was in place to assist the Board with: "the integrity of your Company's financial statements; ***compliance with legal, risk management and oversight, and regulatory requirements***; . . . systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and ***compliance with legal and regulatory requirements; and oversee major financial risk exposures***…"

180. With respect to the Corporate Governance, Sustainability and Corporate Responsibility Committee, the 2019 Proxy stated that the Committee is "primarily responsible for…developing and periodically reviewing [FirstEnergy's] corporate governance policies." According to the 2019 Proxy, "***[t]he Committee is also directly responsible for oversight of our (i) political activities and practices…***"

181. Regarding "Public Policy and Engagement," the 2019 Proxy assured FirstEnergy investors that Defendants had a "***decision-making and oversight processes in place for political contributions and expenditures***," stating:

> ***We have a decision-making and oversight processes in place for political contributions and expenditures***. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. ***Also, your Board's Corporate Governance, Sustainability and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations.***

182.    Based on feedback from our shareholder engagement and outreach, *we recently expanded our website disclosure to include reports on federal and state level lobbying, as well as, the lobbying portion of certain trade association dues.*

183.    The 2019 Proxy also represented that FirstEnergy's compensation structure "mitigate[d] undue risk through compensation design, corporate policies, and effective governance," stating:

**What We Do and Don't Do**

We continually strive to make improvements to our executive compensation plans and programs. Below is a summary of what we do and don't do with respect to executive compensation, the totality of which we believe aligns with the long-term interests of our shareholders and with commonly viewed best practices in the market:

| What We Do | What We Don't Do |
|---|---|
| ✓ **Pay-for-performance**<br>• FE LTIP is 100% at risk, with no solely time-based vesting requirements<br>✓ **Caps on short-term and long-term incentive awards**<br>• Eliminated the prior "Pool of Funds" approach for 2018 FE STIP and implemented a threshold financial performance hurdle<br>  ○ The Company must achieve threshold-level achievement for the Operating Earnings before any STIP award is paid<br>• Individual short-term incentive awards capped at 150% (vs. industry caps at 200%)<br>• Individual long-term incentive awards capped at 200% (consistent with the industry)<br>✓ **Non-overlapping financial performance measures in our short- and long-term incentive plans**<br>✓ **Combination of absolute and relative performance goals**<br>✓ **Robust stock ownership guidelines**<br>✓ **Clawback policy**<br>✓ **Mitigate undue risk through compensation design, corporate policies, and effective governance**<br>✓ **Annual Say-on-Pay vote**<br>✓ **Double-trigger CIC provisions**<br>✓ **Independent compensation consultant for the Compensation Committee comprised of only independent directors**<br>✓ **Beginning in 2018, cap on LTIP payouts if absolute TSR over the performance period is negative** | ⊘ **No executive hedging or pledging allowed**<br>⊘ **No employment agreements**<br>⊘ **No tax gross-ups for our NEOs**<br>⊘ **No repricing of underwater stock options without shareholder approval**<br>⊘ **No excessive perquisites**<br>⊘ **No payment of dividends on unearned shares**<br>⊘ **No new entrants in the SERP – SERP closed since 2014** |

184.    The statements in the 2019 Proxy related to compensation falsely and misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In truth, FirstEnergy's compensation design **incentivized** the Officer Defendants' misconduct.  By paying illicit bribes to public officials to pass favorable legislation for FirstEnergy, including the "decoupling

provision" that, according to Jones, "fixes our base revenues and essentially it takes about one-third of our company and I think makes it somewhat recession-proof" and the pricing provision allowing FirstEnergy to combine the profits of three subsidiaries to avoid a finding that one subsidiary has "significantly excessive" profits that would prompt an Ohio rate payer refund. These provisions propped up FirstEnergy's revenues and, thereby, significantly increased the Officer Defendants' "performance based" compensation. From 2016 to 2019, Jones' total compensation was $55,207,422, including approximately *$48 million* in "performance based" compensation.

185. In short, the 2019 Proxy falsely and misleadingly informed FirstEnergy's shareholders that the Board and its relevant committees were actively working to mitigate significant risks to the Company, ensure the Company's legal and regulatory compliance and, in particular, ensure the Company was not engaged in any misconduct relating to the Company's "political activities and practices," "political contributions and expenditures," and "lobbying." The 2019 Proxy was materially false and misleading when made, because it, among other things, omitted any disclosures regarding FirstEnergy's ongoing participation in the largest political bribery scandal in the history of Ohio. The 2019 Proxy falsely and materially omitted that Defendants had orchestrated a multi-million campaign to corrupt the political process in order to secure the passage of legislation bailing out the Company.

186. Indeed, by the time the 2019 Proxy was filed, the Ohio bribery scheme was already well underway with Householder and his allies elected in the 2018 general election. FirstEnergy had already funneled millions of dollars to the Enterprise. Moreover, by this time, several media outlets were asking "why FirstEnergy decided to put so much money behind Team Householder." Additionally, corporate watchdog groups had already taken notice of the

influence of "dark money" in Ohio politics related to Householder and FirstEnergy policy initiatives.

187. The 2019 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2019 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board. Had FirstEnergy stockholders known the truth, they would not have reelected FirstEnergy's incumbent directors and would have instead worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action.

188. Under this false impression, numerous FirstEnergy stockholders also voted in support of significant executive compensation, including compensation to Defendants Jones, Strah, and Pearson totaling over $11.1 million, $3.4 million, and $3.8 million, respectively, in 2018 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

**D. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Financial Statements in the 2018 Form 10-K**

189. In addition to the 2019 Proxy, FirstEnergy shareholders were instructed to review the Company's 2018 Annual Report. On February 19, 2019, the Director Defendants caused FirstEnergy to file a Form 10-K for the year 2017 ("2018 Form 10-K").

190. The 2018 Form 10-K included consolidated statements of cash flows for FirstEnergy Corp. and FirstEnergy Solutions, including a breakdown of expenses. The Form 10-K did not disclose the millions of dollars in lobbying expenditures that FirstEnergy was paying

into the Householder "pay-to-play" scheme through Generation Now or to other politicians, including Governor DeWine and his daughter Alice.

191.    The "Management Report on Internal Control over Financial Reporting" represented that:

> Using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control — Integrated Framework* published in 2013, management conducted an evaluation of the effectiveness of their internal control over financial reporting under the supervision of the chief executive officer and chief financial officer. ***Based on that evaluation, management concluded that FirstEnergy's internal control over financial reporting was effective as of December 31, 2018.***

192.    This representation was false.  FirstEnergy's internal controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct.  The same management that represented that the Company's internal controls were effective was directly implicated in the largest bribery scheme of public officials in the history of the State of Ohio.

193.    The 2018 Form 10-K included a report from FirstEnergy's outside auditor, PricewaterhouseCoopers, to shareholders concluding that:

> the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

194.    This conclusion was false.  The 2018 Form 10-K did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates.  FirstEnergy's controls did not

demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct.

195. The Form 10-K was signed by Defendants Jones (President, Chief Executive Officer, Director, and "Principal Executive Officer), Strah (Executive Vice President, Chief Financial Officer, and "Principal Financial Officer"), Addison (Director), Anderson (Director), Demetriou (Director), Johnson (Director), Misheff (Director), Mitchell (Director), O'Neil (Director), Pappas (Director), Pianalto (Director), Reyes (Director), and Turner (Director).

196. Officer Defendants Jones and Strah were personally responsible for the management report on internal controls in the 2018 Form 10-K. One of the stated reasons for terminating FirstEnergy officers, including Defendant Jones, in the wake of the scandal was that they withheld relevant information from PricewaterhouseCoopers. Under the Charter of the Audit Committee, Defendants Misheff, O'Neil, and Turner were personally responsible for overseeing the adequacy of the Company's internal controls under the 2013 COSO criteria.

## E. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Statements in the 2020 Proxy

197. On April 1, 2020, the Director Defendants caused FirstEnergy to issue its 2020 Proxy Statement (the "2020 Proxy") in connection with the 2020 annual stockholders meeting to be held on May 19, 2020. The 2020 Proxy was signed by Defendant Yeboah-Amankwah. An opening letter that accompanied the 2020 Proxy was signed by Defendants Jones and Misheff. The letter stated that "in 2019," the year that FirstEnergy funneled over $55 million in secret payments to the Enterprise, Defendants continued "executing [their] strategy for long-term, sustainable growth that benefits [FirstEnergy's] customers, shareholders, communities and employees." The Board conveyed to investors that it had "continued [its] investor outreach in 2019 to discuss [its] strategy, governance practices, executive compensation and corporate

-73-

responsibility." The letter added that "[i]n 2020, we're driving continued accountability and transparency."

198.    In the 2020 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

199.    The 2020 Proxy described the Board's key role in risk oversight. Specifically, the 2020 Proxy stated, "***The Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks***." The 2020 Proxy added that the "Board administers its risk oversight function through the full Board, as well as through the various Board committees." The 2020 Proxy assured investors that the "***Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of the Company***." In sum, the "***Board obtains an understanding of significant risk issues on a timely basis, including the risks inherent in the Company's strategy***."

200.    The 2020 Proxy also detailed how FirstEnergy's Audit Committee, was in place to assist the Board with: "the integrity of your Company's financial statements; ***compliance with legal, risk management and oversight, and regulatory requirements***; . . . systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and ***compliance with legal and regulatory requirements; and oversee major financial risk exposures***…"

201.    With respect to the Corporate Governance and Corporate Responsibility Committee, the 2020 Proxy stated that the Committee is "primarily responsible for…developing

and periodically reviewing [FirstEnergy's] corporate governance policies." According to the 2020 Proxy, *"[t]he Committee is also directly responsible for oversight of our (i) political activities and practices…"*

202.    Regarding "Public Policy and Engagement," the 2020 Proxy assured FirstEnergy investors that Defendants had a "*decision-making and oversight processes in place for political contributions and expenditures*," stating:

> *We have a decision-making and oversight processes in place for political contributions and expenditures*. Our Corporate Political Activity Policy available on our website describes the criteria for certain political contributions and ballot initiative expenditures and the process for approving such contributions and expenditures. *Also, your Board's Corporate Governance and Corporate Responsibility Committee periodically reviews this policy and related practices as well as dues and/or contributions to industry groups and trade associations.* Based on feedback from our shareholder engagement and outreach, *we recently expanded our website disclosure to include reports on federal and state level lobbying, as well as, the lobbying portion of certain trade association dues.*

203.    The 2020 Proxy, therefore, falsely and misleadingly informed FirstEnergy's shareholders that the Board and its relevant committees were actively working to mitigate significant risks to the Company, ensure the Company's legal and regulatory compliance and, in particular, ensure the Company was not engaged in any misconduct relating to the Company's "political activities and practices," "political contributions and expenditures," and "lobbying." The 2020 Proxy was materially false and misleading when made, because it, among other things, omitted any disclosures regarding FirstEnergy's ongoing participation in the largest political bribery scandal in the history of Ohio. The 2020 Proxy falsely and materially omitted that Defendants had orchestrated a multi-million campaign to corrupt the political process in order to secure the passage of legislation bailing out the Company.

204.    Indeed, by the time the 2020 Proxy was filed, HB6 was in effect and over $60 million had been illicitly paid by Defendants. FirstEnergy and its representatives and affiliates

had conducted a massive, misleading advertising campaign in support of HB6 and in opposition to a ballot initiative to repeal HB6 by passing millions of dollars through an intricate web of 'dark money' entities and front companies in order to conceal the Company's involvement. The scheme was also back in action, as in February 2020, the Enterprise wired $1,010,000 from FirstEnergy to Team Householder candidates for the 2020 primary election. Moreover, by this time, there was already heightened scrutiny over FirstEnergy's political contributions. Multiple news reports and corporate governance accountability watchdogs had pointed to and questioned Householder's intimate relationship with FirstEnergy as HB6 moved through the Senate and followed its passage.

205. The 2020 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2020 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board. Had FirstEnergy stockholders known the truth, they would not have reelected FirstEnergy's incumbent directors and would have instead worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action.

206. With respect to the Company's compensation plan, the 2020 Proxy also represented that FirstEnergy's compensation structure "mitigate[d] undue risk through compensation design, corporate policies, and effective governance." The 2020 Proxy stated that FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking" by mitigating features such as "[t]he mix of

compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking[.]"

207. The statements in the 2020 Proxy related to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

208. Under this false impression, numerous FirstEnergy stockholders voted in support of significant executive compensation, including compensation to Defendants Jones, Strah, Reffner, and Pearson totaling over $14.6 million, $6.0 million, $2.4 million, and $7.2 million, respectively, in 2019 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

### F. The Director Defendants Caused FirstEnergy to Issue Materially False and Misleading Financial Statements in the 2019 Form 10-K

209. In addition to the 2020 Proxy, FirstEnergy shareholders were instructed to review the Company's 2019 Annual Report. On February 10, 2020, the Director Defendants caused FirstEnergy to file a Form 10-K for the year 2017 ("2019 Form 10-K").

210. The 2019 Form 10-K included consolidated statements of cash flows for FirstEnergy Corp. and FirstEnergy Solutions, including a breakdown of expenses. The Form 10-K did not disclose the millions of dollars in illegal, undisclosed lobbying expenditures that FirstEnergy was paying to Ohio politicians.

211. The "Management's Report on Internal Control over Financial Reporting" represented that:

> Using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control — Integrated Framework* published in 2013, management conducted an evaluation of the effectiveness of their internal control over financial reporting under the supervision of the chief executive

officer and chief financial officer. ***Based on that evaluation, management concluded that FirstEnergy's internal control over financial reporting was effective as of December 31, 2019.***

212.     This representation was false.  FirstEnergy's internal controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct.  The same management that represented that the Company's internal controls were effective was directly implicated in the largest bribery scheme of public officials in the history of the State of Ohio.

213.     The 2019 Form 10-K included a report from FirstEnergy's outside auditor, PricewaterhouseCoopers, to shareholders concluding that:

> the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

214.     This conclusion was false.  The 2019 Form 10-K did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in illicit lobbying expenditures.  FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct.

215.     The 2019 Form 10-K was signed by Defendants Jones (President, Chief Executive Officer, Director, and "Principal Executive Officer), Strah (Executive Vice President, Chief Financial Officer, and "Principal Financial Officer"), Anderson (Director), Demetriou (Director), Johnson (Director), Misheff (Non-Executive Chairman), Mitchell (Director), O'Neil (Director), Pappas (Director), Pianalto (Director), Reyes (Director), and Turner (Director).

216.    Officer Defendants Jones and Strah were personally responsible for the management report on internal controls in the 2019 Form 10-K. Under the Charter of the Audit Committee, Defendants Misheff, Anderson, Pianalto, and Turner were personally responsible for overseeing the adequacy of the Company's internal controls under the 2013 COSO criteria.

## VI.    DERIVATIVE ALLEGATIONS

217.    Plaintiffs reallege and incorporate ¶¶1-216 above.

218.    Plaintiffs are current owners of FirstEnergy common stock and were owners of FirstEnergy common stock during the period relevant to Defendants' wrongful course of conduct alleged herein.

219.    FirstEnergy is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

220.    Plaintiffs bring this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of breaches of fiduciary duty, unjust enrichment, corporate waste, gross mismanagement, contribution and indemnification, and violations of Section 14(a) of the Exchange Act.

221.    Plaintiffs will adequately and fairly represent the interests of FirstEnergy in enforcing and prosecuting its rights. Prosecution of this action, independent of the FirstEnergy Board, is in the best interests of the Company.

## VII.    THE INDIVIDUAL DEFENDANTS' DUTIES

### A.    Fiduciary Duties

222.    By reason of their positions as officers and directors of FirstEnergy and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants were able to and did directly and/or indirectly, exercise control over the wrongful acts complained of herein. Defendants owed FirstEnergy and its shareholders the duty of good

faith and due care in the management and administration of the affairs of the Company, including ensuring that FirstEnergy operated in compliance with all applicable federal and state laws, rules and regulations. Defendants were and are required to act in furtherance of the best interests of FirstEnergy and its shareholders so as to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

223. Each officer and director owed to FirstEnergy and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. As officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, performance, and management so that the market price of FirstEnergy's stock would be based on truthful and accurate information.

224. The Officer Defendants also had a duty to be honest and truthful to the Director Defendants. The Officer Defendants—including Defendant Jones acting as Chief Executive Officer—breached their fiduciary duties and were not acting in good faith if they withheld their knowledge of the bribery scheme from any Director Defendant.

### B. Control, Access, and Authority

225. Because of their positions of control and authority as directors of FirstEnergy, the Director Defendants were able to and did, directly or indirectly, exercise control over the wrongful acts complained of in this Complaint. Under the laws of the State of Ohio, "all of the authority" of FirstEnergy was "exercised by or under the direction of its directors," including the massive payments of the illegal bribes Householder and his affiliates. *See* R.C. §1701.59(A). Furthermore, any act or authorization of an act by any Board committee—including the Corporate Governance Committee—within the authority delegated to it "shall be as effective for all purposes as the act or authorization of the directors." R.C. §1701.63(F).

226.    Because of their advisory, executive, managerial and directorial positions, each of the Individual Defendants had access to adverse, non-public information about FirstEnergy's conduct in seeking favorable legislation in return for tens of millions of dollars in illegal payments made by FirstEnergy.

227.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of FirstEnergy and was at all times acting within the course and scope of that agency.

## C.    Reasonable and Prudent Supervision

228.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of the Company. By virtue of such duties, the officers and directors of FirstEnergy were required to, among other things:

    a.    Ensure that the Company complied with all applicable legal obligations, requirements, and regulations;

    b.    Ensure that the Company acted within the scope of its legal authority and in accordance with its certificate of incorporation and by-laws;

    c.    Remain informed as to how FirstEnergy was, in fact, operating, and, upon receiving notice or information of imprudent or unsound practices, to take reasonable corrective and preventative actions, including maintaining and implementing adequate financial, operational, and risk-management controls;

    d.    Supervise the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by FirstEnergy, and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company;

    e.    Preserve and enhance FirstEnergy's reputation as befits a public corporation;

    f.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to

provide the highest quality performance of its business and to avoid wasting the Company's assets; and

g.    Refrain from benefiting themselves and other FirstEnergy insiders at the expense of the Company and its public stockholders.

229.    As senior directors and executive officers of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based on truthful and accurate information.    Defendants' misrepresentations and omissions violated these specific requirements and obligations.

**D.    Defendants' Obligations and Representations in the Company's Corporate Codes and Policies**

230.    All Defendants were required to abide by FirstEnergy's Code of Business Conduct (the "Code").  The Code states that "*the Board of Directors, in concert with the CEO and Executive Council, will lead the Company*," with all FirstEnergy personnel "*responsible for complying with applicable laws and regulations* and the principles and provisions included in this Code."  The Code, "*endorsed by FirstEnergy's Board of Directors*," adds that "[k]nown or suspected violations of laws, rules, regulations or this Code are serious matters and must be dealt with accordingly…This reporting requirement includes any actual, potential or suspected violations of the securities laws."   Reiterating the importance of compliance "with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations," Defendants were

required to "not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation."

231. Further, the Code requires "the highest levels of integrity and fairness" as "[m]aintaining high ethical standards builds trust with customers, shareholders, FirstEnergy Personnel, and the communities [FirstEnergy] serves." Defendants "must conduct business…honestly and fairly and not take unfair advantage of anyone through any *misrepresentation of material facts, manipulation, concealment, abuse of privileged information, fraud, bribes, kickbacks, illegal payments, cash gifts, cash equivalent gifts or other unfair business practices*." The Code adds that "special rules apply when dealing with government employees."

232. Regarding corporate funds, the Code discusses the "responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. *Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes.*" The Code adds that FirstEnergy representatives are to "not keep undisclosed funds nor establish any undisclosed accounts" and "not knowingly cause corporate funds to be used for unlawful purposes…"

233. Regarding lobbying, the Code states that "FirstEnergy participates in the political process through political action committees and lobbying activity to the extent permitted by law," mandating no "pressure on personnel, customers, suppliers or shareholders, etc. to contribute to, support, or oppose any political group or candidate."

234. In addition to the Code, the Board of Directors' Code of Ethics and Business Conduct, which "each director must comply with," confirms that the fiduciary responsibility of

the Board includes compliance with laws. In a section titled "Compliance with Laws, Rules, and Regulations," the Code of Ethics and Business Conduct states that, "***Directors shall comply, and oversee and proactively promote compliance by employees, officers and other directors, with laws, rules and regulations applicable to the Company***…" The Board of Directors' Code of Ethics and Business Conduct adds that "Directors shall proactively promote ethical behavior and take steps to ensure the Company… encourages employees to report violations of laws, rules, regulations…"

235. Also, according to the Code of Ethics and Business Conduct, "Directors shall protect the Company's assets from loss, theft, carelessness, misuse and waste. Directors shall also ensure that the Company's assets are being used efficiently and for legitimate business purposes."

236. Further, the Board adopted Corporate Governance Policies, acknowledging that "the Board believes that the long-term success of the Company is dependent upon the maintenance of an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates." The Corporate Governance Policies add that "Board and committee agendas and materials are established with legal and regulatory requirements in mind. The Board expects that Directors will acknowledge adherence to the Board of Directors Code of Ethics and Business Conduct and that management will acknowledge adherence to and conduct operations consistent with the Code of Business Conduct…"

237. Defendants' duties to actively identify and report illegal or unethical business practices within the Company were also identified in FirstEnergy's Political Activity Policy. The policy acknowledges that "[u]nder federal law, there are limits on a corporation's ability to give direct corporate contributions to federal candidates and national political parties." The

policy states that "FirstEnergy does not contribute corporate funds directly to federal political candidates or parties" and that "any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations."  The Political Activity Policy adds that "contribution decisions are based on what is in the best interests of FirstEnergy and not based on the personal preferences of our executives."

238.    Further, a number of board committees exist that monitor specific aspects of FirstEnergy's business.  These include the Audit Committee; the Compensation Committee; the Corporate Governance and Corporate Responsibility Committee; the Finance Committee; and the Operations and Safety Oversight Committee.

239.    The Charter of the Corporate Governance and Corporate Responsibility Committee directs that its members review FirstEnergy's "practices relating to corporate participation, and dues and/or contributions to industry groups and trade associations."  Between 2016 and 2020, the Corporate Governance and Corporate Responsibility Committee included Defendants Anderson, Johnson, Misheff, Mitchell, and Reyes.  According to FirstEnergy's 2018 proxy statement, these Defendants "*maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations*."

240.    The Charter of the Audit Committee required that "*the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws* and corporate policies and review processes relating to training, monitoring and reporting of policy compliance." Moreover, the Charter further provided that "the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations, and shall review the

record keeping and reporting systems to measure and *monitor regulatory compliance requirements*." The Audit Committee was also responsible for overseeing the adequacy of the Company's internal controls. Between 2016 and 2020, the Audit Committee included Defendants Anderson, Misheff, O'Neil, Pianalto, and Turner. According to the Charter, these Defendants had an affirmative obligation to "assist the Board with oversight of the Company's compliance with legal, risk management and regulatory requirements."

241. Defendants failed to meet their responsibilities and obligations as set forth above. Defendants' course of conduct constituted breaches of their fiduciary duties to FirstEnergy, as well as violations of state and federal law, and resulted in significant harm to the Company.

## VIII.  DEMAND FUTILITY ALLEGATIONS

242. Plaintiffs reallege and incorporate ¶¶1-241 above.

243. The FirstEnergy Board, at the time of filing of this action, consisted of the eleven Director Defendants. Pre-suit demand was excused if six of the eleven Director Defendants were incapable of considering objectively whether it is in the Company's best interest to pursue this litigation.

### A. Demand is Excused Because All Director Defendants Participated in Misconduct in Violation of State and Federal Law

244. Demand is futile as to the entire Board because all Director Defendants participated in the wrongdoing and are alleged to have committed violations of state and federal law for which they are accountable to the Company. All Director Defendants were involved in the misconduct and have irreconcilable conflicts of interest which render them incapable of considering objectively whether it is in the Company's best interest to pursue this litigation.

245. The Director Defendants violated Ohio and federal law by, *inter alia*, (i) participating in funneling tens of millions of dollars in bribes and "pay-to-play" payments to

-86-

public officials to obtain favorable legislation in violation of their fiduciary duties; (ii) covering up FirstEnergy's illegal bribery scheme by recommending that stockholders vote against increased disclosure, transparency and accountability for FirstEnergy's lobbying activities while misrepresenting to shareholders that FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements" and that the Board and its relevant committees were actively working to ensure the Company was not engaged in any misconduct relating to the Company's "lobbying activities" and "corporate political participation" in violation of the federal securities laws; and/or (iii) signing and causing the Company to issue Form 10-Ks misrepresenting that FirstEnergy's internal controls were effective based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO in violation of the federal securities laws.

246.     The Director Defendants participated in the bribery scheme and its concealment from shareholders and PricewaterhouseCoopers:

- Each Director Defendant signed FirstEnergy Form 10-Ks which expressly represented that FirstEnergy had effective internal controls that met the COSO requirements, including the requirements that FirstEnergy's internal control "[d]emonstrates commitment to integrity and ethical values" and "[e]nforces accountability."

- Director Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, and Reyes helped conceal FirstEnergy's illicit "pay-to-play" payments by successfully urging shareholders to vote against increased disclosure, transparency and accountability for the Company's lobbying expenditures knowing that "absent a system of accountability, company assets

could be used for objectives contrary to FirstEnergy's long-term interests" and falsely representing, "[a]fter careful consideration," that "Your Company complies with all federal and state lobbying registration and disclosure requirements."

247.    The Director Defendants participation in this wrongdoing exposes the Director Defendants to a substantial risk of non-exculpated liability because the Director Defendants violated their fiduciary duties and the federal securities laws, so that they each have an irreconcilable conflict of interest which renders them incapable of considering objectively whether it is in FirstEnergy's best interest to pursue this litigation.

**B.    Demand is Excused Because Each Individual Defendant Is Incapable of Exercising Objective and Disinterested Judgment**

**1.    Jones**

248.    Demand is excused as to the Defendant Jones because he was personally involved in the largest public bribery scheme in the history of the state of Ohio, funneling more than ***$60 million*** from FirstEnergy to Householder and other public officials.  Jones had dozens of contacts with former Ohio House Speaker Householder from early 2017 through July 2019, including 30 contacts during the first half of 2019.  The 2020 Proxy admits that Defendant Jones was not independent.

249.    Defendant Jones reaped tens of millions of dollars in executive compensation because of his misuse of FirstEnergy resources in paying bribes to Ohio public officials as a *quid pro quo* for favorable legislation.  Defendant Jones was terminated by FirstEnergy after the commencement of this action and after an internal investigation determined that Jones violated certain company policies and FirstEnergy's Code of Conduct.  Defendant Jones has been named as a defendant in at least one putative class action asserting violations of §§10(b) and 20(a) of the

Exchange Act and SEC Rule 10b-5 in connection with FirstEnergy's issuance of materially false and misleading statements and financial reports.

250. Accordingly, due to Jones' participation in the bribery scheme, he is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action. As a result, demand on Jones was futile and excused.

### 2. Anderson

251. Demand is excused as to Defendant Anderson because he participated in the wrongdoing. As a member of the Board and the Audit Committee, Anderson had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements, to meet with management to "review adherence to applicable federal, state, and local laws and corporate policies," and to ensure the adequacy of FirstEnergy's controls under the 2013 COSO criteria, including the requirements that FirstEnergy's internal controls "[d]emonstrates commitment to integrity and ethical values" and "[e]nforces accountability." As a member of the Board and the Corporate Governance and Corporate Responsibility Committee, Anderson had a personal duty to oversee FirstEnergy's lobbying activities, including FirstEnergy's "practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." The Board expressly clarified this duty in 2017. Between 2016 and 2019, Anderson received $1,031,757 in fees, stock awards, and other compensation for his service on the Board.

252. Defendant Anderson has an M.B.A. and is a Certified Public Accountant. According to the Company, "Anderson's experience in the accounting and executive management areas are invaluable assets for FirstEnergy's Board." Defendant Anderson was specifically charged with using his specialized expertise to ensure that the Company complied

with all rules and regulations concerning financial reporting, maintained adequate internal controls, and provided accurate information to its auditors.

253. Despite his known obligations and duties, Anderson opposed shareholder proposals seeking increased disclosure, transparency and accountability for FirstEnergy's lobbying activities and expenditures, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Anderson opposed the creation of a FirstEnergy report to the Audit Committee or other Board committee and to shareholders detailing: (i) Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications; (ii) payments by FirstEnergy used for direct or indirect lobbying or grassroots lobbying, in each case including the amount of the payment and the recipient; (iii) FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation; and (iv) a description of the decision making process and oversight by management and the Board for making payments described in section ii and iii above. Anderson represented, "[a]fter careful consideration," that he opposed such increased disclosure, transparency and accountability because FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."

254. Anderson knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials. Indeed, as a member of the Board and the Corporate Governance and Corporate Responsibility Committee, Anderson represented to shareholders in 2018 that he and other directors "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."

255. Anderson also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

256. Anderson's conduct was not in good faith and violated Ohio law and the federal securities laws. Accordingly, due to Anderson's participation in misconduct for which he is accountable to FirstEnergy, Anderson is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action. As a result, demand on Anderson was futile and excused.

### 3. Demetriou

257. Demand is excused as to Defendant Demetriou because he participated in the wrongdoing. As a member of the Board and the Compensation Committee, Demetriou had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements and that its compensation design mitigated undue risk of illegal conduct by the Officer Defendants. From 2017 through 2019, Demetriou received $704,538 in fees, stock awards, and other compensation for his service on the Board.

258. Despite his known obligations and duties, Demetriou approved an executive compensation design that incentivized the Officer Defendants' use of Company resources in the largest "pay-to-play" scheme in the history of the State of Ohio. Demetriou knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation, including HB6's

"decoupling provision" to make their executive compensation recession proof and the 2019 Ohio budget bill's "excessive profits" provision to avoid an Ohio rate payer refund.

259.    Demetriou also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements.  FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

260.    Demetriou's conduct was not in good faith and violated Ohio law and the federal securities laws.  Accordingly, due to Demetriou's participation in misconduct for which he is accountable to FirstEnergy, Demetriou is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action.  As a result, demand on Demetriou was futile and excused.

### 4.    Johnson

261.    Demand is excused as to Defendant Johnson because she participated in the wrongdoing.  As a member of the Board and the Corporate Governance and Corporate Responsibility Committee, Johnson had a personal duty to oversee FirstEnergy's lobbying activities, including FirstEnergy's "practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."  The Board expressly clarified this duty in 2017.  From 2016 through 2019, Johnson received $953,825 in fees, stock awards, and other compensation for her service on the Board.

262.    Despite her known obligations and duties, Johnson opposed shareholder proposals seeking increased disclosure, transparency and accountability for FirstEnergy's lobbying

activities and expenditures, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Johnson opposed the creation of a FirstEnergy report to the Audit Committee or other Board committee and to shareholders detailing: (i) Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications; (ii) payments by FirstEnergy used for direct or indirect lobbying or grassroots lobbying, in each case including the amount of the payment the recipient; (iii) FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation; and (iv) a description of the decision making process and oversight by management and the Board for making payments described in section ii and iii above. Johnson represented, "[a]fter careful consideration," that she opposed such increased disclosure, transparency and accountability because FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."

263. Johnson knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials. Indeed, as a member of the Board and the Corporate Governance and Corporate Responsibility Committee, Johnson represented to shareholders in 2018 that she and other directors "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."

264. Johnson also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and

ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

265.    Johnson's conduct was not in good faith and violated Ohio law and the federal securities laws.  Accordingly, due to Johnson's participation in misconduct for which she is accountable to FirstEnergy, Johnson is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action.  As a result, demand on Johnson was futile and excused.

### 5.    Misheff

266.    Demand is excused as to Defendant Misheff because he participated in the wrongdoing.  As non-executive Chairman of the Board and a member of the Audit Committee, Misheff had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements, to meet with management to "review adherence to applicable federal, state, and local laws and corporate policies," and to ensure the adequacy of FirstEnergy's controls under the 2013 COSO criteria, including the requirements that FirstEnergy's internal controls "[d]emonstrates commitment to integrity and ethical values" and "[e]nforces accountability." As non-executive Chairman of the Board and member of the Corporate Governance and Corporate Responsibility Committee, Misheff had a personal duty to oversee FirstEnergy's lobbying activities, including FirstEnergy's "practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."  The Board expressly clarified this duty in 2017.  As non-executive Chairman of the Board and a member of the Compensation Committee, Misheff had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements and that its compensation design mitigated undue risk of illegal conduct by the Officer Defendants.  From 2016 to 2019, Misheff received $1,224,230 in fees, stock awards, and other compensation for his service on the Board.

-94-

267.    Defendant Misheff served for nearly a decade as the managing partner of the Northeast Ohio offices of Ernst & Young LLP, a public accounting firm.  According to FirstEnergy, Misheff "has extensive experience performing, reviewing and overseeing the audits of financial statements of a wide range of public companies" and has "vast financial and corporate governance experience[.]"  Misheff was specifically charged with using his specialized expertise to ensure that the Company complied with all rules and regulations concerning financial reporting, maintained adequate internal controls, and provided accurate information to its auditors.

268.    Despite his known obligations and duties, Defendant Misheff opposed shareholder proposals seeking increased disclosure, transparency and accountability for FirstEnergy's lobbying activities and expenditures, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests."  Misheff opposed the creation of a FirstEnergy report to the Audit Committee or other Board committee and to shareholders detailing: (i) Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications; (ii) payments by FirstEnergy used for direct or indirect lobbying or grassroots lobbying, in each case including the amount of the payment and the recipient; (iii)  FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation; and (iv) a description of the decision making process and oversight by management and the Board for making payments described in section ii and iii above.  Misheff represented, "[a]fter careful consideration," that he opposed such increased disclosure, transparency and accountability because FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."

269. Defendant Misheff knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation, including HB6's "decoupling provision" to make their executive compensation recession proof and the 2019 Ohio budget bill's "excessive profits" provision to avoid an Ohio rate payer refund. Indeed, as a member of the Board and the Corporate Governance and Corporate Responsibility Committee, Misheff represented to shareholders in 2018 that he and other directors "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."

270. Misheff also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

271. Misheff's conduct was not in good faith and violated Ohio law and the federal securities laws. Accordingly, due to Misheff's participation in misconduct for which he is accountable to FirstEnergy, Misheff is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action. As a result, demand on Misheff was futile and excused.

### 6. Mitchell

272. Demand is excused as to Defendant Mitchell because he participated in the wrongdoing. As a member of the Board and the Corporate Governance and Corporate

Responsibility Committee, Mitchell had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements and to oversee FirstEnergy's lobbying activities, including FirstEnergy's "practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." The Board expressly clarified this duty in 2017. From 2016 to 2019, Mitchell received $978,193 in fees, stock awards, and other compensation for his service on the Board.

273. Despite his known obligations and duties, Defendant Mitchell opposed shareholder proposals seeking increased disclosure, transparency and accountability for FirstEnergy's lobbying activities and expenditures, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Mitchell opposed the creation of a FirstEnergy report to the Audit Committee or other Board committee and to shareholders detailing: (i) Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications; (ii) payments by FirstEnergy used for direct or indirect lobbying or grassroots lobbying, in each case including the amount of the payment and the recipient; (iii) FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation; and (iv) a description of the decision making process and oversight by management and the Board for making payments described in section ii and iii above. Mitchell represented, "[a]fter careful consideration," that he opposed such increased disclosure, transparency and accountability because FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."

274. Mitchell knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials. Indeed, as a member of the Board and the Corporate Governance and Corporate Responsibility

Committee, Mitchell represented to shareholders in 2018 that he and other directors "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."

275. Mitchell also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

276. Mitchell's conduct was not in good faith and violated Ohio law and the federal securities laws. Accordingly, due to Mitchell's participation in misconduct for which he is accountable to FirstEnergy, Mitchell is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action. As a result, demand on Mitchell was futile and excused.

### 7. O'Neil

277. Demand is excused as to Defendant O'Neil because he participated in the wrongdoing. As a member of the Board and the Audit Committee, O'Neil had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements, to meet with management to "review adherence to applicable federal, state, and local laws and corporate policies," and to ensure the adequacy of FirstEnergy's controls under the 2013 COSO criteria, including the requirements that FirstEnergy's internal controls "[d]emonstrates commitment to integrity and ethical values" and "[e]nforces accountability." As a member of the Board and Chair of the Compensation Committee, O'Neil also had a personal duty to ensure that

FirstEnergy's compensation design mitigated undue risk of illegal conduct by the Officer Defendants. From 2017 through 2019, O'Neil received $739,825 in fees, stock awards, and other compensation for his service on the Board.

278. Despite his known obligations and duties, O'Neil approved an executive compensation design that incentivized the Officer Defendants' use of Company resources in the largest "pay-to-play" scheme in the history of the State of Ohio. O'Neil knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation, including HB6's including the "decoupling provision" to make their executive compensation recession proof and the 2019 Ohio budget bill's "excessive profits" provision to avoid an Ohio rate payer refund.

279. O'Neil also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

280. O'Neil's conduct was not in good faith and violated Ohio law and the federal securities laws. Accordingly, due to O'Neil's participation in misconduct for which he is accountable to FirstEnergy, O'Neil is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action. As a result, demand on O'Neil was futile and excused.

8. **Pappas**

281.    Demand is excused as to Defendant Pappas because he participated in the wrongdoing.  As a member of the Board and the Compensation Committee, Pappas had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements and that its compensation design mitigated undue risk of illegal conduct by the Officer Defendants. From 2016 through 2019, Pappas received $1,009,482 in fees, stock awards, and other compensation for his service on the Board.

282.    Despite his known obligations and duties, Defendant Pappas opposed shareholder proposals seeking increased disclosure, transparency and accountability for FirstEnergy's lobbying activities and expenditures, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Pappas opposed the creation of a FirstEnergy report to the Audit Committee or other Board committee and to shareholders detailing: (i) Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications; (ii) payments by FirstEnergy used for direct or indirect lobbying or grassroots lobbying, in each case including the amount of the payment and the recipient; (iii)  FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation; and (iv) a description of the decision making process and oversight by management and the Board for making payments described in section ii and iii above.  Pappas represented, "[a]fter careful consideration," that he opposed such increased disclosure, transparency and accountability because FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."

283.    Furthermore, despite his known obligations and duties, Pappas approved an executive compensation design that *incentivized* the Officer Defendants' use of Company resources in the largest "pay-to-play" scheme in the history of the State of Ohio.  Pappas knew or

recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation, including HB6's "decoupling provision" to make their executive compensation recession proof and the 2019 Ohio budget bill's "excessive profits" provision to avoid an Ohio rate payer refund.

284.    Pappas also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements.  FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

285.    Pappas's conduct was not in good faith and violated Ohio law and the federal securities laws.  Accordingly, due to Pappas's participation in misconduct for which he is accountable to FirstEnergy, Pappas is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action.  As a result, demand on Pappas was futile and excused.

### 9.    Pianalto

286.    Demand is excused as to Defendant Pianalto because she participated in the wrongdoing.  As a member of the Board and the Audit Committee, Pianalto had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements, to meet with management to "review adherence to applicable federal, state, and local laws and corporate policies," and to ensure the adequacy of FirstEnergy's controls under the 2013 COSO criteria, including the requirements that FirstEnergy's internal controls "[d]emonstrates commitment to integrity and ethical values" and "[e]nforces accountability."  As a member of the Board and the

Compensation Committee, Pianalto also had a personal duty to ensure that FirstEnergy's compensation design mitigated undue risk of illegal conduct by the Officer Defendants. From 2018 through 2019, Pianalto received $452,838 in fees, stock awards, and other compensation for her service on the Board.

287. Despite her known obligations and duties, Pianalto approved an executive compensation design that incentivized the Officer Defendants' use of Company resources in the largest "pay-to-play" scheme in the history of the State of Ohio. Pianalto knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation, including HB6's "decoupling provision" to make their executive compensation recession proof and the 2019 Ohio budget bill's "excessive profits" provision to avoid an Ohio rate payer refund.

288. Pianalto also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates, and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

289. Pianalto's conduct was not in good faith and violated Ohio law and the federal securities laws. Accordingly, due to Pianalto's participation in misconduct for which she is accountable to FirstEnergy, Pianalto is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action. As a result, demand on Pianalto was futile and excused.

### 10. Reyes

290. Demand is excused as to Defendant Reyes because he participated in the wrongdoing. As a member of the Board and the Corporate Governance and Corporate Responsibility Committee, Mitchell had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements and to oversee FirstEnergy's lobbying activities, including FirstEnergy's "practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." The Board expressly clarified this duty in 2017. From 2016 to 2019, Reyes received $948,601 in fees, stock awards, and other compensation for his service on the Board.

291. Despite his known obligations and duties, Defendant Reyes opposed shareholder proposals seeking increased disclosure, transparency and accountability for FirstEnergy's lobbying activities and expenditures, knowing that "[a]bsent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Reyes opposed the creation of a FirstEnergy report to the Audit Committee or other Board committee and to shareholders detailing: (i) Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications; (ii) payments by FirstEnergy used for direct or indirect lobbying or grassroots lobbying, in each case including the amount of the payment and the recipient (iii) FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation; and (iv) a description of the decision making process and oversight by management and the Board for making payments described in section ii and iii above. Reyes represented, "[a]fter careful consideration," that he opposed such increased disclosure, transparency and accountability because FirstEnergy "complies with all federal and state lobbying registration and disclosure requirements."

292. Reyes knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials. Indeed, as a member of the Board and the Corporate Governance and Corporate Responsibility Committee, Reyes represented to shareholders in 2018 that he and other directors "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."

293. Reyes also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates, and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

294. Reyes's conduct was not in good faith and violated Ohio law and the federal securities laws. Accordingly, due to Reyes's participation in misconduct for which he is accountable to FirstEnergy, Reyes is not disinterested and cannot exercise objective and disinterested judgment on the issue whether FirstEnergy should prosecute this action. As a result, demand on Reyes was futile and excused.

### 11. Turner

295. Demand is excused as to Defendant Turner because she participated in the wrongdoing. As a member of the Board and the Audit Committee, Turner had a personal duty to ensure that FirstEnergy complied with its legal and regulatory requirements, to meet with management to "review adherence to applicable federal, state, and local laws and corporate policies," and to ensure the adequacy of FirstEnergy's controls under the 2013 COSO criteria,

-104-

including the requirements that FirstEnergy's internal controls "[d]emonstrates commitment to integrity and ethical values" and "[e]nforces accountability." As a member of the Board and the Compensation Committee, Turner also had a personal duty to ensure that FirstEnergy's compensation design mitigated undue risk of illegal conduct by the Officer Defendants. From 2018 through 2019, Turner received $314,836 in fees, stock awards, and other compensation for her service on the Board.

296. Despite her known obligations and duties, Turner approved an executive compensation design that incentivized the Officer Defendants' use of Company resources in the largest "pay-to-play" scheme in the history of the State of Ohio. Turner knew or recklessly disregarded reports and "red flags" that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation, including HB6's "decoupling provision" to make their executive compensation recession proof and the 2019 Ohio budget bill's "excessive profits" provision to avoid an Ohio rate payer refund.

297. Turner also signed FirstEnergy Form 10-Ks that did not present fairly, in all material respects, FirstEnergy's cash flow because it omitted millions of dollars in payments to Ohio politicians, including Householder and his associates, and that misrepresented to FirstEnergy's shareholders that the Company's internal controls were effective under the 2013 COSO requirements. FirstEnergy's controls did not demonstrate a commitment to integrity and ethical values and did not enforce accountability for illegal and unethical conduct as required under the 2013 COSO framework.

298. Turner's conduct was not in good faith and violated Ohio law and the federal securities laws. Accordingly, due to Turner's participation in misconduct for which she is accountable to FirstEnergy, Turner is not disinterested and cannot exercise objective and

disinterested judgment on the issue whether FirstEnergy should prosecute this action.  As a result, demand on Turner was futile and excused.

### C.    A Majority of the Director Defendants Have Additional Suspicious Contacts with or Donations To Householder

299.    Entities affiliated with several of the Director Defendants contributed funds directly to Householder's political arm "Friends of Larry Householder."

- Defendant Reyes has longstanding ties with Duke Energy Corporation, where he served as Chairman of the Nuclear Safety Review Board until at least 2018.  Duke Energy Corporation PAC, a political action committee with ties to Duke Energy, made several multi-thousand-dollar donations to "Friends of Larry Householder," including at least one $5,500 donation in 2018.  Duke Energy Corporation PAC continued to make several additional multi-thousand-dollar donations in 2019 and 2020, with its most recent donations occurring in late-April 2020, just months before Householder was arrested.

- Defendant Misheff has significant ties to TimkenSteel Corporation due to his role as a founding member of the TimkenSteel Corporation board. Misheff currently serves on TimkenSteel Corporation's audit committee.  TimkenSteel Corp PAC, a political action committee with ties to TimkenSteel Corporation, made a $5,000 contribution to "Friends of Larry Householder" in February 2020, mere months before Householder's arrest.   A TimkenSteel senior executive testified before the Ohio House Energy and Natural Resources Committee on May 15, 2019 in support of HB6.

- Defendant Pianalto is affiliated with Prudential Financial, Inc. where she has served as a member of the Board of Directors since 2015.  In 2019, Prudential Financial, Inc.

State and Federal PAC, a political action committee with ties to Prudential Financial, Inc., donated to "Friends of Larry Householder."

- Defendant Demetriou has longstanding ties to Exxon, having held various positions at the company over a span of 16 years. In 2018 and 2019, Exxon Mobil PAC, a political action committee with ties to Exxon made thousand-dollar contributions to "Friends of Larry Householder."

- Defendant Turner has significant ties with Coca-Cola, having served as its general counsel. In 2019, Coca-Cola Consolidated Employees for Good PAC, a political action committee with ties to Coca-Cola, donated to "Friends of Larry Householder."

## D. Demand Is Excused Because The Director Defendants' Conduct Did Not Constitute A Valid Exercise of Business Judgment

300. The Director Defendants' challenged misconduct at the heart of this case constitutes violations of Ohio and federal law, including facilitating criminal bribery and issuing false and misleading statements in violation of the federal securities laws to cover up this misconduct. As the ultimate decision-making body of the Company, the Director Defendants affirmatively adopted, implemented, and/or participated in a business strategy based on violations of Ohio and federal law. Breaking the law is not a legally protected business decision, and such conduct is incapable of ratification because it cannot be considered a valid exercise of business judgment.

301. Significantly, the sheer size and systemic nature of the "pay-to-play" payments to Ohio politicians render this action distinct from the case of virtually every other Board. A typical corporate board might plausibly claim ignorance concerning individual compliance failures by an individual, rogue employee. In this case, the Director Defendants' fellow director and CEO of the Company, Defendant Jones, with the assistance of *the entire C-suite*—including

the current acting CEO, the CFO, the Chief Legal Officer, the General Counsel, and SVP and President for External Affairs—are **personally implicated** in the largest political bribery scandal in the history of Ohio, funneling more than **$60 million** to recidivist corrupt politician Householder and his associates over a period of years in the face of persistent media scrutiny and shareholder questions. This scheme could not have been implemented without the Director Defendants' approval and participation. All Director Defendants signed the Form 10-Ks that— despite Defendants' representations—did not present fairly, in all material respects, FirstEnergy's cash flows (because it omitted millions of dollars in bribery payments) and that falsely represented that FirstEnergy's internal controls met the 2013 COSO requirements, including "commitment to integrity and ethical values" and "[e]nforces accountability."

302. For all of these reasons, the Director Defendants are incapable to objectively consider a demand to take the actions required to seek the relief requested in this Complaint. Demand was futile.

## IX. CLAIMS AGAINST DEFENDANTS

### COUNT I
**(Breach of Fiduciary Duty Against the Director Defendants)**

303. Plaintiffs incorporate by reference and reallege each of the foregoing paragraphs as if fully set forth in this paragraph.

304. Each of the Director Defendants owed and owe fiduciary duties to FirstEnergy and its stockholders. By reason of their fiduciary relationships, the Director Defendants specifically owed and owe FirstEnergy the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

305.    Each of the Director Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to FirstEnergy by consciously ignoring numerous red flags related to the Ohio bribery scheme.

306.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

307.    Additionally, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the charters of various Board committees that, had they been discharged in accordance with the Director Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

308.    Further, as alleged in detail herein, each of the Defendants (and particularly the Defendants on the Audit Committee) had a duty to ensure that FirstEnergy disseminated accurate, truthful, and complete information to its shareholders. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to FirstEnergy shareholders materially misleading and inaccurate information through, *inter alia*, FirstEnergy's SEC filings and other public statements and disclosures as detailed herein, which failed to disclose that the Company was being operated in an unlawful and/or illicit manner. These actions could not have been a good faith exercise of prudent business judgment.

309.    Accordingly, to the extent any FirstEnergy exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability; (ii) monetary liability for their breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in good faith or that involved

intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the Ohio bribery scheme: (i) involved breaches of their duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law. FirstEnergy's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct.

310. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

311. As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

## <u>COUNT II</u>
### (Breach of Fiduciary Duty Against the Officer Defendants)

312. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

313. This Count is brought against the Officer Defendants solely in their capacity as officers of FirstEnergy.

314. The Officer Defendants owed and owe fiduciary duties to FirstEnergy and its stockholders. By reason of this fiduciary relationship, the Officer Defendants specifically owed and owe FirstEnergy the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

315. The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue

false proxy statements or consciously ignoring numerous red flags related to the Ohio bribery scandal.

316. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

317. Additionally, the Officer Defendants are not entitled to claim any immunity under ORC 1701.59(E) to the extent this claim is asserted against them in their capacity as officers of the Company.

318. As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

319. As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

**COUNT III**
**(Unjust Enrichment Against the Officer Defendants)**

320. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth in this paragraph.

321. By their wrongful acts and omissions and direct participation in the illegal bribery and pay-to-play scheme, the Officer Defendants were unjustly enriched at the expense of and to the detriment of FirstEnergy in the form of, *inter alia¸* salaries, bonuses, stock options, and/or other forms of executive compensation.

322. Plaintiffs, as stockholders and representatives of FirstEnergy, seek restitution from the Officer Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Officer Defendants due to their wrongful conduct alleged in this Complaint.

-111-

## COUNT IV
### (Corporate Waste Against all Defendants)

323. Plaintiffs incorporate by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

324. By their wrongful acts and omissions, Defendants wasted FirstEnergy's valuable corporate assets by, among other things, causing the Company to pay improper fees, salaries, performance-based compensation and other benefits to Defendants who breached their fiduciary duties owed to FirstEnergy and its shareholders. FirstEnergy received no benefit from these improper payments. As a result, Defendants damaged FirstEnergy and are liable to the Company for corporate waste.

325. Plaintiffs, on behalf of FirstEnergy, have no adequate remedy at law.

## COUNT V
### (Contribution and Indemnification Against all Defendants)

326. Plaintiffs incorporate by reference and realleges each of the foregoing allegations as though fully set forth herein.

327. FirstEnergy is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to FirstEnergy.

328. FirstEnergy's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and FirstEnergy is entitled to contribution and indemnification from each Defendant in connection with all such claims that have been, are or may in the future be asserted against, FirstEnergy by virtue of the Defendants' misconduct.

<u>COUNT VI</u>
**(Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
Against the Director Defendants)**

329.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

330.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiffs specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

331.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

332.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2018, 2019, and 2020 Proxies.

333.    These Proxies contained proposals to FirstEnergy shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies, however, misleading suggested that Board and its relevant committees: (i) were actively working to mitigate significant risks to the Company; (ii) ensuring the Company's legal and regulatory compliance; and (iii) ensuring the Company was not engaged in any misconduct relating to the Company's lobbying activities and corporate

political participation. The Proxies violated §14(a) and Rule 14a-9 because they solicited FirstEnergy shareholder votes for, inter alia, director reelection and executive compensation, while simultaneously misrepresenting and/or failing to disclose: (i) FirstEnergy's ongoing participation in the largest political bribery scandal in the history of Ohio; and (ii) that Defendants had orchestrated a multi-million dollar campaign to corrupt the political process in order to secure the passage of legislation bailing out the Company.

334. By reason of this conduct, the Director Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, FirstEnergy mislead and/or deceived its shareholders by making misleading statements that were an essential link in shareholders heeding FirstEnergy's recommendations to re-elect and elect the current Board and provide advisory votes on executive compensation.

335. The false and misleading information contained in the Proxies was material to FirstEnergy's shareholders in determining whether to re-elect and elect the current Board and provide advisory votes on executive compensation. This information was also material to the integrity of the directors who were proposed for election to the Board. Plaintiff, on behalf of FirstEnergy, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper election and reelection of the members of the Board, and advisory votes on executive compensation.

336. This action was timely commenced within three years of the date of each Proxy Statement and within one year from the time Plaintiffs discovered or reasonably could have discovered the facts on which this claim is based.

## X.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demands judgment as follows:

A.    A determination that this action is a proper derivative action maintainable under

the law and that demand was excused as futile;

B.      Declaring that Defendants have breached their fiduciary duties to FirstEnergy and committed other violations of state and federal law;

C.      Determining and awarding to FirstEnergy the damages sustained by it as a result of the violations set forth above from each Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.      Directing FirstEnergy to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other actions as may be necessary;

E.      Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting Defendants' assets so as to assure that Plaintiffs, on behalf of FirstEnergy, has an effective remedy;

F.      Awarding to FirstEnergy restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

G.      Ordering an accounting of all compensation awarded to the Individual Defendants from 2016 through 2019;

H.      Awarding to Plaintiffs costs and disbursements related to this action, including reasonable attorneys' fees, consultant and expert fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## XI.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues so triable.

Dated: January 25, 2021

Respectfully Submitted,

*/s/ John C. Camillus*

**LAW OFFICES OF JOHN C. CAMILLUS LLC**
John C. Camillus (0077435)
P.O. Box 141410
Columbus, OH 43214
Phone: (614) 992-1000
jcamillus@camilluslaw.com

*Liaison Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Maya Saxena (*pro hac vice*)
Lester R. Hooker (*pro hac vice*)
Dianne M. Pitre (*pro hac vice*)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Phone: (561) 394-3399
msaxena@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

- and -

**SAXENA WHITE P.A.**
Thomas Curry (*pro hac vice*)
1000 N. West Street
Suite 1200, Office 1265
Wilmington, DE 19801
Phone: (302) 485-0480
tcurry@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

Jeroen van Kwawegen (*pro hac vice*)
David Wales (*pro hac vice forthcoming*)
Alla Zayenchik (*pro hac vice*)
Matthew Traylor (*pro hac vice*)

1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
jeroen@blbglaw.com
davidw@blbglaw.com
alla.zayenchik@blbglaw.com
matthew.traylor@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**COHEN MILSTEIN SELLS & TOLL PLLC**
Steven J. Toll (*pro hac vice*)
Daniel S. Sommers
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com

- and -

**COHEN MILSTEIN SELLS & TOLL PLLC**

-116-

Richard A. Speirs (*pro hac vice*)
Christopher Lometti (*pro hac vice*)
Amy Miller (*pro hac vice*)
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838 7745
rspeirs@cohenmilstein.com
clometti@cohenmilstein.com
amiller@cohenmilstein.com

*Counsel for Additional Plaintiff Massachusetts Laborers Pension Fund*