**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

EMPLOYEES RETIREMENT SYSTEM :
OF THE CITY OF ST. LOUIS, :
 : **Case No. 2:20-cv-04813**
  **Plaintiff,** :
 : **CHIEF JUDGE ALGENON L. MARBLEY**
  **v.** :
 : **Magistrate Judge Kimberly A. Jolson**
 :
CHARLES E. JONES, et al., :
 :
  **Defendants,** :
 :
 :
FIRSTENERGY CORP., :
 :
  **Nominal Defendant.** :

## OPINION & ORDER

### I. INTRODUCTION

Before the Court is a Motion to Dismiss the Consolidated Verified Shareholder Derivative Complaint by Defendants Michael J. Anderson, Steven J. Demetriou, Julia L. Johnson, Donald T. Misheff, Thomas N. Mitchell, James F. O'Neil III, Christopher D. Pappas, Sandra Pianalto, Luis A. Reyes, Leslie M. Turner, Steven E. Strah, James F. Pearson, K. Jon Taylor, and Nominal Defendant FirstEnergy Corp. ("FirstEnergy" or the "Company") (collectively, the "FirstEnergy Defendants" or "Defendants"). (ECF No. 79).[1] For the following reasons, the Court **DENIES** the Motion to Dismiss.

---

[1] Defendants Robert Reffner, Michael J. Dowling, Charles E. Jones, and Ebony Yeboah-Amankwah have each joined the Motion to Dismiss and Defendants' Reply in Support of the Motion to Dismiss. (Notices of Joinder, ECF Nos. 81−84, 88−91).

## II. BACKGROUND

### A. Facts as Alleged by Plaintiffs

In considering this motion to dismiss, this Court must view the Consolidated Complaint in the light most favorable to Plaintiffs and take all well-pleaded factual allegations as true. *Tackett v. M & G Polymers*, 561 F.3d 478, 488 (6th Cir. 2009).

According to Plaintiffs, this action seeks to hold current and former FirstEnergy directors and officers accountable for their roles in orchestrating a large bribery, racketeering, and pay-to-play scheme with Ohio politicians. (Consol. Compl. ¶ 1, ECF No. 75). Specifically, between 2017 and 2020, FirstEnergy and its most senior officers paid more than $60 million in illegal contributions to Ohio's Speaker of the House, Larry Householder, and other Ohio public officials, in exchange for favorable legislation designed to bail out the Company's failing nuclear power plants. (*Id*. ¶ 2). The U.S. Attorney for the Southern District of Ohio described this plot as "likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio." (*Id*. ¶ 7).

FirstEnergy is an Ohio-based utility company and one of the nation's largest investor-owned electric systems. (*Id*. ¶ 49). It owns and operates two Ohio nuclear power plants and provides electricity to 6 million customers through its ten utility operating companies, which service seven states across the Midwest and the Mid-Atlantic. (*Id.*). The Company's business segment, known as Competitive Energy Services ("CES"), is comprised of three entities: FirstEnergy Solutions ("FES"), FirstEnergy Nuclear Operating Co. ("FENOC"), and Allegheny Energy Supply ("AE Supply").

FirstEnergy began to face significant financial strain in 2016, as its costly nuclear power plants became less profitable. (*Id.* ¶ 3). The Company had invested hundreds of millions of dollars

into the plants' maintenance while demand for nuclear power diminished. (*Id.*). As a result, FirstEnergy reported a $1.259 billion loss in its energy services segment on July 28, 2016. (*Id.* ¶ 53). Shortly thereafter, Moody's and Standard & Poor's downgraded FES's senior unsecured rating and its corporate credit rating to "below investment grade," signifying that FES faced "a substantial risk of default. . ." (*Id.* ¶ 54). By November 2016, the Company announced a strategic review with the goal of exiting the competitive power generation business of FES within twelve to eighteen months. (*Id.* ¶ 55). FirstEnergy director and Chief Executive Officer, Defendant Jones, explained that FES faced several risks, including weak energy and capacity pricing, as well as an obligation to refinance $645 million in debt through 2018. (*Id.*). FirstEnergy's outside auditor announced in February 2017 that FES's "current financial position and the challenging market conditions impacting liquidity raise[d] substantial doubt about its ability to continue as a going concern." (*Id.* ¶¶ 56, 77). The Federal Energy Regulatory Commission ("FERC") rejected FirstEnergy's application to transfer certain assets from CES to another subsidiary in January 2018, further limiting the Company's ability to restructure its debt or declare FES bankruptcy. (*Id.* ¶ 78). In other words, FirstEnergy owned a subsidiary that was causing it significant financial loss, and it had very limited options to extricate the Company from this situation. (*Id.* ¶ 79).

The Company's financial situation also impacted each of the Officer Defendants, since most of their compensation was based on the Company's annual financial performance. (*Id.*). For example, from 2017 to 2019, Defendant Jones's performance-based compensation comprised 87% of his total compensation, which exceeded $55 million cumulatively over those three years. (*Id.* ¶¶ 22, 81). Compensation for other officers between 2017 and 2019 was 76%, 75%, and 74% incentive-based, respectively. (*Id.* ¶ 81).

Meanwhile, Larry Householder sought to regain his position as Ohio Speaker of the House, which he had previously resigned from due to public allegations of money laundering, kickbacks, and illegal campaign contributions. (*Id*. ¶ 57). He ran in and won the November 2016 election for the two-year House seat representing Ohio's 72nd District. (*Id*. ¶ 58). A few days after he assumed office on January 3, 2017, FirstEnergy flew Householder to Washington, D.C. on its private jet so that he could attend the inauguration of former President Donald Trump. (*Id*. ¶ 59). Soon after taking Householder to Washington, FirstEnergy informed investors that it was seeking "legislative solutions" to help its aging nuclear power business. (*Id*. ¶ 60).

Within two months of this trip, Householder established a secret 501(c)(4) entity called "Generation Now," and FirstEnergy and its subsidiaries began making clandestine quarterly payments of $250,000 to it. (*Id.* ¶ 63). According to Householder co-conspirator Neil Clark,[2] Generation Now was structured to be opaque so that donors could "give as much or more to the (c)(4) and nobody would ever know." (*Id*.). From 2017 to 2018, Generation Now spent approximately $3 million of FirstEnergy funds to support Householder's bid for Speaker of the House, as well as the bids of nearly a dozen other House-candidate allies who would ultimately vote for his elevation to Speaker. (*Id*. ¶ 89). Householder was re-elected as Speaker of the House in January 2019. (*Id*. ¶ 101). By July 2020, FirstEnergy and its subsidiaries paid more than $60 million to various entities controlled by Householder, including Generation Now, under the guise of donations. (*Id*. ¶¶ 2, 4−6, 43, 63, 80−82, 100−02).

---

[2] Neil Clark is a longtime lobbyist who owns Grant Street Consultants and was previously a budget director of the Ohio Senate Republican Caucus. (Consol. Compl. ¶ 47, ECF No. 75). Mr. Clark is listed as a member of the "Enterprise" in the FBI Affidavit and was indicted along with Larry Householder, Republican Party Chair-turned-consultant Matt Borges, FirstEnergy Solutions lobbyist Juan Cespedes, and Householder aide Jeff Longstreth. (*See id.* ¶ 48).

The same day that Householder was re-elected, he pledged to create a standing subcommittee on energy generation, which he later admitted was created to pass House Bill 6 ("HB6"). HB6 was introduced in the Ohio state legislature on April 12, 2019, and, according to the FBI, "essentially was created to prevent the shutdown of [FirstEnergy's] nuclear plants." (*Id*. ¶¶ 100−103). As is relevant here, HB6 has three key components.

First, it provided a bailout for the Company by creating a subsidy on each megawatt hour produced by nuclear generators. (*Id*. ¶ 103). Given that FirstEnergy's nuclear power plants produced over 18 million megawatts in 2018 (compared to fewer than 1,100 megawatts produced by Ohio's six remaining solar facilities), 94% of the subsidy went to FirstEnergy. (*Id*.). The subsidy also enabled FirstEnergy to collect more than $160 million annually, and it was funded by a monthly fixed charge on all residential, commercial, and industrial consumers. (*Id*.).

Second, HB6 also included a "decoupling" provision that ensured a guaranteed level of income for FirstEnergy and therefore established a floor for Defendants' performance-based compensation. (*Id*. ¶ 82). According to the FBI Affidavit supporting the Criminal Complaint:

> Decoupling is the dissociation of annual revenue from volume of energy sales. The decoupling mechanism was based upon the baseline revenue the company received in 2018. Therefore, if a given year's annual revenue [was] less than it was in 2018, the company [could] charge retail customers a rider, or surcharge, to compensate for the lost revenue.

(*Id*.). The FBI Affidavit further explains that the decoupling amendment was added to HB6 "as a result of the successful influence campaign waged by [FirstEnergy] and the Enterprise" run by Householder. (*Id*.). Defendant Jones explained during a November 4, 2019 investor call that the decoupling provision "fixes our base revenues and essentially it takes about one-third of our company[,] and I think makes it somewhat recession-proof." (*Id*. ¶ 83). An Ohio energy consultant estimated that the decoupling provision would allow FirstEnergy to charge ratepayers an additional

$355 million through 2024 and guarantee the Company an annual revenue of $978 million. (*Id*. ¶ 84).

Third, HB6 provided that the Public Utilities Commission of Ohio ("PUCO") could unilaterally extend decoupling at the utility's discretion, which would benefit FirstEnergy by an additional $400 million from 2025 through 2030. (*Id*. ¶¶ 85, 144). Notably, in November 2020, PUCO's Chairman, Sam Randazzo, resigned two days after the FBI raided his home and the day before FirstEnergy disclosed that it paid $4.3 million to "an individual who subsequently was appointed to a full-time role as an Ohio government official directly involved in regulating" the Company. (*Id*. ¶ 144).

Even before charges of misconduct surfaced, the public strongly opposed House Bill 6. The bill was criticized as "the worst energy bill of the 21st century." (*Id*. ¶ 6). A statewide ballot referendum seeking to repeal it quickly followed. (*Id*.). Numerous press reports publicly questioned the propriety of FirstEnergy's relationship with Householder, including articles by *Cleveland.com*, the *Columbus Dispatch*, and the *Cincinnati Enquirer*. (*Id*. ¶¶ 97, 105, 113). FirstEnergy vehemently opposed the referendum, spending $38 million over the next few months to defeat it. (*Id*.).

From Householder's Speaker campaign through HB6's passage and referendum survival, multiple media outlets and watchdog groups called attention to the Company's political spending and the unusual relationship between FirstEnergy and Householder. Such reports highlighted the connections between FirstEnergy, Generation Now, and other "dark money groups," and support for favorable Ohio legislation. (*Id*. ¶¶ 57−62, 97). For example, two nonprofit research organizations dedicated to corporate accountability reported that FirstEnergy had the second highest level of political spending relative to its revenue, but ranked only 22nd in

transparency about its political spending. (*Id*. ¶ 72). Moreover, FirstEnergy executives and Householder communicated frequently throughout the period encompassing Householder's campaign, the illegal payments, and HB6's passage. (*Id*. ¶ 8).

Furthermore, Plaintiffs allege that the Director Defendants were aware of shareholders' concerns about the Company's lobbying efforts and campaign contributions and took affirmative steps to conceal them. (*Id*. ¶¶ 66−76). In 2015 and 2016, FirstEnergy shareholders issued formal proposals at annual shareholder meetings that would require the Company to increase its transparency and oversight over lobbying and political spending. (*Id*. ¶ 66). For example, the 2015 proposal stated that "shareholders [were] missing key information needed to assess our company's efforts to influence public policy" because the Company did not disclose "lobbying to influence" state legislation, and that "[a]dditional disclosure [was] needed for shareholders to assess whether lobbying expenditures are in the best interest of stockholders and long-term value." (*Id*.). The Director Defendants campaigned against the proposals each year, ultimately defeating them. (*Id*.). To do so, they told shareholders in both 2015 and 2016 that "[y]our Company complies with all federal and state lobbying registration and disclosure requirements." (*Id*. ¶¶ 67−69).

Shareholders again made a proposal to increase disclosure, transparency, and accountability in connection with the Company's lobbying efforts in March 2017, shortly after FirstEnergy flew Householder to D.C. (*Id*. ¶¶ 70−71). They requested the Company to issue annual reports, which would be presented to the Audit Committee and posted on FirstEnergy's website. (*Id*.). Director Defendants once more urged FirstEnergy shareholders to vote against the proposal, representing that "[a]fter careful consideration," the Company "complies with all federal and state lobbying registration and disclosure requirements." (*Id*. ¶ 74). This effort also failed, although 41% of the votes cast supported the proposal. (*Id*. ¶ 75).

After the vote, the FirstEnergy Defendants solicited feedback to prevent a renewed proposal, which culminated in the Company's 2018 Proxy Statement. (*Id*. ¶ 76). There, the Company represented that the Board "strengthened its oversight over [the Company's] lobby activities" in 2017 and amended the Corporate Governance Committee Charter to "clarify this responsibility." The Board also represented to shareholders that this Committee "maintain[ed] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." (*Id*.). In its 2019 and 2020 Proxy Statements, the Board continued to highlight that it had taken steps to increase transparency and prevent risks such as the use of FirstEnergy funds for illicit lobbying. (*Id*. ¶¶ 177−81, 197−202). Moreover, the Company represented to shareholders on annual reports in the Form 10-Ks for 2017, 2018, and 2019 that FirstEnergy "demonstrate[d] a commitment to integrity and ethical values" and "enforce[d] accountability." (*Id*. ¶¶ 168, 189, 209). The Director Defendants signed these forms, which included statements of cash flows and a breakdown of Company expenses but did not disclose the millions of dollars in lobbying expenditures. (*Id*. ¶¶ 169, 190, 210).

The bribery scheme was exposed on July 21, 2020, when formal criminal charges were brought against Householder and others ("Criminal Complaint"), and reports of FirstEnergy's involvement surfaced soon thereafter. (*Id*. ¶ 124). Although the U.S. Attorney noted that "no one from the Company has of yet been charged," he added that "there are going to be a lot of busy FBI agents in the Southern District of Ohio . . . this is by no means over." (*Id.* ¶ 129). On July 24, 2020, Defendant Jones admitted during an analyst call that FirstEnergy had paid significant, previously undisclosed amounts of money to Generation Now. (*Id*. ¶¶ 130−31). Additionally, the Company

later admitted that its subsidiary, FES, gave $56.6 million to Generation Now in its March 10, 2021 answer in the Ohio ratepayer lawsuit.[3]

The Company's stock value fell 45% in the aftermath, eliminating approximately $12 billion of stock value. (*Id*. ¶ 135). The Company is currently the subject of ongoing investigations by the U.S. Department of Justice, the Securities and Exchange Commission, the Ohio Public Utilities Commission, and the Ohio State Attorney General. (*Id*. ¶¶ 123, 132−35). In addition to its reputational damage, securities analysts estimate the Company faces between $500 million and $1 billion in future sanctions. (*Id*. ¶ 150).

## B. Procedural History

The first derivative action against FirstEnergy's directors and officers was filed on August 7, 2020 in the Northern District of Ohio; the case remains in that district today.[4] Subsequent actions were filed in the Southern District of Ohio, first by Roberta Bloom and two other individuals on September 1, 2020, and later by six additional plaintiff groups.[5] These cases were determined to be related and assigned to this Court. (ECF No. 26). On November 16, 2020, this Court consolidated the cases; appointed Plaintiff Employees Retirement System of the City of St. Louis

---

[3] *Smith v. FirstEnergy Corp.*, No. 2:20-cv-03987-EAS-KAJ (S.D. Ohio) (ECF No. 49). The Court takes judicial notice of the Company's answer in this case, as "such materials are public records [and] are otherwise appropriate for the taking of judicial notice." *Mories v. Box. Sci. Corp.*, No. 2:18-CV-05671, 2020 WL 6060431, at *5 (S.D. Ohio Oct. 14, 2020) (quoting *New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003)).

[4] *Miller v. Anderson*, No. 5:20-cv-01743 (N.D. Ohio). Plaintiffs in the Southern District derivative actions later moved to intervene in this case, seeking to transfer it to the Southern District of Ohio. (*Id.*, ECF No. 17). Although Ms. Miller filed a Notice of Non-Opposition to the Motion to Transfer (*Id.*, ECF No. 19), Defendants opposed (*Id.*, ECF No. 20). Defendants also filed a motion to dismiss the amended complaint. (ECF No. 21). These motions are currently pending before Judge Adams in the Northern District.

[5] Those cases include: *Bloom v. Anderson*, No. 2:20-cv-04534 (S.D. Ohio); *Stavely v. Anderson*, No. 2:20-cv-04598 (S.D. Ohio); *Emps. Ret. Sys. of the City of St. Louis v. Jones*, No. 2:20-cv-04813 (S.D. Ohio); *Beck v. Anderson*, No. 2:20-cv-05020 (S.D. Ohio); *Elec. Workers Pension Fund, Local 103, I.B.E.W. v. Anderson*, No. 2:20-cv-05128 (S.D. Ohio); *Sarnelli v. Anderson*, No. 2:20-cv-05192 (S.D. Ohio); and *Mass. Laborers Pension Fund v. Jones*, No. 2:20-cv-05237 (S.D. Ohio).

and Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W. to serve as Co-Lead Plaintiffs; and appointed Saxena White P.A. and Bernstein Litowitz Berger & Grossmann LLP as Co-Lead Counsel and the Law Offices of John C. Camillus LLC as Liaison Counsel. (ECF No. 44).

On January 25, 2021, Co-Lead Plaintiffs filed their Consolidated Verified Shareholder Derivative Complaint ("Consolidated Complaint"). (ECF No. 75). They assert one federal cause of action—violation of Section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 14a-9—against the Director Defendants.[6] They also allege five state law claims against the Director Defendants and/or the Officer Defendants,[7] including two counts of breach of fiduciary duty, unjust enrichment, corporate waste, and a claim for contribution and indemnification. The FirstEnergy Defendants moved to dismiss for failure to state a claim on February 24, 2021. (ECF No. 79). The motion is now fully briefed and ripe for review.

### III. STANDARD OF REVIEW

A complaint will survive a motion to dismiss if the plaintiff alleges facts that "state a claim to relief that is plausible on its face" and that, if accepted as true, are sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (expounding Fed. R. Civ. P 8(a)(2)'s "short and

---

[6] The Director Defendants include: (1) Charles E. Jones, Chief Executive Officer of FirstEnergy from 2015 until October 29, 2020; (2) Michael J. Anderson, Director since 2007 and Chair of the Audit Committee; (3) Steven J. Demetriou, Director since 2017 and Chair of the Finance Committee; (4) Julia J. Johnson, Director since 2011; (5) Donald T. Misheff, Director since 2012; (6) Thomas N. Mitchell, Director since 2016 and Chair of the Operations and Safety Oversight Committee; (7) James F. O'Neil, III, Director snice 2017 and Chair of the Compensation Committee; (8) Christopher D. Pappas, Director since 2011 and current Executive Director; (9) Sandra Pianalto, Director since 2018; (10) Luis A. Reyes, Director since 2013, and (11) Leslie M. Turner, Director since 2018. (Consol. S'holder Compl. ¶¶ 22–33, ECF No. 75).

[7] The Officer Defendants include: (1) Michael J. Dowling, former Senior Vice President, External Affairs; (2) James E. Pearson, former Chief Finance Officer; (3) Robert Reffner, former Senior Vice President and Chief Legal Officer; (4) Steven E. Strah, President and acting Chief Executive Officer; (5) K. Jon Taylor, former Vice President, Controller and Chief Accounting Officer, former President of Ohio Operations, former Vice President of Utilities, and current Chief Financial Officer; and (6) Ebony Yeboah-Amankwah, former Vice President, General Counsel and Chief Ethics Officer. (*Id*. ¶¶ 34–39).

plain statement" rule). A complaint must therefore "contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable theory." *Edison v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

In assessing the sufficiency and plausibility of a claim, courts "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  A complaint that suggests "the mere possibility of misconduct" is insufficient. *Iqbal,* 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). Thus, dismissal is appropriate only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Guzman v. U.S. Dep't of Homeland Sec.*, 679 F.3d 425, 429 (6th Cir. 2012) (quotation omitted).

Shareholder derivative actions must satisfy the additional pleading standard in Rule 23.1(b)(3), which requires a complaint to state with particularity "any effort by the plaintiff to obtain the desired action from the directors" and, if applicable, "the reasons for not obtaining the action or not making effort." Fed. R. Civ. P. 23.1. Demand is excused as futile under Rule 23.1 when "the directors' minds are closed to argument and . . . they cannot properly exercise their business judgment in determining whether the suit should be filed." *In re Ferro Corp. Derivative Litig.*, 511 F.3d 611, 618 (6th Cir. 2008) (citation omitted). A complaint meets this standard when it alleges particularized facts that create "a reasonable doubt that a majority of the board of directors [was] capable of making a disinterested and independent decision about whether to initiate litigation" at the time of filing. *In re Cardinal Health Derivative Litig.*, No. 2:19-cv-2491, 2021 WL 425966, at *13 (S.D. Ohio Feb. 8, 2021) (citing *In re Gas Nat.*, No. 1:13 CV 02805, 2015 WL 3557207, at *6 (N.D. Ohio June 4, 2015).

## IV. LAW & ANALYSIS

The FirstEnergy Defendants first move to dismiss Plaintiffs' Section 14(a) claim. After concluding the federal cause of action fails, the FirstEnergy Defendants argue the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. Alternatively, they argue that the Plaintiffs have failed to demonstrate demand futility and therefore do not have standing to bring any claim. The Court considers each of these arguments below.

### A. Section 14(a) Claim

Section 14(a) of the Exchange Act makes it unlawful to solicit shareholder approval by using proxy statements that do not comply with the rules and regulations of the Securities Exchange Commission. 15 U.S.C. § 78n(a)(1). Regulation 14a-9 prohibits a proxy solicitation by means of a proxy statement that contains material facts that are false or misleading at the time they are issued and in light of the circumstances under which they are made. 17 C.F.R. § 240.14a−9(a). In enacting Section 14(a), Congress intended to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1082 (6th Cir. 1984) (citing *J.J. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). The provision aims to "control the conditions under which proxies may be solicited with a view to preventing the recurrences of abuses which . . . [had] frustrated the free exercise of the voting rights of stockholders." *Id.* (quoting H.R. Rep. No. 1383, 73d Cong., 2d Sess., 13, 14). Thus, "[o]nly when the proxy statement fully and fairly furnishes all the objective material facts as to enable a reasonably prudent stockholder to make an informed investment decision is the federal purpose in the securities laws served." *Mendell v. Greenberg*, 927 F.2d 667, 674, (2d Cir. 1990), amended, 938 F.2d 1528 (2d Cir. 1990).

To plead a Section 14(a) claim, a plaintiff must allege: (1) a proxy statement contained a material misrepresentation or omission; (2) the defendants were at least negligent in their misrepresentation or omission;[8] (3) the misrepresentation or omission caused plaintiff's injury; and (4) the proxy statement was an essential link to the accomplishment of the transaction that harmed plaintiff. *See, e.g.*, *Smith v. Robbins & Myers, Inc.*, 969 F. Supp 2d 850, 868 (S.D. Ohio 2013); *In re Gas Nat.*, 2015 WL 3557207, at *12.

The Private Securities Litigation Reform Act ("PSLRA") requires heightened, particularized pleadings to support a 14(a) claim: "Under the PSLRA, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Smith*, 969 F. Supp 2d at 867 (quoting *La. Mun. Police Emps. Ret. Sys. v. Cooper Indus. PLC*, 12CV1750, 2012 WL 4958561, at *4 (N.D. Ohio Oct. 16, 2012)).

Defendants argue that the Section 14(a) claim fails as a matter of law because Plaintiffs have not: (1) pled falsity or misleadingness with sufficient particularity; (2) demonstrated negligence; or (3) properly asserted causation. Relatedly, they ask the Court to dismiss Plaintiffs' remaining state law claims for lack of subject matter jurisdiction.

### 1. Falsity or Misleadingness

Federal Rule of Civil Procedure 9(b) and the PSLRA together require a Section 14(a) plaintiff to identify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and all facts on which that belief is formed. *Shaev v. Baker*, No. 16-cv-

---

[8] The FirstEnergy Defendants argue unpersuasively that pleading scienter is essential to state a Section 14(a) claim. For the Court's full analysis on the required state of mind for a Section 14(a) claim, see *infra* subsection IV.A.2.

05541-JST, 2017 WL 1735573, at *15 (N.D. Cal. May 4, 2017) (citing *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1075 (C.D. Cal. 2008)). A statement or omission is materially false or misleading when there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote" and the statement or omission "renders the proxy materials misleading." *Smith*, 969 F. Supp. 2d at 869 (citing *IBEW Local 98 Pension Fund v. Cent. Vt. Pub. Serv. Corp.*, No. 5:11-cv-222, 2012 WL 928402, at *9 (D. Vt. Mar. 19, 2012); *see also In re Gas Nat.*, 2015 WL 3557207, at *12. Moreover, "[t]o the extent the materiality question is close," the general rule at the motion to dismiss stage is that "a complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *In re Gas Nat.*, 2015 WL 3557202, at *13 (quoting *Smith*, 969 F. Supp. 2d at 869 n.23).

Contrary to Defendants' contention, this Court finds that Plaintiffs' allegations meet the heightened pleading requirements of the PSLRA. (*See* ECF No. 80 at 22−23). Plaintiffs allege that the Director Defendants caused the Company to issue Proxy Statements that concealed an illegal bribery scheme, its implications for FirstEnergy's overall business and financial health, and the deficient governance practices at the Company that allowed it to proceed. (Consol. Compl. ¶¶ 151−67, 177−88, 197−208, 329−36, ECF No. 75). Specifically, Plaintiffs assert that the 2018, 2019, and 2020[9] Proxy Statements contained several material misstatements. For example, the

---

[9] The FirstEnergy Defendants argue that the 2020 Proxy Statement lacks an essential link to FirstEnergy's actions because the Consolidated Complaint alleges the improper payments ended by March 2020, a month before the Company filed the 2020 Proxy. (ECF No. 80 at 26). In support of this contention, Defendants offer a one-sentence analysis, citing *Kelley v. Rambus, Inc.*, No. C 07-1238 JF, 2008 WL 5170598 (N.D. Cal. Dec. 9, 2008). *Kelley*, however, holds that failing to disclose corporate actions "that occurred years earlier—i.e., the backdating" cannot "postulate[] an 'essential link.'" *Id.* at *7. Here, unlike the years-long gap in *Kelley*, Plaintiffs allege that over $1 million of FirstEnergy funds were wired to Householder in February 2020, and that Director Defendants issued the 2020 Proxy on April 1, 2020. (Consol. Compl. ¶¶

14

2018 Proxy told investors that the "full Board considers risks applicable to your Company at each meeting in connection with its consideration of significant business and financial developments of your Company." (*Id.* ¶ 158). It also explained how the Company's Audit Committee assisted the Board with "the integrity of your Company's financial statements [and] your Company's compliance with legal, risk management and oversight, and regulatory requirements . . ." (*Id.* ¶ 159). Moreover, it represented that the "Board further strengthened its oversight of your Company's lobbying activities and . . . maintains an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." (*Id.* ¶ 159). Through the 2018 Proxy, Director Defendants also solicited stockholders to re-elect themselves to the Board and to approve executive compensation. (*Id.* ¶ 158).

The 2019 and 2020 Proxies made similar representations. (*See id.* ¶¶ 177−181, 199−202). The 2019 Proxy represented that the Company's compensation structure "mitigate[d] undue risk through compensation design, corporate policies, and effective governance" through its "pay-for-performance" plan. (*Id.* ¶ 183). Similarly, the 2020 Proxy assured shareholders that FirstEnergy had "decision-making and oversight processes in place for political contributions and expenditures," which it said included a periodic review of "this policy and related practices as well as dues and/or contributions to industry groups and trade associations" by "your Board's Corporate Governance and Corporate Responsibility Committee." (*Id.* ¶ 202). Both proxies also solicited votes for the Director Defendants' re-election and sought approval of executive compensation. (*Id.* ¶¶ 177, 198).

---

197, 204, ECF No. 75). This Court therefore declines to infer that a causal link between the 2020 Proxy and FirstEnergy's conduct does not exist.

Moreover, Plaintiffs explain in detail why the proxy misstatements and omissions were misleading—i.e., by the time the Director Defendants filed the 2018 Proxy, FirstEnergy had already "funneled millions to support the candidacies of Householder and his allies in the 2018 election, in exchange for legislative actions desired by the Company's leaders." (*Id.* ¶ 163). Plaintiffs allege that the Company's purported compliance with federal and state lobbying requirements and its representations about its oversight of these expenditures was designed to influence how shareholders voted on multiple occasions. (*Id.* ¶¶ 11, 65−76, 164−67). Plaintiffs maintain that the FirstEnergy Defendants knew these issues were important to shareholders, since they had presented proposals asking for improved disclosures in connection with the Company's lobbying efforts several times. (*Id.*). Without the misleading statements in each of the proxies, Plaintiffs contend that the shareholders would not have voted to re-elect Board members. (*Id.* ¶¶ 164, 177, 198). Instead, they would have "worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action." (*Id.* ¶ 164).

Plaintiffs also describe how the Proxy Statements related to compensation misled shareholders by conveying that the Company's compensation structures "encouraged long-term stockholder value, pay for performance, and good governance." (*Id.* ¶¶ 165−67). They say these statements falsely and misleadingly assured the shareholders that Defendants "were not incentivized to place their own financial interests before the interests of the Company." (*Id.* ¶ 162). On the basis of these representations, FirstEnergy shareholders voted in support of millions of dollars in executive compensation for certain Director Defendants "without the benefit of material information regarding Defendants' roles in, and their failure to address, the Ohio bribery scheme," which Plaintiffs say caused damage to the Company. (*Id.* ¶ 167).

Combined, Plaintiffs make extensive and detailed allegations suggesting that the FirstEnergy Defendants issued numerous false or misleading statements through the proxies, and they provide ample reasons as to why the statements misled shareholders. Extensive facts, outlined in the Consolidated Complaint, support their position. Accordingly, this Court finds that Plaintiffs have met the particularity requirements under Rule 9 and the PSLRA.

The FirstEnergy Defendants argue that Plaintiffs do not properly plead falsity or misleadingness because the Consolidated Complaint does not identify the law or regulation governing "lobby activities and expenditures" the Director Defendants violated. (ECF No. 80 at 22). In support, Defendants profess that the Sixth Circuit does not require companies to disclose their own illegal actions on proxy statements: "[S]tatements regarding 'legal compliance' are not [generally] actionable because companies have no duty to opine about the legality of their own actions . . . Such information is considered 'soft' and, therefore, disclosure is not required." *Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*Omnicare*"), 583 F.3d 935, 945 (6th Cir. 2009).

The Sixth Circuit had previously limited this "soft information" rule to instances where the company remained completely silent about its illegal conduct. *See In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401−02 (6th Cir. 1997). In *Omnicare*, the court applied the soft information rule to plaintiffs' Section 10(b) claim, even though the company made "general statements that it complied with state law and regulations" because plaintiffs had alleged "few factual allegations" about the company's state of mind. *Omnicare*, 583 F.3d at 945−46. Moreover, the company "merely [made] a generic claim that [it] complied with the law without providing *any* specifics and generally refus[ed] to discuss" the topic. *Id.* at 947. These facts are inapposite to the case sub judice. First, Plaintiffs allege that the Director Defendants made numerous specific statements

17

about their legal compliance and risk management actions with respect to lobbying and political spending. Second, as the Court details in subsection IV.A.2 *infra*, Plaintiffs make extensive allegations about the FirstEnergy Defendants' state of mind.

Even with these key differences, the *Omnicare* court did not, as Defendants suggest, require plaintiffs to identify a specific law to overcome the "soft information" rule. This Court declines to impose such a requirement for the first time here. Instead, the Court recalls the purpose of the Exchange Act generally and the proxy rules specifically:

> The securities laws do not operate under the assumption that material information need not be disclosed if management has reason to suppress it. Investors may want to know about illegal activity for the same reason management will be reluctant to reveal it: it threatens to damage the corporation severely. Excepting from the disclosure rules information management has reason to hide would eviscerate the protection for investors embodied in the securities laws.

*Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir. 1987) (considering whether allegations that the director-defendants engaged in bribery were material for a Section 10(b) claim). Even absent a per se rule requiring disclosure of unproven criminal conduct, "corporations are [nevertheless] obligated to disclose facts necessary to ensure that their statements are not misleading. This duty applies to the disclosure of [uncharged, unadjudicated conduct] to the same extent it applies to the disclosure of any other material information." *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 536 F. Supp. 2d 313, 323 (S.D.N.Y. 2007) (citation omitted). Courts must therefore ask whether misstatements or omissions "are sufficiently connected to Defendants' existing disclosures to make those public statements misleading." *Id.* Here, the Court finds Plaintiffs sufficiently established such a connection.

Defendants also contend that Plaintiffs have not satisfied the pleading requirement because the Consolidated Complaint lacks particularized facts establishing each element of the underlying offense of bribery. (ECF No. 80 at 22−24; ECF No. 87 at 18−19). Defendants rely primarily on

*Gamm v. Sanderson Farms, Inc.*, which held that "the facts of underlying illegal acts," including

"the basic elements of [the] underlying" offense, must be pled with particularity for Section 10(b)

claims "when a complaint claims that statements were rendered false or misleading through the

non-disclosure of illegal activity[.]" 944 F.3d 455, 465 (2d Cir. 2019).[10]

Although neither party acknowledges how the *Gamm* court reached this conclusion, this

Court finds its reasoning to be especially instructive here:

> We acknowledged that the PSLRA does not require the plaintiffs plead with
> particularity every single fact upon which their beliefs concerning false or
> misleading statements are based, but rather that plaintiffs must plead with
> particularity *sufficient* facts to support those beliefs. Accordingly, this court held
> that a complaint can meet the new pleading requirement imposed by [the PSLRA]
> by providing documentary evidence and/or a *sufficient general description of the
> personal sources of the plaintiffs' beliefs*, although there is no requirement that the
> plaintiffs name confidential sources.
>
> Applying that standard here, [plaintiffs] were required to plead with particularity
> sufficient facts to support their contention that [the company's] financial
> disclosures were misleading. This necessarily requires that facts of the underlying
> anticompetitive conduct be pleaded with particularity. Otherwise, the complaint
> provides no basis as to what rendered [the company's] statements false or
> misleading. Because [the company's] statements were materially false or
> misleading only to the extent that anticompetitive conduct actually occurred,
> appellants must plead sufficient — though not exhaustive — facts describing the
> essential elements of that underlying conduct.

*Id.* (emphasis added) (internal citations omitted).

Notably, the *Gamm* plaintiffs alleged only that the company "engaged in 'anticompetitive'

conduct" but offered "virtually no explanation as to how that collusive conduct occurred, and

---

[10] The Sixth Circuit has never opined on whether plaintiffs must plead each element of illegal conduct when claiming the non-disclosure of an illegal act was false or misleading for purposes of either Section 10(b) or Section 14(a) claims.

whether and how it affected trade." *Id.* The court found that these facts were insufficient because they did not comport with the stated intent and public policy rational of the PSLRA, which is "to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Id.* (citing *Novak v. Kasaks*, 216 F.3d 300, 313–14 (2d Cir. 2000); H.R. Conf. Rep. No. 104-369, at 31 (1995)). At heart, the *Gamm* court holding was meant to prevent a company from having "to simultaneously defend itself" of illegal conduct and "in an accompanying securities fraud suit based on facts not alleged with the level of particularity required by the statute" because "[s]uch a reality would harm the company's stock and contravene the purpose of securities laws—to protect shareholders' interests." *Id.* at 464–65.

Keeping in line with the *Gamm* court's reasoning, this Court finds that Plaintiffs have sufficiently alleged the facts of the underlying bribery conduct. Bribery occurs when "a public official agrees that payments will influence an official act." *United States v. Terry*, 707 F.3d 607, 612–13 (6th Cir. 2013) ("This agreement must include a quid pro quo—the receipt of something of value in exchange for an official act." (internal citations omitted)). The agreement "can be formal or informal, written or oral." *Id.* Accordingly, "'[m]otives and consequences*, not formalities,' are the keys for determining whether a public official entered an agreement to accept a bribe, and the trier of fact is 'quite capable of deciding the intent with which words were spoken or actions taken as well as the reasonable construction given to them by the official and the payor.'" *Id.* (citing *Evans v. United States*, 504 U.S. 255, 274 (1992) (emphasis added) (Kennedy, J., concurring in part and concurring in the judgment)).

Here, Plaintiffs allege the FirstEnergy Defendants made payments in return for Householder's promise to help enact bailout legislation that would save FirstEnergy from serious financial hardship. (Consol. Compl. ¶¶ 53–61). Plaintiffs describe financial motives for this

20

agreement, which resulted from FES' imperiled fiscal situation, and from the Defendants' desire to increase their incentive-based compensation. (*Id.* ¶¶ 56, 77, 79–81). Plaintiffs allege that the Company flew Householder to Washington, D.C. on its private jet in January 2017; that, during this trip, the "corrupt deal was struck and, as FirstEnergy lobbyist and Householder co-conspirator [Matt] Borges described, the "unholy alliance" was formed; that the next month, in February 2017, Defendant Jones explained to investors the Company was pursuing a "legislative solution [that] was a bailout of the . . . nuclear power plants"; that the Company began making clandestine quarterly payments of $250,000 to Generation Now, which Householder secretly controlled, in March of 2017; that "Householder put FirstEnergy's money to use" to create favorable legislation for the Company. (*Id.* ¶¶ 59–64). The Consolidated Complaint alleges that "Director Defendants actively participated in the bribery and pay-to-play scheme," by allowing the Company to make "massive illegal payments propping up the Officer Defendants' executive compensation" and by covering up the scheme illegally. (*Id.* ¶ 9).

According to Plaintiffs, these efforts culminated in the passage of House Bill 6. (*Id.* ¶ 109) ("While the passage of HB6 in the House helped Householder maintain his agreement with FirstEnergy, it did not fulfill that agreement. Householder still needed to ensure that HB6 passed the Senate and was signed into law."). HB6 allowed FirstEnergy to collect 94% of the nuclear energy subsidy provided for in the bill, or more than $160 million annually. (*Id.* ¶ 103). Media throughout Ohio "derided HB6 as a 'bailout' for the specific benefit of FirstEnergy."). (*Id.*). In sum, the Complaint alleges both the motives and consequences of the alleged bribery.

The Consolidated Complaint also cites the Criminal Complaint and other events related to this action. For example, the Criminal Complaint alleges that Householder and FirstEnergy

engaged in "a sophisticated criminal conspiracy to enact legislation on behalf of [FirstEnergy]."[11] (*Id.* ¶ 7). The Consolidated Complaint quotes U.S. Attorney David DeVillers, who oversaw the criminal case and described it as "likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio . . . bribery, pure and simple. This was a quid pro quo." (*Id.* ¶ 7). Additionally, Householder's co-conspirator, Juan Cespedes, admitted in his October 2020 plea agreement that he and others "orchestrat[ed] payments on multiple occasions to Generation Now . . . in return for specific official action by Householder relating to the passage and preservation of legislation that would go into effect and save the operation of two nuclear power plants in Ohio." (*Id.* ¶ 47).

These allegations assure the Court that Plaintiffs are not merely opportunistic litigants with claims of dubious merit that could place the shareholders' value at risk. Rather, the allegations sufficiently describe the personal sources of Plaintiffs' contention that FirstEnergy's financial disclosures were misleading, and they also provide a sufficient factual basis describing the underlying illegal conduct. The Consolidated Complaint, together with the allegations in the Criminal Complaint and FBI Affidavit, provides FirstEnergy with more than enough particularity to defend themselves against this action. Finally, as the Consolidated Complaint emphasizes, the FirstEnergy stock has already suffered a significant drop in value, and the Court finds no further risk to the shareholders by permitting this action to proceed.

### 2. Level of Culpability

The FirstEnergy Defendants argue that Plaintiffs have failed to plead the requisite level of culpability for their Section 14(a) claim; they contend that the Sixth Circuit requires Plaintiffs to

---

[11] The Criminal Complaint refers to FirstEnergy as "Company A." FirstEnergy later admitted that it was Company A. (ECF No. 86 at 19) (citing *Smith v. FirstEnergy Corp.*, C.A. No. 2:20-cv-03987-EAS-KAJ (S.D. Ohio) (ECF No. 49).

plead scienter and that they have not. Accordingly, the Court considers the appropriate level of culpability for Section 14(a) claims before turning to the sufficiency of Plaintiffs' allegations.

*a. Appropriate Standard*

Neither Section 14(a) nor the Security Exchange Commission's regulations specify the culpable state of mind required for liability under Section 14(a)—scienter or negligence. *See In re Willis Towers Watson Plc Proxy Litig.*, 439 F. Supp. 3d 704, 712 (E.D. Va. 2020), *motion to certify appeal denied*, no. 117CV1338AJTJFA, 2020 WL 923331 (E.D. Va. Feb. 26, 2020) ("The language of Section 14(a) and the applicable regulation . . . do not specify a particular state of mind."). Additionally, the Supreme Court has expressly declined to determine the defendant's requisite state of mind to establish Section 14(a) liability. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 444 n.7 (1976) ("Our cases have not considered, and we have no occasion in this case to consider, what showing of culpability is required to establish the liability under § 14(a) of a corporation issuing a materially misleading proxy statement[.]").

To support the proposition that Plaintiffs must plead scienter as part of their Section 14(a) claim, Defendants primarily rely on dicta in a footnote from *Indiana State District Council v. Omnicare*, 719 F.3d 498, 506−07 n.3 (6th Cir. 2013). The footnote cites to *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980) to support the statement that Section 14(a) "require[s] proof of scienter to state a claim." *Omnicare I*, 719 F.3d at 506−07 n.3. *Adams*, however, issued a narrow holding that required scienter for claims only against outside accountants, and not for corporate insiders, directors, or officers like the Director Defendants. *Adams*, 623 F.2d at 428 ("[W]e conclude that scienter should be an element of liability in private suits under the proxy provisions as they apply to outside accounts."); *see also SEC v. Shanahan*, 646 F.3d 536, 546−47 (8th Cir. 2011) (applying scienter standard to outside directors and

accountants). Significantly, the *Adams* court noted that, at the time, only two circuits had examined the issue of culpability since the Supreme Court established a private right of action under Section 14(a), and that "[b]oth ha[d] prescribed a negligence standard for the corporation issuing the proxy statement." *Id.*

Subsequent decisions in this Circuit have recognized that *Adams* does not apply to claims against corporate insiders responsible for issuing proxy statements. The Northern District of Ohio, for example, holds that corporate officers and directors may be found liable for a Section 14(a) violation when they are negligent:

> Where the defendant is the corporate issuer, and the corporate officials are responsible for drafting the proxy statement, the *Gerstle* negligence standard applies, but not the *Adams* scienter requirement. As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard.

*Fradkin v. Ernst*, 571 F. Supp. 829, 843 (N.D. Ohio 1983) (citing *Gerstle v. Gamble-Skogomo, Inc.*, 478 F.2d 1281 (2d Cir. 1973)); s*ee also In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 689 (M.D. Tenn. 2000) ("[A] § 14(a) claim can be based on negligence, rather than scienter."); *City of Livonia Emps' Ret. Sys. v. Talmer Banorp, Inc.*, Case No. 16-12229, 2018 WL 5840714, at *9 (E.D. Mich. Nov. 8, 2018) (finding that the "plaintiff must prove only that defendants acted at least negligently" to state a Section 14(a) claim). Courts in the Southern District of Ohio agree. *In re Gas Nat.*, 2015 WL 3557207, at *12 (applying negligence standard); *Smith*, 969 F. Supp. 2d at 868 (same). ⸗

A majority of courts outside the Sixth Circuit also routinely apply a negligence standard for Section 14(a) liability against corporate insiders. *Kurr v. Orbital ATK, Inc.*, 276 F. Supp. 3d 527, 539−40 (E.D. Va. 2017) ("[T]he majority of circuits to address the question of whether §

14(a) requires negligence or fraud have found that § 14(a) requires only negligence as the requisite standard of culpability."); *see also Beck v. Dobrowski*, 559 F.3d 680, 682 (7th Cir. 2009) ("Section 14(a) requires proof only that the proxy solicitation was misleading, implying at worst negligence by the issuer."); *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 682 (9th Cir. 2005) ("[U]nlike Section 10(b), Section 14(a) lacks any reference to a manipulative device or contrivance . . . to indicate a requirement of scienter." (internal citations omitted)); *Wilson v. Great Am. Indus., Inc.*, 855 F.2d 987, 995 (2d Cir. 1998) ("As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard."); *Shidler v. All Am. Life & Fin. Corp.*, 775 F.2d 917, 926─27 (8th Cir. 1985) ("[Section 14(a)] Plaintiffs need only show that the defendants negligently drafted the proxy statement."); *Parsons v. Jefferson-Pilot Corp.*, 789 F. Supp. 697, 703 (M.D.N.C. 1992) (holding that a Section 14(a) "plaintiff need not establish that the corporate issuer intended to deceive the shareholders or that the shareholders acted recklessly").

A plain text reading of Section 14(a) underlies the above case law and supports reliance on the negligence standard. The *Knurr* court offers particularly helpful statutory context:

> To begin with, neither the text of § 14(a) nor Rule 14a–9 refers to a specific state of mind. *See* 15 U.S.C. § 78(n); 17 C.F.R. § 240.14a–9. Importantly, where Congress has intended a scienter requirement, it has used words like "manipulative," "deceptive," "device," or "contrivance" to describe the state of mind required to establish liability, and the rules promulgated pursuant to those statutory provisions have used terms like "scheme" or "artifice to defraud." *See, e.g.*, 15 U.S.C. § 78(j)(b); 17 C.F.R. § 240.10b–5. As the Supreme Court has noted, terms like "'device,' 'scheme,' and 'artifice,' all connote knowing and intentional practices." *Aaron v. SEC*, 446 U.S. 680, 696, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). By contrast, the plain text in § 14(a) and Rule 14a–9 conspicuously excludes these words. And significantly, where Congress has omitted such fraud-like words in other areas of securities law, courts have uniformly applied negligence standards.

*Knurr*, 276 F. Supp. 3d at 539. The Court views Section 14(a) similarly and presumes that Congress would explicitly include a heightened level of culpability if it intended to do so. In the absence of such language, and in accordance with courts within and outside this Circuit, this Court analyzes Plaintiffs' Section 14(a) claim under the negligence standard.

### b. Whether Plaintiffs Allege Negligence

Proceeding under a negligence standard for Section 14(a) claims, the question now before the Court is whether Plaintiffs have, in fact, pled facts adequate to state a claim. Here, the Consolidated Complaint states that "Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2018, 2019, and 2020 Proxies." (Consol. Compl. ¶ 332, ECF No. 75). Specifically, Plaintiffs allege numerous "red flags" put the Director Defendants on notice of the bribery scandal. Plaintiffs cite numerous news articles raising concerns about the propriety of the relationship between FirstEnergy, Householder and House Bill 6, including a March 2017 article by the *Dayton Daily News*; an April 2018 article by *Cleveland.com*; a July 2018 article by *Cleveland.com*; an April 2019 article by *WKSU Ohio*; a May 2013 article by *Cleveland.com*; and July 2019 articles by both the *Columbus Dispatch* and *Cincinnati Enquirer*. (*Id*. ¶¶ 57, 62, 97, 105, 113). These articles highlighted the "millions of dollars in mysteriously funded TV and radio ads" which derived "largely from a dark-money group backing FirstEnergy" and that the Company "spent to buy support from legislators for their coal and nuclear bailout[.]" (*Id*. ¶ 105). Plaintiffs also cite other public and press reports, such as a May 2019 report by an Ohio energy watchdog, which discussed "the unmistakable connection between the lobbying by FirstEnergy to pass HB6 and General Now's $1 million donation" and questioned "whether FirstEnergy is using secret money to build public pressure this year[.]" (*Id*.).

The Consolidated Complaint also alleges investors issued formal proposals at annual shareholder meetings, requesting increased Board transparency and oversight of the Company's political spending. (*Id.* ¶¶ 65−66, 70−71, 168). In 2015 and 2016, shareholders said they were "missing key information needed to assess [FirstEnergy's] efforts to influence public policy" and that they needed additional disclosure so they could "assess whether lobbying expenditures [were] in the best interest of stockholders and long-term [Company] value." (*Id.* ¶ 66). By 2017—after the Company began making regular, undisclosed $250,000 payments to Generation Now—shareholders again expressed that they "believe[d] full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders." (*Id.* ¶ 70). The shareholders requested the Company to prepare an annual disclosure report which would include "[p]ayments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient." (*Id.*).

Plaintiffs allege the Director Defendants responded to these concerns by "recklessly disregarding" these red flags in contravention of their fiduciary duties. (*Id.* ¶¶ 254, 258, 263, 269, 274, 278, 283, 287, 292, 296). Instead, Defendants issued multiple Proxy Statements, assuring the shareholders that Defendants were monitoring, managing, and mitigating the Company's significant risks and compliance with legal requirements. (*Id.* ¶¶ 158−62; 177−84; 197−208). The Proxies detailed how the Company's Audit and Corporate Governance Committees implemented the Company's policies around disclosure, oversaw lobbying and political participation activities, and verified the accuracy of financial records. (*Id.* ¶¶ 159−61, 179−81, 200−02). Further, the

Consolidated Complaint asserts that Director Defendants issued these Proxies to solicit votes for director re-election and executive compensation. (*Id*. ¶ 333).

In sum, Plaintiffs allege the Director Defendants misrepresented or failed to disclose FirstEnergy's participation in the bribery scandal, that they had ample notice of the corrupt relationship between FirstEnergy and Householder through numerous public news reports and concerns raised by shareholders, and that they assured the shareholders they were protecting the Company from risk in the same documents they used to seek re-election and compensation approval. The Court finds that these allegations plead negligence on the part of Director Defendants with sufficient particularity.

### 3. Causation

Plaintiffs allege the misleading 2018, 2019, and 2020 Proxy Statements issued by the Director Defendants were an "essential link" in causing harm to FirstEnergy in two primary ways. (*Id*. ¶ 334). First, they argue the Company's shareholders re-elected Defendants Anderson, Demetrious, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board as a result of the misleading Proxy Statements issued by the Director Defendants. (*Id*. ¶¶ 164, 187, 205). Had the shareholders "known the truth," Plaintiffs contend "they would not have re-elected FirstEnergy's incumbent directors and would have instead worked to elect directors who would have worked to prevent or mitigate the harm to the Company giving rise to this action." (*Id*. ¶¶ 164, 187, 205). Furthermore, Plaintiffs allege the Proxy Statements "resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages." (*Id*.). Those damages include "massive losses" resulting from the 45% drop in closing price on FirstEnergy stock (from $41.26 per share to $22.85 per share) after the Criminal Complaint was filed on July 20, 2020. (*Id*. ¶ 135).

28

Second, based on the same Proxies, Plaintiffs say the shareholders voted in support of significant executive compensation that incentivized the Director Defendants' misconduct. (*Id*. ¶¶ 165−67, 188, 206−08). This compensation included $25 million in compensation to Director Defendants in 2017, more than $18 million in 2018, and approximately $30 million in 2019. (*Id*.). Though the Proxy Statements claimed the Company's compensation structure was "intended to mitigate excessive risk taking," Plaintiffs allege the compensation actually incentivized Defendants' misconduct. (*Id*. ¶¶ 79, 81, 87, 162, 184, 258, 278, 283, 287, 296). Furthermore, Plaintiffs allege Defendants were motivated to engage in the Ohio bribery scheme because "it increased the amount of their performance-based compensation tied to the achievement of certain FirstEnergy financial targets." (*Id*.). Incentive-based compensation comprised 74% to 87% of the Officer Defendants' total pay in 2017, 2018, and 2019. (*Id*. ¶ 81).

Most courts, including those in the Southern District of Ohio, break causation in securities cases into two separate but related concepts: loss causation and transaction causation. *See Smith*, 969 F. Supp. 2d at 868 (quoting *Lane v. Page*, 727 F. Supp. 2d 1214, 1227−28 (D.N.M. 2010) (noting that Section 14(a) claims must allege that "the misrepresentations or omissions caused the loss of which plaintiff complains" and that "the proxy statement was an essential link in the completion of the transaction at issue")). Loss transaction "refers to the cause of the particular economic harm,"[12] while transaction causation "refers to whether the misrepresentations induced plaintiffs to engage in the subject transaction." *Id.* (internal quotations omitted); *see also Murray v. Hosp. Corp. of Am.*, 682 F. Supp. 343, 346 (M.D. Tenn. 1988) (finding that Section 14(a) transaction causation requires plaintiffs to show "that they relied on the alleged material misrepresentation or omission in making an investment decision"). Generally, transaction

---

[12] The FirstEnergy Defendants have not contested loss causation.

causation is satisfied when a plaintiff "proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the corporate transaction." *Leff v. CIP Corp.*, 540 F. Supp. 857, 866 (S.D. Ohio 1982) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970)). Corporate transactions include loss-generating "harmful corporate actions." *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 (N.D. Tex. 2008) (quoting *In re Browning-Ferris Indus., Inc. S'holder Derivative Litig.*, 830 F. Supp. 361, 365 (S.D. Tex. 1993)).

The Sixth Circuit has yet to define "transaction causation" for purposes of a Section 14(a) claim under circumstances analogous to those presented here.[13] Other courts, however, have sustained Section 14(a) claims where shareholder-plaintiffs have alleged they would not have voted to re-elect the current directors or approve executive compensation plans if they had been told the truth about their company through truthful proxy statements. *See, e.g.*, *In re Wells Fargo & Co. S'holder Derivative Litig.*, 282 F. Supp. 3d 1074, 1105 (N.D. Cal. 2017; *In re Fossil, Inc.*, 713 F. Supp. 2d 644, 655 (N.D. Tex. 2010); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1016 (N.D. Cal. 2007); *Countrywide*, 544 F. Supp. 2d at 1075−77.

In *Wells Fargo*, for example, Plaintiffs alleged they re-elected the director defendants based on false and misleading proxy statements, which they said caused harm to the company because the directors' re-election enabled them to continue an illicit sales scheme. *In re Wells Fargo*, 282 F. Supp. 3d at 1105. Plaintiffs also alleged that the misleading proxy statements caused shareholders to approve excessive compensation to the director defendants. *Id.* at 1104−05. The court found the plaintiffs adequately alleged loss causation because "the re-election of board

---

[13] The Sixth Circuit considered transaction causation under Section 13(e) of the Exchange Act in *Howing Co. v. Nationwide Corp.*, 972 F.2d 700, 701−02 (6th Cir. 1992), where minority shareholders brought a securities action challenging their corporation's freeze-out merger transaction with its parent company.

members based on false or misleading proxy statements [is] sufficient to establish an "essential link" for purposes of a Section 14(a) claim" *Id*. Additionally, because the proxy statements contained misleading statements that caused shareholders to approve an executive compensation scheme, the plaintiffs also established causation by alleging the shareholders "directly authorize[d] a transaction that resulted in a harm[.]" *Id.* at 1104; *see also Countrywide*, 554 F. Supp. 2d at 1075 (upholding Section 14(a) claims concerning the concealment of corporate fraud where plaintiffs allege that if they "had been told the truth about the [c]ompany, they would have never voted (1) to reelect the current directors in those three years; or (2) to approve two compensation plans for executives and directors[.]").

Similarly, in both *Fossil* and *Zoran*, shareholders brought Section 14(a) claims against the directors of their respective companies for concealing a backdating stock option scheme through misrepresentations in proxy statements. 713 F. Supp. 2d at 655; 511 F. Supp. 2d at 1017. The *Fossil* plaintiffs argued that "but for the false proxy statements, the [corporate fraud] would have been discovered and stopped, thereby preventing harm to" the company and that the "election of the directors by the false proxies [was] an essential link to the harm caused to [the company]." 713 F. Supp. 2d at 655. They also contended that the election of the directors by the false proxies was an essential link the company's harm. *Id*. Likewise, the *Zoran* court found the following:

> [T]he directors use the proxy solicitations to maintain their positions on [the company's] board. Shareholders allegedly kept voting for the board members in blissful ignorance of the scheme to grant insiders backdated options while shortchanging the company. . . . With each election, the board could continue to grant backdated stock options to itself and [company] executives. . . . Had shareholders known that defendants had not followed the dictates of the plan in the past, this likely would have changed their votes. . . .
>
> If defendants had not falsely stated in [the company's] proxy statements that stock options were being granted properly under the plans, and that directors were complying with the terms of the plans that the shareholders approved, shareholders

31

> would have voted those board members out, and the board members would no longer have had the means to grant more backdated stock options.

511 F. Supp. 2d at 1016−17. Based on these allegations, both the *Fossil* and *Zoran* courts determined that these allegations were "sufficiently stated for purposes of surviving Defendants' Rule 12(b)(6) motion." 713 F. Supp. 2d at 655; 511 F. Supp. 2d at 1017 (noting that the question of whether "all these damages items [caused by the continuation of fraud] are compensable under Section 14(a) [was] for another day" and not properly decided at the pleading stage).

The FirstEnergy Defendants argue that Plaintiffs cannot establish causation under this theory because other courts find that "injuries occasioned by mismanagement or breach of fiduciary duty [are] not redressable under the proxy rules simply by virtue of the fact that acts were committed by directors who would not have been elected but for the proxy solicitation." *Browning-Ferris Indus.*, 830 F. Supp. at 370 (holding that allegations of "[d]efendants' failure to impose adequate internal controls" do not state a claim for fraudulent omissions in proxy materials under Section 14(a)); *Gen. Elec. Co. v. Cathcart*, 980 F.2d 927, 930−33 (3d Cir. 1992) (finding no Section 14(a) causation because plaintiff did not "set forth specific facts explaining how a particular [defendant] participated in or was directly responsible for the misconduct alleged"). These cases represent a more common approach, which generally declines to find causation based on re-election of board members and "later misconduct undertaken by" them, instead requiring shareholders to authorize a specific transaction that directly results in economic harm. *In re AGNC Inv. Corp.*, 2018 WL 3239476, at *6 (D. Md. July 3, 2018) ("[T]he mere fact that omissions in proxy materials, by permitting directors to win re-election, *indirectly* lead to financial loss through mismanagement will not create a sufficient nexus with the alleged monetary loss") (emphasis in original). Like-minded courts worry that upholding Section 14(a) claims "anytime a director commits a bad act and is re-elected without the bad act being disclosed in the proxy statement" is

untenable and would negate the transactional causation element. *In re iBasis, Inc. Derivative Litig.*, 532 F. Supp. 2d 214, 222 n.7 (D. Mass 2007) (dismissing Section 14(a) claim where plaintiffs "fail[ed] to allege that directors were paid anything more than what the [c]ompany would normally pay a director" and where no other harm followed the contested proxy statement).

Here, Plaintiffs allege far more than mere mismanagement or an isolated bad act. Rather, they have set forth in detail that the Director Defendants perpetrated an illicit bribery scheme and caused substantial risk to the Company that eventually resulted in the loss of nearly half its stock value. (*See* Consol. Compl. ¶ 135, ECF No. 75). Shareholders repeatedly articulated their concerns about the Board's political spending and lobbying by issuing formal proposals for increased transparency and oversight. (*Id.* ¶ 66). In response, Plaintiffs allege the Director Defendants falsely and misleadingly stated they were overseeing FirstEnergy's political spending in the same Proxy Statements they used to solicit votes for their re-election. (*Id.* ¶¶ 158, 177, 198). Moreover, they assert that the same Proxy misstatements Defendants used to secure their own re-election also elicited the shareholders' support of their incentive-based compensation. (*Id.* ¶¶ 165−67, 188, 206−08).

Like the allegations in *Wells Fargo*, *Fossil*, and *Zoran*, the Consolidated Complaint in the case sub judice adequately pleads causation. Plaintiffs allege that shareholders suffered a loss as a result of their vote to re-elect Board members based on false or misleading information in the Proxy Statements, which enabled Defendants to continue the illicit bribery scheme. Had the Proxy Statements been truthful, Plaintiffs say the shareholders would not have re-elected the Director Defendants. The shareholders' ignorance of the scheme enabled the FirstEnergy Defendants to continue to bribe Householder in exchange for self-serving legislation. Finding that these detailed

33

allegations[14] support a finding of causation at the pleading stage does not threaten to subsume transactional causation due to their unique nature. Therefore, this Court finds that these allegations are sufficient to meet the "essential link" requirement under Section 14(a) for purposes of surviving the FirstEnergy Defendants' motion to dismiss.

### 4. Supplemental Jurisdiction over State Law Claims

This Court finds there is a valid federal predicate claim that shares a common nucleus of operative fact with Plaintiffs' state law claims: the Section 14(a) claim flows from the same criminal scheme that underlies Plaintiffs' claims for breach of fiduciary duty, unjust enrichment, corporate waste, and for contribution and indemnification. The Court therefore exercises supplemental jurisdiction over the remaining state law claims. *See Slaughter v. Reg'l Acceptance Corp.*, No. 2:20-cv-01888, 2020 WL 7342898, at *3 (S.D. Ohio Dec. 14, 2020) (quoting 28 U.S.C. § 1367(a) ("[W]here a federal court has original jurisdiction in a civil action, it also has 'supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'"); *see also Michigan v. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 355 (6th Cir. 2003) ("A related claim is one arising from a common nucleus of facts[.]").

### B. Whether Plaintiffs Have Standing to Bring Their Claims

Defendants also ask the Court to dismiss the Consolidated Complaint because Plaintiffs have not pled demand futility and thus lack standing to bring their claims derivatively.

---

[14] Having determined that Plaintiffs' primary theory of causation is sufficient to overcome Defendants' motion to dismiss, the Court does not analyze separately whether shareholders' votes to approve executive compensation separately establishes causation under Section 14(a).

Under Rule 23.1 of the Federal Rules of Civil Procedure, plaintiffs in a shareholder derivative action must either make a pre-suit demand on the board of directors or state the reasons with particularity for failing to make such a demand. *NECA-IBEW Pension Fund ex rel. Cincinnati Bell, Inc. v. Cox*, No. 1:11-cv-451, 2011 WL 4383368, at *3 (S.D. Ohio Sept. 20, 2011) (citing Fed. R. Civ. P. 23.1(b)(3)). Absent compliance with Rule 23.1, plaintiffs "do not have standing to bring suit." *Stanley v. Arnold*, No. 1:12-cv-482, 2012 WL 5269147, at *3 (S.D. Ohio Oct. 23, 2012). The substantive law of the state of incorporation is applied to determine whether the plaintiff's failure to make a demand is excused, even when derivative claims are brought under federal law. *Id.* (citing *In re Ferro Corp.*, 511 F.3d at 617; *Komen v. Kemper Fin. Serv., Inc.*, 500 U.S. 90, 108−09 (1991)). Here, the state of incorporation is Ohio.

Like the federal rules, Ohio's Rules of Civil Procedure require a derivative action complaint to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action his desires from the directors . . . and the reasons for his failure to obtain the action or for not making the effort." Ohio Civ. R. 23.1. This demand requirement is in place to ensure "that the shareholder exhaust his or her intracorporate remedies before going to court with a derivative suit" and that corporate management has the "first opportunity to institute the litigation[.]" *Carlson v. Rabkin*, 152 Ohio App.3d 672, 789 N.E.2d 1122, 1128 (Ohio Ct. App. 2003)).

Even so, Ohio law recognizes an exception to the general demand rule, which permits shareholders to proceed with a derivative suit without first making a demand if they can show doing so would have been futile. *NECA-IBEW Pension Fund*, 2011 WL 4383368, at * 3 (citing *Carlson*, 789 N.E.2d at 1128). To plead demand futility, plaintiffs bear the burden of demonstrating that "the directors' minds are closed to argument and that they cannot properly

35

exercise their business judgment in determining whether the suit should be filed." *Carlson*, 789 N.E.2d at 1128.

Plaintiffs must cite facts that "show the presumed ability of the directors to make unbiased, independent business judgments about whether it would be in the corporation's best interests to file the action does not exist in this case." *Ferro*, 511 F.3d at 618. Ohio law generally "presumes" that directors can exercise independent business judgment about whether to sue some or all of the company's directors, and Ohio courts "have consistently rejected the idea that demand is always futile when the directors are targeted as the wrongdoers of the suit the shareholders wish the corporation to bring. *Stanley*, 2012 WL 5269147, at *4 (citing *Drage v. Procter & Gamble*, 119 Ohio App. 3d 19, 694 N.E.2d 479, 483 (Ohio Ct. App. 1997)).  Accordingly, Ohio courts have found demand to be presumptively futile when "the directors are antagonistic, adversely interested or involved in the transactions attacked." *Id.* (citing *Bonacci v. Ohio Highway Express, Inc.*, No. 60825, 1992 WL 181682, at *4 (Ohio Ct. App. July 30, 1992). For example:

> A demand may also be excused when all directors are named as wrongdoers and defendants in a suit, when there is self-dealing by the directors such that the directors gain directly from the challenged transactions, or when there is domination of nondefendant directors by the defendant directors.

*Id.* (citing *Carlson*, 789 N.E.2d at 1128). A complaint meets this standard when it alleges particularized facts "creating a reasonable doubt that a majority of the board of directors [at the time of filing] is capable of making a disinterested and independent decision about whether to initiate litigation." *Cardinal Health*, 2021 WL 425966, at *13 (applying Ohio law) (citing *In re Gas Nat. Inc.*, 2015 WL 3557207, at *6); *cf. Stanley*, 2012 WL 5269147, at *7 (finding that "broad, conclusory allegations . . . against the directors as a group does not excuse demand," particularly when the "vast majority of the current Board . . . is composed of outside Directors") (internal quotations omitted).

36

Applying Ohio law, courts in this Circuit recognize certain categories of facts that independently establish futility and excuse demand, two of which are relevant here. First, demand is futile when director defendants actively participated in the complained-of wrongdoing. *See, e.g.*, *Smith*, 969 F. Supp. 2d at 866; *Fradkin*, 571 F supp. 829 at 840 n.20. Second, demand is also futile and excused when a complaint adequately alleges a majority of the board of directors face a substantial likelihood of liability because they acted with reckless disregard for the company's best interest by failing to take action to prevent or remedy unlawful conduct. *See, e.g.*, *Cardinal Health*, 2021 WL 425966, at *14−15. The Court considers each of these demand excuses in turn.

### *1. Director Defendants' Active Participation in the Scheme*

At this juncture,[15] Plaintiffs "need not actually prove liability of each defendant . . . in order to show demand futility. Plaintiff[s'] allegations that all directors are named defendants in this action and all defendants actively participated in the alleged wrongdoing is sufficient under Ohio law to demonstrate demand futility." *Smith v. Robbins & Myers, Inc.*, No. 3:12-cv-281, 2012 WL 5845072, at *3 (S.D. Ohio Nov. 19, 2012); *see also NECA-IBEW Pension Fund*, 2011 WL 4383368, at *4 (finding demand futility where "director defendants are the very same people who approved the [complained-of corporate wrongdoing], and plaintiff has named all directors who approved the compensation as defendants"). Courts distinguish between cases where defendants' "status as directors" or their "passive approval of corporate measures" serve as bases for demand futility, and those where the Board actively participated in the illicit conduct and ordered the dissemination of misleading proxy. *Smith*, 969 F. Supp. 2d at 865 (excusing demand after plaintiff

---

[15] This quote derives from Judge Timothy S. Black's ruling on the plaintiff's motion for leave to file a second amended complaint. Although the standard of review for a request to amend is not identical to the standard for a motion to dismiss, the Court finds the same reasoning applicable to the motion it considers here, which precedes discovery. Moreover, Judge Black applied a similar reasoning to defendants' motion to dismiss in the same case the following year. *Smith*, 969 F. Supp. 2d at 865.

alleged "the Board's active participation in the sales process and Proxy"); *see also Fradkin*, 571 F. Supp. at 840 n.20 (finding futility "because all of the directors at the time of the purported adoption of the Option Plan and issuance of the proxy statement are defendants; and they are all alleged to committed violations of federal and state law for which they are accountable to the Company and to the class.").

Plaintiffs allege all of FirstEnergy's Board of Directors as of the filing of this suit—including Defendants Jones, Anderson, Demetrious, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner— participated actively in the wrongdoing complained of in the Consolidated Complaint. Specifically, Plaintiffs assert FirstEnergy director and CEO Defendant Jones was involved personally in the bribery scheme, making numerous direct calls to Householder as they worked to pass HB6. (Consol. Compl. ¶ 125, ECF No. 75). Directors Anderson, Johnson, Misheff, Mitchell, and Reyes served on the Corporate Governance Committee throughout the criminal scheme and claimed they "maintain[e] an informed status with respect to the Company's practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." (*Id.* ¶ 239).[16] Moreover, Plaintiffs aver that the Director Defendants represented to shareholders on multiple occasions that they exercised active and informed oversight over the Company's political and lobbying activities. (*Id.* ¶¶ 159−61, 177−81, 199−202). Against this backdrop, Plaintiffs also allege the Directors urged the Company's

---

[16] Defendants argue unconvincingly that Plaintiffs' allegations about the Director Defendants' committee service are insufficient because "courts repeatedly reject allegations of membership on committees, and recitation of the roles of the committees, as establish a likelihood of liability." *Monday v. Meyer*, No. 1:10 CV 1838, 2011 WL 5974664, at *7 (N.D. Ohio Nov. 29, 2011) ("[T]he Complaint would have to show some specific report or piece of information that the committee was given which would have tipped them off to misconduct."). Here, however, Plaintiffs do not simply rely on Defendants' membership on committees, nor do they merely recite the committees' roles. Instead, they quote the Director Defendants in their repeated assurances to shareholders that they were informed about and actively overseeing the Company's political spending. Moreover, the Court finds the significant size of the bribes—$61 million— to constitute information that would have tipped off the committees to misconduct.

shareholders to vote against proposals for improved disclosure, transparency, and accountability for FirstEnergy's lobbying efforts for three consecutive years. (*Id.* ¶¶ 9, 245−46).[17]

Based on the Director Defendants' contemporaneous representations about their oversight and their repeated efforts to encourage shareholders to vote against increased transparency and disclosure, it is more than plausible that Director Defendants were directly overseeing Jones' and the Officer Defendants' illicit political activities and that the five members of the Corporate Governance Committee were fully informed of the Company's "practices relating to corporate political participation." (*Id.* ¶¶ 23, 25, 26, 27, 31). *See Cardinal Health*, 2021 WL 425966, at *12 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Plaintiffs have therefore met their burden to show demand futility.

### 2. Substantial Likelihood of Liability

The Consolidated Complaint also presents allegations that constitute a second demand excuse, i.e., that a majority of FirstEnergy's Board faces a substantial likelihood of liability

---

[17] Defendants also argue Plaintiffs have not met Rule 23.1 requirements because they have not alleged demand futility on a director-by-director basis. (ECF No. 80 at 20 (citing *Stanley*, 2012 WL 5269147, at *7) ("A derivative plaintiff must allege particularized facts as to each director, demonstrating why he or she is unable to consider a demand.")). More recently, though, courts in the Southern District have recognized their discretion about when to apply this approach:

> In some cases, courts perform a director-by-director analysis to determine whether a majority of the board is alleged to be sufficiently disinterested to consider a litigation demand in good faith. However, courts have discretion to perform that analysis in the manner best suited to the unique facts of the case at hand. *See In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 461 (S.D.N.Y. 2010).

*Cardinal Health*, 2021 WL 425966, at *14. Under the unique facts of this case, which include the Company's own admissions about having made previously-undisclosed payments forming the basis of the Criminal Action, Plaintiffs have alleged the Directors actively paid significant, previously undisclosed amounts of money to Generation Now and $4 million to Sam Randazzo, sufficient to survive the motion to dismiss. (*See* Consol. Compl. ¶¶ 85, 130).

because they acted with reckless disregard for the Company's best interests. *See, e.g.*, *Cardinal Health*, 2021 WL 425966, at *14−15 (excusing demand where the complaint "plausibly alleges a substantial likelihood of liability" for a majority of the board because they acted with reckless disregard for the company's best interest by failing to take action to comply with a federal statute); *Stanley*, 2012 WL 5269147, at *5 (finding that a board is considered incapable of making a disinterested and independent decision "if the particularized allegations of the complaint present a substantial likelihood of liability for a majority of the board" rather than "the mere threat of personal liability"); *Fradkin*, 571 F. Supp. at 840 n.20 (excusing pre-suit demand where the director defendants were "all alleged to have committed violations of federal and state law for which they are accountable to the Company and to the class" and therefore "have irreconcilable conflicts of interest.").

Directors of an Ohio corporation face personal liability if clear and convincing evidence shows they "acted with reckless disregard for the corporation's best interest." *Cardinal Health*, 2021 WL 425966, at *14 (citing Ohio Rev. Code § 1701.59(E)). In cases like this one, directors face liability when they ignore "red flags" that put them on notice of possible misconduct, and they recklessly fail to investigate and take affirmative action to protect the interests of the company. *Id.* (citing *Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, CA. No. 1091-VCL, 2007 WL 2982247, at * 7 (Del. Ch. Oct. 9, 2007) (requiring clear and convincing evidence of the directors' reckless disregard)). Red flags that should prompt action by a board of directors include public news reports of corporate misconduct. *Cardinal Health*, 2021 WL 425966, at *9, *17 (identifying *Washington Post* and *West Virginia Gazette-Mail* articles as among the red flags that helped establish the defendants' substantial likelihood of liability); *Shaev*, 2017 WL 1735573, at *4, *13 (finding that allegations including a *Los Angeles Times* article support "the Court's conclusion that the Director

Defendants consciously disregarded their fiduciary duties to the company"). Corporate directors also "have a duty to exercise oversight and to monitor the corporation's operational viability, legal compliance, and financial performance" under Ohio law. *Marchand v. Barnhill*, 212 A.3d 805, 809 (Del. 2019).[18]

This Court finds Plaintiffs have alleged by clear and convincing evidence that Defendants' "knew or recklessly disregarded reports and 'red flags' that FirstEnergy was paying massive amounts of illicit bribes to Householder and other public officials to ensure passage of legislation" and took affirmative steps to conceal the scheme. (*Id*. ¶¶ 254, 258, 263, 269, 274, 278, 283, 287, 292, 296).

First, Plaintiffs lay out in detail the Company's imperiled financial situation, which intensified in 2016. (*See id*. ¶¶ 3, 53). Plaintiffs allege that the Director Defendants knew the Company' nuclear power business was suffering more than a billion dollars in losses, which threated the financial health of the Company as a whole. (*Id*. ¶ 53). After Moody's and Standard and Poor's downgraded FES's credit rating to "below investment grade" and the Federal Energy Regulatory Commission rejected the Company's application to transfer assets from FES, Plaintiffs assert that the Director Defendants knew the Company could no longer deactivate its failing plants, restructure its debt, or declare bankruptcy. (*Id*. ¶ 78).

Faced with these difficulties, Plaintiffs argue the Company's "Board and senior management decided to seek 'legislative solutions' to the Company's financial woes." (*Id*. ¶ 3). Plaintiffs cite the Criminal Complaint, which "meticulously catalogued evidence implicating" the FirstEnergy Defendants and their involvement in the wrongdoing, "including transcripts of phone

---

[18] "Ohio courts routinely look to Delaware case law for guidance in deciding corporate law issues generally, and demand futility issues specifically." *Cardinal Health*, 2021 WL 425966, at 813 n.7 (citing *In re Keithley Instruments, Inc. Derivative Litig.*, 599 F. Supp. 2d 875, 888 n.10 (N.D. Ohio 2008).

calls, recorded conversations, call logs, text messages, meeting minutes and bank records." (*Id.* ¶ 8). For example, "Householder had over 200 phone calls with FirstEnergy executives between 2016 and 2019, including at least 84 calls with Defendant Jones." (*Id.*). In sum, the Consolidated Complaint asserts that the Director Defendants sought to influence state legislators to provide the Company with a large bail out, that the Company spent large sums to do so, and that the Company enlisted Householder to achieve that end. (*Id.* ¶¶ 3–8).

Second, Plaintiffs describe numerous red flags that they say put Defendants on notice that careful Board-level oversight was required. These red flags stem back to the respective histories of Householder and FirstEnergy: Householder had previously resigned his position as Speaker under a well-publicized FBI investigation into allegations of money laundering, kickbacks, and campaign contributions in exchange for favorable legislation; and FirstEnergy had previously paid illegal bribes to the Executive Director of Ohio's office of Consumer's Counsel. (*Id.* ¶¶ 52, 57). Indeed, Plaintiffs allege this latter scandal caused shareholders to scrutinize FirstEnergy's political activities and to submit three proposals that would require the Board to develop greater "[a]ccountability and transparency in the use of . . . company funds to influence legislations, regulations, and public policy[.]" (*Id.* ¶¶ 65–67). The Director Defendants opposed all three proposals and actively campaigned against them. (*Id.* ¶¶ 66–69, 74–75).

Additionally, the Consolidated Complaint cites numerous other public indicators from prominent press outlets reflecting potential impropriety in the relationship between Householder and FirstEnergy. For example, in March 2017, the *Dayton Daily News* called attention to Householder's reputation as the "prince of darkness" and related it to his trip aboard FirstEnergy's corporate jet to former President Trump's inauguration. (*Id.* ¶¶ 12, 57). In April 2018, a *Cleveland.com* article shined light on the "big checks" FirstEnergy was giving to Householder and

noted concern about "why FirstEnergy decided to put so much money behind Team Householder." (*Id*. ¶¶ 12, 97). The *Columbus Dispatch*, the *Cincinnati Enquirer*, *WKSU Ohio*, and others reported similar findings and concerns (*Id*. ¶¶ 97, 105, 113).

Plaintiffs also cite several public media reports that followed the passage of HB6, discussing the "unprecedented" and "mysteriously funded" campaign of advertisements in support of the bill. (*Id*. ¶ 105). In particular, a July 2019 *Columbus Dispatch* article quoted an expert who noted, even just based on publicly disclosed payments, "the amount of money that FirstEnergy Solutions . . . and allied dark-money groups spent to buy support from legislators for their coal and nuclear bailout has been astronomical." (*Id*.).

Taken as true, these allegations together support this Court's inference that a majority of the Director Defendants recklessly disregarded their duties to the Company and allowed the criminal scheme to continue unchecked. *Shaev*, 2017 WL 1735573, at *13 ("While any of these red flags might appear relatively insignificant to a large company . . . when viewed in isolation, when viewed collectively they support an inference that a majority of the Director Defendants consciously disregarded their fiduciary duties despite knowledge regarding widespread illegal [] activities, and therefore, that there is a substantial likelihood of director oversight liability."); *Delaware Cnty. Emps. Ret. Fund. v. Sanchez*, 124 A.3d 1017, 1019 (Del. 2015) ("[I]t is important that the trial court consider all the particularized facts pled by the plaintiffs . . . in their totality and not in insolation from each other, and draw all reasonable inferences from the totality of those facts in favor of the plaintiffs."). Accordingly, the Court finds that Plaintiffs have alleged Defendants face a substantial likelihood of liability, and that demand was therefore excused.

Because Plaintiffs have sufficiently pled demand futility, the Court finds that Plaintiffs have standing.

## IV. CONCLUSION

For the reasons articulated above, the Court **DENIES** Defendants' Motion to Dismiss. (ECF No. 79).

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: May 11, 2021**