**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF ST. LOUIS, *et al.*, | Case No. 2:20-cv-04813 |
| Plaintiffs, | Chief Judge Algenon L. Marbley |
| v. | Magistrate Judge Kimberly A. Jolson |
| CHARLES E. JONES, *et al.*, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| FIRSTENERGY CORP., | |
| Nominal Defendant. | |

**PLAINTIFFS' UNOPPOSED MOTION FOR**
**PRELIMINARY SETTLEMENT APPROVAL**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ vi

I.      PRELIMINARY STATEMENT ............................................................................ 1

II.     BACKGROUND AND PROCEDURAL HISTORY ............................................. 3

        A.      FirstEnergy's Bribery Scandal and the Ensuing Derivative Actions ..................... 3

        B.      Plaintiffs' Allegations Against the Defendants ........................................................ 5

        C.      Plaintiffs Defeat Defendants' and the SLC's Efforts to Dismiss or Stay
                FirstEnergy's Claims ................................................................................................ 5

        D.      Plaintiffs Take Extensive Written and Document Discovery, Building a
                Strong Evidentiary Record to Support Their Claims .............................................. 7

        E.      The Parties Engage in Mediation Before Judge Phillips, Ultimately
                Resulting in the Proposed Settlement ................................................................... 10

        F.      Subsequent Developments ..................................................................................... 11

III.    THE TERMS OF THE PROPOSED SETTLEMENT ..................................... 12

IV.     ARGUMENT ......................................................................................................... 13

        A.      The Standards Governing Preliminary Approval ................................................. 13

In considering whether to approve a derivative action settlement, courts typically follow a two-step process: (1) preliminary approval; and (2) notice followed by a fairness hearing.  *In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1015–16 (S.D. Ohio 2001).  If the Court grants preliminary approval, it will direct the parties to disseminate notice of the Proposed Settlement and a fairness hearing.  *Brent v. Midland Funding, LLC*, 2011 WL 3862363, at *12 (N.D. Ohio Sept. 1, 2011) (citing *Williams v. Vukovich*, 720 F.3d 909, 920–21 (6th Cir. 1983)).  At the preliminary approval stage, the Court considers whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval…." *Telectronics*, 137 F. Supp. 2d at 1015–16 (quoting Manual for Complex Litigation § 30.44 (2d ed. 1985)).

        B.      The Court Should Grant Preliminary Approval of the Proposed Settlement ........ 15

                1.      The Proposed Settlement is the Product of Serious, Informed, Non-
                        Collusive Negotiations ............................................................................. 15

The Proposed Settlement is the product of serious, informed, non-collusive negotiations based on a robust factual record, including an extensive documentary record amounting to hundreds of

thousands of pages (broader than even the documentary record secured by the DOJ before it entered into a Deferred Prosecution Agreement with FirstEnergy) and responses to written discovery from all Defendants and FirstEnergy. *See Castillo v. Morales, Inc.*, Case No. 12-cv-650, 2015 WL 13022263, at *1 (S.D. Ohio Aug. 12, 2015) (granting preliminary approval where settlement was "result of arms-length negotiations conducted after Class Counsel [had] adequately investigated the claims and became familiar with the strengths and weaknesses of those claims"). Further, the Proposed Settlement results from serious, non-collusive negotiations facilitated by retired United States District Judge Layn R. Phillips. "The participation of an independent mediator in settlement negotiations *virtually [e]nsures* that the negotiations were conducted at arm's length and without collusion between the parties." *In re Wendy's Co. S'holder Deriv. Action*, Case No. 16-cv-1153 (S.D. Ohio Jan. 24, 2020), Preliminary Approval Order (Ex. 10 hereto) at 14 (emphasis in original) (quoting *Bert v. AK Steel Corp.*, No. 02-CV-467, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008)). Retired Judge Phillips's involvement has been specifically noted as a factor weighing in favor of settlement approval. *See, e.g.*, *Voulgaris v. Array Biopharma Inc.*, C.A. No. 17-cv-02789, 2021 WL 6331178, at *6 (D. Colo. Dec. 3, 2021).

2.    The Proposed Settlement Is Fair, Reasonable, and Adequate, and Falls Within the Range of Possible Approval............................................ 17

The Proposed Settlement also "has no obvious deficiencies, does not improperly grant preferential treatment" to any constituency and easily "falls with the range of possible approval." *Telectronics*, 137 F. Supp. 2d at 1015–16. Indeed, it is one of the most significant settlements of a shareholder derivative action ever achieved.

a.    The $180 Million Monetary Component of the Proposed Settlement Represents a Highly-Favorable Recovery .................. 17

The $180 million monetary component of the Proposed Settlement is an extraordinary result: three times the size of any prior derivative recovery in the history of the Sixth Circuit; among the largest derivative recoveries ever achieved, in any forum, in the history of the United States; and the third-largest insurer-funded derivative recovery on record. Though Plaintiffs had confidence in their ability to prevail on the merits at trial, Plaintiffs also identified certain risks including with respect to recoverability, given that the Individual Defendants' personal assets and D&O insurance represented the only possible sources of recovery and further litigation would "waste" or erode the relevant insurance policies, risking that a comparable future judgment would be unrecoverable and a quintessential pyrrhic victory. Further, derivative litigation is "notoriously difficult and unpredictable," *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d at 1205, including due to Ohio's requirement to establish by "clear and convincing evidence" that the directors or officers acted or failed to act with "deliberate intent to cause injury" to FirstEnergy or with "reckless disregard" for FirstEnergy's best interests. Ohio Rev. Code §§ 1701.59(E) and 1701.641(D). Despite these risks, Plaintiffs recovered a full 78.26% of the $230 million penalty imposed on FirstEnergy pursuant to the DPA--a recovery that compares favorably even with other significant settlements of derivative actions involving unusually large monetary recoveries. *See, e.g.*, *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 338 (S.D.N.Y. 2011) (approving settlement representing 3.26% of $2.3 billion in penalties connected to the relevant misconduct).

b. The Proposed Settlement's Governance Reforms Constitute Important Additional Relief That Was Only Achievable Through a Negotiated Resolution .................................................. 21

The Proposed Settlement also includes extremely significant corporate governance reforms including the departures of *six* Defendants from FirstEnergy's board of directors (an unprecedented turnover); a comprehensive review by the newly refreshed Board of the current C-Suite executives, to be completed by no later than 90 days following the commencement of the review; and additional enhancements to oversight, disclosures, and alignment of incentives for executive compensation. These reforms will remain in effect for at least five years and were designed with the assistance of an experienced, outside corporate governance expert, Columbia Law School's Jeffrey N. Gordon. Plaintiffs anticipate the reforms may ultimately prove just as valuable to FirstEnergy as the monetary component of the Proposed Settlement or any financial recovery that could have been achieved through trial. *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983) (the "effects of [a derivative] suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment"). Further, these reforms constitute "a form of relief that [plaintiffs] could not have obtained at trial" and so were only achievable through a negotiated resolution. *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1067 (Del. Ch. 2015).

c. The Proposed Settlement Provides FirstEnergy with Immediate Relief and Avoids the Trouble and Uncertainty of Further Litigation for the Company .......................................... 22

The derivative nature of this litigation compelled Plaintiffs to act in the best interests of FirstEnergy at all times, including affording weight to FirstEnergy's interests in avoiding the uncertainty, trouble, and distraction of further litigation arising from the bribery scandal and potential collateral harm that could befall the Company as a result of further adversarial litigation between the parties to this Action. *See Wells Fargo*, Case No. 16-cv-05541, ECF No. 274, Preliminary Approval Order at 9 (N.D. Cal. May 14, 2019) (Ex. 11 hereto) (granting preliminary approval for derivative settlement, recognizing that the proposed settlement would benefit the nominal defendant company by avoiding "lingering uncertainty" and facilitating "Wells Fargo's efforts to move past this series of scandals").

C. Attorneys' Fees and Expenses ............................................................................ 23

Plaintiffs' Counsel and the SLC, on behalf of itself and the Company, will attempt in good faith to negotiate an appropriate award of attorneys' fees and litigation expenses for all Plaintiffs' Counsel based upon the substantial benefits conferred upon the Company by the Proposed Settlement and the risks of undertaking the prosecution of the Actions on a contingent basis. Any such agreement would be subject to Court approval. If Plaintiffs' Counsel and the SLC are unable to reach agreement, Plaintiffs will submit an application to the Court. Any fee request submitted to this

Court will be based upon the substantial benefits conferred upon the Company by the Proposed Settlement and the risks of undertaking the prosecution of the Actions on a contingent basis, and will not exceed 27% of the Settlement Fund. Additionally, Co-Lead Counsel in the Southern District Action intend to apply to the Court for service awards for each of the Plaintiffs ("Service Awards") in an amount not to exceed $10,000 for each Plaintiff, to be paid out of the Court-awarded attorneys' fees and litigation expenses. Plaintiffs respectfully submit that, for present purposes, the Fee and Expense Award is within the range of possible approval. "It is not abnormal for negotiated attorneys' fee awards to comprise between 20% to 30% of the total award." *Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886, 898 (6th Cir. 2019).

D.      The Proposed Notice is Adequate and Reasonable................................................ 24

The parties propose providing notice to current FirstEnergy stockholders by (a) filing a copy of the Stipulation and the Notice as an exhibit to a Form 8-K with the United States Securities and Exchange Commission, (b) posting a copy of the Settlement Stipulation and the Notice on the Company's corporate website, which documents shall remain there through the Effective Date of the Settlement, and (c) publishing a Summary Notice in *Investor's Business Daily* and over the *PR Newswire*. The proposed notice program is consistent with notice programs approved by other courts in this District as fully satisfying the requirements of Rule 23.1 of the Federal Rules of Civil Procedure and due process. *See, e.g., Bailey v. White*, 320 F. App'x 364, 367 (6th Cir. 2009) ("notice must 'be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'") (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 629 (6th Cir. 2007))); *In re Big Lots, Inc. S'holder Litig.*, Case No. 12-cv-445 (S.D. Ohio Apr. 6, 2018), ECF No. 120, Preliminary Approval Order at 4 (Ex. 12 hereto).

V.     THE PARTES' PROPOSED SCHEDULE OF EVENTS................................................ 25

The parties propose a standard schedule of events leading up to the Settlement Hearing including dates for provision of notice, filing papers in support of the Proposed Settlement and the Fee and Expense Award, and any comment by current FirstEnergy Stockholders.

VI.    CONCLUSION............................................................................................................... 27

# TABLE OF AUTHORITIES

Page(s)

## <u>Cases</u>

*AOL Time Warner S'holder Deriv. Litig.*, No. 02 Civ. 6302, 2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006)................................................................................................................................ 22

*Bailey v. White*, 320 F. App'x 364 (6th Cir. 2009)................................................................. iv, 25

*Bert v. AK Steel Corp.*, No. 02-CV-467, 2008 WL 4693747 (S.D. Ohio Oct. 23, 2008)......... ii, 16

*Bloom v. Anderson*, Case Nos. 20-cv-04534, 20-cv-04813, 20-cv-05128, 20-cv-05237, 20-cv-05529, 20-cv-05610, 2020 WL 6710429 (S.D. Ohio Nov. 16, 2020) ....................................... 4

*Bloom v. Anderson*, Case Nos. 20-cv-04534, 20-cv-04813, 20-cv-05128, 20-cv-05237,20-cv-05529, 20-cv-05610, 20-cv-05876, 2020 WL 6737655 (S.D. Ohio Nov. 17, 2020) .................. 4

*Booth Fam. Tr. v. Jeffries*, No. 05-cv-0860 (S.D. Ohio Nov. 01, 2011) ...................................... 25

*Bowling v. Pfizer*, 144 F. Supp. 3d 945 (S.D. Ohio 2015)..................................................... 14, 15

*Brent v. Midland Funding, LLC*, 2011 WL 3862363 (N.D. Ohio Sept. 1, 2011)...................... i, 14

*Castillo v. Morales, Inc.*, Case No. 12-cv-650, 2015 WL 13022263 (S.D. Ohio Aug. 12, 2015). ii, 15

*Doe v. Ohio*, Case No. 91-cv-00464, 2020 WL 728276 (S.D. Ohio Feb. 12, 2020).................... 15

*Does 1-2 v. Déjà vu Servs., Inc.*, 925 F.3d 886 (6th Cir. 2019)............................................... iv, 24

*Emps. Ret. Sys. of City of St. Louis v. Jones*, 2020 WL 7487839 (S.D. Ohio Dec. 21, 2020)........ 6

*Emps. Ret. Sys. of City of St. Louis v. Jones*, Case No. 20-cv-04813, 2021 WL 1890490 (S.D. Ohio May 11, 2021) ............................................................................................................... 5

*Emps. Ret. Sys. of City of St. Louis v. Jones*, Case No. 20-cv-4813, 2021 WL 4894833 (S.D. Ohio Oct. 20, 2021)................................................................................................................. 7

*Emps. Ret. Sys. of City of St. Louis v. Jones*, 20-cv-4813, 2021 WL 5275827 (S.D Ohio Nov. 12, 2021)...................................................................................................................................... 6

*Emps. Ret. Sys. of City of St. Louis v. Jones*, Case Nos. 21-3993/4041, 2021 WL 6067034 (6th Cir. Dec. 16, 2021)..................................................................................................................... 7

*FirstEnergy Corp. Sec. Litig.*, Case No. 20-cv-0375, 2021 WL 2414763 (S.D. Ohio June 14, 2021)...................................................................................................................................... 3

*Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203 (6th Cir. 1992) .................................. ii, 13, 19

*IBEW Local 697 Pension Fund v. Int'l Game Tech., Inc.,* No. 09-cv-00419, 2012 WL 5199742 (D. Nev. Oct. 19, 2012) ........................................................................................... 17

*In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025 (Del. Ch. 2015) ..................... iii, 22

*In re Apple Computer, Inc. Deriv. Litig.*, No. C 06-4128, 2008 WL 4820784 (N.D. Cal. Nov. 5, 2008)................................................................................................................................... 22

*In re Big Lots, Inc. S'holder Litig.*, Case No. 12-cv-445 (S.D. Ohio Apr. 6, 2018)............... iv, 25

*In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959 (Del. Ch. 1996) ........................................ 19

*In re Community Health Sys., Inc. S'holder Deriv. Litig.*, No. 11-cv-00489 (M.D. Tenn. Jan. 17, 2017)....................................................................................................................................... 2

*In re Galena Biopharma, Inc. Deriv. Litig.*, Case No. 14-cv-00516, 2016 WL 10840600 (D. Or. June 24, 2016) ................................................................................................................. 18, 19

*In re Inter-Op Hip Prothesis Liab. Litig.*, 204 F.R.D. 330 (N.D. Ohio 2001)............................. 14

*In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336 (S.D.N.Y. 2011) .................. ii, 20, 22

*In re Regions Morgan Keegan Sec.*, No. 08-2260, 2015 WL 11145134 (W.D. Tenn. Nov. 30, 2015)..................................................................................................................................... 14

*In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985 (S.D. Ohio 2001) ....................... *passim*

*In re the Boeing Company Derivative Litigation*, C.A. No. 219-0907 (Del. Ch. 2022).............. 17

*In re Wells Fargo & Company Shareholder Derivative Litigation*, C.A. No. 3:16-cv-05541 (N.D. Cal. 2020) .......................................................................................................................... 17

*In re Wendy's Co. S'holder Deriv. Action*, Case No. 16-cv-1153 (S.D. Ohio Jan. 24, 2020).. ii, 16

*Kritzer v. Safelite Solutions, LLC*, 2012 WL 1945144 (S.D. Ohio May 30, 2012) ...................... 24

*Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) .......................................................... iii, 21, 4

*Miller v. Anderson*, Case No. 5:20-cv-01743, 2021 WL 2255516 (N.D. Ohio May 13, 2021) ..... 6

*Miller v. Anderson*, Case No. 5:20-cv-01743, 2021 WL 4220780 (N.D. Ohio Sept. 16, 2021)  6, 7

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) ...................................................................... 22

*Peace Officers' Annuity & Ben. Fund of Ga. v. Davita Inc.*, 2021 WL 2981970 (D. Colo. July 15, 2021)..................................................................................................................................... 24

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235 (6th Cir. 2011).......... 20

*Schuh v. HCA Holdings, Inc.*, Civil Action No. 11-cv-01033, 2016 WL 10570957 (M.D. Tenn. April 14, 2016) ................................................................................................................... 24

*Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521 (E.D. Ky. 2010) .................... 20

*UAW v. Gen. Motors Corp.*, 497 F.3d 615 (6th Cir. 2007)..................................................... iv, 25

*USA v. FirstEnergy Corp.*, Case No.:21-cr-00086, ECF No. 3 (Deferred Prosecution Agreement)
(S.D. Ohio July 22, 2021) ................................................................................................. 4

*Voulgaris v. Array Biopharma Inc.*, C.A. No. 17-cv-02789, 2021 WL 6331178 (D. Colo. Dec. 3,
2021)................................................................................................................................ ii, 16

*Williams v. Vukovich*, 720 F.3d 909 (6th Cir. 1983)................................................................ i, 14

## Statutes

Ohio Rev. Code §§ 1701.59(E) and 1701.641(D) ................................................................. ii, 19

## Other Authorities

Kevin LaCroix, "*Largest Derivative Lawsuit Settlements*," THE D&O DIARY (updated Feb. 12,
2022) (available at: https://www.dandodiary.com/2014/12/articles/shareholders-derivative-
litigation/largest-derivative-lawsuit-settlements/)...................................................................... 2

Manual for Complex Litigation § 30.44 (2d ed. 1985)............................................................. i, 14

## Rules

FRCP 23(e) ........................................................................................................................... 15

FRCP 23.1............................................................................................................. iv, 3, 13, 25

Court-appointed Co-Lead Plaintiffs Employees Retirement System of the City of St. Louis ("St. Louis") and Electrical Workers Pension Fund, Local 103, I.B.E.W ("Local 103"), together with additional Plaintiff Massachusetts Laborers Pension Fund ("MLPF," and collectively with "Co-Lead Plaintiffs," "Plaintiffs"), respectfully submit this Unopposed Motion for Preliminary Settlement Approval.

## I.  PRELIMINARY STATEMENT

Plaintiffs bring shareholder derivative claims for breach of fiduciary duty and violations of the federal securities laws against numerous current and former directors and officers of nominal defendant FirstEnergy Corp. ("FirstEnergy" or the "Company"), alleging their involvement in an illicit scheme to bribe Ohio public officials to take favorable legislative and regulatory action on behalf of the Company.  Plaintiffs are now pleased to report that, following 18 months of fiercely-contested litigation across two District Courts and the Sixth Circuit Court of Appeals, Plaintiffs have secured a historic global settlement (the "Proposed Settlement") on behalf of FirstEnergy which, if approved, will resolve this Action and parallel derivative actions pending in the Northern District of Ohio and in the Ohio Court of Common Pleas (all together, the "Derivative Actions"). Significantly, all parties in all pending Derivative Actions, as well as the special litigation committee of FirstEnergy's board of directors (the "SLC"), fully support the Proposed Settlement. This Motion is unopposed as to the relief sought.

Plaintiffs brought this Action to achieve twin goals: (i) to remediate the financial harm to FirstEnergy as a result of the bribery scheme (including, most notably, a $230 million penalty paid by FirstEnergy pursuant to a Deferred Prosecution Agreement (the "DPA") with the Department of Justice (the "DOJ")); and (ii) to achieve internal governance reforms at the Company to deter and prevent the recurrence of misconduct in the future.  The Proposed Settlement achieves these aims.  Under the terms of the Proposed Settlement, FirstEnergy will receive *$180 million*.  This

1

recovery is three times greater than any prior derivative recovery in the history of the Sixth Circuit[1] and among the largest derivative recoveries ever achieved, in any forum, in the history of the United States.[2]  Under the terms of the Proposed Settlement, FirstEnergy will also benefit from significant non-monetary relief, including the departures of *six* legacy directors who oversaw the misconduct from FirstEnergy's board of directors (the "Board"), a prompt review of FirstEnergy's remaining C-Suite executives by the newly-refreshed Board, and the Board's formal undertaking of active oversight over FirstEnergy's political spending and lobbying activities—no longer leaving that to management.  These reforms—designed by Plaintiffs with the assistance of an experienced outside corporate governance expert, Columbia Law School Professor Jeffrey N. Gordon—are tailored to ensure that the newly-refreshed Board is properly empowered and takes full accountability for FirstEnergy's lobbying, political contributions, and political activities, and that the Company's future political activities remain aboveboard.

Plaintiffs achieved this result by vigorously prosecuting their claims on behalf of the Company for 18 months with a team of more than 30 attorneys.  Plaintiffs prevailed on myriad contested motions and secured extensive discovery over the strenuous efforts and objections of all Defendants and the SLC, including a document production *broader* than that obtained by the DOJ prior to its entry into the DPA with FirstEnergy.  Through those efforts, Plaintiffs developed considerable confidence in their ability to ultimately prevail at trial, but also identified significant risks associated with further litigation—including as to the recoverability of damages.  Having

---

[1] *See In re Community Health Sys., Inc. S'holder Deriv. Litig.*, No. 11-cv-00489 (M.D. Tenn. Jan. 17, 2017) (Transcript) (Ex. 1 hereto) (approving settlement comprised of $60 million payment and reforms, described as "the biggest derivative settlement in the Sixth Circuit").

[2] *See* Kevin LaCroix, "*Largest Derivative Lawsuit Settlements*," THE D&O DIARY (updated Feb. 12, 2022) (available at: https://www.dandodiary.com/2014/12/articles/shareholders-derivative-litigation/largest-derivative-lawsuit-settlements/) (collecting largest derivative settlements).

weighed the strengths and weaknesses of their litigation position and the benefits to the Company available through a negotiated resolution, Plaintiffs engaged with Defendants and the SLC in extensive, arm's-length, and hard-fought negotiations facilitated by a highly-experienced mediator, retired United States District Judge Layn R. Phillips.  Those negotiations culminated in the Proposed Settlement.  As explained below, the Proposed Settlement is an extraordinary result for FirstEnergy—likely superior to any result that could have been achieved through trial—and meets all of the requirements for preliminary approval under Rule 23.1 and relevant precedent. Accordingly, Plaintiffs respectfully request that the Court grant preliminary approval of the Proposed Settlement, approve the form and manner of the parties' proposed Notice, and schedule a Settlement Hearing.

## II.     BACKGROUND AND PROCEDURAL HISTORY

### A.     FirstEnergy's Bribery Scandal and the Ensuing Derivative Actions

In July 2020, the DOJ filed an 80-page criminal complaint against former Ohio Speaker of the House Larry Householder and two FirstEnergy lobbyists, detailing a "sophisticated criminal conspiracy" in which FirstEnergy executives funneled more than $60 million in illicit payments to public officials, including Householder, in exchange for favorable official action.  In announcing the complaint, the DOJ made unmistakably clear that FirstEnergy and its leaders remained the subject of investigation.  The fallout from that revelation was catastrophic for FirstEnergy, leading to the firing of numerous senior executives and an onslaught of litigation and investigatory proceedings.  *See FirstEnergy Corp. Sec. Litig.*, Case No. 20-cv-0375, 2021 WL 2414763 at *2 (S.D. Ohio June 14, 2021) (Marbley, J.) (detailing the "host of criminal and civil investigations, lawsuits, regulatory reviews and other proceedings" involving FirstEnergy).  A year later, FirstEnergy would concede its criminal liability in connection with the scheme.  Specifically, on July 20, 2021, the Board authorized FirstEnergy's entry into the DPA, pursuant to which the Board

agreed to use *$230 million* of FirstEnergy's money to pay a criminal penalty and admitted that FirstEnergy executives had "*conspired ... to pay millions of dollars to and for the benefit of public officials in exchange for specific official action*."[3]

In the meantime, between August and November of 2020, FirstEnergy shareholders commenced numerous derivative suits seeking to hold FirstEnergy officers and directors accountable for the harm incurred by the Company as a result of their involvement in the bribery scheme. Nine such actions were filed in this Court, which the Court subsequently consolidated into this Action, with St. Louis and Local 103 appointed to serve as Co-Lead Plaintiffs and their counsel appointed to serve as Co-Lead Counsel. *See* ECF No. 44; reported at *Bloom v. Anderson*, Case Nos. 20-cv-04534, 20-cv-04813, 20-cv-05128, 20-cv-05237, 20-cv-05529, 20-cv-05610, 2020 WL 6710429 (S.D. Ohio Nov. 16, 2020); ECF No. 45; reported at *Bloom v. Anderson*, Case Nos. 20-cv-04534, 20-cv-04813, 20-cv-05128, 20-cv-05237, 20-cv-05529, 20-cv-05610, 20-cv-05876, 2020 WL 6737655, at *1 (S.D. Ohio Nov. 17, 2020) (consolidating subsequently filed derivative suit into this Action). One additional action was filed in the Northern District of Ohio (the "Northern District Action" or "NDA");[4] and two additional actions were filed and subsequently consolidated in the Court of Common Pleas for Summit County (the "State Court Action").[5]

---

[3] *See USA v. FirstEnergy Corp.*, Case No.:21-cr-00086, ECF No. 3 (Deferred Prosecution Agreement) at 17 (S.D. Ohio July 22, 2021) (emphasis added).

[4] The Northern District Action is captioned *Miller v. Anderson et al.*, Case No. 5:20-cv-01743 (N.D. Ohio).

[5] The State Court Action is captioned *In re FirstEnergy Corp., Stockholder Derivative Litigation*, Case No. CV-2020-07-2107 (Ohio Ct. of Common Pleas, Summit Cnty.).

B.    **Plaintiffs' Allegations Against the Defendants**

The allegations of Plaintiffs' Consolidated Verified Shareholder Derivative Complaint in this Action (the "Complaint," ECF No. 75) and their legal underpinnings are detailed exhaustively in this Court's 44-page Opinion & Order denying Defendants' motions to dismiss. *See generally* ECF No. 93; reported at *Emps. Ret. Sys. of City of St. Louis v. Jones*, Case No. 20-cv-04813, 2021 WL 1890490 (S.D. Ohio May 11, 2021) (the "MTD Opinion").[6]  In sum, Plaintiffs alleged that: (i) certain current and former executive officers (the "Officer Defendants") breached their fiduciary duties to FirstEnergy and committed other state law violations in connection with their perpetration of the bribery scheme;[7] and (ii) certain current and former directors (the "Director Defendants") breached their fiduciary duties to FirstEnergy by actively participating in the scheme when they allowed it to occur without intervention and by issuing false and misleading proxy statements concealing the scheme to secure their reelection in violation of Section 14(a) the Securities Exchange Act of 1934.[8]

C.    **Plaintiffs Defeat Defendants' and the SLC's Efforts to Dismiss or Stay FirstEnergy's Claims**

In October 2020, Plaintiffs moved to intervene in the Northern District Action, seeking to transfer it to the Southern District for consolidation with this Action.  *See* NDA ECF No. 17.  While the plaintiff in the Northern District Action did not oppose that motion, Defendants did.

---

[6] The other Derivative Actions pending in the Northern District and in State Court include certain additional defendants not named in this Action and, in the case of the State Court Action, certain additional causes of action (while omitting the federal claims asserted herein).  The gravamen of each case is, however, the same, and all parties in all of the Derivative Actions have agreed to the Proposed Settlement as a global resolution of all of the pending Derivative Actions.

[7] The Officer Defendants in this Action are Defendants Jones, Dowling, Pearson, Reffner, Strah, Taylor, and Yeboah-Amankwah.

[8] The Director Defendants in this Action are Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, O'Neill, Pappas, Pianalto, Reyes, and Turner.

Defendants also sought to stay this Action pending resolution of their motions to dismiss the Northern District Action. But this Court denied that motion, finding that the threat of "duplicative litigation," the basis on which Defendants sought a stay, was of "Defendants own doing." ECF No. 59 at 8; reported at *Emps. Ret. Sys. of City of St. Louis v. Jones*, 2020 WL 7487839, at *3 (S.D. Ohio Dec. 21, 2020).

Plaintiffs thereafter filed their operative Complaint in this Action, Defendants moved to dismiss, and the parties engaged in extensive briefing thereon. ECF Nos. 75, 80, 86, 87. On May 11, 2021, the Court issued its comprehensive MTD Opinion sustaining all of Plaintiffs' claims against all Defendants in their entirety.[9] Two days later, the Northern District of Ohio issued a decision on Plaintiffs' long-pending transfer motion: that Court declined to transfer its action, but allowed Plaintiffs to intervene and have their complaint deemed operative there. NDA ECF No. 72; reported at *Miller v. Anderson*, Case No. 20CV1743, 2021 WL 2255516 (N.D. Ohio May 13, 2021). Plaintiffs did so, filing in the Northern District Action a complaint substantively identical to the Complaint in this Action. NDA ECF No. 75. Defendants moved again to dismiss, but, following further briefing, the Northern District adopted this Court's reasoning and likewise denied Defendants' motions to dismiss. NDA ECF No. 117; reported at *Miller v. Anderson*, Case No. 20CV1743, 2021 WL 4220780 (N.D. Ohio Sept. 16, 2021).

In July 2021, the FirstEnergy Board announced the formation of the SLC. By then, the Derivative Actions had been pending for nearly a year and this Court's MTD Opinion already had been issued. Nevertheless, the SLC moved on July 20, 2021 to stay all of the Derivative Actions,

---

[9] Defendants subsequently moved to certify an interlocutory appeal of the Court's decision denying their motions to dismiss but the Court, on November 12, 2021, likewise denied that motion in its entirety. ECF No. 151; reported at *Emps. Ret. Sys. of City of St. Louis v. Jones*, 20-cv-4813, 2021 WL 5275827 (S.D Ohio Nov. 12, 2021).

arguing it needed six months to investigate FirstEnergy's claims. ECF No. 120. Plaintiffs opposed the requested stay, arguing that the belated formation of the SLC and its requests for a stay were a mere artifice to achieve delay and avoid discovery. ECF No. 127. Both this Court and the Northern District agreed. In a September 16, 2021 order denying the SLC's motion to stay, the Northern District observed that "[b]y all appearances, FirstEnergy was willing to go without an SLC up until it realized these matters would not be dismissed at the pleadings stage." NDA ECF No. 117 at 2; reported at *Miller*, 2021 WL 4220780, at *1. On October 20, 2021, this Court likewise denied the SLC's requested stay, finding "the SLC offer[ed] no genuine justification for the delay in its creation" and that "indications of delay" in the formation of the SLC warranted a rejection of the motion. ECF No. 142; reported at *Emps. Ret. Sys. of City of St. Louis v. Jones*, Case No. 20-cv-4813, 2021 WL 4894833, at *3 (S.D. Ohio Oct. 20, 2021).

The SLC initiated a flurry of appeals of this Court's and the Northern District's denials of the stay motion and petitioned to mandamus this Court and the Northern District in the Sixth Circuit Court of Appeals. Plaintiffs moved to dismiss the appeals for lack of jurisdiction and opposed the mandamus petitions as improper. The Court of Appeals agreed, conclusively resolving that discovery in the federal Derivative Actions would proceed unimpeded. *Emps. Ret. Sys. of City of St. Louis v. Jones*, Nos. 21-3993/4041, 2021 WL 6067034 (6th Cir. Dec. 16, 2021).

When the parties entered into the Term Sheet on February 9, 2022, the SLC had still not concluded its investigation or issued a report.

### D. Plaintiffs Take Extensive Written and Document Discovery, Building a Strong Evidentiary Record to Support Their Claims

On May 28, 2021, shortly after this Court issued its MTD Opinion, Plaintiffs served document requests on FirstEnergy and all Defendants. Responses were served on June 28, 2021. The parties thereafter engaged in negotiations concerning the scope of appropriate discovery, but

those negotiations were short lived: after the SLC filed its motions to stay on July 20, 2021, FirstEnergy and all Defendants refused to engage in any discovery until the SLC's stay motions were resolved.  Plaintiffs, however, continued to press for discovery.  Because FirstEnergy had already made significant productions to the DOJ likely to encompass much of the record relevant to Plaintiffs' claims, Plaintiffs saw no basis for FirstEnergy to refuse to produce at least those documents immediately.  When Defendants refused to provide even these materials, Plaintiffs sought relief from this Court.  Specifically, at Plaintiffs' request, Magistrate Judge Jolson held discovery conferences on October 7, 2021 and October 27, 2021 (ECF Nos. 138, 144), ultimately resulting in FirstEnergy's production of all documents previously produced to the DOJ as well as to the SEC.[10]   In the meantime, on November 8, 2021, the Northern District held a case management conference and ordered a discovery schedule that contemplated the completion of all paper discovery by January 17, 2022, with depositions to commence on February 1, 2022 and to be completed by May 1, 2022.  NDA ECF No. 160.

Over the ensuing months, Plaintiffs continued engaging in significant additional document and written discovery (including serving additional document requests, interrogatories and requests for admission), seeking material beyond that previously produced to the DOJ and SEC to further bolster the record in support of Plaintiffs' claims.  For months Plaintiffs fought vigorously to achieve the widest possible breadth of discovery.  For example, FirstEnergy and the Defendants initially refused to produce documents dated before January 1, 2017 or after Householder's arrest in July 2020.  Through persistent efforts, however, Plaintiffs ultimately obtained FirstEnergy's and

---

[10] On November 23, 2021, FirstEnergy confirmed to Plaintiffs that it had "produced [to Plaintiffs] all documents that it produced in response to document requests from the DOJ and SEC." *See* November 23, 2021 Letter from A. MacDonald to A. Zayenchik (Ex. 2 hereto).  Those documents, 288,164 pages in all, were produced to Plaintiffs in three tranches between November 5 and 19, 2021.  *See id.*

all Defendants' agreement to include in their productions all relevant information dated or created over a span of more than five years, commencing January 1, 2016 and extending until at least mid-June 2021.  Following contentious negotiations, Plaintiffs also successfully convinced FirstEnergy to produce every single set of Board and Board committee meeting minutes and materials, without any culling for responsiveness, for that entire five-year period and through to the present.  As to other categories of documents, Plaintiffs secured FirstEnergy's agreement to search its custodial ESI using approximately 200 search terms and the Defendants' agreement to search their custodial ESI using approximately 260 search terms.  Plaintiffs further incessantly fought for and secured the Company's and Defendants' agreement to review and produce relevant text messages exchanged between each Defendant and 30 counterparties, without the application of search terms.  Additionally, Plaintiffs secured FirstEnergy's agreement to produce flight logs for the years 2016–2021, without the application of search terms or culling, as well as any phone logs for Defendants within FirstEnergy's possession, custody, or control.

Through the dogged efforts of a team of over 30 attorneys working on their behalf, Plaintiffs ultimately obtained and reviewed over 500,000 pages of documents produced by Defendants and third parties, including FirstEnergy's auditors, PwC and Clearsulting LLC, FirstEnergy shareholders, Nathan Cummings Foundation and Green Century, illicitly funded 501(c)(4) entities, Partners for Progress and Generation Now, multiple non-defendant former members of the Company's board of directors, and Defendant Jones' cellular service provider, Verizon.  Plaintiffs also expended considerable effort in preparing for depositions, which were set to commence on February 10, 2022.[11]

---

[11] Although discovery proceeded apace in the federal Derivative Actions, the State Court Action remained at the pleading stage.  There, Defendants' motion to dismiss and the SLC's motion to stay remained *sub judice* at the time of the Proposed Settlement.

Through these efforts, Plaintiffs developed a comprehensive and nuanced understanding of the events giving rise to this Action and of the strengths and weaknesses of their litigation position.  Plaintiffs also determined that Defendants' insurance coverage was the primary source of any recovery on the scale of the damages incurred by FirstEnergy as a result of the bribery scheme, and that those insurance policies were "wasting" and subject to erosion in connection with defense costs and settlements both in the Derivative Actions and in other related actions arising from the scheme.

### E. The Parties Engage in Mediation Before Judge Phillips, Ultimately Resulting in the Proposed Settlement

In late December 2021, the parties collectively agreed to schedule a mediation before retired United States District Judge Layn R. Phillips for purposes of exploring the possibility of a negotiated resolution.  Following preliminary negotiations between the parties and an exchange of two rounds of detailed mediation statements, a mediation was held before Judge Phillips on February 1, 2022, with all parties in all of the Derivative Actions and the SLC participating.  No agreement was reached at the 13-hour long mediation.  Following the mediation, however, the parties continued to engage in several days (and nights) of intense negotiations facilitated by retired Judge Phillips.

On February 9, 2022, the parties reached an agreement in principle for resolution of the Derivative Actions and executed a Term Sheet.  The parties thereafter proceeded to negotiate the terms of the final Settlement Stipulation, which was executed on March 11, 2022, and is attached hereto as Exhibit 3.  The Joint Declaration of Jeroen van Kwawegen and Thomas Curry, attached hereto as Exhibit 4, further details the litigation and settlement process.  The Declaration of Professor Jeffrey N. Gordon, attached hereto as Exhibit 5, details his involvement in crafting the corporate governance reforms that are part of the Proposed Settlement.

10

Additionally, a declaration by Judge Phillips concerning the mediation process is attached hereto as Exhibit 6. As Judge Phillips explains therein, "[t]he mediation process was an extremely hard-fought negotiation from beginning to end and was conducted by experienced and able counsel on both sides. Throughout the mediation process, the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith" and "the arguments and positions asserted by all involved were the product of substantial work, they were complex and highly adversarial, and they reflected a detailed and in-depth understanding of the strengths and weaknesses of the claims and defenses at issue in this case." *Id.* at ¶12.

F. **Subsequent Developments**

On February 10, 2022, all parties to all three Derivative Actions filed joint motions to stay those Actions pending settlement proceedings in this Court. This Court and the Court of Common Pleas granted the requested stay. The Northern District did not. Instead, on February 11, 2022, the Northern District issued an Order and Decision that denied the requested stay without prejudice, expressed the Northern District's view that Plaintiffs had taken insufficient discovery before entering the Proposed Settlement,[12] requested 11 categories of information concerning the Proposed Settlement, and set a hearing to be held on March 9, 2022. NDA ECF No. 274. The parties to the Northern District Action and the SLC submitted responses to the Northern District's information requests on February 22, 2022. Those responses are attached hereto as Exhibits 7-9.

---

[12] The Court in the Northern District Action had previously, at a pair of January 2022 status conferences, indicated its view that mediation before deposition discovery would be premature. Plaintiffs, of course, considered the Northern District's views before agreeing to the Proposed Settlement. However, Plaintiffs ultimately determined based on their intimate knowledge of the record and other circumstances relating to recoverability and the time value of proposed governance reforms that could only be obtained through a negotiated resolution, that pressing further litigation in lieu of the Proposed Settlement would only delay implementation of the reforms achieved by the Proposed Settlement while jeopardizing Plaintiffs' ability to secure a monetary recovery for FirstEnergy on the scale of the $180 million ultimately achieved.

11

At the March 9, 2022 hearing in the Northern District Action, the Northern District reiterated its previously-expressed views concerning the Proposed Settlement and requested additional information from Plaintiffs' counsel concerning the facts giving rise to the Derivative Actions and the Proposed Settlement. Thereafter, on March 11, 2022, the Northern District issued an order requesting briefing on the applicability of the mediation privilege to certain information requested by the Northern District at the March 9, 2022 hearing. NDA ECF No. 286. Responses to that order are due on March 16, 2022. *Id.* at 3.

## III. THE TERMS OF THE PROPOSED SETTLEMENT

The terms of the Proposed Settlement, which is fully supported by all parties in all of the Derivative Actions and by the SLC, are summarized below:

**Consideration:** The Proposed Settlement contains two components. *First*, Defendants' insurers will pay $180 million to FirstEnergy. Ex. 3, Settlement Stipulation ¶2(a). *Second*, FirstEnergy will adopt the significant corporate governance reforms detailed in Exhibit A to the parties' Settlement Stipulation. *Id.* at ¶2(b). Specifically, as part of the Proposed Settlement: (i) six defendant directors have agreed to leave FirstEnergy's Board; (ii) the Board—which will thereafter consist of a supermajority of independent, non-defendant directors—will be required to assume responsibility to actively oversee FirstEnergy's political spending and lobbying activities, implement a process to review the most senior executives of FirstEnergy who were not terminated in the wake of the bribery scandal, and ensure the Company's compensation system, including claw-back policies, align executives' financial incentives with legal compliance; and (iii) FirstEnergy will be required to make specific disclosures concerning its political activities in the Company's annual proxy statements, thereby facilitating shareholders' oversight and ability to remove directors who do not take their relevant oversight responsibilities seriously. *Id.* at Exhibit

A.  The import of these governance improvements is discussed in Professor Gordon's declaration, attached hereto as Exhibit 5.

**Release:**  In exchange for the consideration described above, the Proposed Settlement provides that all plaintiffs in all Derivative Actions will provide a customary global release, on behalf of the Company, of all derivative claims arising from facts alleged in any of the Derivative Actions.  Notably, however, the Proposed Settlement *does not* release the Company's existing claims for recoupment of compensation from three executives who were terminated by the Company in the wake of the scandal and are Defendants in the Derivative Actions: Jones, Dowling, and Chack.  *See* Ex. 3 ¶1(z).  Nor does the Proposed Settlement release any direct claims or other non-derivative claims against the Company or any third parties arising in any way from the bribery scheme (including those direct claims being prosecuted in the related action before this Court captioned *In re FirstEnergy Corp. Sec. Litig.*, Case No. 20-cv-03785 (S.D. Ohio)).

**Attorneys' Fees and Costs:**  In accordance with the Proposed Settlement, Plaintiffs intend to seek a Court-approved award of attorneys' fees and expenses and to seek the Court's permission to pay, from any awarded attorneys' fees and expenses, service awards to each of the Plaintiffs in the Derivative Actions.  *See id.*  ¶¶16–21.

## IV.    ARGUMENT

### A.    The Standards Governing Preliminary Approval

Pursuant to Federal Rule of Civil Procedure Rule 23.1(c), "[a] derivative action may be settled . . . only with the court's approval."  The Sixth Circuit has recognized, however, that "settlements are welcome" in shareholder derivative actions and that, "[a]bsent evidence of fraud or collusion, such settlements are not to be trifled with."  *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992).  In considering whether to approve a derivative action settlement, courts typically follow a two-step process: (1) preliminary approval; and (2) notice followed by a

fairness hearing.  *See In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1015–16 (S.D. Ohio 2001).  If the Court grants preliminary approval, it will direct the parties to disseminate notice of the Proposed Settlement and the Settlement Hearing to other Company stockholders.  *Brent v. Midland Funding, LLC*, No. 11 CV 1332, 2011 WL 3862363, at *12 (N.D. Ohio Sept. 1, 2011) (citing *Williams v. Vukovich*, 720 F.3d 909, 920–21 (6th Cir. 1983)).  At the Settlement Hearing, the Court will then consider and make a final determination as to whether the Proposed Settlement is "fair, reasonable, and adequate."  *Id.*

The preliminary approval stage requires the Court to conduct a "threshold inquiry" that serves as "only the first step in an extensive and searching judicial process" leading to potential final approval of the Proposed Settlement.  *In re Inter-Op Hip Prothesis Liab. Litig.*, 204 F.R.D. 330, 337–38 (N.D. Ohio 2001).  At this stage, the Court "is not obligated to, nor could it reasonably, undertake a full and complete fairness review."  *Id.* at 350; *see also In re Regions Morgan Keegan Sec.,*, No. 08-2260, 2015 WL 11145134, at *4 (W.D. Tenn. Nov. 30, 2015) (at preliminary approval stage, the court "decides whether notice of the proposed settlement would be appropriate, but makes no final determination about the settlement's fairness").  Instead, the Court considers whether "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with the range of possible approval…."  *Telectronics*, 137 F. Supp. 2d at 1015–16 (quoting Manual for Complex Litigation § 30.44 (2d ed. 1985)); *see also Bowling v. Pfizer*, 144 F. Supp. 3d 945, 952 (S.D. Ohio 2015)

14

(preliminary approval is warranted if settlement falls "within the range of what ultimately could be considered fair, reasonable, and adequate").[13]

**B.** **The Court Should Grant Preliminary Approval of the Proposed Settlement**

Where a "proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval," preliminary approval is appropriate. *Telectronics*, 137 F. Supp. 2d at 1015–16. The Proposed Settlement here meets this standard and should, accordingly, be preliminarily approved.

**1.** **The Proposed Settlement is the Product of Serious, Informed, Non-Collusive Negotiations**

The Proposed Settlement is the product of "serious, informed, non-collusive negotiations[.]" *Id.* Plaintiffs were unquestionably adequately informed concerning the facts giving rise to this litigation, and the strengths and weaknesses of their case, prior to negotiating the Proposed Settlement. Indeed, as detailed above, Plaintiffs secured and reviewed an extensive documentary record that amounted to hundreds of thousands of pages and was broader than even

---

[13] Recent amendments to Rule 23(e), which governs class actions rather than derivative suits, but are nonetheless relevant by analogy, now explicitly set forth factors to consider in determining whether a proposed settlement is "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2). Specifically, the Rule now requires courts to consider whether: (i) class representatives and class counsel have adequately represented the class; (ii) the proposal was negotiated at arm's length; (iii) the relief provided for the class is adequate; and (iv) the proposal treats class members equitably. *Id.* These amendments to the Rule were not intended to "displace" the factors developed by the Circuit Courts. *See* Fed. R. Civ. P. 23(e)(2) 2018 Advisory Comm. Notes. "Therefore, in considering whether to approve the parties' proposed settlement, a District Court in the Sixth Circuit should look to both the factors found in Rule 23 as well as the Sixth Circuit's traditional factors." *Doe v. Ohio*, Case No. 91-cv-00464, 2020 WL 728276, at *3 (S.D. Ohio Feb. 12, 2020). Consistent with case law governing derivative settlements, these factors reflect both procedural concerns (*e.g.*, the conduct of the litigation and of negotiations leading to the proposed settlement) and substantive concerns (*e.g.*, the relief provided). *See* Fed. R. Civ. P. 23(e)(2) 2018 Advisory Comm. Notes.

the documentary record secured by the DOJ before it entered into the DPA with FirstEnergy. Plaintiffs also received responses to written discovery from all Defendants and from FirstEnergy. This substantial discovery armed Plaintiffs with the factual record necessary to negotiate the terms of the historic Proposed Settlement. *See Castillo v. Morales, Inc.*, Case No. 12-cv-650, 2015 WL 13022263, at *1 (S.D. Ohio Aug. 12, 2015) (granting preliminary approval where settlement was "result of arms-length negotiations conducted after Class Counsel [had] adequately investigated the claims and became familiar with the strengths and weaknesses of those claims").

There also can be no question that the Proposed Settlement results from extensive negotiations that were serious and non-collusive. Indeed, it results from intense negotiations facilitated by retired United States District Judge Layn R. Phillips, who is a preeminent mediator. As Judge Phillips explains in his attached declaration, "[t]he mediation process was an extremely hard-fought negotiation from beginning to end and was conducted by experienced and able counsel on both sides. Throughout the mediation process, the negotiations between the Parties were vigorous and conducted at arm's-length and in good faith." Ex. 6 at ¶12.

As this Court has aptly explained, "[t]he participation of an independent mediator in settlement negotiations *virtually [e]nsures* that the negotiations were conducted at arm's length and without collusion between the parties." *In re Wendy's Co. S'holder Deriv. Action*, Case No. No. 16-cv-1153 (S.D. Ohio Jan. 24, 2020), Preliminary Approval Order (Ex. 10 hereto) at 14 (emphasis in original) (quoting *Bert v. AK Steel Corp.*, No. 02-CV-467, 2008 WL 4693747, at *2 (S.D. Ohio Oct. 23, 2008)). And numerous courts throughout the country have acknowledged the involvement of retired Judge Phillips in particular as a factor weighing in favor of settlement approval. *See, e.g., Voulgaris v. Array Biopharma Inc.*, Civil Action No. 17-cv-02789, 2021 WL 6331178, at *6 (D. Colo. Dec. 3, 2021) ("The arm's-length nature of the parties' negotiations and

the active involvement of an independent mediator, such as Judge Phillips in particular, provide strong support for approval of the Settlement."); *IBEW Local 697 Pension Fund v. Int'l Game Tech., Inc.,* No. 09-cv-00419, 2012 WL 5199742, at *2 (D. Nev. Oct. 19, 2012) (finding settlement fair when it was reached with "the assistance of an experienced and reputable private mediator, retired Judge Phillips").

### 2. The Proposed Settlement Is Fair, Reasonable, and Adequate, and Falls Within the Range of Possible Approval

The Proposed Settlement also "has no obvious deficiencies, does not improperly grant preferential treatment" to any constituency and easily "falls within the range of possible approval." *Telectronics*, 137 F. Supp. 2d at 1015–16.  Indeed, it is one of the most significant settlements of a shareholder derivative action ever achieved, including both a significant monetary recovery *and* unprecedented internal governance reforms tailored to improve FirstEnergy's corporate governance disclosure obligations and prevent the recurrence of misconduct going forward.

### a. The $180 Million Monetary Component of the Proposed Settlement Represents a Highly-Favorable Recovery

The $180 million monetary component of the Proposed Settlement is, as noted, three times the size of any prior derivative recovery in the history of the Sixth Circuit[14] and among the largest derivative recoveries ever achieved, in any forum, in the history of the United States.[15]  Indeed, it is the third-largest insurer-funded derivative recovery on record.[16]  It also represents an

---

[14] *See* note 1, *supra*.

[15] *See* note 2, *supra*.

[16] The only larger such recoveries known to Plaintiffs were achieved in *In re Wells Fargo & Company Shareholder Derivative Litigation*, C.A. No. 3:16-cv-05541 (N.D. Cal. 2020) ($240 million insurer-funded cash recovery in action alleging breaches of fiduciary duty in connection with an illicit scheme to create millions of customer accounts without customers' knowledge) and *In re the Boeing Company Derivative Litigation*, C.A. No. 219-0907 (Del. Ch. 2022) ($237.5

extraordinary result for FirstEnergy in this case, comparing favorably with any recovery that Plaintiffs could reasonably have hoped to recover following trial, an inevitable appeal, and the entry of a final judgement.  Though Plaintiffs believed their claims were strong and had confidence in their ability to prevail on the merits at trial, Plaintiffs also identified certain risks inherent in pressing further litigation in lieu of the Proposed Settlement.

In particular, Plaintiffs harbored serious concerns regarding recoverability, given that the Individual Defendants' personal assets and D&O insurance represented the only possible sources of recovery for Plaintiffs' claims asserted on behalf of FirstEnergy.  The Proposed Settlement, significantly, captures the vast majority of Defendants' available D&O insurance, which Plaintiffs reasonably determined represented the primary source of any recovery on the scale of the damages alleged.  Defendants' relevant policies are "wasting" policies, subject to erosion to pay defense costs and settlements in this Action as well as defense costs and any settlements in other related actions.  Pressing further litigation in lieu of settlement therefore created a serious risk of substantial erosion of the policies, rendering any future judgment on the scale of $180 million unrecoverable and a quintessential pyrrhic victory.[17]

Further, given the nature of the alleged misconduct in this Action, Plaintiffs also harbored concerns that, if a negotiated resolution could not be reached at this time, they would ultimately face additional or collateral litigation with Defendants' insurers regarding their obligation to cover Defendants in connection with the wrongful acts alleged.  *See, e.g.*, *In re Galena Biopharma, Inc.*

---

million insurer-funded cash recovery in action alleging breaches of fiduciary duty in connection with oversight failures leading to mass-fatality aircraft disasters).

[17] At the time of Proposed Settlement, Defendants possessed approximately $220 million in remaining insurance coverage, subject to potential erosion in connection with defense costs or settlements of the Derivative Actions, as well as multiple other related actions including, for instance, the pending related consolidated federal securities class action.

*Deriv. Litig.*, Case No. 14-cv-00516, 2016 WL 10840600, at \*2 (D. Or. June 24, 2016) (noting the individual defendants' "insurers dispute coverage and if the Action does not settle and continues to be litigated, there is a risk that insurance coverage will be denied and an additional insurance coverage lawsuit may ensue").

Moreover, though Plaintiffs were highly confident in the merits of their claims, derivative litigation is "notoriously difficult and unpredictable," *Granada Invs.* 962 F.2d at 1205, and besides the time-value of money, litigating this Action through trial and possible appeals was not a risk-free proposition. Notably, to recover damages for alleged breaches of fiduciary duty under Ohio law, Plaintiffs would have been required to prove by "clear and convincing evidence" that the directors or officers acted or failed to act with "deliberate intent to cause injury" to FirstEnergy or with "reckless disregard" for FirstEnergy's best interests. Ohio Rev. Code §§ 1701.59(E) and 1701.641(D). Satisfying this standard, particularly as to the Director Defendants, would have presented challenges. It is widely-recognized that fiduciary breach claims premised on oversight failures, even in jurisdictions such as Delaware with standards of proof lower than Ohio's "clear and convincing" evidence standard, are "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *See In re Caremark Int'l Inc. Deriv. Litig.,* 698 A.2d 959, 967 (Del. Ch. 1996).

Similarly, Plaintiffs faced potential appellate issues with respect to Plaintiffs' theory of liability for the Director Defendants under Section 14(a) of the Exchange Act. As this Court recognized when denying Defendants' motions to dismiss, "the Sixth Circuit has yet to define 'transaction causation' for purposes of a Section 14(a) claim under circumstances analogous to those presented here." MTD Opinion at 30. Although this Court correctly denied Defendants' motion for interlocutory appeal regarding this issue (ECF No. 151), the lack of clear controlling

19

precedent by the Sixth Circuit created risk and could have resulted in a prolonged appellate process even after a successful trial, which militates in favor of approving the Propose Settlement. *See Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 531 (E.D. Ky. 2010), *aff'd sub nom., Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235 (6th Cir. 2011) (approving settlement "[g]iven the unsettled nature of the law with respect to certain claims").

Given these practical limitations and risks, among others, the $180 million monetary component of the Proposed Settlement is an extraordinary result. Plaintiffs' damages case has centered on the $230 million penalty imposed on FirstEnergy pursuant to the DPA, a full 78.26% of which is recovered by the Proposed Settlement.[18] This recovery, even assuming significant additional damages, compares favorably with other significant settlements of derivative actions involving unusually large monetary recoveries. *See, e.g.*, *In re Pfizer Inc. S'holder Deriv. Litig.*, 780 F. Supp. 2d 336, 338 (S.D.N.Y. 2011) (granting final approval of derivative settlement with $75 million monetary component, which represented 3.26% of $2.3 billion in penalties paid to the federal government in connection with the relevant misconduct). All things considered, the $180 million recovery here is a striking result as compared both to precedent and to what Plaintiffs could reasonably have hoped to recover following trial.

---

[18] At the time of the Proposed Settlement, it was not possible to determine the total damages incurred by FirstEnergy with precision, as much of those damages remained speculative. For instance, damages associated with the amorphous reputational harm inflicted upon the Company as a result of the bribery scandal are very difficult to quantify. The same is true regarding estimates of the potential liabilities facing FirstEnergy in the related consolidated federal securities class action and consolidated consumer class action, as well as potential liabilities flowing from ongoing regulatory proceedings. The sources of readily identifiable damages to FirstEnergy included principally the $230 million penalty imposed by the DPA, the approximately $60 million in corporate funds misappropriated for use in the bribery scheme, the more than $100 million in compensation FirstEnergy paid to the Individual Defendants while the scheme was on going, and the Company's defense costs incurred in connection with the various related actions and regulatory investigations, which FirstEnergy regularly discloses in its filings with the SEC.

**b.** **The Proposed Settlement's Governance Reforms Constitute Important Additional Relief That Was Only Achievable Through a Negotiated Resolution**

The Proposed Settlement, moreover, pairs its historic monetary recovery with extremely significant corporate governance reforms. These reforms were designed by Plaintiffs with the assistance of an experienced, outside corporate governance expert, Columbia Law School's Jeffrey N. Gordon, and are tailored to prevent recurrence of similar misconduct in the future while restoring FirstEnergy's reputation with regulators, shareholders, customers, and the public. As Professor Gordon explains in his attached declaration, the achieved reforms "will significantly improve shareholder welfare at FirstEnergy and also help establish an improved template for board responsibility-taking and accountability-enabling in the challenging area of the Company's political activity." Ex. 5 ¶22.

Here, the Proposed Settlement ensures that the Board will be refreshed at FirstEnergy's annual meeting in Spring 2022, rather than at some indeterminate time in the future, or not at all. Further, within 30 days of that annual meeting, the refreshed Board will engage in a comprehensive review of the Company's current C-Suite executives, to be completed by no later than 90 days following the commencement of the review. Accordingly, FirstEnergy stockholders will be able to take comfort that the senior-most members of the Company have been reviewed by a refreshed Board no later than 120 days after the Company's annual meeting. The other corporate governance reforms will take effect immediately upon final approval of the Proposed Settlement, and will ensure significantly enhanced oversight, disclosures, and alignment of incentives for executive compensation.

Plaintiffs believe that the achieved reforms ultimately may prove even more valuable to FirstEnergy than the monetary component of the Proposed Settlement. *Cf. Maher v. Zapata*, 714 F.2d 436, 461 (5th Cir. 1983) (recognizing that the "effects of [a derivative] suit on the functioning

21

of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment"); *see also Pfizer*, 780 F. Supp. 2d at 342 (recognizing reforms aspects of settlement to "provide considerable corporate benefits … in the form of a significantly improved institutional structure for detecting and rectifying the types of wrongdoing that have … caused extensive harm to the company").[19] Notably these reforms constitute "a form of relief that [plaintiffs] could not have obtained at trial" and that was, therefore, only achievable through a negotiated resolution. *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1067 (Del. Ch. 2015) (commenting favorably on non-monetary aspects of a shareholder derivative settlement).

### c.    The Proposed Settlement Provides FirstEnergy with Immediate Relief and Avoids the Trouble and Uncertainty of Further Litigation for the Company

Finally, the derivative nature of this litigation compelled Plaintiffs to act in the best interests of FirstEnergy at all times.  This required Plaintiffs to weigh FirstEnergy's interests in avoiding the uncertainty and distraction of further litigation arising from the bribery scandal and potential collateral harm that could befall the Company as a result of further adversarial litigation between the parties to this Action.  *See Wells Fargo*, C.A. No. 16-cv-05541, ECF No. 274, Preliminary Approval Order at 9 (Ex. 11 hereto) (granting preliminary approval for derivative settlement, recognizing that the proposed settlement would benefit the nominal defendant company by avoiding "lingering uncertainty" and facilitating "Wells Fargo's efforts to move past this series of scandals") (N.D. Cal. May 14, 2019) (citing *In re Apple Computer, Inc. Deriv. Litig.*,

---

[19] *See also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970) (recognizing that "a corporation may receive a 'substantial benefit' from a derivative suit … regardless of whether the benefit is pecuniary in nature"); *AOL Time Warner S'holder Deriv. Litig.*, No. 02 Civ. 6302, 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (non-monetary benefits alone can be "substantial enough to merit [settlement] approval").

No. C 06-4128, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008) ("The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest.")).

The Proposed Settlement here provides FirstEnergy with meaningful financial compensation for the financial harm caused by the bribery scandal, implements reforms to deter and prevent the recurrence of misconduct, *and* provides certainty and finality to the Company, facilitating its efforts to move past the scandal. Plaintiffs submit that it is an extraordinary result for the Company and one easily meeting the requirements for preliminary approval.

### C.     Attorneys' Fees and Expenses

Plaintiffs' counsel and the SLC, on behalf of itself and the Company, will attempt in good faith to negotiate an appropriate award of attorneys' fees and litigation expenses for Plaintiffs' counsel in all Derivative Actions based upon the substantial benefits conferred upon the Company by the Proposed Settlement and the risks of undertaking the prosecution of those Actions on a contingent basis. Any such agreement would be subject to Court approval. Any fee request submitted to this Court, whether agreed to by the SLC or not, will be based upon the substantial benefits conferred upon the Company by the Proposed Settlement and the risks of undertaking the prosecution of the Derivative Actions on a contingent basis, and will not exceed 27% of the Settlement Fund. Additionally, Co-Lead Counsel in this Action intend to apply to the Court for service awards for each of the Plaintiffs ("Service Awards") in an amount not to exceed $10,000 for each Plaintiff, to be paid out of the Court-awarded attorneys' fees and litigation expenses.

Assuming the Court preliminarily approves the Proposed Settlement, Plaintiffs' requested Fee and Expense Award will be fully addressed in connection with briefing on Plaintiffs' motion for final approval of the Proposed Settlement. At that time, Plaintiffs will submit additional

detailed information in support of their requested award and the Court will have the opportunity to evaluate the reasonableness of the request in full. Plaintiffs respectfully submit that, for present purposes, the contemplated Fee and Expense Award is within the range of possible approval. Plaintiffs have committed to seek no more than 27% of the total monetary recovery achieved by the Proposed Settlement, without ascribing any valuation to the significant governance reforms achieved by the Proposed Settlement. "It is not abnormal for negotiated attorneys' fee awards to comprise between 20% to 30% of the total award." *Does 1-2 v. Déjà vu Services, Inc.*, 925 F.3d 886, 898 (6th Cir. 2019); *see also Schuh v. HCA Holdings, Inc.*, Civil Action No. 11-cv-01033, 2016 WL 10570957, at *1 (M.D. Tenn. April 14, 2016) (awarding "attorneys' fees of 30% of the [$215 million total] Settlement Amount," holding "the awarded fee is in accord with Sixth Circuit authority and consistent with other fee awards in cases of this size").[20]

### D. The Proposed Notice is Adequate and Reasonable

No later than five business days after the Court grants preliminary approval, the Company will notify current FirstEnergy stockholders by (a) filing a copy of the Stipulation and the Notice (in the form attached as Exhibit D to the Settlement Stipulation) as an exhibit to a Form 8-K with the United States Securities and Exchange Commission, (b) posting a copy of the Settlement Stipulation and the Notice on the Company's corporate website, which documents shall remain there through the Effective Date of the Settlement, and (c) publishing a Summary Notice (in the form attached as Exhibit E to the Settlement Stipulation) in *Investor's Business Daily* or similar

---

[20] Indeed, numerous federal District Courts nationwide have awarded comparable or higher fees in large complex actions such as this one. *See, e.g.*, *Kritzer v. Safelite Solutions, LLC*, 2012 WL 1945144, at *9 (S.D. Ohio May 30, 2012) (fee award of nearly 52%); *Peace Officers' Annuity & Ben. Fund of Ga. v. Davita Inc.*, 2021 WL 2981970, at *5 (D. Colo. July 15, 2021) (fee award of 30%).

publication. The Company will assume administrative responsibility for and will pay any and all costs and expenses related to disseminating the Notice.

The proposed Notice will advise the Company's stockholders of the essential terms of the Proposed Settlement, and of information regarding Plaintiffs' counsel's intended application for Court approval of a Fee and Expense Award and Service Awards to be paid therefrom. It also will set forth the procedure for objecting to the Proposed Settlement and/or the Fee and Expense Award and Service Awards, and will provide specifics on the date, time and place of the Settlement Hearing, thereby satisfying the requirements of Rule 23.1. *See, e.g., Bailey v. White*, 320 F. App'x 364, 367 (6th Cir. 2009) ("notice must 'be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections'") (quoting *UAW v. Gen. Motors Corp*., 497 F.3d 615, 629 (6th Cir. 2007)). The same type of notice proposed here has been approved by other courts in this District as fully satisfying the requirements of Rule 23.1 and the requirements of due process. *See In re Big Lots, Inc. S'holder Litig.*, Case No. 12-cv-445 (S.D. Ohio Apr. 6, 2018), ECF No. 120, Preliminary Approval Order at 4 (Ex. 12 hereto) (providing for similar notice program to stockholders); *Booth Fam. Tr. v. Jeffries*, No. 05-cv-0860 (S.D. Ohio Nov. 01, 2011), ECF No. 254, Preliminary Approval Order at 3 (Ex. 13 hereto) (same).

## V. THE PARTES' PROPOSED SCHEDULE OF EVENTS

Pursuant to the proposed Preliminary Approval Order, the parties propose the following schedule of events leading to the Settlement Hearing:

| Event | Date |
|---|---|
| Filing of Notice via Form 8-K with the SEC | Within 5 business days after entry of the Preliminary Approval Order |

| Event | Date |
|---|---|
| Posting of Notice on FirstEnergy's website | Within 5 business days after entry of the Preliminary Approval Order |
| Last day for counsel for FirstEnergy to file appropriate proof of compliance with respect to dissemination of Notice | At least 21 calendar days prior to the Settlement Hearing |
| Filing of all papers in support of the Proposed Settlement, including the Fee and Expense Award and Service Awards | At least 28 calendar days prior to the Settlement Hearing |
| Last day for Current FirstEnergy Stockholders to comment on the Proposed Settlement | At least 14 calendar days prior to the Settlement Hearing |
| Filing of all reply papers in support of the Proposed Settlement, including responses to Current Shareholder comments, if any | At least 7 calendar days prior to the Settlement Hearing |
| Settlement Hearing | At least 65 calendar days after entry of the Preliminary Approval Order |

The parties' proposed preliminary approval order also includes a customary prosecution bar enjoining Plaintiffs, FirstEnergy, or anyone else from commencing or prosecuting any other action asserting any of the claims alleged in this Action—including the Northern District Action and the State Court Action—pending this Court's determination as to whether final approval should be granted. *See* Ex. C to Settlement Stipulation at ¶16. All parties in all of the Derivative Actions support the Proposed Settlement. Absent a prosecution bar, Plaintiffs in another court may nevertheless be forced to prosecute (1) the same claims; (2) on behalf of the same party (FirstEnergy); (3) against the same Defendants, that this Court will release if it approves the Proposed Settlement. This would undermine the Proposed Settlement and could deprive FirstEnergy of the benefits of the Proposed Settlement before it has been considered following notice and a final approval hearing in this Court. FirstEnergy only has the right to recover once against its Officers and Directors for the misconduct alleged here.

26

Plaintiffs further note that because the Proposed Settlement is supported by all parties to all of the Derivative Actions and this motion for preliminary approval is unopposed as to the relief sought, no responses or reply briefs are expected.  Accordingly, this Motion is now fully briefed.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant preliminary approval of the Proposed Settlement, approve the form and manner of the parties' proposed Notice approve and direct the implementation of the Notice plan, and schedule a Settlement Hearing.

Dated: March 11, 2022                                Respectfully submitted,

*/s/ John C. Camillus*
**LAW OFFICES OF JOHN C. CAMILLUS LLC**
John C. Camillus (0077435)
P.O. Box 141410
Columbus, OH 43214
Phone: (614) 992-1000
jcamillus@camilluslaw.com

*Liaison Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Maya Saxena
Joe E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Phone: (561) 394-3399
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

**SAXENA WHITE P.A.**
Thomas Curry
Tayler D. Bolton
1000 N. West Street, Suite 1200

27

Wilmington, DE 19801
Phone: (302) 485-0480
tcurry@saxenawhite.com
tbolton@saxenawhite.com

**SAXENA WHITE P.A.**
Steven B. Singer
Sara DiLeo
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
ssinger@saxenawhite.com
sdileo@saxenawhite.com

- and -

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Jeroen van Kwawegen
Alla Zayenchik
Margaret Sanborn-Lowing
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
jeroen@blbglaw.com
alla.zayenchick@blbglaw.com
margaret.lowing@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Daniel S. Sommers
Molly J. Bowen
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
mbowen@cohenmilstein.com

- and -

28

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Christopher Lometti
Richard A. Speirs
Amy Miller
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838 7745
clometti@cohenmilstein.com
rspeirs@cohenmilstein.com
amiller@cohenmilstein.com

*Counsel for Additional Plaintiff Massachusetts Laborers Pension Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 11, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys on record.

*/s/ John C. Camillus*

John C. Camillus
