# EXHIBIT 10

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF ST. LOUIS, *et al.*, | Case No. 2:20-cv-04813 |
| Plaintiffs, | |
| v. | Chief Judge Algenon L. Marbley |
| CHARLES E. JONES, *et al.*, | |
| Defendants, | Magistrate Judge Kimberly A. Jolson |
| and | |
| FIRSTENERGY CORP., | |
| Nominal Defendant. | |

### DECLARATION OF MICHAEL J. HYNES
### FILED ON BEHALF OF HYNES & HERNANDEZ, LLC IN SUPPORT OF
### PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT AND REQUEST
### FOR ATTORNEYS' FEES AND EXPENSES

I, Michael J. Hynes, declare as follows:

1.  I am a partner of Hynes & Hernandez, LLC ("H&H"). I submit this Declaration in support of Plaintiffs' Motion for Final Approval of Settlement and Request for Attorneys' Fees and Expenses in connection with the Settlement[1] of the above-captioned shareholder derivative action (the "Action"). I have knowledge of the matters set forth herein based on personal knowledge, my review of the firm's records, and consultation with other firm personnel.

2.  This firm is counsel of record for plaintiffs Roberta Bloom, Joan Randell, and Arlene Pogolowitz (the "Bloom Plaintiffs"). H&H prepared and filed the Verified Stockholder

---

[1] As defined in the Stipulation and Agreement of Settlement dated March 11, 2022 (ECF No. 170-3).

Derivative Complaint for the Bloom Plaintiffs in the U.S. District Court for the Southern District of Ohio, No. 2:20-cv-04534, on September 1, 2020 (the "Bloom Action"). Thereafter, H&H, among other things, assisted in the coordination of the Bloom Action with other stockholder derivative actions concerning FirstEnergy Corp. ("FirstEnergy or the "Company") and maintained continuing primary responsibility for interaction with Co-Lead Counsel for the Southern District Plaintiffs, as well as undertaking discrete tasks assigned by Co-Lead Counsel.

3.     The information in this Declaration regarding H&H's time, including in the schedule attached hereto as Exhibit 1, was prepared from daily time records regularly prepared and maintained by my firm in the ordinary course of business. I am the Partner who oversaw my firm's activities in the litigation, and I, together with attorneys working under my direction, reviewed my firm's daily time records to confirm their accuracy. The purpose of this review was to confirm both the accuracy of the entries in the time records as well as the necessity for, and reasonableness of, the time and expenses committed to the Action. As a result of this review, reductions were made to both time and expenses in the exercise of billing judgment. Based on this review and the adjustments made, I believe that the time reflected in the firm's lodestar calculation and the litigation expenses for which payment is sought are reasonable and were necessary for the effective and efficient prosecution and resolution of the Action.

4.     The total number of hours expended on this Action by my firm's attorneys from its inception through March 11, 2022 was 181.1. The total resulting lodestar for my firm is $142,585. The schedule attached hereto as Exhibit 1 is a detailed summary reflecting the amount of time spent by each attorney from my firm who was involved in the Action, and the lodestar calculation based on my firm's current hourly rates. Different timekeepers within the same employment

category may have different rates based on a variety of factors, including years of practice, relevant experience, relative expertise, and the rates of similarly experienced peers at other firms.

5. Set forth below is a description of the services rendered by each attorney for whom fees are requested and who committed the following number of the hours in prosecuting the Action:

- **Michael J. Hynes** (Partner) (66.1 hours). Mr. Hynes was actively involved in researching the factual allegations and potential claims for the complaint in the Bloom Action. Mr. Hynes reviewed and kept apprised of all relevant pleadings in the Action and was involved in initiating communications with numerous counsel for other derivative actions filed on behalf of First Energy. Mr. Hynes was primarily responsible for communications with Co-Lead Counsel for the Southern District Plaintiffs and undertook discrete tasks assigned by Co-Lead Counsel.

- **Ligaya T. Hernandez** ( Partner) (115.0 hours). Ms. Hernandez was primarily responsible for the major strategy and tactical decisions for the Bloom Action. Ms. Hernandez was actively involved in researching the factual allegations and potential claims, crafted the complaint in the Bloom Action, and reviewed and kept apprised of all relevant pleadings in the Action. Ms. Hernandez was primarily responsible for communicating with additional counsel for the Bloom Plaintiffs and certain other counsel involved in other derivative actions filed on behalf of First Energy. Ms. Hernandez also attended the hearing regarding selecting lead counsel for the Action and provided support to Co-Lead Counsel.

6. The qualifications and backgrounds of the attorneys identified in the previous paragraph may be found in my firms' resume, which is attached hereto as Exhibit 3.

7. The hourly rates charged by H&H are reasonable for several reasons. *First*, the rates charged by H&H are its customary hourly rates.

8. *Second*, the hourly rates charged by H&H are reasonable in light of the firm's highly specialized skill and experience when it comes to litigating shareholder derivative litigation. H&H has extensive experience litigating shareholder derivative actions. Several examples include the following: *In re Galena Biopharma Inc. Derivative Litigation*, Lead Case No. 3:14-cv-382-SI (D. Colo.) ($15 million of insurance proceeds paid to the Company and the implementation of extensive corporate governance measures), *County of York Employees Retirement Plan and Lynne*

*Schwartz v. Andrea Jung, et al., (Avon Products, Inc.)*; Index No. 651304/2010, Part 39, Supreme Court of the State of New York (implementation of extensive foreign business practices measures to ensure compliance with the Foreign Corrupt Practices Act), and *In re Fifth Street Finance Corp. Shareholder Derivative Litig.*, Lead Case No. 3:15-cv-01889 (D. Conn.) ($30 million in monetary benefits to FSC plus corporate governance and oversight enhancements, including creation of a Risk and Conflicts Committee).   More recently, H&H was part of the litigation team that prosecuted claims on behalf of Equifax Inc. ("Equifax") against certain of Equifax's current and former officers and directors for breaches of fiduciary duty arising out of Equifax's massive 2017 data breach. *In re Equifax, Inc. Derivative Litigation,* Case No. 1:18-cv-17 (N.D. Ga.). The terms of the Equifax settlement included: (1) the Defendants' agreement to cause their insurers to pay to Equifax the sum of thirty-two million five hundred thousand dollars ($32,500,000); and (2) Equifax's adoption and/or maintenance of numerous corporate governance and internal control reforms. *Id.*

9.      *Third*, the hourly rates charged by H&H are consistent with the rates for similar services by lawyers of reasonably comparable skill, experience, and national reputation.  *See, e.g. In re Snap Inc. Sec. Litig.*, No. 2:17-cv-03679-SVW-AGR, 2021 WL 667590, at *4 (C.D. Cal. Feb. 18, 2021), *In re Snap Inc. Sec. Litig.,* No. 2:17-cv-03679-SVW-AGR, ECF No. 386-9, at PAGEID #:18483-18485 (approving fee award in securities fraud class action with hourly rates ranging from $780-$920 for partners); *In re BHP Billiton Ltd. Sec. Litig.*, No. 16-cv-01445, 2019 WL 1577313, at *1 (S.D.N.Y. Apr. 10, 2019), *In re BHP Billiton Ltd. Sec. Litig.*, No. 16-cv-01445, ECF No. 122-1 at 2 (approving fee award in securities fraud class action with hourly ranging from $790-$1030 for partners).

10. *Fourth*, H&H has special expertise when it comes to litigating shareholder derivative cases, and courts across the country have approved H&H's fees at its standard hourly rates. *See, e.g., JS Halberstam Irrevocable Grantor Trust v. Davis et al.,* Case No. 3:21-cv-00413-SI (D. Or.); *In Re Universal Health Services, Inc., Derivative Litigation*, Case No. 17-02187 (E.D. PA); *In re The RealReal, Inc. Stockholder Derivative Litigation*, Master File No.: 1:20-cv-01212-LPS (D. Del.).

11. *Fifth*, H&H's implied hourly rate of $787, based on the firm's lodestar and total hours billed, falls well within the range of those approved by courts in the Southern District of Ohio in shareholder derivative cases. *See Rudi v. Wexner*, No. 2:20-CV-3068, 2022 WL 1682297, at *5 (S.D. Ohio May 16, 2022) ("*L Brands*") (granting fee award with hourly rates of up to $1,685 for partners and $1,245 for associates), *L Brands*, 2:20-cv-03068, ECF No. 26-9 at PAGEID #: 1080; *In re Big Lots, Inc. S'holder Litig.*, No. 2:12-CV-445, 2018 WL 11356561, at *5 (S.D. Ohio Aug. 28, 2018), *Big Lots*, No. 2:12–cv–445, ECF No. 122-3 at PAGEID #: 2760 (approving hourly rates of up to $925 for partners and $650 for associates).

12. Based on records maintained by my firm, H&H incurred a total of $899.67 in unreimbursed litigation expenses in connection with the prosecution and settlement of the Action. (Plaintiffs' Counsel are not seeking separate reimbursement for their unreimbursed litigation expenses in this matter, but instead are seeking an "all in" attorneys' fee as a percentage of the total monetary recovery.) The firm's expenses are fully categorized in Exhibit 2 attached hereto.

13. The litigation expenses incurred in this Action are reflected in the books and records of H&H, which are regularly prepared and maintained in the ordinary course of business. These records are prepared from expense vouchers, check records and other source materials and are an accurate record of the expenses incurred. These expenses were reasonably necessary in the

prosecution of the Action. Courts have typically found that these kinds of expenses are payable to counsel who create a benefit for shareholders.

14. My firm undertook this litigation on an entirely contingent basis and have not been paid for any of their work, nor have any of their costs or expenses been reimbursed. My firm undertook the litigation of the Action with the expectation that it would have to devote many hours of hard work to the prosecution of a case involving complex factual and legal issues without any guarantee of successful resolution or of compensation for their efforts. The prosecution of this Action involved the expenditure of significant resources, including the time spent by attorneys and professional staff, as well as the substantial expenses that were incurred during the litigation, while my firm received no compensation during the course of the litigation.

15. This Declaration provides the Court with time only through March 11, 2022 (the date that the Stipulation and Agreement of Settlement was signed). Accordingly, this Declaration does not encompass time incurred from March 12, 2022 through the present. Also, this Declaration does not include time spent preparing Plaintiffs' Motion for Final Approval of Settlement and Request for Attorneys' Fees and Expenses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of June 2022, at West Chester, Pennsylvania.

_Michael J. Hynes_
Michael J. Hynes
Hynes & Hernandez, LLC

## EXHIBIT 1

*Employees Retirement System of the City of St. Louis, et al., v. Charles E. Jones, et al.*
Case No. 2:20-cv-04813

### HYNES & HERNANDEZ, LLC TIME REPORT

### Inception through March 11, 2022

| NAME | HOURS | HOURLY RATE | LODESTAR |
|---|---|---|---|
| **Partners** | | | |
| Michael J. Hynes | 66.10 | $850.00 | $56,185.00 |
| Ligaya T. Hernandez | 115.00 | $750.00 | $86,400.00 |
| **TOTAL LODESTAR** | | | **$142,585.00** |

**EXHIBIT 2**

*Employees Retirement System of the City of St. Louis, et al., v. Charles E. Jones, et al.*
Case No. 2:20-cv-04813

**HYNES & HERNANDEZ, LLC EXPENSE REPORT**

| CATEGORY | AMOUNT($) |
|---|---|
| Online Legal and Factual Research | $724.17 |
| Printing and Photocopy | $67.50 |
| Administrative Costs | $108.00 |
| | |
| **TOTAL EXPENSES:** | **$899.67** |

**EXHIBIT 3**

*Employees Retirement System of the City of St. Louis, et al., v. Charles E. Jones, et al.*
Case No. 2:20-cv-04813

## HYNES & HERNANDEZ, LLC FIRM RESUME



**101 Lindenwood Drive**
**Suite 225**
**Malvern, PA 19355**
**Telephone: (484) 875-3116**
**Fax: (484) 875-9273**

## FIRM RESUME

### I.  THE FIRM

Hynes & Hernandez, LLC is a boutique law firm with a national practice dedicated to providing exceptional legal services in shareholder litigation, with a focus on corporate malfeasance and breaches of fiduciary duty. The firm is comprised of experienced attorneys who built their careers at prominent law firms specializing in complex civil litigation.

The attorneys at Hynes & Hernandez, LLC are recognized leaders in shareholder litigation. The firm is dedicated to representing individual and institutional investors who have been wronged by corporate transgressions such as breaches of fiduciary duty, mismanagement, corporate waste and insider trading. The purpose of the firm is to help shareholders hold wrongdoers accountable for the damages inflicted on the company and its shareholders by corporate misconduct. The attorneys at Hynes & Hernandez, LLC have a proven track record of obtaining not only monetary recoveries for shareholders in shareholder litigation, but also significant and innovative corporate governance reforms that inure directly to the benefit of the company and its investors. Corporate governance refers to the system by which companies are directed and controlled. Corporate governance is intended to increase the accountability of a company's management to investors and to avoid corporate wrongdoing and malfeasance that can result in investor loss. The lawyers at Hynes & Hernandez, LLC have witnessed first-hand how companies and their shareholders benefit from improved corporate governance.

Many instances of corporate misconduct result from a lack of adequate corporate governance. Conversely, good corporate governance fosters fairness, transparency, and accountability to shareholders and has been shown to benefit companies and shareholders alike. For example, studies have shown that companies with poor corporate governance scores have 5-year returns that are 3.95% below the industry average, while companies with good corporate governance scores have 5-year returns that are 7.91% above the industry-adjusted average. The difference in performance between these two groups is 11.86%. *Corporate Governance Study: The Correlation between Corporate Governance and Company Performance*, Lawrence D. Brown, Ph.D., Distinguished Professor of Accountancy, Georgia State University and Marcus L. Caylor, Ph.D. Student, Georgia State University.

### II.  ATTORNEY PROFILES

#### MICHAEL J. HYNES

Mr. Hynes is a founding Partner of Hynes & Hernandez, LLC. Prior to forming Hynes & Hernandez, LLC, Mr. Hynes was a partner at two nationally recognized securities firms. He

practiced in the area of shareholder derivative litigation at both firms, serving as head of the Shareholder Derivative Litigation Department at the latter firm.

Mr. Hynes has served as lead or co-lead counsel in numerous high profile derivative actions relating to the "backdating" of stock options, including *In re Monster Worldwide, Inc. Derivative Litig.*, Index No. 06-108700 (New York County, NY); *In re Barnes & Noble, Inc. Derivative Litig.*, Index No. 06-602389 (New York County, NY); *In re Affiliated Computer Services, Inc. Derivative Litig.*, Cause No. 06-3403 (Dallas County, TX); and *In re Progress Software Corp. Derivative Litig.*, Civil A. No. 07-1937-BLS2 (Suffolk County, MA). More recently, he was involved in litigation concerning Computer Sciences Corporation, *Bainto v. Laphen, et al.*, Consolidated Case No.: A-12-661695-B (District Court Clark County, Nevada) and NCR Corporation, *Williams v. Nuti, et al.*, No. 1:13-cv-01400-SCJ (N.D. Ga. Apr. 26, 2013). Settlements of these, and similar actions, resulted in significant monetary recoveries and corporate governance improvements for those companies and their public shareholders. Mr. Hynes is currently litigating cases involving breaches of fiduciary duties arising out of the payment of excessive compensation to executive officers, violations of the Foreign Corrupt Practices Act, and violations of the False Claims Act. He has also successfully argued an appeal before the Superior Court of Pennsylvania in the matter of *Gray, L. v. DeNaples, L., et al.,* Docket No. 2198 MDA 2014.

Prior to concentrating on shareholder derivative litigation, Mr. Hynes practiced law at Cozen O'Connor, where he concentrated on bankruptcy and commercial litigation. He was also an attorney with the Defenders' Association of Philadelphia from 1991 to 1996, where he defended thousands of misdemeanor and felony cases and obtained jury trial experience. Mr. Hynes received his law degree from Temple University School of Law (J.D. 1991, *cum laude*), and is a graduate of Franklin and Marshall College (1987). Mr. Hynes is licensed to practice law in Pennsylvania, New Jersey and Montana, and has been admitted to practice in the United States Court of Appeals for the Ninth Circuit and the United States District Courts for the Eastern and Middle Districts of Pennsylvania. He also sat on the Board of Directors of the Public Interest Law Center for six years.

## LIGAYA T. HERNANDEZ

Ms. Hernandez has years of experience at some of the top class action litigation firms in the country. She specializes in representing shareholders in derivative suits.

Ms. Hernandez has successfully achieved several multi-million dollar recoveries in derivative cases throughout her career. She has also had a lead role in cases that resulted in significant corporate governance for companies, which greatly benefits its public shareholders. Notable cases include:

- *Harbor Police Retirement System v. Roberts,* Cause No. 09-09061 (95th District Court, Dallas County, Texas). Counsel in a shareholder derivative action alleging corporate waste as to a departing executive officer's retirement package. Settlement of the action required substantial modifications to corporate policies, designed to heighten the independence of outside directors in awarding executive compensation.

- *Williams v. Nuti et al.*, No. 1:13-cv-01400-SCJ (N.D. Ga. Apr. 26, 2013). Counsel in a shareholder derivative action where settlement required a number of enhancements to the company's corporate compliance program.

- *In re Maxwell Technologies, Inc. Derivative Litigation,* Case No. 13-CV-966 (S.D. Cal. 2015). Counsel in a shareholder derivative action based on allegations that management misrepresented its consolidated financial statements as they related to the recognition of certain of the company's revenues. Settlement included improvements to the company's policies and procedures concerning the company's compliance with applicable laws and regulations, as well as enhancing the board of directors' oversight of the company's compliance function.

- *In re Galena Biopharma, Inc. Derivative Litig.,* Case No. 3:10-cv-00382-S (D. Or. 2015). Counsel in a shareholder derivative action where management was accused of inflating the company's share price with a misleading marketing campaign and committing insider trading. Settlement included the payment of $15 million to the company, the cancellation of certain stock options that were accused of being improperly granted, and the implementation of significant corporate governance that addressed, among other things, the company's stock option granting policies.

Ms. Hernandez received her J.D. and a Health Law Certificate from Loyola University Chicago in 2009. While in law school she served as Senior Editor for the Annals of Health Law Journal and received the CALI Award for highest grade in Appellate Advocacy. Ms. Hernandez received a Master in Health Services Administration in Health Policy from The George Washington University and a Bachelor of Science degree in Biology from the University of Pittsburgh. She is licensed to practice law in Pennsylvania and New Jersey and is admitted to practice before the United States District Court for the Eastern District of Pennsylvania and the United States District Court for the District of New Jersey.

Ms. Hernandez has also been named a "Rising Star" by Pennsylvania Super Lawyers since 2015.

## III. ACHIEVEMENTS

Below are some notable cases that Hynes & Hernandez, LLC has litigated on behalf of its clients:

### *Marvin H. Maurras Revocable Trust v. Bronfman, Jr. et al.*, Case No. 12-cv-03395 (N.D. Ill.)

Accretive Health Inc. ("Accretive"), a registered debt-collection agency in Minnesota and several other states, was alleged to have violated numerous debt collection statutes and patient privacy laws in connection with the operation of its business. These violations became public when the Minnesota Attorney General's Office filed a lawsuit against Accretive in federal district court in Minnesota on January 19, 2012, citing numerous violations of state and federal health privacy laws, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Emergency Medical Treatment and Active Labor Act ("EMTALA"), debt collection laws, and consumer fraud laws. *Swanson v. Accretive Health, Inc.*, Civil File No. 12-145 RHK/JJK (D. Minn. Jan. 19, 2012). Through the shareholder derivative suit, Hynes & Hernandez, LLC achieved

important reforms pertaining to Accretive's internal compliance program to address and remediate the alleged misconduct.

Among other things, Accretive implemented the following corporate governance reforms as part of the settlement:

- Creation of a Compliance Oversight Committee whose function, among other things, was to facilitate the continued development, implementation and operation of an effective compliance program and scrutinize the external and internal environment through early detection and reporting of potential risks (economic, regulatory, inadvertent, political) that will minimize losses to Accretive and its clients;

- A Compliance Oversight Committee charter that will allow, among other things, the Compliance Oversight Committee to (1) assess risks of non-compliance with (a) applicable debt collection regulations and laws and (b) HIPAA, EMTALA, and other applicable privacy laws; (2) train and heighten awareness on compliance, ethics, and policies and communicate methods for reporting possible violations; and (3) reinforce Accretive's culture of collaboration and compliance and audit and monitor adherence to Accretive's compliance and ethics related policies and procedures;

- Continued engagement of an independent, third-party supplier to provide and monitor a whistle-blower hotline to Accretive employees, to provide an anonymous communication channel for employees; and

- Procedures governing reported violations of Accretive's Code of Business Conduct and Ethics through the whistle-blower hotline, including the requirement that the General Counsel or his designee, as appropriate (a) evaluate such information; (b) inform the Chief Executive Officer ("CEO") and audit committee of any alleged violations involving an executive officer or a director of Accretive; (c) determine whether an informal inquiry or a formal investigation is necessary, and initiate such inquiry or investigation as appropriate; and (d) report the results of any such inquiry or investigation, together with a recommendation as to a disposition of the matter, to the CEO, or in the event an executive officer or director is involved to the audit committee, for action.

### _Gloria Basaraba v. Robert Greenberg, et al.,_ Case No. CV-13-05061-PSG (C.D. Cal.)

Skechers U.S.A., Inc. ("Skechers") was accused of making numerous "unfounded claims" in the advertising of its highly promoted "Shape-ups" line of rocker-bottom shoes. These "unfounded claims" resulted in consumer and personal injury lawsuits and a $40 million settlement with the Federal Trade Commission prohibiting Skechers' continued use of numerous "unfounded claims" in Shape-ups advertising. Through the diligence of Hynes & Hernandez, LLC and after extensive negotiations, a settlement was reached which directly addressed the underlying claims in the litigation. For example, the Settlement called for all significant advertising campaigns to be reviewed by the legal department or outside legal counsel to ensure its appropriateness and legal compliance. The settlement also provided for the maintenance of a code of business ethics to be overseen by Skechers' General Counsel with the assistance of the company's Human Resources Department. The settlement required periodic business ethics and code of conduct training to its

employees and additional training for managers with functions that require the approval, preparation, execution, or dating of documents. The settlement also resulted in various improvements that support Skechers' compliance procedures and board-level oversight, including a requirement that the Head of Internal Audit, who is responsible for reviewing Skechers' internal controls, report to the Chair of the Audit Committee on an ongoing, real time basis.

Moreover, the settlement included measures that strengthen the board of directors' independence and transparency. These measures include rotation of the lead director position, ensuring the independence of the board of directors' committees, written independence guidelines, increased director training and greater access to information for shareholders. As nearly every corporate governance expert has recognized, an independent board of directors and strong audit committee is the bedrock of sound corporate governance and supervision of corporate affairs. *See, e.g.*, Ira M. Millstein & Paul W. MacAvoy, *The Active Board of Directors and Performance of the Large Publicly Traded Corporation*, 98 Colum. L. Rev. 1283, 1318 (1998) (finding "a substantial and statistically significant correlation between an active, independent board and superior corporate performance"); *Beyond "Independent" Directors: A Functional Approach to Board Independence*, 119 Harv. L. Rev. 1553, 1553 (2006) (noting that "the need for active, independent boards has become conventional wisdom").

### *In re Maxwell Technologies, Inc. Derivative Litigation*, Case No. 13-cv-966 (S.D. Cal.)

Maxwell Technologies, Inc. ("Maxwell") was alleged to lack the internal controls necessary to prevent improper revenue recognition and to have falsely represented its operations and finances between April 28, 2011 and 2013. Hynes & Hernandez, LLC was an integral part of a team of attorneys that caused Maxwell to adopt corporate governance reforms that not only strengthened Maxwell's internal controls, but also made Maxwell's board of directors more effective representatives of Maxwell and its shareholders. The governance measures include: (1) the requirement that the board of directors hold executive sessions at least twice quarterly; (2) enhanced director training; (3) the requirement that the audit committee meet periodically with Maxwell's legal, internal audit and regulatory operations department to ensure there is meaningful oversight over Maxwell's financial risks; (4) mandatory quarterly meetings and reports between the audit committee and the Chief Compliance Officer to discuss significant internal control issues and material enterprise, operational, financial legal/regulatory and reputational risks; (5) the implementation of annual comprehensive employee training regarding revenue recognition, Generally accepted accounting principles, and other financial reporting regulations and policies; and (6) the establishment of an internal audit plan to ensure that Maxwell has proper internal controls in place and are being followed by Maxwell employees.

### *In re Galena Biopharma, Inc. Derivative Litig.*, Case No. 3:14-cv-382-SI (D. Or.)

The derivative action brought on behalf of Galena Biopharma, Inc. ("Galena") and its shareholders arose from allegations that certain officers and/or directors of Galena secretly hired a stock promotion firm to "pump up" Galena's stock price, so they could later sell Galena stock while in possession of non-public information at a time when Galena stock was trading at artificially inflated prices. It was also alleged that certain of Galena's directors used inside information to improperly grant stock options to themselves and fellow officers and/or directors which violated Delaware law because such options were spring-loaded, *i.e.*, granted just prior to the release of

material information that was reasonably expected to drive the market price of Galena stock higher, and also failed to comply with the statutory requirements of the Delaware General Corporation Law.

Hynes & Hernandez, LLC was an integral part of a team of law firms that resolved the matter on favorable terms to Galena and its shareholders. The settlement required the payment of $15 million to Galena by its directors and officers' liability insurance carrier. In addition, as part of the settlement, a total of 1.2 million stock options that were alleged to have been improperly granted to the director defendants were cancelled in their entirety. Further, the former CEO forfeited over $800,000 of contractual severance payments due to him and over 1.1 million stock options with an intrinsic value of approximately $503,062. In total, the settlement provided Galena with financial consideration worth over $20.8 million.

Furthermore, the settlement required the implementation of significant corporate governance reforms at Galena specifically designed to remediate the alleged wrongdoing. These measures include reforms to Galena's stock option granting practices, the appointment of a new independent director, reforms to the board of directors and management structure and policies, the adoption of a formal Enterprise Risk Management program and other reforms designed to make Galena's officers and directors more effective and responsive fiduciaries.

### *County of York Employees Retirement Plan and Lynne Schwartz, Derivatively on Behalf of Avon Products, Inc. v. Andrea Jung, et al.,* **Index No. 651304/2010 (N.Y. Sup. Ct.)**

The derivative action brought on behalf of Avon Products, Inc. ("Avon") alleged breach of fiduciary duty claims against certain officers and directors in connection with, among other things, alleged violations of the Foreign Corrupt Practices Act of 1977 ("FCPA"). It was alleged that Avon violated the FCPA by paying bribes and kickbacks to get or retain business in China. Eventually, Avon was forced to pay fines in the amount of $135 million to settle actions with the U.S. Department of Justice and the U.S. Securities and Exchange Commission.

As a result of the prosecution and settlement of the derivative action, Avon agreed to implement and maintain significant corporate governance measures designed to detect and deter violations of the FCPA and to improve the Company's compliance practices when it conducts business in countries with a high corruption risk profile. The corporate governance provisions include, among other things, the appointment of a Chief Ethics and Compliance Officer ("CECO"), at least bi-annual reporting by the CECO to the audit committee on the status of compliance efforts, implementation of remedial measures, training statistics, and potential violations. The settlement also provided for designated compliance personnel for each business unit, a certification process requiring global commercial business leaders to provide quarterly certifications on unit compliance with the FCPA and amendments to the audit committee charter requiring semi-annual review of FCPA and anti-corruption compliance. The governance measures further include the implementation of an FCPA Testing Program and associated third-party compliance mechanisms that permit Avon to engage in its global businesses with sufficient controls and other safeguards in place. The court concluded that the settlement conferred substantial benefits on Avon and its shareholders.

***In re Fifth Street Finance Corp. S'holder Derivative Litig.***, Lead Case No. 3:15-cv-01795-<u>RNC</u> (D. Conn.)

The shareholder derivative actions brought on behalf of Fifth Street Finance Corp. ("FSC"), a publicly traded business development company ("BDC"), alleged that insiders at FSC's external manager, Fifth Street Asset Management, Inc. ("FSAM"), caused FSC to take actions contrary to its interests in order to inflate FSAM's stock price before FSAM's November 2014 initial public offering. Hynes & Hernandez, LLC was part of the litigation team that negotiated a settlement conferring substantial monetary and non-monetary benefits on FSC.

In particular, the settlement secured advisory fee enhancements expected to generate monetary benefits worth at least $30 million to FSC. In addition, the settlement provided for corporate governance, oversight, and conflicts management enhancements to substantially improve the compliance control environment at FSC and FSAM. For example, FSC agreed to adopt measures that will: (i) enhance the independence and rigor of FSC Board oversight, including the appointment of two new independent directors, and ensure that FSAM insiders are held accountable to FSC's outside directors; (ii) increase the rigor of FSC's policies and procedures for valuing investments and credits, including enhanced direct Board oversight, more rigorous review of troubled credits, and greater transparency to ensure reasonable valuation and revenue recognition, and timely disclosure of impairments; (iii) create a Risk and Conflicts Committee to address actual and potential conflicts of interest between FSC and FSAM and FSAM insiders, particularly with respect to co-investments, the Investment Advisory Agreement ("IAA"), and FSC's asset valuation procedures; (iv) establish stock ownership requirements that align FSC's directors' interests with the interests of FSC shareholders; and (v) require the formal retention of and consultation with independent outside counsel to enhance the outside directors' ability to assess and mitigate conflicts of interest, particularly with respect to the annual review and negotiation of the IAA with FSAM.

### <u>*Salley v. Debrandere, at al.*</u>, Case No. 17-cv-03777 (D. MD)

The action brought on behalf of Osiris Therapeutics, Inc. ("Osiris") alleged breach of fiduciary duty claims against certain officers and directors in connection with, among other things, their failure to adopt and implement adequate accounting and financial reporting systems and for allegedly causing Osiris to make false and misleading statements regarding its financial condition. Specifically, Osiris issued a restated 2014 Form 10-K and restated Forms 10-Q for the quarters ended March 31, 2015 and June 30, 2015, as the original financial reports were based on misleading accounting regarding distributor relationships. These restatements removed over $3 million of sales and shifted another $3.9 million in sales between the quarters. The restated financials showed Osiris missing its sales targets for all three quarters. Hynes & Hernandez, LLC was part of the litigation team that negotiated a settlement conferring substantial benefits on Osiris.

The settlement included comprehensive reforms designed to enhance Osiris's overall corporate governance practices, and specifically address management's governance failures. These reforms included the adoption of a compensation claw-back policy, the adoption of a related-party transactions policy, enhancements to the Audit Committee of the Board's oversight and compliance policies, annual review of the Corporate Governance Principles by the Board and other reforms designed to make Osiris' officers and directors more effective and responsive fiduciaries.

In sum, these reforms at both the Board and management levels left Osiris as a better governed company with stronger internal controls, enhanced communication and greater independent oversight, and made Osiris' directors and officers more effective representatives of the stockholders.

### *In re Equifax, Inc. Derivative Litigation*, Case No. 1:18-cv-17 (N.D. Ga.)

Hynes & Hernandez LLC was part of the litigation team that prosecuted claims on behalf of Equifax Inc. ("Equifax") against certain of Equifax's current and former officers and directors for breaches of fiduciary duty arising out of Equifax's massive 2017 data breach.

The terms of the settlement included: (1) the Defendants' agreement to cause their insurers to pay to Equifax the sum of thirty-two million five hundred thousand dollars ($32,500,000); and (2) Equifax's adoption and/or maintenance of numerous corporate governance and internal control reforms.

Among other things, these corporate governance reforms included:

- Equifax's compensation clawback policy was revised to add a financial and reputational harm standard;

- The Board eliminated payments totaling approximately $2.8 million under the Company's 2017 Annual Incentive Plan for certain members of the senior leadership team;

- The Compensation Committee approved a cybersecurity metric as part of the 2018 and 2019 Annual Incentive Plans. Achievement of this metric cannot increase compensation, but failure to meet it will decrease any award;

- The Technology Committee Charter was revised to add responsibilities related to cybersecurity and technology related risk management, state that all Committee members must be independent, provide for executive sessions with relevant corporate officers, authorize engagement of outside advisors, and review escalation protocols with respect to reporting of cybersecurity incidents to management, the Committee, and the Board;

- The Technology Committee Charter and Audit Committee Charter were revised to provide that the Committees coordinate to oversee risk management with respect to cybersecurity and hold joint meetings as appropriate;

- Equifax enhanced its training program for all employees, in particular in the areas of security and compliance. Equifax has increased the number of individuals in its security organization; and

- Equifax has implemented a new Enterprise Risk Management ("ERM") framework. Equifax established a new Risk Office, with a direct line of communication to the Board, to enhance and coordinate the second line of defense under the Company's updated ERM framework. Equifax created an ERM team within the Risk Office.

***In Re Revolution Lighting Technologies, Inc. Derivative Action,* Case No. 1:19-cv-03913 (S.D.N.Y.)**

Revolution Lighting Technologies, Inc. ("Revolution") designs, manufactures, markets, and sells light-emitting diode lighting solutions for various usages to industrial, commercial, and government markets. The shareholder derivative actions brought on behalf of Revolution allege that from 2014 through 2018, Revolution improperly recorded its revenue using the bill-and-hold method of revenue accounting. In August 2018, Revolution disclosed that it had identified certain deficiencies in its revenue recognition patterns. Specifically, Revolution concluded that the timing of its revenue recognition was incorrect, such that its annual reported revenue should have been less in 2014 to 2016 by, respectively, about $5 million, $7 million, and $5 million, and its revenue should have been more in 2017 and the first half of 218 by about, respectively, $11 million and $3 million. By October 2018, the SEC was investigating Revolution's revenue recognition practices for its financial statements covering 2014 through the second quarter of 2018, and due to the alleged deficiencies related to its internal controls, Revolution was unable to timely file its periodic reports with the SEC. Hynes & Hernandez, LLC was part of the litigation team that negotiated a settlement conferring substantial benefits on Revolution.

The settlement reforms included:

- *Internal Accounting Practices*. Revolution will undertake changes to processes by which inventory bill and hold revenue is tracked and accounted for. In addition to other changes, the Company's accounting department shall now provide monthly reports disclosing where inventory is physically maintained and whether is it subject to bill and hold accounting. Further, any business divisions that are known to use bill and hold accounting shall be directly solicited when preparing such monthly reports. Additionally, the changes provide for the timing of such reports (within three days following the close of the month) and the reporting chain for such information (provided to the Chief Executive Operating Officer, Chief Operating Officer, and the Chief Operations Officer.

- *Establishment of a Corporate Compliance Committee and a Corporate Compliance Officer*. As part of this Settlement, Revolution Lighting will establish both a Corporate Compliance Committee and a Corporate Compliance Officer position. The Compliance Committee will be principally charged with oversight of Revolution's compliance with regulatory risk. This will include oversight of Revolution's Codes of Conduct and ethical responsibilities of directors, officers and employees of the Company. The Compliance Committee shall be responsible for review and evaluation of all compliance complaints and have the power to conduct independent investigations into such complaints. The Compliance Committee shall have a direct line of reporting to the Board. Similarly, the Corporate Compliance Officer (who shall chair the Compliance Committee) shall be primarily responsible for overseeing Revolution's ethics and compliance programs. This will include implementing procedures for measuring and evaluating compliance and informing senior management of the same.

- *Enhanced Board Independence and Director Education*.  The reforms bolster the Board's independence and competence by: (i) adding an additional independent director to the Board; (ii) strengthening the definition of director independence requiring and obligations for appointment of independent board members; and (iii) revising Revolution's guidelines to limit directors to serving on, at most, two other public companies' boards of directors.

- *Additional Audit Committee Responsibilities*.  Revolution's Audit Committee, in addition to oversight of the new accounting policies, will be responsible for review of the accounting treatment for significant new transactions and greater supervision of the application of the Company's codes of conduct and ethics as it pertains to financial transactions and in particular, bill and hold transactions. The Audit Committee shall also affirmatively determine if related-party transactions are in the best interest of the Revolution and its shareholders. Revolution shall retain an independent consultant to conduct an annual materiality /risk analysis for Revolution.

- *Additional Governance Changes*.  In addition, Revolution will adopt changes to its Nominating and Compensation Committee for the purpose of obtaining qualified new directors and provide a more informed basis for determining compensation of Revolution's officers and directors.  Additionally, Revolution has adopted a mandatory training program for all employees concerning Revolution's codes of conduct and ethics.

### *In Re Capstone Turbine Corp. Stockholder Derivative Litigation*, Case No. 2:16-cv-01569-DMG (RAOx) (C.D. Cal.)

The action alleged that between at least November 2013 and October 2015, certain officers and directors caused Capstone Turbine Corporation ("Capstone") to make repeated false and/or misleading statements about Capstone's business and business prospects that led stockholders and the investing public to believe Capstone was on an upward trajectory. The alleged false and misleading statements issued by Capstone failed to disclose: (1) BPC Engineering ("BPC"), one of Capstone's main Russian distributors, was unlikely to be able to fulfill many of its legal and financial obligations to Capstone; (2) Capstone failed to make appropriate adjustments to its accounts receivable and backlog to account for BPC's inability to fulfill its obligations to Capstone; (3) as such, Capstone issued financial statements in violation of Generally Accepted Accounting Principles; (4) Capstone lacked adequate internal controls over accounting; and (5) as a result of the foregoing, Capstone's financial statements were false and misleading and/or lacked a reasonable basis.

Hynes & Hernandez, LLC, acting as Co-Lead Counsel, crafted a settlement comprised of substantial and comprehensive reforms to Capstone's corporate governance processes and procedures. The corporate governance measures of the settlement were specifically designed to address the alleged wrongdoing in the action by, among other things, increasing board independence requirements; enhancing the board-level Audit Committee's supervision and oversight duties and responsibilities, including in connection with the Capstone's recognition of revenue and Whistleblower Policy; enhancements to the duties and responsibilities of the management-level Disclosure Committee to ensure sufficient oversight of and to ensure the timeliness and accuracy of Capstone's public disclosures; the separation of the positions of Chief

Financial Officer and Chief Accounting Officer; the appointment of a new Chief Accounting Officer; enhanced monitoring and disclosure practices and requirements relating specifically to Capstone's key distributors; new written policies and requirements relating to Capstone's sales backlog to ensure accurate disclosures concerning Capstone's true revenue and business prospects; additional procedures related to the credit extended by Capstone to its customers; and improvements to Capstone's Whistleblower Policy.

***In re Aqua Metals, Inc. Stockholder Derivative Litigation,* Master File No.: 1:18-cv-00201-LPS (D. Del.)**

The action was brought derivatively on behalf of nominal defendant Aqua Metals, Inc. ("Aqua Metals") and alleges that certain officers and directors violated the federal securities laws and breached their fiduciary duties by making or permitting the Company to make materially false statements or omissions, causing the Company to fail to maintain internal controls, and committing other violations of state and federal law with respect to the Company's AquaRefining technology, a novel process of recycling lead.

Hynes & Hernandez, LLC, acting as Co-Lead Counsel, secured a settlement that guarantees Aqua Metals substantial benefits in the form of corporate governance reforms, which improve the Company's internal controls and address the alleged deficiencies that resulted in the alleged wrongdoing. In particular, the reforms provide for the appointment of a new independent director, separation of the Chairman of the Board and Chief Executive Officer positions, creation of a new executive-level disclosure committee ("DC") and DC charter, implementation of a new formal whistleblower policy, enhanced meeting requirements for certain members of the Board and its committees, and increased director education.

***In re Vanda Pharmaceuticals Inc. Derivative Litigation,* Case No. 1:19-cv-04293-FB-LB (E.D.N.Y.)**

The action concerned alleged breaches of fiduciary duty by certain current and former officers and directors of Vanda Pharmaceuticals Inc. ("Vanda") relating to the purported off-label promotion of Vanda's two commercially-available drugs: Fanapt®, which is FDA-approved to treat schizophrenia in adults, and Hetlioz®, which is FDA-approved to treat Non-24-Hour Sleep-Wake Disorder ("Non-24"), a circadian rhythm disorder, as well as (2) the FDA's imposition of a partial clinical hold on clinical trials for tradipitant, a drug in Vanda's development pipeline.

Hynes & Hernandez, LLC was part of the litigation team that negotiated a settlement conferring substantial benefits on Vanda. The terms of the settlement included the creation of a management-level Disclosure Committee and the adoption of a charter outlining the Committee's membership, the responsibilities and duties of its members, and its annual training. In addition, Vanda's General Counsel and Head of Compliance were required to undertake together a comprehensive review of Vanda's policies to ensure that such policies are consistent with current laws and regulations, and appropriate in scope with respect to Vanda's operations and risks. The Company's decision to implement and maintain the reforms led to improved policies and procedures relating to all of Vanda's most important processes and improved transparency.

***In re The RealReal, Inc. Stockholder Derivative Litigation,* Master File No.: 1:20-cv-01212-LPS (D. Del.)**

The RealReal Inc. ("TRR") promotes itself as the world's largest online marketplace for authenticated, consigned luxury goods. On June 27, 2019, TRR held its Initial Public Offering ("IPO"), wherein the IPO related documents maintained that TRR's luxury items were, *inter alia,* put through a "rigorous, multi-point, brand-specific authentication process" conducted by "highly trained" authentication staff. Other public representations by TRR similarly touted TRR's rigorous authentication processes by highly trained experts. However, the action alleged that the TRR's authentication process was nowhere near as robust as professed, and most items purportedly "authenticated" by TRR were merely reviewed by TRR's copywriters, who had minimal training or experience in authentication. The action further alleged that between June 27, 2019, and November 20, 2019, officers and directors of TRR breached their fiduciary duties by making and/or causing TRR to make a series of materially false and misleading statements and omissions regarding TRR's authentication processes, risk exposure and purported growth and success, and by failing to maintain internal controls.

Hynes & Hernandez, LLC was an integral part of the litigation team that negotiated a settlement that improves TRR's internal controls regarding its authentication practices –the core of the TRR's business– and directly addresses the deficiencies that resulted in the alleged wrongdoing.

The settlement reforms included:

- Improvements to TRR's authentication practices: requires having the Chief Operating Officer ("COO") be responsible for the oversight of the training of the authentication staff by incorporating semi-annual assessments of all authentication staff and certifications into TRR's existing training programs; to ensure that all individuals hired comply with the authentication practices and are skilled regardless of their hire date, a special assessment shall be held for such individual within thirty (30) business days of his or her hiring after which a certification shall be provided; and requires training shall be in person where practicable and determined to be most effective.

- A new written policy that establishes Board oversight of TRR's retail sales practices and relationship with retain customers: requires that the CCO or its designee shall report to the Board no less than semi-annually regarding oversight for retail sales practices and other elements of TRR's relationship with retail customers; requires that the report, at a minimum, shall include any significant and/or potentially material issues with respect to retail sales practices and TRR's relationship with retail customers; and mandates that the Board will monitor any remedial actions taken with respect to any material issues and get updates as needed.

- The creation of a new management-level risk and compliance committee: the committee shall be responsible for (1) determining, implementing, and assessing TRR's risk management policies and the operation of TRR's risk management framework; and (2) identifying material risks relating to TRR's compliance with all applicable laws and regulations; requirements for the committee process include, among other things, reporting to the Audit Committee any compliance issues that may have significant financial implications or are sufficiently material to trigger a disclosure obligation, free and open

access to TRR management and employees to fulfill its responsibilities, and meeting on a quarterly basis.

- <u>Improvements to TRR's Disclosure Committee Charter:</u> the Disclosure Committee Charter shall be amended to require that (1) the Disclosure Committee will report to the Board and Audit Committee; and (2) the Disclosure Committee shall include TRR's authentication process in its disclosure control considerations and in connection therewith the evaluation of customer or whistleblower complaints shall be considered in the assessment and validation of such disclosure.

- <u>Improvements to TRR's Whistleblower policy and procedures:</u> includes amendments to the policy and processes to specify that the whistleblower communication channel may be used to "report concerns relating to business practices, ethical business or personal conduct, integrity, and professionalism" and provides a specific process for complaints regarding officers and directors.