## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| EMPLOYEES RETIREMENT SYSTEM OF THE CITY OF ST. LOUIS, *et al.*, | Case No. 2:20-cv-04813 |
| Plaintiffs, | Chief Judge Algenon L. Marbley |
| v. | Magistrate Judge Kimberly A. Jolson |
| CHARLES E. JONES, *et al.*, | JURY TRIAL DEMANDED |
| Defendants, | |
| and | |
| FIRSTENERGY CORP., | |
| Nominal Defendant. | |

## PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR FINAL APPROVAL OF SETTLEMENT, AN AWARD OF ATTORNEYS' FEES AND EXPENSES, AND PLAINTIFF SERVICE AWARDS

## TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ........................................................................ 1

II. ARGUMENT ................................................................................................ 5

  A. The Reaction of FirstEnergy's Shareholders Supports Approval ........................... 5

Court-approved notice was timely issued to FirstEnergy shareholders advising them of the Settlement and Plaintiffs' request for attorneys' fees and expenses.  The reaction of FirstEnergy's shareholders overwhelmingly supports approval of the Settlement as only one objection, by a holder of 200 shares, was received out of approximately 570 million shares outstanding.  *See Olden v. Gardner*, 294 Fed. Appx. 210, 217 (6th Cir. 2008) (79 objections in a class of nearly 11,000 members "tends to support a finding that the settlement is fair"); *Hainey v. Parrott*, 617 F. Supp. 2d 668, 675 (S.D. Ohio 2007) (noting that "a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable, and adequate.").

  B. Plaintiffs Overcame Significant Hurdles to Achieve the Settlement ...................... 7

Plaintiffs faced significant legal and procedural challenges in achieving the Settlement.  Among other things, under Ohio law, Plaintiffs were required to prove Defendants' intent by "clear and convincing" evidence in connection with their state law claims—a high standard of proof. Procedurally, Plaintiffs faced opposition not only from numerous highly regarded defense firms, but from an SLC, appointed by the Company to investigate and potentially take over the claims asserted by Plaintiffs.  Plaintiffs prevailed at every step of the litigation and developed a significant factual record that led to the Settlement.

  C. Augenbaum's Objections to the Settlement Are Without Merit ........................... 9

Augenbaum's objection to the Settlement should be rejected.  As a threshold matter, by proffering his Demand to FirstEnergy's Board he conceded its independence to properly consider any potential claim pertaining to the Company's bribery scandal.  Further, Augenbaum's three grounds for objection to the Settlement should also be rejected on the merits. First, Augenbaum wrongly asserts that claims against Clearsulting and PwC are released by the Settlement, despite the plain terms of the Settlement and the SLC and Plaintiffs' express confirmation that these claims are not released.   Second, Augenbaum claims that the significant financial benefit achieved by the Settlement is inadequate, because the insurance proceeds received "left money on the table."  This misconstrues the Settlement terms and the nature of the insurance, and ignores the sizable monetary recovery immediately received by FirstEnergy.  Finally, Augenbaum baselessly objects to the scope of the release, despite the fact that the release is fully tethered to the "allegations, transactions, facts, matters, disclosures or nondisclosures set forth in the Complaints," all of which were focused on the conduct of Defendants allegedly harming FirstEnergy in connection with the Company's bribery scandal, and the fact that his counsel has agreed to effectively identical releases in other derivative settlements.

D.      The SLC's Objection to the Fee Request Is Without Merit ................................. 16

Following dissemination of the Court approved notice, no FirstEnergy shareholder has objected to Plaintiffs' requested Fee and Expense Award or the proposed Service Awards. The absence of any shareholder objection to the fee award weighs in favor of approval *Gilbert v. Abercrombie & Fitch Co.*, 2016 WL 4159682, at *18 (S.D. Ohio Aug. 5, 2016), *rep. and rec. adopted*, 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016) (approving requested fee award and finding "it is worth noting that, although potentially thousands of stockholders were informed of the potential for an award of attorneys' fees and costs, and of the amount of fees and costs sought . . . there were no objections filed").

1.      The SLC Deserves No Credit for the Governance Reforms ..................... 16

The SLC incorrectly argues, with no supporting case law, that the requested fee must be reduced "in light of the SLC's role in achieving the benefits of the Settlement." However, the Settlement Term Sheet, the Stipulation of Settlement, and the Company's public filings all acknowledge that the directors' departures, among other Reforms, were the result of the terms of the Settlement and that "Plaintiffs' litigation and settlement efforts in the Actions are a primary factor in the Board's agreement to adopt, implement and maintain the Reforms." The SLC has presented no evidence of any pre-Settlement effort on its part to implement any of the governance reforms.

2.      The SLC Made Every Effort to Prevent Plaintiffs from Succeeding ........ 18

The SLC made repeated attempts to delay and thwart Plaintiffs' efforts to prosecute the litigation despite the Court's finding that demand was futile. Further, the Settlement, including the extensive governance reforms, were achieved only after hard-fought arm's-length negotiations between Plaintiffs and counsel for the SLC. The SLC does not claim to have provided any benefit with respect to the monetary recovery or most of the Reforms obtained by Plaintiffs.

E.      The *Ramey* Factors Support Plaintiffs' Counsel's Requested Fee and
Expense Award ................................................................................................... 20

The value of the benefit to FirstEnergy (Factor 1)—unprecedented governance improvements and payment of $180 million (the largest derivative settlement ever in the Sixth Circuit)—provide extraordinary benefits to the Company and its shareholders. Attorneys should be rewarded for prosecuting derivative litigation that provides exceptional results to stockholders (Factor 2). Counsel should be compensated for risky cases taken on a contingent fee basis (Factor 3). A lodestar cross-check reflecting a multiplier of 3.54 is well within the range of reasonableness that courts find acceptable (Factor 4). Highly complex and risky litigation efforts together with settlement negotiations involving many different parties and interests reflect the complexity of the

litigation and achievements obtained through Settlement (Factor 5).  Counsel for all parties were highly-skilled and possessed the highest levels of integrity and professionalism.  (Factor 6).

Under the totality of the circumstances and the *Ramey* factors, Plaintiffs' Fee and Expense Award request of 27% is reasonable.  The SLC has provided no persuasive authority supporting its position that a lower fee is appropriate.

There has been no objection to the requested $10,000 Service Awards for Plaintiffs.

III.     CONCLUSION ............................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Americas Mining Corp. v. Theriault*,
    51 A.3d 1213 (Del. 2012) ..................................................................................................20

*Bell Atlantic Corp. v. Berger*,
    2 F.3d 1304 (3d Cir. 1993)..................................................................................................6

*In re Boeing Company Deriv. Litig.*,
    C.A. No. 2019-0907-MTZ (Del. Ch. Feb. 23, 2022)............................................................19

*Brosz v. Fishman*,
    No. 1:13-cv-00753, 2016 WL 7494883 (S.D. Ohio Dec. 29, 2016).......................................8

*In re Cardinal Health Sec. Litig.*,
    528 F. Supp. 2d 752 (S.D. Ohio 2007) .............................................................20, 21, 22, 23

*In re Caremark Int'l., Inc. Deriv. Litig.*,
    698 A.2d 959 (Del. Ch. 1996)..............................................................................................7

*In re Cincinnati Gas & Elec. Co. Sec. Litig.*,
    643 F. Supp. 148 (S.D. Ohio 1986) ....................................................................................20

*In re Citigroup Inc. Sec. Litig.*,
    965 F. Supp. 2d. 369 (S.D.N.Y. 2013)..................................................................................7

*City of Plantation Police Officers' Retirement System v. Jeffries*,
    No. 2:14-cv-01380, 2014 WL 7404000 (S.D. Ohio Dec. 30, 2014)......................................22

*City of Tamarac Firefighters' Pension Tr. Fund v. Corvi*,
    C.A. No. 2017-0341-KSJM, 2019 WL 549938 (Del. Ch. Feb. 12, 2019)...............................8

*In re Delphi Corp. Sec. Deriv. & ERISA Litig.*,
    248 F.R.D. 483 (E.D. Mich. 2008) .................................................................................7, 16

*Emp. Ret. Sys. of City of St. Louis v. Jones*,
    No. 2:20-cv-04813, 2021 WL 1890490 (S.D. Ohio May 11, 2021).......................................8

*Emp. Ret. Sys. of City of St. Louis v. Jones*,
    2021 WL 6067034 (6th Cir. Dec. 16, 2021) .......................................................................18

*In re Extreme Networks, Inc. Sec. Litig.*,
    No. 15-cv-04883-BLF, 2019 WL 3290770 (N.D. Cal. July 22, 2019)....................................7

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  343 F. Supp. 3d 394 (S.D.N.Y. 2018)......................................................................7

*Gilbert v. Abercrombie & Fitch Co.*,
  No. 2:15-cv-02854, 2016 WL 4159682 (S.D. Ohio Aug. 5, 2016), *rep. and*
  *rec. adopted*, 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016)..................................15

*Granada Invs., Inc. v. DWG Corp.*,
  962 F.2d 1203 (6th Cir. 1992) .............................................................................21

*Hainey v. Parrott*,
  617 F. Supp. 2d 668 (S.D. Ohio 2007) ...................................................................7

*In re Hewlett-Packard Co. S'holder Deriv. Litig.*,
  No. 3:12-cv-06003-CRB, 2015 WL 1153864 (N.D. Cal. Mar. 13, 2015)..........14, 15

*Higgs v. Warranty Grp.*,
  No. 2:02-cv-01092, 2009 WL 971477 (S.D. Ohio Feb. 5, 2009) ...........................16

*In re Keithley Inst. Inc. Deriv. Litig.*,
  599 F. Supp. 2d 875 (N.D. Ohio 2008)....................................................................8

*Maher v. Zapata Corp.*,
  714 F.2d 436 (5th Cir. 1983) ..................................................................................6

*McDannold v. Star Bank, N.A.*,
  261 F.3d 478 (6th Cir. 2001) ................................................................................12

*In re McKesson Corp. Deriv. Litig.*,
  Case No. 4:17-cv-01850-CW (N.D. Cal. Apr. 22, 2020) .............................5, 23, 24

*Olden v. Gardner*,
  294 Fed. Appx. 210 (6th Cir. 2008).........................................................................7

*Pope v. Cliffs Nat. Resources, Inc.*,
  No. 1:14-cv-01234, 2014 WL 4930681 (N.D. Ohio Oct. 1, 2014)..........................17

*Popular Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*,
  636 F.3d 235 (6th Cir. 2011) ................................................................................13

*Rikos v. Proctor & Gamble Co.*,
  No. 1:11-cv-0026, 2018 WL 2009681 (S.D. Ohio Apr. 30, 2018).........................23

*Seinfeld v. Coker*,
  847 A.2d 330 (Del. Ch. 2000)................................................................................20

*Unisuper Ltd. v. News Corp.*,
  898 A.2d 344 (Del. Ch. 2006)................................................................................15

*In re Wells Fargo & Co. S'holder Deriv. Litig.*,
    445 F. Supp. 3d 508 (N.D. Cal. 2020), *aff'd*, 845 F. App'x 563 (9th Cir. 2021) ....................24

**STATUTES**

Ohio Rev. Code § 1701.59(E)........................................................................................................7

Ohio Rev. Code § 1701.641(D) .....................................................................................................7

Court-appointed Co-Lead Plaintiffs Employees Retirement System of the City of St. Louis ("St. Louis") and Electrical Workers Pension Fund, Local 103, I.B.E.W ("Local 103"), together with additional Plaintiff Massachusetts Laborers Pension Fund ("MLPF," and collectively with Co-Lead Plaintiffs, "Plaintiffs"), respectfully submit this reply in further support of their Motion for Final Approval of Settlement, an Award of Attorneys' Fees and Expenses, and Plaintiff Service Awards (ECF No. 179, the "Motion") and in response to the Objection of Todd Augenbaum ("Augenbaum") to the Settlement (ECF No. 181, the "Augenbaum Obj.") and the Objection of the Special Litigation Committee ("SLC") to Plaintiffs' requested Fee and Expense Award (ECF No. 182, the "SLC Obj.").

## I. PRELIMINARY STATEMENT

As detailed in Plaintiffs' Motion and supporting papers, the Settlement achieves unprecedented governance reforms (the "Reforms") *and* a $180 million cash payment that ranks as the largest monetary recovery in any derivative action in the history of the Sixth Circuit and among the largest such recoveries ever in any forum. It is the product of hard-fought litigation and robust, arm's-length negotiations, including a mediation supervised by a respected mediator, retired United States District Court Judge Layn R. Phillips. The Settlement provides significant benefits to FirstEnergy and its shareholders in the form of the $180 million cash payment, as well as the Reforms, which include an overhaul of the composition of FirstEnergy's board of directors (the "Board"); an in-depth review of FirstEnergy's entire senior executive team to determine whether they should remain at the company; an undertaking by the Board to take ownership of, and direct oversight over, FirstEnergy's political spending and lobbying activities; and enhanced public disclosure requirements to shareholders concerning those activities, including reports by an independent third-party auditor. Motion at 19–27. The importance and substantial value of these

Reforms are detailed in the Declaration of Columbia Law School Professor Jeffrey N. Gordon ("Gordon Decl."). Ex. 4 to Plaintiffs' Motion (ECF No. 179-3).

The response from FirstEnergy's shareholders has been overwhelmingly positive. FirstEnergy is a large corporation with more than *570 million* shares of outstanding common stock, held by thousands of shareholders, including numerous sophisticated institutional investors. Indeed, institutional investors collectively hold approximately 86% of FirstEnergy's outstanding shares. *See* Ex. 2 hereto (showing that 86% of FirstEnergy's approximately 570 million outstanding shares are held by institutional investors). Following the Court-approved notice of the Settlement and extensive news coverage relating to this matter, *none* of the sophisticated institutional investors holding approximately 86% of FirstEnergy's outstanding shares has objected to the Settlement. And, of course, St. Louis, Local 103, and MLPF—all sophisticated institutional investors in their own right—fully support the Settlement.

Indeed, of the thousands of shareholders who hold FirstEnergy's approximately 570 million shares, only one individual investor—Todd Augenbaum ("Augenbaum"), who purports to hold 200 shares, representing approximately 0.000035% of the stockholder interest in FirstEnergy—has submitted an objection. Notably, Augenbaum's counsel at Abraham Fruchter & Twersky LLP ("AFT") also represents another FirstEnergy shareholder who has not objected to the Settlement, Leslie Katz ("Katz"). Moreover, both Augenbaum and Katz conceded the independence of the FirstEnergy Board by making a litigation demand when the Board was still dominated by a majority of directors who oversaw the Company during the scandal, including those whose departures were secured by the Settlement. Ex. B to Augenbaum Obj. (ECF No. 181-2). After joining Katz's litigation demand on March 23, 2021, Augenbaum sat idly by while Plaintiffs vigorously joined issue with Defendants, defeating Defendants' motions to dismiss and

subsequent motion to certify an interlocutory appeal, defeating the SLC's stay motions, defeating the SLC's appeals and mandamus petitions to the Sixth Circuit, successfully invoking this Court's authority to compel document productions, engaging in hard-fought discovery negotiations and ultimately receiving and reviewing a voluminous discovery record broader than that secured by the DOJ, and marshalling that discovery record in leading the process of mediation and negotiations resulting in the Settlement.

After more than a year of inaction—and having conceded the ability of a Board dominated by Defendants to consider claims related to FirstEnergy's bribery scandal—Augenbaum criticizes the historic result secured by Plaintiffs who chose the path of intense, hard-fought, and expensive litigation against the Defendants and the SLC and who, as a result, have achieved a Settlement revolutionizing the Company's governance and securing a monetary recovery unprecedented in this Circuit. The Court should reject Augenbaum's attempt to disrupt the Settlement, which is not opposed by a single other FirstEnergy shareholder (including Katz, AFT's client who served the litigation demand that Augenbaum later joined).

The substance of Augenbaum's objection is also meritless. Augenbaum first complains that the Settlement might release certain potential claims against third parties that are the subject of his litigation demand. But a plain reading of the release makes clear that the potential claims identified by Augenbaum have not been released, as further confirmed by a letter from the SLC to Augenbaum's counsel. Ex. C to Augenbaum Obj. (ECF No. 181-3). Augenbaum also complains that Plaintiffs did not recover all of the remaining insurance in the Settlement, while ignoring that the $180 million recovery represented more than 80% of the remaining insurance (a wasting asset) and that Plaintiffs reasonably determined continued litigation would jeopardize the recovery to FirstEnergy and delay or foreclose Plaintiffs' ability to secure the Company's institution of the

unprecedented governance Reforms achieved by the Settlement. Finally, Augenbaum complains that the Settlement's general release language is too broad. Not so. The Settlement's release language is tethered to allegations in the Complaints, standard, and proper. Underscoring the hollowness of his objection, Augenbaum's own counsel has signed effectively identical releases in other derivative settlements.

After the Court-approved notice and extensive media coverage, no FirstEnergy shareholder has objected to Plaintiffs' requested Fee and Expense Award, or to the request for Plaintiff Service Awards. The SLC acknowledges that Plaintiffs' counsel is entitled to a reasonable fee, but argues that the award should be reduced "in light of the SLC's role in achieving the benefits of the Settlement." SLC Obj. at 3. The SLC ignores that the Settlement is the result of hard-fought, arms'-length negotiations that could only take place because Plaintiffs defeated the SLC's stay motion, defeated the SLC's appeal of the denial of the stay and the SLC's request for a writ of mandamus against this Court, and successfully sought this Court's intervention to compel discovery. *See* Motion at 9–14. Indeed, the Settlement was achieved only after "an extremely hard-fought negotiation from beginning to end," including "extensive negotiations concerning the corporate governance reforms, including negotiations directly between a representative of the SLC and counsel for Plaintiffs." Declaration of Hon. Layn R. Phillips (Ex. 5 to Plaintiffs' Motion) (ECF No. 179-5) at ¶¶12, 8.

The Settlement itself also contradicts the SLC's argument, as it acknowledges that "Plaintiffs' litigation and settlement efforts in the Actions are a ***primary*** factor in the Board's agreement to adopt, implement, and maintain the Reforms." Settlement Stipulation (Ex. 1 hereto)

– 4 –

at ¶6 (emphasis added).[1] The SLC has presented no evidence to support its argument that it should be credited for achieving Reforms that Plaintiffs achieved in the Settlement.

The SLC also argues that the requested Fee and Expense Award is "excessive when compared to awards for comparable derivative settlements," (SLC Obj. at 2) while ignoring the most comparable derivative settlements. Most conspicuously, the SLC ignores the recent *McKesson* derivative case, which involved a $175 million recovery plus governance reforms, settled at a similar juncture (following motion practice and document discovery, but before depositions), and also involved an SLC. There, the Court awarded 25% of the monetary recovery in attorneys' fees. Here, an upward adjustment from the percentage awarded in *McKesson* from 25% to 27% is supported by the much more extensive motion practice (including at the appellate level) that were all "must win" disputes for Plaintiffs, and the more extensive Reforms in the Settlement here. The SLC offers no legal support for its argument that attorneys' fees should be limited to 13.5% of the monetary recovery, which would be contrary to the *Ramey* factors.

The Court should reject Augenbaum's objection to the Settlement and the SLC's objection to the requested Fee and Expense Award. The Settlement should be finally approved and the requested Fee and Expense Award and Service Awards should be approved as well.

## II.     ARGUMENT

### A.     The Reaction of FirstEnergy's Shareholders Supports Approval

---

[1] Plaintiffs re-attach a copy of the Settlement Stipulation to this Reply because the version of the Settlement Stipulation attached as Ex. 3 to Plaintiffs' Motion (ECF No. 179-3) inadvertently did not include the final signature pages for certain parties. The version attached as Ex. 1 hereto, which was also previously attached as an exhibit to Plaintiffs' preliminary approval motion (*see* ECF No. 170-3), includes all executed signature pages.

Pursuant to the Court's Order of Preliminary Settlement Approval (ECF No. 176), FirstEnergy provided the Court-approved Notice informing FirstEnergy shareholders of the terms of the proposed Settlement[2] and that Plaintiffs' counsel would apply for an award of attorneys' fees not to exceed 27% of the $180 million monetary recovery that is part of the Settlement. *See* ECF No. 180. The Notice also informed shareholders of their right to object to the proposed Settlement and the Fee and Expense Award, and of the July 21, 2022 deadline for filing any such objections. *See* Ex. D to Settlement Stipulation (Ex. 1 hereto).[3]

On July 7, 2022, pursuant to the scheduling order entered by the Court in the Preliminary Approval Order, Lead Plaintiff and Lead Counsel filed their opening Motion in support of the Settlement and the requested Fee and Expense Award, supported by, among other things, declarations of the Lead Plaintiffs, Lead Counsel, Professor Jeffrey N. Gordon, and the Hon. Layn R. Phillips (ret.). *See* ECF No. 179.

---

[2] FirstEnergy also provided notice of the terms of the Settlement when the parties entered into the Term Sheet by filing a Current Report on Form 8-K with the SEC on February 10, 2022, and in numerous subsequent public SEC filings.

[3] Additionally, on July 13, 2022, the United States District Court for the Northern District of Ohio issued an Order in the substantially identical Northern District Action directing Plaintiffs and FirstEnergy to give notice to the Attorney General for the State of Ohio and FirstEnergy shareholders that the Court was inviting new counsel to come forward to prosecute the Northern District Action. Pursuant to this order, Plaintiffs and FirstEnergy gave notice by email of the Northern District's Order, as well as the pending settlement proceedings in this Court, to the Attorney General for the State of Ohio and FirstEnergy shareholders comprising nearly 70% of the stockholder interest in FirstEnergy. *Miller v. Anderson*, No. 5:20-CV-01743 (N.D. Ohio), ECF Nos. 332–334. Plaintiffs respectfully submit that the proceedings in the Northern District are not relevant to the present Motion. There is nothing unusual about a derivative settlement including a release encompassing parallel litigation. *See Bell Atlantic Corp. v. Berger*, 2 F.3d 1304 (3d Cir. 1993) (affirming approval of derivative settlement over objection of plaintiff prosecuting a parallel action); *Maher v. Zapata Corp.*, 714 F.2d 436 (5th Cir. 1983) (same). Augenbaum has not objected to this aspect of the release in the Settlement.

Following the Court-approved Notice program and the filing of Plaintiffs' Motion, only Augenbaum filed an objection. His 200 shares represent approximately 0.000035% of FirstEnergy's greater than 570 million outstanding shares. Institutional investors owned approximately 86% of the publicly traded FirstEnergy stock. *See* Ex. 2 hereto. No institutional investor has objected to the proposed Settlement. This reaction of FirstEnergy's shareholders supports approval of the Settlement. *See Olden v. Gardner*, 294 Fed. Appx. 210, 217 (6th Cir. 2008) (finding that 79 objections in a class of nearly 11,000 members "tends to support a finding that the settlement is fair"); *Hainey v. Parrott*, 617 F. Supp. 2d 668, 675 (S.D. Ohio 2007) (noting that "a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable, and adequate.").[4]

### B. Plaintiffs Overcame Significant Hurdles to Achieve the Settlement

Augenbaum's objection ignores the legal standards and litigation risks assumed by Plaintiffs and their counsel while Augenbaum and his counsel sat idly by after conceding the independence of the Board. Plaintiffs achieved the Settlement despite facing formidable challenges: pursuing a legal theory that has been recognized as "possibly the most difficult theory

---

[4] *See also In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d. 369, 382 (S.D.N.Y. 2013) (the reaction of the class supported the settlement where "not a single objection was received from any of the institutional investors that hold the majority of Citigroup stock."); *In re Extreme Networks, Inc. Sec. Litig.*, No. 15-cv-04883-BLF, 2019 WL 3290770, at *9 (N.D. Cal. July 22, 2019) ("Many potential class members are sophisticated institutional investors; the lack of objections from such institutions indicates that the settlement is fair and reasonable."); *In re Delphi Corp. Sec. Derivative & ERISA Litig.*, 248 F.R.D. 483, 499 (E.D. Mich. 2008) ("If only a small number [of objections] are received, that fact can be viewed as indicative of the adequacy of the settlement."); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 343 F. Supp. 3d 394, 410 (S.D.N.Y. 2018) ("The overwhelmingly positive reaction—or absence of negative reaction—weigh[ed] strongly in favor of confirming the Proposed Settlement" where "[o]ut of more than 1.3 million potential class members who received Notice Packets, two . . . objections were filed by retail investors whose total share ownership equaled 1,100, or 0.0003% of the shares at issue in the litigation") (internal citations omitted).

– 7 –

in corporation law upon which a plaintiff might hope to win a judgment," *In re Caremark Int'l., Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996), while facing opposition from Defendants and the SLC represented by 10 separate law firms. At trial, Plaintiffs would have been required to prove by "clear and convincing evidence" that the defendants acted or failed to act with "deliberate intent to cause injury" to FirstEnergy or with "reckless disregard" for FirstEnergy's best interests. Ohio Rev. Code §§ 1701.59(E) and 1701.641(D). Plaintiffs' federal law claims included a theory of transaction causation untested at the appellate level in this Circuit. ECF No. 93 (the "MTD Opinion") at 30, reported at *Emp. Ret. Sys. of City of St. Louis v. Jones*, No. 2:20-cv-04813, 2021 WL 1890490, *15 (S.D. Ohio May 11, 2021) (noting "[t]he Sixth Circuit has yet to define 'transaction causation' for purposes of a Section 14(a) claim under circumstances analogous to those presented here.").

Meanwhile, Augenbaum's litigation demand on the Board—now the basis for his objection—played right into the Director Defendants' defense that they were independent and acted in good faith. Specifically, by making his demand, Augenbaum conceded that a majority of the Board at the time of his demand was independent and could consider whether to pursue claims on behalf of FirstEnergy in connection with the bribery scandal. *See City of Tamarac Firefighters' Pension Tr. Fund v. Corvi*, C.A. No. 2017-0341-KSJM, 2019 WL 549938, at *5 (Del. Ch. Feb. 12, 2019) ("By making a pre-suit demand, a stockholder 'tacitly concedes' the disinterest and independence of the board to respond."; "After making a pre-litigation demand, a stockholder plaintiff may not pursue claims challenging the subject matter of the demand[.]"; "This limitation applies to all derivative claims arising from the subject matter of the demand, even legal theories

not expressly identified by the stockholder…").[5] This is exactly the opposite of what this Court found in denying the motion to dismiss and allowing discovery to commence.  *See generally* MTD Opinion (ECF No. 93) (finding demand futile as to all Director Defendants based on Plaintiffs' allegations that they participated in and faced a substantial likelihood of liability in connection with the Company's bribery scandal and issuing false and misleading proxy statements).

While Augenbaum was conceding the independence of a majority of the Board when a majority of the Board continued to be comprised of Defendants in this action, Plaintiffs assembled an evidentiary record significant enough that Defendants and the SLC agreed to the terms of Settlement, which included an overhaul of the Board.  Defendants and the SLC only accepted the terms of the Settlement after hard-fought litigation in which Plaintiffs were required to prevail on every motion at every stage in this Court and in the Court of Appeals for the Sixth Circuit.  The disjunction between Plaintiffs' successful efforts and litigation strategy and Augenbaum's lack of efforts and wrong strategy is striking, and provides significant context for the Court's consideration of Augenbaum's objection, particularly given the absence of a single additional objection from among the other holders of FirstEnergy's approximately 570 million shares of common stock (including Katz, the stockholder who actually served the litigation demand Augenbaum merely later co-signed).

C.     **Augenbaum's Objections to the Settlement Are Without Merit**

---

[5] *In re Keithley Inst. Inc. Deriv. Litig.*, 599 F. Supp. 2d 875, 888 n.10 (N.D. Ohio 2008) ("Ohio courts routinely look to Delaware case law for guidance in deciding corporate law issues generally. . ."); *Brosz v. Fishman*, No. 1:13-cv-00753, 2016 WL 7494883, at *4 (S.D. Ohio Dec. 29, 2016) (in context of Ohio corporation, applying Delaware law and recognizing "Plaintiff conceded the Board's independence by making [a] demand.").

Augenbaum argues that the Settlement should be rejected because the *$180 million* monetary recovery is inadequate and because the scope of the release is too broad. These arguments are without merit.

According to Augenbaum, the Court should reject the Settlement because FirstEnergy will continue to incur defense costs and may face hypothetical future judgments involving direct claims that exceeded the total available insurance of approximately $220 million at the time the parties reached agreement on the terms of the Settlement. Augenbaum Obj. at 7–9. This argument is nonsensical. The plain terms of the Settlement do not provide a release to FirstEnergy's insurance carriers for direct claims. *See* Settlement Stipulation at ¶¶7–10. The Settlement is funded, moreover, by all insurance that would be available to cover claims against FirstEnergy.[6] A recovery of more than 80% of available insurance also compares very favorably to recoveries in other "mega" derivative action settlements where insurance dynamics have been publicly disclosed. *See* Motion at 32–33 (in *Wells Fargo*, plaintiffs secured a $240 million recovery where Defendants had $550 million of insurance; in *Boeing*, plaintiffs secured a $237.5 million monetary recovery where Defendants had $500 million of insurance).

Augenbaum stands alone in his desire to sacrifice the very significant financial benefit to FirstEnergy to continue the litigation, even though he has already conceded that a majority of the directors overseeing the bribery scandal were sufficiently independent to fairly consider pursuing claims on behalf of the Company relating to the scandal. This is to say nothing of sacrificing the

---

[6] The $180 million component of the Settlement is funded by $107,715,952.64 of the remaining Side A/B insurance—fully exhausting the Side A/B policies after earlier erosion—and $72,284,047.36 of excess Side A policies (*i.e.*, insurance for claims against directors and officers whose costs are not indemnified or advanced by FirstEnergy). The Settlement, therefore, does not "leave on the table" any insurance that would have been available to FirstEnergy in connection with other claims, while also capturing for FirstEnergy $72.28 million of insurance that would not have otherwise been available to FirstEnergy.

– 10 –

Reforms secured by the Settlement and the risk of dissipating the Company's insurance to litigate tangential claims likely to have little value.

Augenbaum's objection raises the question whether he considered or understood the benefits of the Settlement before filing the objection. Augenbaum appears to argue, for example, that the corporate governance Reforms are merely cumulative of reforms that were part of the DPA. Augenbaum Obj. at 10, n.12. However, nothing in the DPA required the departure of six directors. Nothing in the DPA required a review of the C-suite. Nothing in the DPA required the Board to undertake an affirmative obligation to review and approve FirstEnergy's political action and lobbying plan going forward or to provide direct oversight over the implementation of that plan. And nothing in the DPA required the extensive additional disclosures of FirstEnergy's political action and lobbying actions in the Company's annual proxy statements issued in connection with director elections. As Professor Gordon explained in his Declaration, the Reforms "are a significant addition to the compliance measures set forth in the DPA" and "work in several ways to reduce significantly the risk of a recurrence of unlawful political contributions and an ensuing bribery scandal at FirstEnergy and thus will produce significant improvement in shareholder welfare and protection for the Company and, consequently, improved shareholder wealth and enterprise value," "provid[ing] a model for how boards generally can assert a responsible oversight and monitoring role for political activity by corporations and management." Ex. 4 to Plaintiffs' Motion (ECF No. 179-4) at ¶15; *see also id.* at ¶19 (recognizing the "extraordinary" nature of the director departures secured by Plaintiffs and noting that, "[o]n rare occasion, a *regulator* insists on the departure of independent directors . . . But board refreshment was not a condition for the DPA settlement with the Justice Department in this case. Rather the board turnover here directly followed from the derivative litigation.").

Augenbaum also misunderstands the scope of the release granted by the Settlement.  Under the terms of the Stipulation, the Settlement (if approved) will release FirstEnergy's claims against "Released Defendants' Persons," who are defined as follows:

> "Released Defendants' Persons" means Defendants, any other individual named as a defendant in any complaint filed in any of the Actions, the Company, the SLC, and any entity in which the Company has a controlling interest, as well as their respective current and former parents, affiliates, subsidiaries, officers, directors, agents, successors, predecessors, assigns, assignees, partnerships, partners, committees, joint ventures, trustees, trusts, employees, immediate family members, heirs, insurers and reinsurers (in their capacities as such), and consultants, experts, and attorneys (***provided, however, that consultants, experts and attorneys are only "Released Defendants' Persons" insofar as they were engaged by Defendants and are not released under this Stipulation if and to the extent that they were engaged by the Company***).

Settlement Stipulation (Ex. 1 hereto) at § 1(y) (emphasis added).

Under these plain terms, PricewaterhouseCoopers and Clearsulting are not covered by the release to the extent they were engaged by FirstEnergy.  The SLC confirmed this understanding to Augenbaum's counsel by letter dated July 19, 2022.  *See* Exhibit D to Augenbaum Obj.  As a result, Augenbaum's pursuit of his demand on the Board that FirstEnergy pursue claims against PricewaterhouseCoopers and Clearsulting are not impacted by the Settlement and his objection on these grounds is meritless.  *Cf.* Ex. B to Augenbaum Obj. (ECF No. 181-2) at 1 (Augenbaum joining the Katz demand) and at 6 (Katz demand noting that "since approximately June 2019, Clearsulting has provided consulting services to FirstEnergy" and that PricewaterhouseCoopers was "the Company's independent auditor since 2002.").

Augenbaum also criticizes the Settlement for preserving additional claims against former FirstEnergy executives Charles Jones, Michael Dowling, and Dennis Chack.  Augenbaum Obj. at 10–12.  According to Augenbaum, the extensive Reforms and $180 million recovery are not fair, reasonable, and adequate, because Plaintiffs were required to ***also*** settle FirstEnergy's compensation claims.  Augenbaum does not cite a single case to support this extraordinary claim.

*See id.* It is nonsensical for Augenbaum to criticize the Settlement because, in addition to securing an immediate and certain recovery for the claims asserted by Plaintiffs under relevant state and federal laws, it *preserves* rather than releases certain claims arising out of the terminated Defendants' employment agreements that are being separately pursued by the Company and its new independent directors. This carve-out augments rather than restricts the ultimate potential recovery for FirstEnergy and, in fact, provides further support for the fairness of the Settlement as a whole.

It is well-established that this Court "enjoys wide discretion in evaluating the settlement of derivative actions under Rule 23.1." *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 488 (6th Cir. 2001). It is equally well-established that this Court considers seven factors to determine whether a proposed settlement is fair, reasonable, and adequate: (1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of representative counsel and the representative parties; (6) the reaction of absent class members (or in a derivative suit, other shareholders); and (7) the public interest. *Popular Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011). Here, as detailed in Plaintiffs' opening papers, *each* of the seven factors supports approval of the Settlement. Motion at 27–43.

Finally, Augenbaum argues that the Settlement Stipulation's release is impermissibly broad. Not so. If approved, the Settlement releases the following claims against the "Released Defendants' Persons"):

> any and all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, local, statutory, regulatory, common, foreign or other law or rule, ***that Plaintiffs, the Company, or the SLC (i) asserted in the Complaints or (ii) could have asserted on behalf of the Company that in any way are based on, arise from or relate to the allegations, transactions, facts, matters, disclosures or nondisclosures set***

– 13 –

***forth in the Complaints***, including but not limited to the conduct, actions, inactions, deliberations, votes, statements or representations of any Released Defendants' Person. ***For the avoidance of doubt, this release will not cover, include, or release (i) any direct claims of Plaintiffs or any other FirstEnergy stockholder***, including without limitation any direct claims asserted under the federal securities laws, including without limitation claims asserted in In re FirstEnergy Corp. Sec. Litig., Case No. 20-cv-03785-ALM-KAJ (S.D. Ohio) (and all consolidated cases), or direct claims of Plaintiffs or any other FirstEnergy stockholder asserted in any of the related actions or proceedings identified in Exhibit B hereto; ***(ii) any claims relating to the enforcement of the Settlement; or (iii) any claims of the Company to recoup compensation from Charles Jones, Michael Dowling, and Dennis Chack*** (which for avoidance of doubt Jones, Dowling, and Chack deny have any basis and reserve their right to oppose and defend against on any and all grounds available and to assert any related claims including, but not limited to, claims for compensation, pensions, deferred compensation, incentive compensation, equity, and any and all benefits under any plan, program, arrangement, or other vehicle, in which any of them participated, accrued benefits, or any other claim for benefits or compensation that is otherwise related to their employment with the Company, and further including any claims for wrongful termination and/or any and all claims relating thereto).

Stipulation of Settlement (Ex. 1 hereto) at §1(z).

This is standard language for the settlement of derivative claims and is appropriately limited to FirstEnergy's claims that are connected to the facts and circumstances giving rise to the pending Derivative Actions. Indeed, Augenbaum's own counsel routinely agrees to settlements with equally broad and virtually identical release language.[7]

---

[7] For example, Augenbaum's counsel entered into a settlement agreement in *Nordstrom v. McMahon*, C.A. No. 3:20-cv-00904-VAB (D. Conn.) (ECF No. 114-1) defining "Released Shareholders' Claims" as:

> "any and all claims and causes of action of every nature and description, whether known claims or Unknown Claims, whether arising under federal, state, common, or foreign law, that ***(i) were or could have been asserted by Shareholders or any other WWE shareholder derivatively on behalf of WWE, or by WWE directly, and (ii) arise out of or relate to the allegations, transactions, facts, matters, disclosures, or non-disclosures set forth in, or defense of, the Federal Actions, the Delaware Actions, or the Litigation Demands***, including all claims relating to the Board's and DRC's responses to the Litigation Demands and the books-and-records claims asserted by Plaintiff Bernard Leavy."

Augenbaum's reliance on *In re Hewlett-Packard Co. Shareholder Derivative Litigation*, No. 3:12-cv-06003-CRB, 2015 WL 1153864 (N.D. Cal. Mar. 13, 2015) is misplaced.  The *Hewlett-Packard* litigation involved multiple complaints that referenced many challenged corporate acquisitions and other conduct unrelated to the principal transaction at issue, ranging to HP's foreign-loan programs, share sales and repurchases, management hiring and compensation, and disclosures.  The action ultimately litigated, however, was focused on a single transaction. Judge Breyer determined that a release encompassing the myriad other transactions and events initially pled in some complaints, but never litigated "lack[ed] a tether to the subject of [the *Hewlett-Packard*] litigation."  *See In re Hewlett-Packard Co. S'holder Derivative Litig.*, C.A. No. No. 3:12-cv-06003-CRB, Order Denying Motion for Preliminary Approval of Second Amended Settlement, at 1–2 (N.D. Cal. Dec. 19, 2014) (attached as Ex. 5 hereto).  By contrast, the claims released in the Settlement here are fully tethered to the "allegations, transactions, facts, matters, disclosures or nondisclosures set forth in the Complaints," all of which were focused on the conduct of Defendants allegedly harming FirstEnergy in connection with the Company's bribery scandal.[8]  ECF No. 179-3 (Stipulation of Settlement), at §1(z).  Thus, Augenbaum is unable to

---

Ex. 3 hereto at 13 (emphasis added); see also Ex. 4 hereto at 11–12 (settlement agreement agreed to by Augenbaum's counsel in *Panther Partners Inc. v. Jianpu Technology Inc.*, No. 1:18-cv-9848-PGG (S.D.NY) (ECF No. 107)).

[8] This Court is familiar with the operative complaint in this action, which was addressed at length in the Court's MTD Opinion (ECF No. 93).  The operative complaint in the Northern District Action was prepared by the same counsel and is substantively identical.  *Miller v. Anderson*, No. 5:20-CV-01743 (N.D. Ohio), ECF No. 75.  The operative complaint in the State Court Action (attached as Ex. 7 hereto) is similarly focused entirely on matters pertaining to the Company's bribery scandal.

show the Settlement improperly releases any actual or potential claims outside the scope of the litigation.[9]

### D.     The SLC's Objection to the Fee Request Is Without Merit

Following the Court-approved Notice, no FirstEnergy shareholder has objected to Plaintiffs' requested Fee and Expense Award.  The absence of any shareholder objection to the requested Fee and Expense Award weighs in favor of approval.  *Gilbert v. Abercrombie & Fitch Co.*, No. 2:15-cv-02854, 2016 WL 4159682, at *18 (S.D. Ohio Aug. 5, 2016), *rep. and rec. adopted*, 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016) (approving requested fee award and finding "it is worth noting that, although potentially thousands of stockholders were informed of the potential for an award of attorneys' fees and costs, and of the amount of fees and costs sought . . . there were no objections filed");  *Higgs v. Warranty Grp.*, No. 2:02-cv-01092, 2009 WL 971477, at *5 (S.D. Ohio Feb. 5, 2009) ("[t]he Court finds it significant that out of the extensive number of Class Members who received Notice, there were no objections to . . . Class Counsel's Application for Fees"); *In re Delphi Corp. Sec., Deriv. & ERISA Litig.*, 248 F.R.D. 483, 504 (E.D. Mich. 2008) ("[t]he Class's reaction to the requested fee award is also important evidence of the fairness and reasonableness of the fee request").

### 1.     The SLC Deserves No Credit for the Governance Reforms

---

[9] *Unisuper Ltd. v. News Corp.*, 898 A.2d 344 (Del. Ch. 2006) is likewise inapposite.  *Unisuper* involved litigation over a decision by News Corp.'s board of directors to extend a poison pill without a shareholder vote.  The parties to the litigation settled and sought approval of a release that would have released claims relating not only to the board's past conduct but also any claims relating to the proposed future adoption of a pill by shareholder vote, which was scheduled to occur five months after the settlement.  *Id.* at 347–48.  The Court rejected the parties' attempt to release claims based on this future event, finding that "no facts relating to the October 2006 Rights Plan were alleged in the underlying action, much less were they part of the underlying action's operative facts" and that "the release is overly broad in that it attempts to release claims arising from an event that has not yet happened." *Id.* at 348.  No such issues are present here.

The SLC acknowledges that "Plaintiffs' counsel is entitled to a reasonable fee" and supports an award based on the percentage approach.  *See* SLC Obj. at 3.  However, the SLC argues that the requested fee must be reduced "in light of the SLC's role in achieving the benefits of the Settlement" to the unprecedentedly low level of 13.5% or less.  *Id.*

The SLC's argument should be rejected.  *First*, the Term Sheet executed by all parties on February 9, 2022 expressly provided, "***As part of the Settlement***, six directors who have been on the Board a minimum of five years will not stand for re-election."  Term Sheet (ECF No. 166-1) at Ex. A ¶1.  When FirstEnergy publicly announced the terms of the Settlement in an SEC filing and press release the following day, it likewise acknowledged the directors' departures were occasioned by, and a term of, the Settlement.  *See* FirstEnergy Current Report on Form 8-K (Feb. 10, 2022).  The Settlement Stipulation again included the director departures as an express term of the Settlement (*see* Settlement Stipulation at Ex. A) and reported the adoption of a resolution by the FirstEnergy Board—including all members of the SLC—acknowledging unambiguously that "*Plaintiffs' litigation and settlement efforts in the Actions **are a primary factor** in the Board's agreement to adopt, implement, and maintain the Reforms*" which includes the director departures (*id.* at ¶6) (emphasis added).  Nowhere is the SLC credited with achieving these Reforms.

Plaintiffs applaud FirstEnergy and the SLC for starting to implement the corporate governance reforms that Plaintiffs achieved in the Settlement before this Court has made a final determination as to whether the Settlement is fair, reasonable, and adequate.  As detailed in Professor Gordon's affidavit, the Reforms will greatly benefit FirstEnergy and its shareholders.  Indeed, the early implementation of the Reforms demonstrates how critical these fundamental governance changes were to FirstEnergy's efforts to quickly move forward and away from the bribery scandal.  But the early implementation of part of the Reforms before this Court's

assessment of the Settlement does not break the causal link between Plaintiffs' counsel's efforts and the Reforms achieved.[10]

Meanwhile, the SLC has not presented any evidence of any effort on its part to implement any of the governance reforms in the Settlement during the seven months that it was formed before the parties entered into the Term Sheet. During this period, no legacy directors were forced to step down; the Board did not start a review of FirstEnergy's most senior executives to determine whether they should remain at the Company; the Board did not take responsibility for actively overseeing FirstEnergy's lobbying, political contributions, and political activities, including approving FirstEnergy's political activities and lobbying plan; and FirstEnergy did not agree to provide the enhanced disclosures in the annual proxy statements secured by the Settlement. The SLC did not issue a report with any findings of its purported investigation either.

### 2. The SLC Made Every Effort to Prevent Plaintiffs from Succeeding

Plaintiffs' Counsel were able to achieve the benefits of the Settlement by defeating the SLC's (and Defendants') repeated attempts to halt the litigation. The Board, still dominated by the Director Defendants, formed the SLC after the Court denied their motions to dismiss and found that a majority of the Board faced a substantial likelihood of liability.

From its inception, the SLC did everything in its power to interfere with Plaintiffs' prosecution of FirstEnergy's claims against the Defendants. The SLC immediately sought to stay the action over Plaintiffs' objection. ECF No. 120. Plaintiffs opposed the motion, arguing that:

---

[10] The cases cited by the SLC rest on the same erroneous assumption. For example, the SLC quotes the finding in *Pope v. Cliffs Nat. Resources, Inc.*, No. 1:14-cv-01234, 2014 WL 4930681, at *2–3 (N.D. Ohio Oct. 1, 2014) that "there is no evidence to suggest that [the] litigation had any causal effect" on the company's decision to enact the relevant reforms. The Term Sheet and Settlement Stipulation, entered into after hard-fought litigation and negotiations, show the opposite is true here.

(i) the Board had already availed itself of a purportedly "independent" review committee to investigate itself while aggressively opposing Plaintiffs' efforts in this Court, (ii) a stay would unfairly prejudice Plaintiffs, and (iii) allowing discovery to proceed would cause no hardship or inequity to the SLC or FirstEnergy. ECF No. 127. When the Court denied the stay (ECF No. 142), the SLC appealed that decision to the Sixth Circuit with a request for expedited treatment and for issuance of a writ of mandamus to require this Court to grant the stay it had declined. Plaintiffs successfully moved to dismiss the SLC's appeal and its request for a writ of mandamus. *Emps. Ret. Sys. of the City of St. Louis v. Jones*, 2021 WL 6067034 (6th Cir. Dec. 16, 2021) (Sixth Circuit decision rejecting appeals from orders of this Court and the Northern District denying SLC's stay motions). Only after Plaintiffs successfully requested the intervention of Magistrate Judge Jolson during conferences held on October 7 and 27, 2021, did the SLC finally relent and were Plaintiffs able to commence meaningful discovery.

Nor was the SLC aligned with Plaintiffs during the negotiations of the Reforms. The Settlement was only achieved after "an extremely hard-fought negotiation from beginning to end," including "extensive negotiations concerning the corporate governance reforms, including negotiations directly between a representative of the SLC and counsel for Plaintiffs." Declaration of Hon. Layn R. Phillips (Ex. 5 to Plaintiffs' Motion) at ¶¶12, 8. The SLC has not presented any evidence showing otherwise.

Even if the SLC should be given some credit for the departure of directors (and it has presented no evidence that it should), the SLC does not claim credit for any of the many other meaningful reforms achieved by Plaintiffs. Nor does the SLC claim any credit for the $180 million monetary recovery achieved by Plaintiffs. As described in Plaintiffs' Motion, Plaintiffs' counsel base their requested Fee and Expense Award on a percentage of the monetary recovery, taking the

– 19 –

Reforms into account as an additional plus factor. Thus, even if the SLC were to be given some kind of partial credit for the director departures secured by Plaintiffs that occurred following the parties' agreement to the terms of Settlement, that would not provide grounds for a reduction of the requested Fee and Expense Award.

      **E.**      **The *Ramey* Factors Support Plaintiffs' Counsel's Requested Fee and Expense Award**

The SLC argues that precedent supports its proposed award of "no greater than 13.5%," rather than the 27% requested by Plaintiffs. SLC Obj. (ECF No. 182) at 2. The SLC, however, cites only two derivative cases in which a fee of 13.5% or lower was awarded—*Boeing* and *Seinfeld*—and both cited precedents are easily distinguished from the present application. In *Boeing*, plaintiffs' counsel requested 7.69% of a derivative recovery based on their pre-suit agreement with the representative plaintiffs. Plaintiffs' counsel in *Boeing* acknowledged that the request was "far below any metric we are aware of under the case law." *In re Boeing Company Deriv. Litig.*, C.A. No. 2019-0907-MTZ, Settlement Hearing and Ruling of the Court, Tr. at 63 (Del. Ch. Feb. 23, 2022) (Ex. 28 to Plaintiffs' Motion). No such agreement exists here and, accordingly, Plaintiffs do so seek an award consistent with case law.

In *Seinfeld*, Plaintiffs' counsel were awarded 10% of a derivative recovery—but that case settled after plaintiffs' counsel had spent a grand total of 190 hours working on the case. *Seinfeld v. Coker*, 847 A.2d 330, 339 (Del. Ch. 2000) ("Here, counsel spent only 190 hours on the case. It is this factor that mandates the fee be reduced from 20 percent, as plaintiffs request, to 10 percent."). By contrast, Plaintiffs' Counsel here worked over 23,000 hours—prevailing on

numerous contested motions, defeating an appeal, and engaging in extensive discovery efforts—to achieve the benefits of the Settlement.[11] *See* Motion at 50–53.

Contrary to the SLC's arguments, Plaintiffs' Counsel's requested Fee and Expense Award is supported by each of the *Ramey* factors[12], none of which are meaningfully disputed:

**(1)** <u>**The value of the benefit rendered to the corporation or its stockholders**</u>: Plaintiffs' Counsel achieved: (a) unprecedented governance Reforms that were tailored to prevent recurrence of the underlying misconduct leading to the largest bribery scandal in the history of the State of Ohio; and (b) payment of $180 million, constituting the largest derivative settlement ever in the Sixth Circuit. This is a significant benefit to FirstEnergy and a historically valuable outcome in a derivative lawsuit. "District courts in this Circuit widely regard this first *Ramey* factor as the most important." *Cardinal Health*, 528 F. Supp. 2d at 764.

---

[11] The other cases cited by the SLC involving awards of greater than 13.5% but less than 20% are likewise distinguishable. *Cardinal Health* and *Americas Mining* both involved recoveries many times larger than the recovery here, warranting lower percentages under the "declining percentage" principle. *See In re Cardinal Health Sec. Litig.*, 528 F. Supp. 2d 752, 771 (S.D. Ohio 2007) (awarding 18% of *$600 million* recovery in securities suit); *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1218 (Del. 2012) (affirming award of 15% of *$2.0316 billion* recovery). *Cincinnati Gas* is a securities suit from more than 35 years ago where plaintiff's counsel's discovery efforts merely consisted of reviewing a record achieved by others in related actions. *In re Cincinnati Gas & Elec. Co. Sec. Litig.*, 643 F. Supp. 148, 151 (S.D. Ohio 1986) ("Counsel's discovery duties entailed scrutiny of the very thorough 'discovery' accomplished by others"; awarding 15% of $13.9 million recovery).

[12] *See Cardinal Health*, 528 F. Supp. 2d at 764 (describing the *Ramey* factors as follows: "1) the value of the benefit rendered to the corporation or its stockholders, 2) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others, 3) whether the services were undertaken on a contingent fee basis, 4) the value of the services on an hourly basis [the lodestar cross-check], 5) the complexity of the litigation, and 6) the professional skill and standing of counsel involved on both sides.").

(2) **Society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others:** Derivative litigation is "notoriously difficult and unpredictable," *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1025 (6th Cir. 1992), and counsel should be encouraged to accept worthy engagements that lead to exceptional results benefiting all shareholders.

(3) **Whether the services were undertaken on a contingent fee basis:** Plaintiffs' Counsel took on their respective engagements a contingent fee basis, thereby accepting the risk of investing substantial time and expenses without any assurance of being compensated. If counsel had failed to win a judgment or settlement, counsel would have received nothing and forfeited their efforts and expenses.

(4) **The value of the services on an hourly basis (the lodestar cross-check)**: Plaintiffs' Counsel worked a total of 23,217.55 billable hours at an average hourly rate of approximately $591, resulting in a lodestar of $13,722,648.75.[13] Dividing the requested fee of $48.6 million by the lodestar results in a proposed multiplier of 3.54. This is within the range that courts in this Circuit find acceptable. *See Cardinal Health*, 528 F. Supp. 2d

---

[13] In a footnote, the SLC suggests that Plaintiffs' counsel has provided no information from which either the SLC or the court can determine how counsel allocated their time. SLC Br. at 9, n. 3. Not so. Plaintiffs' counsel provided a detailed record of the time worked by each professional at each firm as well as detailed descriptions of each timekeeper's role in the case and tasks performed. *See* Exs. 6-17 to Plaintiffs' Motion. This information is more than sufficient for the Court to assess the reasonableness of counsel's time for purposes of performing the "lodestar cross-check." Assuming the Court applies the preferred "percentage of the benefit" approach, there is no need for the Court to "endure time-consuming parsing of reams of attorney time sheets and hindsight recalculations," or any similarly "agonizing" exercise. *Cardinal Health*, 528 F. Supp. 2d at 761.

– 22 –

at 767 (noting that "[m]ost courts agree that the typical lodestar multiplier in a large post-PSLRA securities class action ranges from 1.3 to 4.5").[14]

**(5)** <u>**The complexity of the litigation:**</u> Plaintiffs faced highly motivated Defendants and the SLC represented by well-resourced law firms of the highest caliber (ultimately including attorneys from 10 different law firms), a "clear and convincing" legal standard, a seemingly endless succession of "must-win" motions in this Court and in the Court of Appeals, and complex negotiations involving at least 13 insurance carriers, many represented by their own experienced counsel.

**(6)** <u>**The professional skill and standing of counsel involved on both sides:**</u> Plaintiffs' Counsel respectfully submit that all counsel representing all parties, including the SLC, are attorneys of exceptional professional skill and standing, and acted with the highest levels of professionalism and integrity in connection with this matter.

Evaluating these factors under a totality of the circumstances, Plaintiffs' Counsel's requested Fee and Expense Award is reasonable and consistent with precedent, including this Court's fee decision in *Cardinal Health*, 528 F. Supp. 2d 752. There, in a representative action resulting in a $600 million payment, the Court awarded attorney fees of 18%—a result which fully supports counsel's fee request here. *Id.* at 770. *First*, *Cardinal Health* involved only a monetary recovery, not any corporate governance reforms. The historic governance Reforms achieved here

---

[14] The SLC relies on *City of Plantation Police Officers' Retirement System v. Jeffries*, No. 2:14-cv-01380, 2014 WL 7404000 (S.D. Ohio Dec. 30, 2014) to argue that counsel's lodestar multiplier of 3.54 is too high and should instead be between 1.25 and 2.29. *See* SLC Br. at 9. However, in *Jefferies* the Court merely observed that courts have typically awarded fees based on a multiplier of between 1.25 and 2.29 *in cases involving non-monetary relief*. *See Jeffries*, 2014 WL 7404000, at *18 Moreover, the SLC ignores that the Jefferies court continued by explaining that courts "*typically award attorneys' fees in cases [involving common funds] based on a lodestar multiplier <u>between 1.25 and 5</u>.*" *Id.* (emphasis added).

support a percentage award larger than the percentage awarded in *Cardinal Health*. *See* Motion at 47–49 (detailing fees awarded by courts for substantial governance reforms). *Second*, this Court recognized in *Cardinal Health* the "declining percentage principle" suggesting that the percentage of the recovery awarded in fees should decrease as the size of the recovery increases. *Cardinal Health*, 528 F. Supp. 2d at 763. While the $180 million recovery here is certainly substantial, it is less than a third of the $600 million recovery in *Cardinal Health*. Under the declining percentage principle, because the recovery is substantially lower, the percentage of the recovery should be substantially higher. *Third*, the fee award of 18% in *Cardinal Health* reflected a lodestar multiplier of approximately 5.9. *Id.* at 767. The requested fee award of 27% here involves a substantially lower multiplier of 3.54.[15]

The requested Fee and Expense Award is also supported by other large derivative settlements. Motion at 45–46. Most conspicuously, the SLC fails to mention the recent *McKesson Corporation* derivative settlement, where a sister court awarded plaintiffs' counsel a total fee and expense award of 25% of a $175 million monetary recovery and a separate award of $421,223.91 in expenses.[16] *McKesson* settled at a similar juncture to the present action (following contested

---

[15] The SLC argues that the derivative cases relied upon by Plaintiffs "involved fee awards that were significantly lower in absolute terms" (SLC Obj. at 6)—ignoring *percentages*, notwithstanding clear law favoring the "percentage of the fund" approach to determining an appropriate fee award. *See, e.g.*, *Rikos v. Proctor & Gamble Co.*, No. 1:11-cv-0026, 2018 WL 2009681, at *8 (S.D. Ohio Apr. 30, 2018) (citing *Cardinal Health*, 528 F. Supp. 2d at 760). The SLC thus touts, for example, that the award in the comparable *Community Health* derivative case was only $20 million without acknowledging that award constituted 33.3% of the monetary recovery achieved, and that the award in *City of Monroe* derivative case was $22 million without acknowledging that award constituted 25% of the monetary recovery achieved (in a case settled before any contested motion practice). *Compare* SLC Obj. at 6–7 *with* Motion at 45–46.

[16] Here, Plaintiffs do not seek a separate reimbursement of their more-than-$200,000 in expenses, rendering SLC's (incorrect) suggestion that Plaintiffs have provided insufficient information concerning their expenses largely irrelevant. In any event, Plaintiffs respectfully submit that they

motions and extensive document discovery efforts, but before depositions) and also involved an SLC. *In re McKesson Corp. Deriv. Litig.*, Case No. 4:17-cv-01850-CW, ECF No. 231 at 9–10 (N.D. Cal. Apr. 22, 2020) (Ex. 35 to Plaintiffs' Motion). Plaintiffs respectfully submit that a modest upward deviation from the 25% awarded in *McKesson* to the requested 27% here is warranted because: (i) Plaintiffs engaged in significantly more motion practice than plaintiffs in *McKesson*, including in the Court of Appeals; and (ii) the governance reforms achieved in *McKesson*, though substantial, were not as significant as the Reforms here.[17]

The SLC also ignores the *Wells Fargo* derivative action. There, a sister court awarded 22% of a $240 million monetary recovery. *In re Wells Fargo & Co. S'holder Deriv. Litig.*, 445 F. Supp. 3d 508, 526 (N.D. Cal. 2020), *aff'd*, 845 F. App'x 563 (9th Cir. 2021). *Wells Fargo* settled at a similar juncture as this action (following contested motions and extensive document discovery efforts, but before depositions) and involved corporate governance reforms in addition to the financial recovery. Similar to *McKesson*, the governance reforms were not as significant as the Reforms here, the motion practice did not involve motion practice before the Court of Appeals, and the "declining percentage principle" also supports an upward deviation from the awarded 22%.[18]

---

have provided a breakdown of their categories of expense that is consistent with standard practice and sufficient to assess the reasonableness of the expenses incurred.

[17] The *McKesson* plaintiffs' brief in support of their fee application, which details the procedural history of that action and the achieved reforms, is attached as Ex. 6 hereto. Most notably, though the *McKesson* plaintiffs secured term limits on McKesson's directors, they did not achieve the near-immediate departures of six directors achieved here. Nor did they secure anything like the mandated C-Suite review process secured by Plaintiffs in this case.

[18] The recent *Cardinal Health* derivative settlement in this District, which remains subject to final approval, provides another data point. The settlement pending in that action consists of $124 million in cash, but *no* governance reforms. There, the company has consented to the plaintiffs' request for a 25% fee and expense award. *See In re Cardinal Health, Inc. Deriv. Litig.*, C.A. No. 2:19-cv-2491 (S.D. Ohio), Plaintiffs' Unopposed Motion for Preliminary Settlement Approval of

Finally, Plaintiffs note that no one has objected to the request for permission to pay $10,000 Service Awards from any Fee and Expense Award.  Plaintiffs respectfully submit that such permission is appropriate and consistent with precedent here.  *See* Motion at 54–55.

## III.    CONCLUSION

For the reasons set forth in Plaintiffs' Memorandum of Law in Support of Final Approval and the reasons set forth above, the Court should approve the Settlement; approve the requests for attorneys' fees and expenses and the plaintiffs' service awards; reject the sole objection to the Settlement; and reject the sole objection to the request for attorneys' fees.

Dated: July 28, 2022                          Respectfully submitted,

*/s/ John C. Camillus*
**LAW OFFICES OF JOHN C.**
**   CAMILLUS LLC**
John C. Camillus (0077435)
P.O. Box 141410
Columbus, OH 43214
Phone: (614) 992-1000
jcamillus@camilluslaw.com

*Liaison Counsel for Lead Plaintiffs*

**SAXENA WHITE P.A.**
Maya Saxena
Joseph E. White, III
Lester R. Hooker
Dianne M. Pitre
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Phone: (561) 394-3399
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
dpitre@saxenawhite.com

**SAXENA WHITE P.A.**

---

Proposed Settlement (ECF No. 100) at 12 ("Cardinal has agreed to pay Plaintiffs' Counsel an aggregate Fee and Expense Award of 25% of the Settlement Amount, subject to Court approval.").

Thomas Curry
Tayler D. Bolton
1000 N. West Street, Suite 1200
Wilmington, DE 19801
Phone: (302) 485-0480
tcurry@saxenawhite.com
tbolton@saxenawhite.com

**SAXENA WHITE P.A.**
Steven B. Singer
Sara DiLeo
10 Bank Street, 8th Floor
White Plains, NY 10606
Phone: (914) 437-8551
ssinger@saxenawhite.com
sdileo@saxenawhite.com

- and –

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Jeroen van Kwawegen
Alla Zayenchik
Margaret Sanborn-Lowing
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
jeroen@blbglaw.com
alla.zayenchick@blbglaw.com
margaret.lowing@blbglaw.com

*Co-Lead Counsel for Lead Plaintiffs*

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll
Daniel S. Sommers
Molly J. Bowen
1100 New York Ave. NW, Fifth Floor
Washington, D.C. 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
mbowen@cohenmilstein.com

- and –

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Christopher Lometti
Richard A. Speirs
Amy Miller
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838 7745
clometti@cohenmilstein.com
rspeirs@cohenmilstein.com
amiller@cohenmilstein.com

*Counsel for Additional Plaintiff Massachusetts
Laborers Pension Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys on record.

_/s/ John C. Camillus_

John C. Camillus
